# IN THE UNITED STATES DISTRICT COURT FOR

# THE DISTRICT OF COLUMBIA

DENNIS SHELDON BREWER, Individually
1210 City Pl, Edgewater, NJ 07020,

and on Behalf of All Others Similarly Situated

Plaintiffs,

v.

**Known Federal Defendants:**

Mr. Christopher Wray
Director, Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, District of Columbia 20535-0001
202-324-3000,

Ms. Kimberly Cheatle
Director, United States Secret Service
245 Murray Ln SW - BLDG T-5
Washington, DC 20223
202-406-5708,

Mr. Alejandro Mayorkas
Secretary, Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528-0075
202-282-800,

Case: 1:23−cv−00415
Assigned To : Unassigned
Assign. Date : 2/14/2023    Jury Demand
Description: Pro Se Gen. Civ. (F−Deck)

Civil Action No:

**DEMAND FOR JURY TRIAL**

RECEIVED

FEB 1 4 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Ms. Janet Yellen
Secretary, Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
202-622-2000,

Mr. William Burns
Director
Central Intelligence Agency
Washington, DC 20505
(505) 855-6744,

Mr. Lloyd Austin
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000
703-571-3343,

Dr. Stefanie Tompkins
Director, Defense Advanced Research Projects
Agency
675 North Randolph Street
Arlington, VA 22203-2114
(703) 526-6630,

Secretary Frank Kendall III
United States Air Force
United States Space Force
1690 Air Force Pentagon
Washington, DC 20330-1670
(703) 697-3039,

Secretary Christine Wormuth
United States Army
101 Army Pentagon,
Washington, DC 20310-0101
(703)-695-6518,

Secretary Carlos Del Toro
United States Navy
1000 Navy Pentagon
Washington, DC 20350-1000

(703)-695-0965,

Hon. Merrick Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
202-514-2000,

Ms. Avril Haines
Director of National Intelligence
Office of the Director of National Intelligence
Washington, DC 20511,

Mr. Louis DeJoy
Postmaster General
United States Postal Service
475 L'Enfant Plaza, SW
Washington, DC 20260-2200
202-268-2000,

**Known State and Local Defendants:**

City of New York
Attention: Georgia Pestana
Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212-356-1000,

City of New York Police Department
Ernest F. Hart
Deputy Commissioner for Legal Matters
Attention: PALS Unit
One Police Plaza
New York, New York 10038
646-610-5400,

Colonel Patrick J. Callahan
State Police
State of New Jersey

P.O. Box 7068
West Trenton, NJ 08628
609-882-2000,

Superintendent Kevin P. Bruen
State Police
State of New York
1220 Washington Ave, Bldg. 22
Albany NY, 12226
518-457-6721,

Mr. Rick Cotton
Executive Director
Port Authority of New York and New Jersey
Four World Trade Center
150 Greenwich St
New York, NY 10006
201-239-3500,

Mr. John Bilich
Chief of Security
Port Authority of New York and New Jersey
Police Department
Four World Trade Center
150 Greenwich St
New York, NY 10006
201-239-3500,

Mr. John Gay
Inspector General
Port Authority of New York and New Jersey
Police Department
Four World Trade Center
150 Greenwich St
New York, NY 10006
201-239-3500,

Sheriff Anthony Cureton
Sheriff's Department
County of Bergen
2 Bergen County Plaza
Hackensack, NJ 07601

201-336-6000,

Mr. James Tedesco
County Executive County of Bergen, New
Jersey
One Bergen County Plaza
5th Floor, Rm 580
Hackensack, NJ 07601-7076
201-336-6000,

County of Maricopa County, Arizona
c/o Maricopa County Attorney
225 West Madison Street
Phoenix, AZ 85003,

Sheriff Paul Penzone
Maricopa County Sheriff's Department
550 West Jackson Street
Phoenix, AZ 85003
602-876-1000,

Ms. Amanda L. Ray
Commissioner
California Highway Patrol
601 North 7th Street
Sacramento, CA 95811
(916) 843-3000,

Mr. Steven C. McCraw
Director
Texas Department of Public Safety
5805 North Lamar Blvd
Austin, TX 78752-4431
(512) 424-2000,

Colonel Kedrick Wills
Idaho State Police
700 South Stratford Drive
Meridian, Idaho, 83642
208-884-7360,

Commissioner Jess Anderson

Utah Department of Public Safety
South 4501 South 2700 West
Salt Lake City, Utah 84129
801-965-4461,

Commissioner Mark Glass
Florida Department of Law Enforcement
2331 Phillips Road
Tallahassee, FL 32308
850-410-1000,

Port of Seattle
c/o Mr. Pete Ramels
General Counsel/Chief Compliance Officer
2711 Alaskan Way
Seattle, WA 98121,

Port of Seattle Police Department
c/o Mr. Pete Ramels
General Counsel/Chief Compliance Officer
2711 Alaskan Way
Seattle, WA 98121,

**Known Other Entity Defendants:**

Match Group Apps, LLC
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group Financeco 2, Inc.
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group Financeco 3, Inc.
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group Financeco, Inc.
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St

Wilmington, DE 19801,

Match Group Holdings II, LLC
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group Holdings I, LLC
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group, Inc. (4655563)
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Match Group, Inc. (2097382)
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

The Match Group, Inc.
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

The Match Group, LLC
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Bumble, Inc.
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Walmart Inc.,
Wal-Mart (China) Investment Co., Ltd.
c/o CT Corporation System
1015 15th St NW
Suite 1000

Washington, DC 20005,

Costco Wholesale Corporation
c/o CT Corporation System
1015 15th St NW
Suite 1000
Washington, DC 20005,

The Kroger Company..
c/o Corporation Service Company
1090 Vermont Ave. NW
Washington, DC 20005,

PPG Industries Inc.
c/o Prentice-Hall Corporation System, Inc.
1090 Vermont Ave. NW
Washington, DC 20005,

Establish Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Dominick & Dickerman LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Technology Sales Leads, Inc.
c/o National Registered Agents, Inc
155 Federal Street, Suite 700 2nd Floor
Boston MA 02110,

WeFunder Admin, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Advisors, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder BD, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder, Inc.
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Portal LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder Portfolio, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

WeFunder SPV, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, DE 19904,

Blackpool Group, Inc.
c/o Jonathan Cross
401 E Las Olas Blvd.
Ste. 1400
Fort Lauderdale, FL 33301,

The Shefford Group, Inc.
c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Shefford & Associates, LLC
c/o Jonathan Cross
3980 Premier Drive Suite 110
High Point, NC 27265,

Shefford Capital Partners, LLC
c/o: Jonathan Cross
2255 Glades Rd 324A Boca Raton, FL 33431,

Loeb & Loeb, LLP
c/o Mitchell Nussbaum
Vice Chairman
345 Park Avenue
New York, NY 10154
212-407-4159,

Engleman Associates, Inc.
aka SoftSelect Systems
c/o: Mark Engleman
607 East Reserve Street
Vancouver, Washington 98661
360-699-6150,

Chardan CM Investments LLC
c/o Corporate Creations Network Inc
3411 Silverside Road Tatnall Bldg. Ste 104
Wilmington DE 19810,

EarlyBirdCapital, Inc.
c/o United Corporate Services, Inc.
874 Walker road Ste E
Dover, DE 19904,

Arlon Group LLC
c/o: The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801,

Hughes Hubbard & Reed LLP
c/o: Mr. Daniel Weiner
Partner
One Battery Park Plaza
New York, NY  10004-1482
212-837-6000,

Bay State Milling Co.
c/o CT Corporation System

155 Federal St, Ste 700
Boston, MA 02110,

Briggs & Stratton Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Badger Meter, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Raynor Mfg. Co.
c/o Michael E Setchell
1101 E River Rd
Dixon , IL 61021,

First Alert Holdings, Inc
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Borg-Warner Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Adtran, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Adtran Holdings, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Western Digital Corporation
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Bio-Lab, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Brightstar Corp.
c/o Rod Millar, CEO
9725 NW 117th Avenue #300
Miami, FL 33178,

Rockwell Collins, Inc. (2650152)
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Rockwell Collins, Inc. (3359922)
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Rocketdyne, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

Steel and Pipe Supply Company, Inc.
Cogency Global Inc.
2101 SW 21ST Street, Topeka, KS 66604,

Samsonite Corporation
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

The Holland Group, Inc. (2225471)
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808,

The Holland Group, Inc. (2404845)
c/o Corporation Service Company
251 Little Falls Drive

Wilmington, DE 19808,

Raymond F. Sullivan, LLC
c/o: Raymond Sullivan
Attorney
10440 Little Patuxent Parkway, Suite 900
Columbia, MD 21044,

ABT Trading Inc.
c/o Registered Agents Inc.
7901 4TH Street North
Ste 300
St. Petersburg, FL 33702,

AGI Partners LLC
c/o Harvard Business Services
16192 Coastal Highway
Lewes, DE 19958,

Acme Markets, Inc. 1013755
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Acme Markets, Inc. 2112922
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801,

Assure Group International, LLC
c/o Alexander Gibbs
Ste 200 0
1401 Mercantile Ln
Largo MD 20774,

Axial Networks, Inc.
c/o Peter Lehrman
902 Broadway, 19TH Floor
New York, NY 10010,

Banco Advisors, LLC
c/o Greg Smith
16100 N 71st St Ste 140,

Scottsdale, AZ, 85254,

Cornhusker Capital
c/o Reginald McGaugh
1545 North 18th ST
Omaha, NE 68110,

Crossroads Financial LLC
c/o Lee Haskin, CEO
6001 Broken Sound Pkwy
Suite 620
Boca Raton FL 33487,

DC International LLC
c/o Phillip G. Daleuski
1471 Dewar Dr Ste 147
Rock Springs, WY 82901,

Fractal Advisors LLC
c/o Mr. Michael Roznowski
9308 Lee Court, Leawood, KS 66206,

Bibby Financial Services, Inc.
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805,

Consumerbase LLC dba Exact Data
c/o CT Corporation System
208 S. LaSalle ST, Ste 814
Chicago, IL 60604,

Insight Network Spain
c/o: Mr. Don Keiser
Calle Antina 22 Primera Planta, 03130,
St. Pola, Comunidad Valenciana, España.
Teléfono: +34 96 541 17 58,

Madison Street Capital Advisors, LLC
c/o: Charles Botchway
105 W Madison Street, 12th Floor
Chicago, IL 6060,

New America Lending, LLC
c/o: David Choate Hughes

2812 Pat Tillman Drive
Springfield, Illinois 62711,

Richard A. Miller Consulting, LLC
c/o Richard A. Miller
15 Avery Street
Tunkhannock, PA 18657,

Foshan Shunde XinJianHan Trading Co, Ltd
c/o Mr. Raymond Poon
Chairman
35 Prospect Park West
Apartment 15C
New York, NY 11215,

Sallyport Commercial Finance, LLC
c/o Steven N Kurtz, Esq.
15303 Ventura Blvd, Ste 1650
Sherman Oaks, CA  91403,

Louis Skaar & Sons, Inc.
c/o Charles A Homer
1000 Riverwalk Drive, Ste 200
Idaho Falls, ID 83405,

Skaar Brothers, LLC
c/o DuWayne Skaar
22958 Signature Point Lane
Wilder, ID 83676,

Skaar Brothers Farms, LLC
c/o DuWayne Skaar
22958 Signature Point Lane
Wilder, ID 83676,

Sole Source Capital LLC
c/o: The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington DE 19801,

Adamson Brothers LLC
c/o: Legalinc Corporate Services Inc.
651 N Broad St Ste 201
Middletown DE 19709,

Adamson Brothers, LLC
c/o Mr. Andy Altahawi
205D Chubb Ave Ste 240
Lyndhurst, NJ  07071,

Adamson Brothers Corp
c/o Mr. Andy Altahawi
116 Scarlet Oak Lane
Paramus, NJ 07652,

Adamson Brothers Inc
c/o Mr. Andy Altahawi
2423 SW 147th Ave #706
Miami, FL 33185,

Adamson Brothers Inc
c/o Mr. Andy Altahawi
12 N State Rt 17
Paramus, NJ 07652-2644,

Adamson Brothers, Inc.
c/o Delaware Corporations LLC
1000 N. West St., Ste 1501
Wilmington, DE 19801,

Adamson Brothers Financial Corp
c/o Harvard Business Services, Inc.
16192 Coastal Highway
Lewes, DE 19958,

Ranch Creek Partners, LLC
c/o JD Kritser
19020 N.E. 84th St.
Redmond, WA 98053,

**Known Personal Defendants:**

Mr. Joseph Arpaio
12808 Vía Del Sol
Fountain Hills, AZ 85268,

Mr. Dean T. Smith
1610 Foxridge Circle
Auburn, CA 95603,

Mr. Andy Altahawi
116 Scarlet Oak Lane
Paramus, NJ 07652,

Mr. Jason Waseman
1013 John Paul Jones Dr
Stafford, VA 22554,

Mr. Brad Kumin
2 June Breeze Pl
Spring, TX 77382,

Mr. Jon Nickless
4823 10th Ave
Kearney, NE 68845,

Mr. Michael Castro
87 Parque De Oeste Dr, Apt 2
Farmington, NM 87401,

Mr. Paul Smith
118 Crandon Dr
Saint Louis, MO 63105,

Mr. Peter LeBlond
2915 Ridgewood Ave
Cincinnati, OH 45213,

Mr. Michael Callahan
705 Lenape Trail
Westfield, NJ 07090,

Mr. Vito Perillo
12728 SE 172nd St
Renton, WA 98058,

Mr. Larry R. Cook
7715 NE 196th St
Kenmore, WA 98028,

Mr. Larry R. Cook
P.O. Box 666
Anacortes, WA 98221,

Mr. Michael Kurgan
772 Barnaby Pl
Wheeling, IL 60090,

Mr. Darrell C. Pray
2609 W Canyon Avenue, Apt 302
San Diego, CA 92123,

Mr. Marc Chalom
507 Valley Brook Ave
Lyndhurst, NJ 07071,

Mr. William Drumm
263 N First St
Beach Haven, NJ 08008,

Mr. Conrad Ross
8 Hidden Hills Dr
Greenville, SC 29605,

Mr. Conrad Ross (alternate address)
114 Gelnaw Ln
Montvale, NJ 07645,

Ms. Kristine J. Volk
9940 Four Views St
Las Vegas, NV 89143,

Mr. Dennis and Mrs. Pamela Amsbaugh
92 South T ST
Lakeview OR 97630,

Mr. Brandon Hutchison
60087 Screech Alley Loop
John Day, OR 97845,

Mr. David Choate Hughes
2812 Pat Tillman Drive
Springfield, IL 62711,

John Does (unknown number),

                    Defendants.

i. This case is complex and far-reaching due to the nature and extent of the violations of law and acts against civil rights undertaken by these Defendants against Lead Plaintiff and others of this class. The scope of this case rivals or exceeds the scope of the MKUltra secret drugging program of Defendant CIA and the Cointelpro burglary, violence, and assaults program of Defendant FBI, which were systematic, programmatic and long-running violations of the Constitution and rule of law by the United States between 1953 and 1973. A Complaint Table of Contents is shown at pages 21-28. As the historical record demonstrates, Defendant Department of Justice has never in its entire history acted against broad-based institutional corruption to establish and prosecute insider criminal liability and secure justice for the thousands of felonies committed and the thousands of persons victimized under the color of law by abuse of "state secrets" when these acts are institutional criminal acts of Defendant United States. Neither Congress nor the Executive has lifted a finger to remedy or even desist in these acts under the BRMT program running since the early 1970s, and an inseparable and inescapable interference in the life of the Lead Plaintiff and others of this class of plaintiffs, including victimized US persons and other innocents. See LP Evidentiary Exhibits pages 6645-6699, then 1-10, for an explanation of BRMT, then see 11-25 for a crude private sector reverse functioning comparable.

ii. Constitutional and legal protections have been functionally shredded and destroyed as this Complaint clearly demonstrates with prima facie evidence and clarity. This lawless program continues as this Complaint is being written, so this litigation and the accompanying request for an emergency temporary restraining order are literally the only reasonable remedy for the Lead Plaintiff and all those similarly situated. Given the series of lethal attempts described in Table 1 at page 30-46, Article III courts are the only refuge for these Plaintiffs and may literally be the only way to avoid lethal outcomes to this class of Plaintiffs.

**iii. Defendant United States:** The term "Defendant United States" is used herein to refer to the departments and agencies of the United States organized in the Executive branch of government and thereby subject to the direct and/or indirect authority of the President of the United States. "Defendants" refers to any and all defendants. The specific organizations and individuals involved in a specific act or set of acts are not readily discernible to the Plaintiffs. Thousands of organizations located in tens of thousands of places with over 1 million personnel have "top secret" clearances in the United States are known to participate in national security operations. The names of some agencies are classified.  Another 18,000 organizations have over 700,000 officers. Police  powers and intelligence personnel involved in the acts and violations herein operate undercover locally to the Plaintiffs and also operate remotely using technology, as do their partners, allies, informants, and others. Hence, they are identified as part of the more general class known herein as "Defendants."  Defendants also includes various officers, contractors, agents, licensed and unlicensed private individuals and members of the general public both organized and unorganized who have acted at times in violation of law and/or in coordination with public officials.

**iv. Page Numbering, Tables, Interline Exhibits:** All page number references herein relate to the RED colored Bates numbering at the bottom of each page. Table 1 begins at page 30. Table 2 beings at page 133. These tables are numbered with paragraph references 1-xxx or 2-xxxx. Interline Exhibits are found throughout the Complaint.

**v. Exhibits:** Exhibits filed with this initial complaint are identified as LP Evidentiary Exhibits. Most exhibits are identified and located by the RED page number at the bottom of each page. Emails are identified and located by the <u>date of the email</u> in YYMMDD format, the sequence in which they are filed. The short title of each email relates to the Lead Plaintiff's

principal contact's name and the subject matter of the email, not necessarily the topic indicated in the subject line of the specific email. The emails submitted are a sampling of key emails and do not indicate the volume of total emails which are related to the contact or the subject.

**vii. Compendium, Table of Contents:** A compendium which includes the name and brief description of selected key entities and individuals, listings of selected key emails, documents, disbursements in both date and alphabetic orders is filed at LP Evidentiary Exhibits pages 934-1075.

Note that crucial evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts. Note that virtually all emails from 180304 through 200709 are blocked and inaccessible to Lead Plaintiff throughout the preparation of this Complaint. This greatly impacts the Plaintiffs' ability to completely address many of the claims presented herein at this time. For convenience of reference throughout this Complaint, the Table of Contents on the next page lists the RED color page number at the bottom of each page for key sections, tables, and interline exhibits.

### COMPLAINT TABLE OF CONTENTS

| ITEM (Use RED numbers at bottom of page for all references in this Complaint and LP Evidentiary Exhibits page references) | PAGE |
|---|---|
| **COMPLAINT** | 28 |
| *Table 1:* Botched Cover-Up - Lethal Acts Directed Against Lead Plaintiff Accelerate In 2022 as Evidence is Delivered To SDNY US Attorney's Office | 30 |
| Paragraph 1-010 | 36 |
| Paragraph 1-020 | 40 |
| Paragraph 1-030 | 42 |
| Paragraph 1-040 | 43 |
| Paragraph 1-050 | 45 |
| *Interline Exhibit 1:* Indirect Verbal Threat and Subsequent Lethality Events | 47 |
| A. Indirect Verbal Threat in NYC on July 17, 2022 | 47 |
| B. Follow-On Mass Casualty Attempt north of NYC on Sep 11, 2022 | 48 |

| | |
|---|---|
| C: Follow-On Indirect BRMT Assisted Assault in NYC park on Sep 17, 2022 | 49 |
| D. Follow-On Vehicle Rundown Sequence in NYC and Bergen County, NJ on Nov 18 and 19, 2022 | 52 |
| **PARTIES** | 72 |
| Plaintiffs | 72 |
| Defendants | 73 |
| **JURISDICTION AND VENUE** | 98 |
| **FACTS** | 100 |
| Origins of BRMT Lie In Defendant CIA's Deadly MKUltra Mind Control Program | 101 |
| *Interline Exhibit 2:* Redmond Residence – Add Rear Landscaping 14,000 Square Feet | 104 |
| *Interline Exhibit 3:* Kirkland Residence -Rebuild and 60% Square Footage Enlargement | 105 |
| *Interline Exhibit 4:* A Sample WinnettOrganics Organic Vegetable Arizona Business Plan | 112 |
| *Interline Exhibit 5:* $100,000 From Investor Dean T. Smith | 113 |
| *Interline Exhibit 6:* Fraudulent Financings: Private Placement and S-1 | 114 |
| *Interline Exhibit 7:* Kroger Corporate Email Account Hides True Identity | 115 |
| *Interline Exhibit 8:* Walmart WinnettOrganics Produce Supply Contract Meeting at Bentonville, AR Home Office | 115 |
| *Interline Exhibit 9:* WinnettOrganics Organic "Produce Consultant" is Defendant Joseph Arpaio, Convicted Serial Civil Rights Violator | 117 |
| *Interline Exhibit 10:* Lead Plaintiff Subsequently Sued Individually For Alleged Misuse of Investor Funds Resulting From Police Powers Corporate Entity Conspiracy | 118 |
| *Interline Exhibit 11:* Lead Plaintiff Starts New Enterprise - Sheldon Beef Example Business Plan | 119 |
| *Interline Exhibit 12:* Cover Page of Sheldon Beef Sales Contract Signed With Defendant Walmart Inc., subsidiary Wal-Mart (China) Investment Co., Ltd. | 120 |
| *Interline Exhibit 13:* Defendant NYPD Confirms "Terror" Investigation, on Sep 3, 2021, *13A:* Denies Same "Terror " Investigation on Sep 15, 2021 | 121 |
| *Interline Exhibit 13A:* Defendant FBI Stonewalls With "Liar Letter" | 123 |
| *Interline Exhibit 14:* Lead Plaintiff Injuries in NYC Morningside Park Sep 16, 2022 | 127 |
| *Table 2:* Timeline of Key Events 1972 to 2022 – Pattern of Racketeering Acts and Rights Violations | 133 |
| Paragraph 2-0020 | 143 |
| Paragraph 2-0040 | 155 |
| Paragraph 2-0060 | 166 |
| Paragraph 2-0080 | 175 |

| | |
|---|---|
| **Paragraph** 2-0100 | 184 |
| Paragraph 2-0120 | 193 |
| Paragraph 2-0140 | 201 |
| Paragraph 2-0160 | 210 |
| Paragraph 2-0180 | 220 |
| Paragraph 2-0200 | 226 |
| *Interline Exhibit 15:* Lead Plaintiff's Psychological Fitness | 235 |
| *Interline Exhibit 16:* Relevant Categories of Defendant DARPA Projects | 236 |
| *Interline Exhibit 17:* Defendant CIA Mind Control Objective | 237 |
| *Interline Exhibit 18:* Redmond Residence of Lead Plaintiff Acquired at Age 29 (1985) | 249 |
| *Interline Exhibit 19:* Reverse Floorplan of Kirkland Residence of Lead Plaintiff (1990) and Actual Condition and DIY Improved Floorplan at Forced Sale in 2005 (below) | 250 |
| *Interline Exhibit 20:* US Airways Flight 1549 LGA to CLT Landing Site on January 15, 2009 Follows Tradecraft Signatures Precursor Events | 253 |
| *Interline Exhibit 21:* Bio-Lab Chemical Warehouse Poison Gases Incident on May 25, 2004 Follows Lead Plaintiff's Headquarters Visit Weeks Earlier | 255 |
| *Interline Exhibit 22:* 58th Anniversary of MLK "I Have A Dream" Speech Lincoln Memorial Permit Allegedly Cancelled by Organizer – FOIA Response | 259 |
| *Interline Exhibit 23:* Defendant Department of Justice's Inspector General Investigations Division Declines Investigation of Defendant FBI and Lead Plaintiff's Reply | 261 |
| *Interline Exhibit 24:* Senate Ratification of International Covenant on Civil and Political Rights | 271 |
| *Interline Exhibit 25:* Senate Ratification of Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment | 272 |
| **CLAIMS FOR RELIEF** | 273 |
| **SUBORDINATE COUNTS** (Ninety-two example subcounts attaching to various Principal Counts as indicated in each Principal Count) | 273 |
| *L-1 Lethality* Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose | 276 |
| *L-2 Lethality* Events: Washington State BRMT Falls | 278 |
| *L-3 Lethality* Events: Washington State BRMT Induced Suicide Ideation | 283 |
| *L-4 Lethality* Events: Inciting Public Vigilantism | 288 |
| *L-5 Lethality* Events: New Jersey BRMT Induced Suicide Ideation | 294 |
| *L-6 Lethality* Events: New Jersey Cliffside Park BRMT Falls | 299 |
| *L-7 Lethality* Events: BRMT Near Falls on Staircases in New Jersey and New York | 304 |
| *L-8 Lethality* Events: New Jersey, Hackensack, BRMT Fall | 309 |
| *L-9 Lethality* Events: California, BRMT Induced Extreme Eye Watering | 314 |

| | |
|---|---|
| *L-10 Lethality* Events: New Jersey, Edgewater Bedroom  BRMT Falls | 320 |
| *L-11 Lethality* Events: Website Hacks to Eliminate or Delay Covid Vaccination | 325 |
| *L-12 Lethality* Events: New Jersey Edgewater BRMT Falls | 330 |
| *L-13 Lethality* Events: North Bergen Hospital Fall | 335 |
| *L-14 Lethality* Events: New York Metro North Mass Casualty Attempt | 340 |
| *L-15 Lethality* Events: New York Morningside Park BRMT Fall | 345 |
| *L-16 Lethality* Events: New Jersey North Bergen Vehicle Rundown | 350 |
| *C-1 Commercial* Frauds: Theft of Receivables, Check Frauds | 356 |
| *C-2 Commercial* Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover | 359 |
| *C-3 Commercial* Frauds: Fraudulent Financings and Loans - NYC Broker/Investor | 364 |
| *C-4 Commercial* Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution | 369 |
| *C-5 Commercial* Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm | 375 |
| *C-6 Commercial* Frauds: Fraudulent Investor Personation - Investments and Loans | 379 |
| *C-7 Commercial* Frauds: Fraudulent Investor Personation and Investments | 388 |
| *C-8 Commercial* Frauds: Fraudulent Financings – Private Placement and Public IPO | 389 |
| *C-9 Commercial* Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing | 396 |
| *C-10 Commercial* Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities | 400 |
| *C-11 Commercial* Frauds: Fraudulent Financing Fees | 403 |
| *C-12 Commercial* Frauds: Fraudulent  Financial Services – Domestic Debt Broker | 405 |
| *C-13 Commercial* Frauds: Fraudulent Financial Services -International Debt Broker | 408 |
| *C-14 Commercial* Frauds: Fraudulent Financial Services – Mid-Market Investment Bank | 412 |
| *C-15 Commercial* Frauds: Fraudulent Financial Services - International Financial Services Institution | 416 |
| *C-16 Commercial* Frauds: Fraudulent Financial Services – Wall Street Investment Bank | 420 |
| *C-17 Commercial* Frauds: Fraudulent Financings and Representation, Online Referral Services | 438 |
| *C-18 Commercial* Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses | 442 |
| *C-19 Commercial* Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus | 476 |
| *C-20 Commercial* Frauds: Fraudulent Financings, Online Platform | 481 |
| *C-21 Commercial* Frauds: Fraudulent Sales Leads | 485 |

| | |
|---|---|
| *C-22 Commercial* Frauds: Fraudulent Sales Lead Solicitation Services | 489 |
| *C-23 Commercial* Frauds: Fraudulent Sales Lead Solicitation Services | 492 |
| *C-24 Commercial* Frauds: Fraudulent Sales Lead Development Services | 495 |
| *C-25 Commercial* Frauds: Fraudulent Sales Lead Development Services | 498 |
| *C-26 Commercial* Frauds: Fraudulent Sales Opportunities, International | 501 |
| *C-27 Commercial* Frauds: Fraudulent Sales Opportunities, Domestic | 508 |
| *C-28 Commercial* Frauds: Fraudulent  Sales and Marketing Representation | 522 |
| *C-29 Commercial* Frauds: Resource Dissipation By Professional Services, Web | 527 |
| *C-30 Commercial* Frauds: Deprivation of Honest Professional Services, Legal | 532 |
| *C-31 Commercial* Frauds: Deprivation of Honest Professional Services, Legal | 538 |
| *C-32 Commercial* Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ | 543 |
| *C-33 Commercial* Frauds: Professional Services, Employees, Recruiters, Various Positions | 559 |
| *C-34 Commercial* Frauds: Fake Professional Services, Employees, Recruiters, Logistics | 572 |
| *C-35 Commercial* Frauds: Fake Professional Services, Employees, Sales | 577 |
| *C-36 Commercial* Frauds: Fake Professional Services, Employees, CFO | 581 |
| *C-37 Commercial* Frauds: Fake Professional Services, Employees, Controller | 586 |
| *C-38 Commercial* Frauds: Fake Production Asset Purchase Options, Professional Services | 589 |
| *C-39 Commercial* Frauds: Fake Production Asset Purchase Options, AZ | 605 |
| *C-40 Commercial* Frauds: Fake Production Asset Purchase Options, OR, ID, TX | 612 |
| *P-1 Personal Frauds:* Rights Violations - Illegal Searches, Hacking, and Harassing | 622 |
| *P-2 Personal Frauds:* Rights Violations - Illegal Searches, Hacking, and Harassing | 628 |
| *P-3 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation | 632 |
| *P-4 Personal Frauds:* Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne | 637 |
| *P-5 Personal Frauds:* Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse - Jeanette | 641 |
| *P-6 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts | 648 |
| *P-7 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Dates | 655 |
| *P-8 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Dates | 660 |
| *P-9 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Dates | 664 |

| | |
|---|---|
| *P-10 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship | 668 |
| *P-11 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship | 676 |
| *P-12 Personal Frauds:* Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship | 683 |
| *P-13 Personal Frauds:* Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction | 690 |
| *P-14 Personal Frauds*: Biological and Medical Invasions - Access to Basic Health Care | 697 |
| *P-15 Personal Frauds*: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities | 704 |
| *P-16 Personal* Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation | 711 |
| *P-17 Personal Frauds:* Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses | 717 |
| *P-18 Personal Frauds:* Biological and Medical Invasions - BRMT Induced Torture, Washington State | 724 |
| *P-19 Personal Frauds*: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts | 731 |
| *P-20 Personal Frauds*: Biological and Medical Invasions - BRMT Induced Torture, New Jersey | 739 |
| *P-21 Personal Frauds*: Biological and Medical Invasions – Food Borne Illnesses | 748 |
| *P-22 Personal Frauds*: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities | 751 |
| *P-23 Personal Frauds*: Theft and Takings - Financial Resources, Unpaid Compensation | 759 |
| *P-24 Personal Frauds:* Theft and Takings - Financial Resources, Theft of Funds and Services | 767 |
| *P-25 Personal Frauds:* Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment | 774 |
| *P-26 Personal Frauds:* Theft and Takings - Financial Resources, Imposed Litigation Expenses | 782 |
| *P-27 Personal Frauds*: Theft and Takings -Financial Resources, Banking System Manipulations | 791 |
| *P-28 Personal Frauds*: Rights - Misuse of Official Records, Mispersonation | 797 |
| *P-29 Personal Frauds*: Rights - Blocking Information Access and Supplying Deliberate Disinformation | 800 |
| *P-30 Personal Frauds*: Rights - Illegal Searches, Continual Monitoring | 804 |
| *P-31 Personal Frauds*: Rights - Privacy and Quiet Enjoyment | 808 |
| *N-1 National Security Frauds:* Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties | 810 |

| | |
|---|---|
| *N-2 National Security Frauds:* Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP | 817 |
| *N-3 National Security Frauds:* Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK | 824 |
| *N-4 National Security Frauds:* Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack | 831 |
| *N-5 National Security Frauds*: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK | 843 |
| **PRINCIPAL COUNTS** (Forty-three triable counts of law, citing subcounts and incorporating by reference all contents and exhibits of each subcount cited) | 851 |
| *AA. Physical and Emotional Injuries* | |
| 1  Attempted Murder | 851 |
| 2  Attempted Manslaughter | 863 |
| 3  Conspiracy To Murder | 875 |
| 4  Soliciting Crime Of Violence | 887 |
| 5 Bioweapons and Bioweapons Delivery Systems Prohibited | 898 |
| 6 Posse Comitatus - Use Of Military To Violate Constitutional Rights | 911 |
| 7 Conspiracy to Torture | 925 |
| 8 Torture – Mental and Physical Abuse | 944 |
| 9 War Crimes Against Civilians - Torture | 964 |
| 10 Assault | 985 |
| 11 Aggravated Battery | 999 |
| 12 Violent Crimes In Aid Of Racketeering Enterprises - Terrorism | 1012 |
| 13 Interference With Interstate Commerce By Threats Or Violence | 1025 |
| 14 Tampering With Consumer Products – Conspiracy Against Rights | 1038 |
| *BB. Income, Property, and Reputation Injuries* | |
| 15 Peonage | 1049 |
| 16  Involuntary Servitude | 1066 |
| 17 Forced Labor | 1082 |
| 18 Sexual Abuse | 1100 |
| 19 Frauds - Mail | 1111 |
| 20  Frauds – Electronic Mail | 1122 |
| 21 Frauds - Wire | 1139 |
| 22 Fraud And Related Activity - Computers | 1156 |
| 23 Attempts And Conspiracy - Mail Fraud | 1174 |
| 24 Attempts And Conspiracy – Scheme To Defraud of Honest Services- Mail, Wire, Email | 1185 |
| 25 Interstate And Foreign Travel Or Transportation For Racketeering Purposes | 1201 |
| 26 Fifth Amendment – Property Rights and Illegal Takings, | 1214 |

| *CC. Personal and Constitutional Rights Injuries* | |
|---|---|
| 27 Racketeering - Monetary Benefit From Unlawful Activity; | 1230 |
| 28 Civil Rights - Conspiracy Against Rights | 1243 |
| 29 Civil Rights Generally - Deprivation of Rights Under Color of Law | 1261 |
| 30 Civil Rights Generally - Federally Protected Activities | 1279 |
| 31 Involuntary Servitude, Intentional Discrimination in Employment | 1293 |
| 32 Civil Rights - Deprivation of Rights, Fourteenth Amendment – Equal Protection | 1311 |
| 33 Civil Rights - Deprivation of Rights Under Color of Law Fourth Amendment - Searches and Warrants | 1329 |
| 34 Searches Exceed Authority, Malicious Procurement, Without Warrant. | 1345 |
| 35 Civil Rights - Deprivation of Rights Under Color of Law, Anti-Terrorist Forfeiture Protection | 1363 |
| 36 False Information and Hoaxes In Furtherance of BRMT Torture and Theft | 1381 |
| *DD. Threats, Retaliation, and Negligence Injuries* | |
| 37 Negligence: Failure To Protect | 1399 |
| 38 Negligence: Failure To Supervise | 1417 |
| 39 Negligence: Failure To Train | 1435 |
| 40 Negligence: Failure To Report, Misprison of Felony | 1454 |
| 41 Tampering With Witness | 1473 |
| 42 Retaliating Against Witness | 1484 |
| 43 Prohibited Activities - Pattern Of Racketeering Acts | 1496 |
| **PRAYER FOR RELIEF** | 1514 |
| **JURY DEMAND** | 1534 |
| **SIGNATURE** | 1534 |

*BRMT: See LP Evidentiary Exhibits pages 6645-6699, then pages 1-10 explaining BRMT, then early stage private sector comparable at 11-25, FDA approved for human trials in 2021.*

## COMPLAINT

1.  This Complaint arises on three basic claims against Defendant United States and its

co-conspirator Defendants which demand the attention of and action by this Court:

**First,** Defendant United States has and does illegally deploy and operate Brain Remote

Management Technology ("BRMT" herein) against US persons in violation of (i) the

Constitution, of (ii) <u>five</u> ratified international treaties, of (iii) 18 USC § 175, and of (iv) Title 42

Chapter 21 Civil Rights, all as summarized at paragraph 7, pages 55-56. BRMT violates (v) the

"state secret" privilege in *Totten v. United States, 92 U. S. 105, 107* (1876), requiring this assertion of privilege be "**not inconsistent with law**," paragraph 41, page 71B.

**Second,** Defendant United States and its co-conspirator Defendants, named and as yet unidentified, have and continue to engage in (vi) an expansive pattern of violations of human, Constitutional, and civil rights under 42 USC §§ 1981, 1985; and in (vii) an associated-in-fact pattern of racketeering acts, including, without limitation, involuntary servitude, forced labor, human trafficking, and other prohibited acts under 18 USC § 1962; against Lead Plaintiff and this class of Plaintiffs, causing direct harm to these Plaintiffs; and (viii) violating the "good faith" standard for "qualified immunity" in *Harlow v. Fitzgerald, 457 U.S. 800* (1982), at para 44, page 71 herein, through their bad faith patterns of racketeering and civil rights violations and injuries.

**Third,** these acts and the associated-in-fact enterprise of Defendants have been, are, and will be (ix) threats to life, liberty, rights, and the rule of law, for the Lead Plaintiff, for this class of Plaintiffs, and for all US persons so long as these acts continue. Absent direct and explicit prohibition by this Court this pattern of abuse and injury will continue. Regardless of any obfuscation by government claims of classification, these acts directly imperil life and liberty and must be ordered immediately halted, as consistent with this District Court in *Horn v. Huddle, 94-1756 (RCL), Memorandum Opinions of August 26 and September 4, 2009.* See LP Evidentiary Exhibits pages 10781-10799.

**A.    Defendant United States has and continues to illegally deploy BRMT against US persons. Defendants' RICO conspiracy directly injures and criminally threatens Lead Plaintiff and other Plaintiffs' well-being, including in interstate commerce.**

2.    To conceal their violations of human, Constitutional, ratified treaty, and legal rights of Plaintiffs and sustain cover-up of the prohibited BRMT bioweapon program against US persons,

Defendants engage in ever more aggressive intimidation, injury, and lethality attempts on Lead Plaintiff in 2022, using their massive budgets, manpower, and co-conspirators to create a series of natural appearing scenarios for their accelerated 2022 assassination attempts, Table 1 below.

3.   The intensity of Defendants' lethality attempts on Lead Plaintiff has grown as Defendants' long series of criminal acts has been forensically reverse engineered and exposed by the Lead Plaintiff in writing through approximately 30 letters and exhibits to the US Attorney for the Southern District of New York from December 2021 to November 2022, including several copied or addressed to the Attorney General of the United States.

**Table 1: Botched Cover-Up - Lethal Acts Directed Against Lead Plaintiff Accelerate and Intensify as Reverse Engineering of Defendants' Criminal Acts are Transmitted to DOJ and SDNY in 2022**

| Dates denoted as (YYMMDD) | Events specifically directed at Lead Plaintiff are noted in italics below | Location |
|---|---|---|
| 1-001<br><br>Severe injury or death risks begin in the late 1970s and continue into the present. | *Lead Plaintiff knowing engages in risk-oriented activities, including whitewater rafting, canoeing, rock climbing and other outdoor sports throughout college and beyond, and is very familiar with normal risks related to these outdoor activities. During and after pilot training, Lead Plaintiff planned and executed two off-airport non-emergency landings, and experienced and handled several emergencies, including a fog incursion, an accidental cloud incursion in a mountainous terrain, a fuel contamination event requiring an inflight engine restart, two near mid-airs, numerous difficult landings, and other incidents.*<br><br>*All are handled calmly and successfully. None of these risks present in any unusual way, so most are simply noted here but not explored for that reason. However, a series of potentially lethal, repetitive, and anomalous situations and incidents have been noted since that time, and the frequency of these events notably increased in 2022. These include:* | *United States, Canada, United Kingdom, France, Switzerland, Luxembourg, Monaco* |

A. *BC Sea-to-Sky Highway early afternoon near death melatonin overdose during driving adjacent to unguarded sea cliff is first known BRMT lethality attempt on a summer vacation return in the 1980s.*

B. *An order to drive from Sacramento to San Francisco for a project meeting in extremely dense morning fog occurred in the first quarter of 1984.*

C. *A series of statue falls which could result in injury or death began in the early 1990s, including while climbing a ladder to the roof of the Kirkland residence, walking a mountain trail on a solo hike in the early 2000s, other incidents in Washington state and continued in New Jersey into 2008. A statue fall type incident from bed, striking the head on a nightstand during the fall is noted about 6 months and again about 18 months after the fall by a doctor at the Bergen Community College Dental Hygiene Clinic, Paramus, NJ, as noted in their medical records.*

D. *A series of high risk trip and fall incidents on stairs or into vehicle traffic, and similar high risk incidents begin in 2019 and continue through 2021.*

E. *Incidents with lethal potential accelerate in 2022. These include (1) BRMT induced choking while alone, (2) hospital fall with potential to penetrate right temple in April, (3) mass casualty potential involving an express train to New York City traveling 50-60 mph at sundown on September 11, (4) somersault fall on September 17, and (5) simulated vehicle rundown sequence on November 18-19 occur in the months following the first ever indirect verbal threat delivered in New York City on July 16, 2022. Many of these and prior injurious and potentially lethal incidents occur on City of New York municipal property and require direct coordination between Defendant City of New York, Defendant NYPD, and Defendant United States BRMT induced brain hijackings to implement.*

| | | |
|---|---|---|
| 1-002<br><br>1953 -1973<br>Precursor<br>programs<br>of<br>Defendants<br>CIA and<br>Army<br>criminally<br>use drugs<br>to bio-<br>medically<br>abuse US<br>and<br>Canadian<br>citizens | *As MKUltra begins in 1953, a contract researcher turned whistleblower "falls" from the window of Room 1018A in the New York City Statler Hilton hotel room he shares with a Defendant CIA chemist and personal assistant to the Program Manager Sidney Gottlieb, who reports directly to CIA Director Richard Helms. (See LP Evidentiary Exhibits pages 9679-9696.)*<br><br>*The whistleblower, Frank Olson, a well experienced senior researcher, and former Army Bioweapons lab manager, dies on the sidewalk below, directly across from Penn Station a few hours before these two roommates are supposedly taking a train to Washington, DC the next morning to disclose the program's existence and the whistleblower's moral trepidations about surreptitious dosing of civilians and soldiers without their knowledge and consent with senior managers.*<br><br>*Over the next twenty years, nearly 100 million doses of LSD will be secretly given without consent, resulting in unknown death, injury, mayhem, and violence to these unknowing drugged individuals and innocent bystanders before the evidence is destroyed in 1973, obstructing criminal and civil justice for these millions of CIA felonies.* | |

| | | |
|---|---|---|
| *1-003* | *Defendant CIA's MKUltra mind control program originates directly from Nazi drug experimentation on political and ethnic prisoners in the Dachau Concentration Camp system. The Dachau system began incarcerating political and ethnic prisoners under martial law about 6 weeks after Hitler became Chancellor of Germany. As World War II was ending, Defendants CIA (OSS is renamed CIA in 1947) and Army, and the Department of State collaborate to bring 1,600 Nazi doctors, scientists, and engineers to America and employment by Defendant United States and various labs and institutes, including those used for its covert research and development operations. Several Nazi doctors are deployed as Defendant CIA initiates MKUltra.* | *Various interstate locations in 44 states, particularly including WA, CA, MA, NJ, and NY. International locations visited physically as listed above. Various countries in North America, Latin America, South America, Africa, Europe, Asia, Southeast Asian Island nations, and Australia as corresponding commercial customers and suppliers through 2022.* |
| *1-004* | *MKUltra's managers and team members, ranging from doctors to sex workers, illicitly and illegally administer 100 million doses of LSD to US and Canadian citizens and soldiers. Defendant United States does not renounce the MKUltra goal of mind control as it publicly ends MKUltra in 1973 because of third party exposure. BRMT secretly begins around this time, discontinuing the thoroughly discredited and sometimes deadly method, while retaining the program mind control objective and the illegal surreptitious methods which violate the Constitution, ratified international treaties and the law.* | |
| *1-005*<br><br>*1972-2002 overview* | *While the actions are completely unrecognized as the direct responsibility of Defendant United States and its RICO co-conspirators on any level by the Lead Plaintiff until years after the 9/11/2001 attacks, Defendant United States has already sustained domestic and international intelligence and national security pretexting against the Lead Plaintiff for decades.* | |

| | | |
|---|---|---|
| *1-006* | *Around 1972 at age 16, Lead Plaintiff is involuntarily enrolled in the BRMT program. BRMT is the biomedically driven successor program to Defendant CIA's MKUltra mind control project.* | |
| *1-007* | *In Spring 1979, Lead Plaintiff is surreptitiously visited by Defendant CIA's Director Stansfield Turner (a retired Navy Admiral). Turner, not then recognized by Lead Plaintiff, makes a National Gallery East Building rotunda cameo walk-by appearance and strong extended eye contact with Lead Plaintiff on a weekday early afternoon as the Lead Plaintiff makes his first visit to Washington, DC on the way back to college from his MBA recruiting interview with GTE, a telecommunications and manufacturing conglomerate headquartered in Stamford, CT.* | |
| *1-008* | *Lead Plaintiff experiences a DC gun in the back daylight robbery (now known as simulated) near the hostel where he stays, from which he simply walks off as soon as the street intersection crosswalk light permits. This likely occurs earlier the same day as CIA Director Turner does his cameo, though the exact timing is not recalled.* | |
| *1-009* | *Shortly after Lead Plaintiff's MBA program graduation, he is employed in August 1979 at Haskins and Sells (later known as Deloitte, Haskins & Sells, DHS, then Deloitte), an international accounting and consulting firm with 16,000 US employees. Defendants FBI and CIA use Lead Plaintiff, usually indirectly and always without his knowledge or consent, either as part of or in the same consulting office as, commercial cover intelligence acquisition (domestic spying and investigations, and international spying), including the Longacres Racetrack chemist murder investigation; Imperial Manufacturing (marine survival suits), Bremerton, WA; Saudia Airlines enterprise information system; South Africa banking system ATM network; Republic of Palau information system, funded by US Department of interior before independence); PGE Portland, OR; Puget Sound Power and Light. All these 1980s projects are strategic information systems commercial cover intelligence access projects- domestic and* | |

*international spying, some legitimate, some Constitutional violations of the Fourth Amendment, though none are recognized by Lead Plaintiff for their actual intent at the time – that will come many years later in the early 2020s.*

*Lead Plaintiff is the only person on the sidewalk on the north side of the old federal courthouse in Seattle, WA during the morning transit of a federal domestic terror suspect to a federal court appearance through a secure basement parking entrance to the courthouse in an unmarked three vehicle convoy on vacant streets in the early 1980s while walking to his car one morning. This was most likely the first federal court appearance of Christopher Boyce in late August 1981, after being recaptured. Boyce was an escapee who had been convicted of selling satellite technology secrets to Russia.*

*These terror themed and national security "state secrets" themed cameos will recur repeatedly in an ever accelerating and escalating fashion in both domestic (nationwide) consulting and engineering projects involving missile, satellite, and nuclear technologies, and in friendly allied countries (including the UK and Canada) over the next four decades as this timeline and Complaint clearly and unmistakably demonstrate.*

*Eventually the Lead Plaintiff himself becomes the object of these terrifying cameos and scenarios, beginning in 1996 and accelerating in the Summer 2001, about 90 days before the 9/11/2001 attacks, then dramatically accelerating in their aftermath. This pattern of acts, violations, and injuries is driven by these Defendants. Defendant United States leads ever more aggressive pretexting, criminal acts, and other color of law violations against Lead Plaintiff. One must simply follow the evidence to comprehend this inevitable, prima facie conclusion.*

*Defendants United States motive: Hiding a prohibited weapon system which violates US and international law and five ratified treaties - the BRMT bioweapon and bioweapon system used to victimize the Lead Plaintiff, and a currently unknown number of other victims. 18 USC § 175 and the 1972 Bioweapons Treaty, among others.*

*Representative clients: Sea-Trust Bank, Seattle, WA; Sun-Trust Bank, Miami, FL; Rainier Bancorporation, Seattle, WA; Bank Administration Institute, Washington, DC; Federal Deposit Insurance Corporation, Washington, DC; City of Bellevue, WA; Legislative Transportation Committee, State of Washington, Olympia, WA; Amfac Distribution, Folsom, CA; Westin Hotel, Seattle, WA; Hilton Hotel, Salt Lake City, UT; City of Tacoma, WA; Pierce County, WA; San Francisco, CA School District; Buffalo, NY School District; Spring, TX School District.*

| 1-010 | *Lead Plaintiff is also referred by a DHS consulting administrative assistant to and volunteers as, a Board of Trustees member and later as Chair, of a consumer organic and natural foods grocery cooperative. This coop was formed by and has activist members who are domestic intelligence targets of FBI, such as civil rights, anti-war, and non-conforming lifestyle activists. FBI also co-opts the executive leadership at this and other consumer retail grocery cooperatives in California. FBI may also engineer the bankruptcy of three Seattle, WA area wholesale grocery companies to assemble a more amenable platform for its broader spying on other retail cooperatives, though this is not yet confirmed, and further discovery is required.*<br><br>*These techniques were common practice at Defendant FBI, even including the use of violent militias against similar activists, throughout the Cointelpro program into the 1970s. Notably, Whitey Bulger was managed by Defendant FBI's Boston Field Office beginning in 1975. He ran the Winter Hill Gang, personally committed 11 murders and was complicit in 8 more before he fled Boston after being tipped off by Defendant FBI in 1994.* | |
| 1-011 | *In the early 1990s, Lead Plaintiff is bounced through two environmental services firms. Both are likely used to investigate environmental law violations and other contractor frauds and public corruption (public contract payoffs). The first company, purchased and majority owned by Plaintiff, is wrecked by denial of government benefits (SBA contractor bonding), forcing Lead Plaintiff into personal Chapter 7 bankruptcy. The second company is used to entangle the Lead Plaintiff in international intelligence involving CSIS and MI-6, likely to facilitate more intrusive direct spying on the Lead Plaintiff, a US person, conducted by those services for their American "cousins."* | *Alliance Environmental representative customers: Snoqualmie High School; Bellevue High School; Sedro Woolley High School; Mortenson Construction, Sea-Tac Airport B, C, D Concourse Expansion; Bates-Vocational-Technical School; all in the State of Washington.* |

| 1-012 | In the mid-1990s, Lead Plaintiff is placed at Pacific Pipeline a book distribution firm in Kent, WA on a referral from a commercial cover informant or agent is CEO of the wholesale consumer cooperative founded by Puget Consumers Coop and two partners. This book wholesaler, Pacific Pipeline, is used by Defendant FBI to spy on booksellers in the Pacific Northwest and nationally before it too is wrecked, a few months after Lead Plaintiff attempts and is rebuffed from a buyout to preserve and expand the company. | Pacific Pipeline Representative customers: Barnes & Noble, Costco, Crown Books, hundreds of independent booksellers operating individual retail stores in Washington, Oregon, and Alaska. |
|---|---|---|
| | Lead Plaintiff's buyout was intended to provide independent booksellers more competitive muscle to compete with Amazon and national bookselling retail chains. A collaborative marketplace system, which would precede but be similar to that now innovation now used by Amazon and Walmart, but with each retail bookseller have their own distinct online identity and access to 108,000 titles they were unable to stock at their retail location. Since this did not match up with Defendants' objectives to perpetuate involuntary servitude, forced labor and BRMT development and deployment in future years, this buyout is sabotaged in the cradle by agents of Defendant United States. | |
| 1-013 | Defendant United States begins an earnest years-long effort to directly enmesh Lead Plaintiff directly in a wide variety of matters which are closely and tangentially related to national security beginning in his next trafficked employment at CNA Industrial Engineering, just as that company, a captive engineering services intelligence support enterprise, kicks off its engineering design and equipment implementation for construction of the massive Boeing/Air Force Delta IV heavy lift rocket factory in Decatur, AL. | |

| 1-014 | This pattern of Defendant United States placing the Lead Plaintiff in and then wrecking its commercial cover operations continues in the late 1990s with CNA Industrial Engineering with the Air Force Delta IV rocket assembly plant design and construction for Boeing, several projects involving aerospace and space technologies, and a transitional project for a CIA commercial cover officer who manages a domestic corporate commercial arts distribution project before his return after six months to his foreign deployment. | Representative clients:

Boeing/Air Force, Decatur, GA - Delta IV rocket assembly plant engineering And material handling equipment installation |
|---|---|---|
| 1-014A | Prior to Lead Plaintiff's arrival, CNA is used for domestic intelligence gathering on "Japanese Miracle" companies Sony, Sega, Nintendo as they entered the US market – domestic intelligence and national security issues. | Zetec, Issaquah, WA – ERP selection for nuclear power and aerospace non-destructive testing services |
| 1-014B | Lead Plaintiff runs or manages engineering and information technology project managers and teams on technology and engineering projects which design, develop, and deploy systems at, among others, domestic international airports in Washington and Alaska; a non-destructive testing company for nuclear power plants, aerospace equipment, and other sensitive technologies in civilian and military use; as well other companies of interest to domestic and international intelligence operations, into 2002. | Hughes Satellite Division – Torrance, CA satellite failures analysis |
| 1-015

2002 – 2022 overview | In the aftermath of the 9/11/2001 intelligence failures which failed to exploit known leads to prevent this attack, the Defendant United States and its co-conspirators will use massively expanded funding and overreaching and illegal abuses of powers to expand this national security pretexting of Lead Plaintiff into the terrorism domain, leading to extremely dangerous, torturous, and near deadly outcomes for the Lead Plaintiff between 2002 and 2022 at the hands of these and other Defendants. | Sea-Tac International Airport – baggage systems design and installation . HomeGrocer.com, Bellevue, WA - regional distribution facilities in WA, OR, CA |

| | | |
|---|---|---|
| 1-015A | During an escorted pre-project tour (in late Spring or early Summer 2002) of several docks area maintenance buildings for an upcoming engineering study CNA Industrial Engineering, is to conduct, one team member and Lead Plaintiff are left standing unescorted next to tarp-covered nuclear submarine pump for about 10 to 15 minutes. This is a very serious violation of shipyard rules for visitors with no security clearance, as this pump is very highly classified nuclear propulsion technology. | Puget Sound Naval Shipyard – nuclear sub and aircraft carrier maintenance facility, Bremerton, WA |
| 1-016 | US Marines have shoot-to-kill orders to protect sensitive nuclear technology, as Lead Plaintiff is reminded during pre-tour briefing. Lead Plaintiff experiences BRMT pushes (urges) to lift the green tarp which covers the pump and shipping pallet it rests on, but resists these impulses at the time, in fear of life and well-being. The tour occurs on a weekday during normal work hours for 15,000 employees. Besides the five to six person escort team, only about a dozen total personnel are seen in the entire shipyard work area the day of the tour. | Anchorage International Airport - baggage Systems for terminal expansion and modernization, Anchorage, AK |
| 1-017 | After Labor Day 2002, lethality efforts and other programmed harms by Defendants take a dramatic turn for the worse and continue accelerate since that time into 2022, when they are accelerated still further. Lead Plaintiff fails to recognize this on-going pattern of lethality efforts until a durable sequence of recognizable visual threats begins around 2004. | |
| 1-018 | Lead Plaintiff fails to recognize this on-going pattern of lethality efforts until a durable sequence of recognizable visual threats begins around 2004. | Beach Café and Bar, Kirkland, WA |
| 1-019 | Direct visual threats are delivered to Lead Plaintiff periodically from approximately late 2004 through 2005 in this favored hangout. For example, a taller medium build White male in his late 30s to early 40's, with the appearance of a federal undercover police powers officer or agent, makes a distinct gun-like point and hold finger and thumb motion suggestive of a behind the ear mob style execution hit in the nearly empty Beach Café bar in early evening. | |

| | | |
|---|---|---|
| 1-020 | *This progression of visual threats and other coercive psychological operations gradually becomes more and more threatening, prompting his flight December 23, 2005 from the Seattle, WA area to Boston, MA to protect family, loved ones, and friends from these predators seeking them out to pressure Lead Plaintiff by enmeshing them in some entrapment or intimidation effort.* | |
| 1-021 | *This seemingly voluntary relocation by Lead Plaintiff is actually trafficking. Using a sequence of threats of violence and simultaneous place of safety pretexting (basically good-cop bad-cop psychological operations teamed with BRMT enhancement, then unrecognized), Defendants deploy BRMT and psychological operations to direct their trafficking of Lead Plaintiff to Boston, MA, and homelessness in 2006-2007.* | |
| 1-022 | *Lead Plaintiff's further trafficking to the New York City area in 2007 is to place him in the location where Defendants have the most elaborate array of human and technical assets, and collaborative police powers operations, to manage the Lead Plaintiff's desired destiny.* | |
| 1-023 | *After ten months of fake employment at Establish in Fort Lee, NJ, Lead Plaintiff is subject to torturous treatment for the better part of two years, leading to a second suicide ideation. Days after Lead Plaintiff files a Complaint in Newark federal district court on June 23, Defendants orchestrate a second brief homeless period, then deprive him of homeless services, leading a crisis and six months of Soviet-style confinement in a mental institution from October 2, 2010 to March 31, 2011.* | |
| 1-024 | *In 2021-2022, Lead Plaintiff diligently works to reverse engineer the BRMT biomedical and technology system, its development and increasing sophistication over its 50 year history, and the key perpetrators of this criminal RICO and rights conspiracy. Defendants respond to these efforts to secure justice by dramatically accelerating their collaborative harassment and their sequence of lethality, intimidation, and tampering attempts in northern NJ and the greater New York City area.* | |

| | | |
|---|---|---|
| 1-025 | *A regional commuter express train is sabotaged by a tree on the tracks at sundown on September 11, 2022. This potential mass casualty incident, a derailment which could lay the train on its side at high speed, occurs on Sunday evening while hundreds of people, including Lead Plaintiff, are returning to NYC on an express train traveling at 50-60 mph. accident.* | |
| 1-026 | *Defendants continue their attempts to intimidate and/or assassinate the Lead Plaintiff after this train derailment effort. Defendants openly use City of New York municipal property, Defendant NYPD personnel, and other co-conspirators, including other police powers in the region in these efforts as they continue their attempts to intimidate, severely injure, and/or assassinate Lead Plaintiff.* | |
| 1-027 | *These practices mimic those in outdated assassinations manuals, which include techniques such as giving the appearance of or driving a subject to suicide; arranging an apparently natural fall of 75 feet or greater; just as the one which "befell" the whistleblower in Room 1018A of the Statler Hilton, across the street from New York City's Penn Station, near the beginning of MKUltra in 1953. This whistleblower might have saved countless lives lost and other destruction of US and Canadian citizens and soldiers over the next 20 years. He simply never got the chance.* | |
| 1-028 | *Defendants' obvious and transparent goal is to evade accountability yet again and to perpetuate their "state secrets" cover-up of systematic criminal abuse of US persons and other innocents by Defendant United States BRMT bioweapons and bioweapon delivery system. These acts are simply the current generation of "final solutions" by Defendants as directly inherited from their conduct in the MKUltra era and as inspired by the Nazi's Dachau human experimentation and exploitation which preceded it.* | |
| 1-029 | *A non-exhaustive list of example Incidents in 2021 and 2022 are described in greater detail below. This period corresponds directly with the most diligent reverse engineering effort and the sequence of communications* | |

| | | |
|---|---|---|
| | *attempted by the Lead Plaintiff with the Department of Justice and its Inspector General's Investigations Division in Washington, DC, and with its US Attorney for the Southern District of New York, as well as the federal District Court for the District of Columbia.* | |
| *1-030*<br><br>*210304,*<br>*210412* | *Two colonoscopies are required due to bowel cleanout failure on the first attempt. Blocking caused by BRMT forced continuous muscle closure of bowel exit which continues into late 2022. During recovery from the 210412 colonoscopy, Lead Plaintiff experienced another in the series of statue falls. Near miss of penetration of right temple, a weak point on the skull, on the roller stand base of a hospital bed tray.* | *Palisades Medical Center, North Bergen, NJ* |
| 1-031<br><br>Beginning December 6, 2021 (211206) | Letters connecting prior CIA commercial cover activities, FBI, Secret Service, Maricopa County Sheriff Joseph Arpaio, NYPD, and other police powers agencies and members of the private sector professional community, as well as national political figures to (1) KKK Act of 1871 Constitutional and civil rights abuses, (2) RICO pattern of racketeering activities, delivered to SDNY. | Attempted mail and email deliveries to various rights-related entities fail, so delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-032<br><br>220516,<br>220613,<br>220617 | Letters - Details of precursor tradecraft signaling related to US Airways flight 1549 (LaGuardia to Charlotte, NC, with BRMT bird ingestion, dual engine flameout, and emergency landing in Hudson River) are delivered to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-033<br><br>220617 | Letter -Details of reasonably probable BRMT related precursor agitation noted in letter based upon media accounts of high profile NYC subway murder to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| *1-034*<br><br>*220621* | *Delacorte Richard III faked outside violence with simulated undercover response from in theater crowd.* | *Delacorte Theater, Central Park, New York City* |

| | | |
|---|---|---|
| *1-035*<br><br>*220712* | *Capital One ACH security breach demonstrates the perpetrators have the ability to modify account numbers in the transmission process between Capital One web site on my personal computer, Wells Fargo and CapitalOne for $8 payment. System security has been demonstrably compromised by this hack.* | *Noted online at residence and in letter sent to CapitalOne on July 15, 2022 via US mail.* |
| *1-036*<br><br>*220716* | *First ever indirect verbal threat delivered to me by male voice from behind during intermission at 1+1 play on July 16, 2022.* | *Chain Theater Mainstage, New York City* |
| 1-037<br><br>220718 | Letter - Current threat environment including 1+1 incident on 220716 and tradecraft processor behaviors indicating possible homicide included in two letters to SDNY. Tradecraft precursor behaviors are suggestive of motive and of intent to also indirectly threaten this person's other closely related individuals. See Interline Exhibit 1 at the end of the Timeline. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-038<br><br>220718 | Letter – A prominent person in New York City suffers injuries which are inconsistent with the accidental method of death described in the media reports the Lead Plaintiff is able to access. A tradecraft frontrunner event witnessed by Lead Plaintiff is reported to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-039<br><br>220720 | Letter - Current threat environment further clarification and prior similar pattern and practice letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-040<br><br>220725 | Letter regarding prior suppression of web searches related to brain-computer interfaces and relationship to BRMT to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-041<br><br>220801 | Letter to SDNY regarding mass casualty incidents and tradecraft signaling related to (1) May 2004 Bio-Lab Conyers, GA warehouse fire 5.5 months before 2004 election and (2) US Airways 1549 (LGA departure to Hudson River emergency landing) on January 15, 2009, five days before Bush 43 leaves office January 20, 2009 at Obama inauguration. Transmit letter regarding mass | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |

| 1-042 220810 | Letter - Morphological comparables possible identifications across time and personal timeline letters to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
|---|---|---|
| 1-043 220812 | Letter - ACH system hack of account number by perpetrators in payment system between my Wells Fargo web account and CapitalOne letter to SDNY. Further likely morphological comparables and pickets letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-044 220819 | Letter - Recurrent morphological comparables letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza |
| 1-045 220901 | Letter - Potential indirect and victim impacts letter to SDNY. Commercial leads letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-046 220909 | Letter - Biolab Conyers, GA 2004 warehouse chlorine and phosgene gas arson indicated fire analysis transmitted to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| 1-047 220911 | MTA Metro North Hudson Line - tree "falls" to impede three of four rail tracks including both northbound tracks and the southbound express track immediately after sundown. Train engine and several following passenger cars impacted by tree debris, but the mass of the upper story branches of this tree which partially block the southbound express track is insufficient to cause a derailment. Train speed estimated in the range of 50 to 60 mph prior to collision with tree's upper story branches and successful rapid stop. Based upon braking behavior and noises I heard while seated 3 or 4 cars behind engine, Engineer had noted tree a about five to seven seconds prior | Zero wind day, light rain earlier in the day, tree likely mature at 120 feet tall or thereabouts. Improbable as a natural event given the surrounding circumstances, height of tree |

| | | |
|---|---|---|
| | *noises I heard while seated 3 or 4 cars behind engine, Engineer had noted tree a about five to seven seconds prior to collision and made rapid stop but was not able to avoid contact with upper story tree branches. Transition from daylight to darkness likely made tree more difficult for engineer to see in time to avoid as eyes were likely adjusting from sunlight to darkness and view ahead was by headlight only.* | circumstances, height of tree and its adjacency to right of way. |
| 1-048<br><br>220916 | Letter - Lethality Risks letter detailing Hudson Line incident above and history of prior incidents is transmitted to SDNY. Evidence tampering letter to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| *1-049*<br><br>*220917* | *Morningside Park indirect assault occurs. Full somersault on third or fourth sets of steps on purposely darkened walk from southwest corner down to baseball field.* | *Morningside Park, New York City* |
| 1-050<br><br>220919 | Morningside Park indirect BRMT assisted assault incident report transmitted to SDNY. | Delivered by hand to SDNY building entry Security checkpoint at St. Andrews Plaza. |
| *1-051*<br><br>*220923* | *Phone number for Addy, a past contact of prior personal interest, and supplied to SDNY in a July 5, 2022 letter is used by an unidentified person or entity to deliver a health care related business voice mail from Braven Health, my health plan provider, to me.* | *Noted in cell phone recent calls log. Call occurs on my birth date.* |
| *1-052*<br><br>*221016* | *Defendants manipulated cut and paste commands in MS-Word on personal computer to attempt to delete three counts from draft Complaint: (1) witness tampering, (2) witness retaliation, and (3) misuse of official documents. Manipulation caught during review which was undertaken due to prior experiences with document tampering by Defendants.* | *See enclosed incident report for details.* |
| *1-053*<br><br>*221108* | *Identify indications of tampering with SDNY delivered letters on my personal computer. SDNY folders containing letters and enclosures are missing from that subdirectory, but copies exist in my LP Evidentiary Exhibits subdirectory being used for civil litigation preparation at this time. Evidence of time gaps in accessibility to business accounts emails between 180304 and 200709 noted, though access* | *Noted in document comparisons across subdirectories and folders.* |

| | | |
|---|---|---|
| | *appears to be currently blocked rather than those emails being deleted. Evidence of extensive missing email conversation strings related to certain individuals and entities outside of this blocked period was also noted.* | |
| 1-054<br><br>221109 | A version of this tabulation of Lead Plaintiff letters to DOJ, and the simultaneous acceleration of Defendants' threats and incidents between December 12, 2021 and November 8, 2022 is mailed to DOJ and SDNY. | |
| 1-055<br><br>221118 | *Electric scooters travel on deliberately darkened one-way streets in the wrong direction on 21st and 22nd Streets while Lead Plaintiff walks the west sidewalk of 8th Avenue between 23rd Street subway station to an Atlantic Theater event on West 20th Street. No other traffic is on these streets in either direction. As Lead Plaintiff returns to the subway, car traffic is flowing in the proper direction.* | |
| 1-056<br><br>221119 | *An afternoon trip to NYC is followed by a Walmart 88th Street shopping trip in North Bergen, NJ. Various people block and impede while shopping (rather typical) and there is a honey trap and loud customer scenario with child emulation of adult loud phrasing run while standing in the customer service line (also quite typical in Lead Plaintiff's experience). Upon exiting Walmart, cross parking lot diagonally to drive in front of Wendy's fast food. Compact white car about 150-200 feet north in drive aisle in front of Wendy's. Determine no threat of collision and cross. Car rapidly but quietly accelerates after my head turns forward and right to Wendy's entrance, so the vehicle is not in my peripheral vision. Car rapidly decelerates in the last moments and comes to a final stop about 5 feet to my left. BRMT freezes my head looking forward and right toward entrance as car approaches rapidly from left. Also am unable to move quickly out of the car's path due to BRMT dictating walking pace. About 15 minutes later, I encounter a male appearing to vomit into men's restroom sink on my entry. Balance of trip relatively uneventful to City Place via bus, light rail, bus.* | |
| 1-057 | *A reasonable interpretation using my two decades of known experience with tradecraft strongly suggests this is a vehicle rundown threat sequence over two days. As before, it is intended to intimidate a key witness to Defendants' prior criminal acts and to perpetuate their long-running cover-up.* | |

**Interline Exhibit 1: Indirect Verbal Threat and Subsequent Lethality Events** – July 17 through November 19, 2022 begins here (see also Table 1-036, 1-047, 1-049, 1-055, 1-056 above):



**A. Indirect Verbal Threat** - An unknown male voice behind me delivers an indirect verbal threat, (what are we going to do with you or a phrase very similar), during intermission as I remain in the front row of this small theater. Since the set up on entry was quite familiar, including a single tall white female in her late 30s to early 40s sitting alone in the two seat row directly ahead on entry to the theater (classic tradecraft), and there had been previous in-house production where I was likely the only guest, all

others being police powers personnel and friends, this was a deliberately set up scenario and sequence and an in-house production for the specific purpose of delivering the indirect verbal threat at intermission.

**B. Follow-On Mass Casualty Attempt:** Approximate area of attempted express train derailment on September 11, 2022. Train collision with tree is heard as the tree's remains bang against the car where I am seated, several cars behind engine occurs at approximately 7:15 pm as the train travels south at 50 to 60 mph toward the just set sun (7:11pm). Initial eye adjustment from light to dark requires about 5-8 minutes, so the train engineer's night vision was limited at the time of the collision and potential derailment. No wind, rain, or excess moisture to account for a natural tree fall at this particular time, indicating careful planning for maximum effect. Hundreds of passengers and crew are on board on a Sunday evening return to NYC. The four track mainline is adjacent to the Hudson River.



Typical mainline in this area. Southbound express track is second from left. Hudson River on far left:



**C: Follow-On Indirect BRMT Assisted Assault - Morningside Park, NYC, somersault fall sequence** on

September 17, 2022, 7:29pm (sunset 7:01pm):



Path from 109th and Morningside Drive Taco restaurant to the southwest corner of Morningside Park.

Taco restaurant at right is where I purchased an evening meal. It has very bright fluorescent lighting. The

distance from this restaurant to the Morningside Park entry just behind the blue car in the distance is

250 feet, about 45-50 seconds to adjust from very bright light to a very dark path which is shielded from

other area lighting by a heavy tree border. A typical adjustment period from bright task lighting to

moonless nighttime darkness is about 5 to 8 minutes, with full adjustment requiring about 30 minutes or

longer, according to most sources.

Nonetheless, I successfully negotiated four sets of darkened stairs before BRMT was used - my head was forced upright and looking ahead rather than down as needed to see the lead step, and my walking pace was quickened just prior to my somersault fall on the set of stairs as the point shown below.

Area street lighting is old fashioned gas lantern style low intensity electric lighting. Sunset on this date was at 7:00pm. The fall occurred at 7:29pm. The movie was due to start at 7:30pm. The area had very light traffic, with few cars in the area at 7:29pm.

This scenario was designed by Defendants United States, NYPD, and City of New York's using their intimate knowledge of me, including my food preferences, a Parks Department summer movies series screening of Spielberg's West Side Story at Morningside Park, and their perpetual surveillance of Lead Plaintiff, including his usual practice of planning transit services to reach locations in NYC well in advance so his likely route was known and could be influenced by both schedule and BRMT. This is a common practice, as misdirection and misinformation are fairly typical when I am in in and enroute to NYC, such as by hiding certain subway stations on Google maps during my route planning, posting incorrect or reversed bus schedules on the NJ Transit website, and so on and on, over the past seventeen years.

Morningside Park southwest corner – location of somersault fall:



Street view of southwest corner of Morningside Park path entry at the corner of Morningside Drive and W 110th Street:



Morningside Park – southwest corner path to baseball field viewing location:



**D. Follow-On Vehicle Rundown Sequence – New York City, NY and North Bergen, NJ** occurs after dark

on



November 18 and 19, 2022: Google street view W 21st St from 8th Avenue, looking east at top, west at bottom. Images captured by Google on August 2022. Note streetlight on the right side of street (top), on left side of street (bottom). Both this street and W 22nd Street were completely dark with no streetlights operating on November 18, 2022 as Lead Plaintiff walked along 8th Avenue between W 23rd Street subway station to a theater production on W 20th Street on November 18, 2022.



On November 19, 2022, part two of this vehicle rundown threat sequence occurs in the Walmart Parking Lot, North Bergen, NJ is Used For Vehicle Rundown Threat After Dark on November 19, 2022. BRMT freezes Lead Plaintiff's head looking toward Wendy's entry door as vehicle accelerates out of his peripheral vision from left side to panic stop, and a final stop about 5 feet short of striking Lead Plaintiff.



Lead Plaintiff diagonally crosses parking lot to Wendy's about 7pm on Nov 19, 2022. Compact white car rapidly accelerates and then panic stops 15 feet from Lead Plaintiff in drive aisle nearest Wendy's entry door.

4.  BRMT is a technology based mind control system in illegal use against US persons, including this entire class of injured Plaintiffs. BRMT biomedical experimentation and deployment began in the 1970s as Defendant United States' straight line continuation of its failed illegal MKUltra drug dosing from 1953 to 1973. MKUltra was the straight line continuation of years of drugging experiments in the Nazi's Dachau Concentration Camps. Set up a few weeks after Hitler's rise to Chancellor in 1933, the Dachau camps housed political, ethnic, and religious prisoners through the end of World War II in Europe in May 1945. As the first of twelve

Nuremberg Trials, seven of these Dachau doctors were sentenced to death, nine to long prison

sentences, and seven were acquitted, see US v Karl Brant et al, in the Nuremberg trail record

from November 21, 1946 and August 20, 1947. Nonetheless, some Nazi Dachau "medical

doctors and researchers" were secretly brought to the United States as part of Operation

Paperclip between 1945 to 1959 and employed by Defendant United States to pursue illegal

drugging and other internationally prohibited  "medical research" on Americans and Canadians.

    5.  Using the Dachau expertise of these doctors as a springboard for its mind control

research, Defendant CIA purchased and illegally deployed 100 million LSD doses against US

and Canadian citizens and soldiers through more than 140 projects, in collaboration with

Defendant United States Army's Bioweapons Lab. MKUltra's experimental protocols illegally

drug dosed unwitting civilians and soldiers, then permitted those drug-impaired hallucinating

victims to return immediately and unsupervised to normal activities. This negligent practice

endangered, injured, and killed both hallucinating program victims and other innocent people.

Police reports shows that drug-impaired people are at least as dangerous as any other impaired

person as the perpetrator or victim of assaults, homicides, rape, motor vehicle accidents and all

other forms of public mayhem and disruption. As the program ramped up in 1953, a

whistleblower was likely murdered. Frank Olson, a contract researcher formerly with the US

Army Bioweapons Lab, raised legal and ethical concerns, was secretly drugged with LSD, and

nine days later plummeted ten stories from a New York City hotel room he shared with the

MKUltra Program Director's personal assistant. President Ford and CIA Director Colby

apologized for the 1953 death under CIA Director Helms in 1975 based upon the findings of a

Commission headed by Vice President Rockefeller. A 1994 exhumation and forensic autopsy led

nine of ten members of the autopsy team to conclude Frank Olson's death resulted from blunt-

force trauma to the head and injury to the chest which occurred before Olson fell ten stories to the sidewalk at 2AM.

6.  As MKUltra's epic failure to achieve mind control became clearer in the late 1960s, it was finally shut down in 1973, and the evidence of its failure and the victims it impaired or destroyed was destroyed in a cover-up. The CIA Director was sent to Iran as it's Ambassador as Nixon cleared the administration for his second term. But the mind control objective remained behind in the CIA. It's replacement was the prohibited BRMT program. This type of bioweapons platform was banned in April 1972 by the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, 1975)*, just as the BRMT program was being initiated. BRMT was an internationally prohibited weapon even before it was developed and deployed by Defendant United States. BRMT was a crude weapon which manipulated brain hormones by the late 1970s, such as melatonin for sleep, and oxytocin for love. See lethality subcount L-1 at page 276 for its impact.

7. Defendant United States continues to develop and operates succeeding generations of BRMT in violation of US law and of international treaties it sponsored, negotiated, and ratified, and having force of law throughout the United States. It violates (a) the *United Nations Charter* and *Universal Declaration of Human Rights*, (effective in force - EIF 1948), (b) *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, (effective in force  (EIF 1975), (c) *International Covenant on Civil and Political Rights* (EIF 1976), (d) *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (EIF 1987), (e) *Geneva Convention relative to the protection of civilian persons in time of war* (EIF 1949), under the 2001 AUMF

(115 Stat. 224 PL 107-40 September 18, 2001) in violations of 18 USC § 2441 (grave breaches of Geneva Convention Article 3), (f) the *Constitution of the United States of America* (EIF June 21, 1788), and its *First, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth* (section 1) amendments (EIF 1790, 1865 – 13th, 1868- 14th), (g) 18 USC § 175 prohibiting bioweapons and bioweapons delivery system development and use, and 18 USC §178(2) development and delivery of toxin prohibited, (h) 18 USC § 1385 posse comitatus violations by the US Space Force and its predecessor US Air Force, through its technical support and provisioning of classified satellite communications and precision location systems, (i) 18 USC §§ 1581, 1584, 1589, prohibiting involuntary servitude, forced, peonage, and trafficking for same, (j) 18 USC § 1962 patterns of racketeering acts, in violation of the Racketeering Influenced and Corrupt Organizations Act, which Defendant Department of Justice has itself used to criminally prosecute various government and private associated-in-fact enterprises, conspiracies to and patterns of racketeering acts since 1970, (k) 18 USC § 2331, prohibiting terrorism, (l) 18 USC § 2340A prohibiting torture, (m) 42 USC § 1981, prohibiting conspiracies to and deprivations of civil rights, and (n) together with other co-conspirator Defendants, against dozens of additional sections of Title 18, additional sections of Title 42, and state statutes across dozens of states, as specifically cited at each of the 43 Principal Counts in the Complaint, and comprising 2,599 examples of violations of the relevant statutes cited therein.

8. Under law and controlling case law, Defendants lack any valid legal right to assert "state secrets" privilege or "qualified immunity" as valid defenses. Defendants' pattern of prohibited and illegal acts has and does pose a clear and present danger to any and all US persons which these Defendants may wish to entangle in their corrupt pattern of racketeering acts, civil

rights violations, and prohibited BRMT bioweapon acts, violations, abuses, and injuries, not simply to one aggrieved civil litigant.

**How the Prohibited BRMT Bioweapon and Bioweapon Delivery System Work Against US Persons**

9.  BRMT is a classified and heretofore unknown type of legally prohibited weapons system. Other technologically complex systems unknown to the public for decades after they are first used in military and intelligence applications are commonplace. The GPS system on your smartphone was a classified top secret system which  operated from the first generations of satellites in the 1960s for ship, bomber, and fighter navigation. Legally permitted military stealth technology was unknown in the 1980s to the commercial pilots who spotted these aircraft flying alongside their own at night, and simultaneously completely invisible to their air traffic controllers' radars. Pulse jet technology, spotted in daylight flight over prohibited airspace in western Utah in early 2008 by the Lead Plaintiff, is still unknown to the public. So, we will begin with an explanation of the secret and legally prohibited BRMT bioweapon and bioweapon delivery system, its basic operation, and the technologies it exploits to act illegally on US persons and as it can be adapted to other brained creatures based upon neurological analysis of their brains and nervous systems.

10.  The BRMT bioweapon is intended, designed, and acts to excite or suppress production of biological compounds (among others) which are extraordinarily important to the proper functioning of the human mind and body, including to human will and decision-making. See a summary description and brief examples of the extraordinarily broad array of adverse effects of BRMT bioweapon operations directly experienced by the Lead Plaintiff from the

1980s to the present at LP Evidentiary Exhibits pages 181 – 181C and Complaint Interline Exhibit 1D, page 52.

**How BRMT Hijacks and Commands Human Brains**

11. Grossly oversimplified, the adult human brain is a six to eight pound biochemical manufacturing and processing plant filled with neurons, the cells which interact biochemically form thoughts and send messages to other neurons (to complete the thought or command an action) over synapses (using chemical messages to communicate across adjacent neuron cell membranes). Glia cells are the neurons' servant and guardian cells which regulate the environment, keep the local environment sanitary, supply needed chemicals (oxygen, trace compounds, and so forth), guard against viruses and other intruders, in support of this network of neurons. Neuronal networks (simplified here as nerves) carry messages across the brain to other parts of the brain for further processing, for conversion and communication to other parts of the body, such as muscles and organs to coordinate walking, breathing, swallowing, talking, operating a car, and so forth.

12. The brain operates consciously (experienced, for example as thought and through some forms of action, speech, and body language) and unconsciously (experienced through regulated and monitored functions like breathing, adjusting eye focus, moving the head, and so forth). Boundaries between conscious and unconscious actions are not clear cut, of course, as we know from observing ourselves and each other in various situations, such as observing voluntary and involuntary changes in expression and body language, and sudden awareness of normally ignored body system signals like pain. See LP Evidentiary Exhibits pages 6645-6685 for a basic explanation of neuroscience – the science of the brain and nervous system.

13. The prohibited BRMT bioweapon and bioweapon delivery system is an offensive weapon intended as a computer to brain interface. It is the antilog (opposite form) of a beneficial medical device (a brain-to-computer interface controlled by the user). First, consider the beneficial medical uses of these types of technologies - brain-to -computer interfaces. Current early-stage and experimental commercial forms of brain to computer interfaces are medical devices which control a remote device through the user's thoughts and nerve impulses. They are being used in FDA approved human trials to, for example, move an artificial hand, arm, or leg, order a robotic action to assist in eating, or in a semiautonomous use like monitoring and counteracting a Parkinson's tremor or ALS symptoms. They use brain research (neuroscience) and biology in compliance with 18 USC § 175(c) and FDA regulations for peaceful and useful purposes.

14. Over the past decade private companies have invested hundreds of millions of dollars to develop medical devices which are crude commercial variants of brain-computer interfaces similar in concept and theory of operation to the prohibited BRMT bioweapon. Commercial prototype devices are being tested as of 2022 in pioneering medical treatments of brain injuries, diseases, and other biological and biochemical disorders, such as ALS and Parkinson's disease. Synchron, a pioneering New York City-based medical device company received FDA permission for the first ever implant of a brain-computer interface device, which was performed in July 2022 for a patient suffering from ALS. An Elon Musk company, Neura-Link, is investing $100 million of Musk's money to develop this type of technology into commercial medical products. Other companies are developing brain-computer interfaces to control artificial limbs, among other medical uses. See LP Evidentiary Exhibits pages 11-139 filed herewith.

**Prohibited BRMT Bioweapon and Bioweapon Delivery System Operates Like Other Remote Offensive Weapon Systems**

15.  BRMT, the computer to brain bioweapon operates in precisely the opposite manner as these medical devices. Rather than assisting the person to perform some operation or create more favorable brain or body function (such as ALS tremor and other symptom suppression), the prohibited BRMT bioweapon hijacks the victim's brain for the BRMT operator's remote command and control, prohibited under 18 USC § 175(a) to produce 18 USC § 175(b) detrimental and toxic levels of biological compounds. The prohibited BRMT bioweapon uses its prohibited remote bioweapon to deliver precisely addressed energy (similar to an x-ray or radio wave which is also a form of energy, though with different wavelengths than BRMT – simply put, at different power levels and pulse rates) which directly injure the brain remotely, by penetrating the skull to a particular region or point in the brain or central nervous system, and delivering and/or suppressing the biological compounds in the brain used to maintain function, and to think and/or act, effectively unnaturally manipulating toxic effects in the brain and central nervous system. This is the same type of act as a hijacker would take to assume command of a car, airplane, or ship -  but without the conscious awareness of the person being hijacked, as they cannot detect this activity, it seems entirely natural to the victim. (A brief reminder to the skeptic – northwest Wyoming's thermal geysers, mud pots, and boiling springs were dismissed from around 1807 until the 1850s as the fantasies of a drunken and delusional man and of those who followed him. After the invention of photography in 1839, an official expedition was sent to the region in 1871, including both a photographer and the artist Thomas Moran. The following year, this near fifty year fantasy yarn of a drunken, delusional man became the world's first national park, now visited by about 3.5 million people each year.)

**Prohibited BRMT Bioweapon and Bioweapon Delivery System Operates Like Other Remote Offensive Weapon Systems**

15.  BRMT, the computer to brain bioweapon operates in precisely the opposite manner as these medical devices. Rather than assisting the person to perform some operation or create more favorable brain or body function (such as ALS tremor and other symptom suppression), the prohibited BRMT bioweapon hijacks the victim's brain for the BRMT operator's remote command and control, prohibited under 18 USC § 175(a) to produce 18 USC § 175(b) detrimental and toxic levels of biological compounds. The prohibited BRMT bioweapon uses its prohibited remote bioweapon to deliver precisely addressed energy (similar to an x-ray or radio wave which is also a form of energy, though with different wavelengths than BRMT – simply put, at different power levels and pulse rates) which directly injure the brain remotely, by penetrating the skull to a particular region or point in the brain or central nervous system, and delivering and/or suppressing the biological compounds in the brain used to maintain function, and to think and/or act, effectively unnaturally manipulating toxic effects in the brain and central nervous system. This is the same type of act as a hijacker would take to assume command of a car, airplane, or ship -  but without the conscious awareness of the person being hijacked, as they cannot detect this activity, it seems entirely natural to the victim. (A brief reminder to the skeptic – northwest Wyoming's thermal geysers, mud pots, and boiling springs were dismissed from around 1807 until the 1850s as the fantasies of a drunken and delusional man and of those who followed him. After the invention of photography in 1839, an official expedition was sent to the region in 1871, including both a photographer and the artist Thomas Moran. The following year, this near fifty year fantasy yarn of a drunken, delusional man became the world's first national park, now visited by about 3.5 million people each year.)

(such as space-based digital signaling platforms used for other military purposes such as encrypted communications, precision location, and routine navigation), the prohibited BRMT bioweapon is operated remotely from a secured location just like any armed drone aircraft since around 2005, and as many other modern weapons systems and surveillance systems operate daily. Precision location technology and speed of light transmission rates are used so no direct contact between the supercomputer-based BRMT weapon, the BRMT bioweapon delivery system (using a space-based platform and locally corrected signal) is required. No implant is needed as the precision focused energy commands a specific sequence of biochemical actions in the brain. No notice, no device, no consent is required due to this illegal act being performed behind the "state secret" curtain under the same tacit permission structure used for all forms of illegal acts against victims. And the victim is completely unaware of prohibited BRMT commands as they enter through the skull totally unnoticed into the brain. Just like Covid sneaks through your airway to infect the lungs – BRMT wreaks its form of havoc and mayhem on the unsuspecting victim. In summary, the prohibited BRMT weapon's computer generated signals (which are focused energy like an x-ray, ultrasound, or radio wave) penetrate the skull, hack the brain's natural biochemistry at very specific locations in very precisely times sequences, and directly energize neurons (brain and nerve) cells to orchestrate any conscious or unconscious human action, such as moving limbs, altering body rhythms, changing mood, thought, speech, or action (such as falling asleep or becoming hypervigilant), inducing mental illness, and all manner of other havoc through the brain and central nervous system.

19.  Since a single supercomputer installation can easily manage three quadrillion (3 million billion) calculations per second, a single instance of the prohibited BRMT bioweapon can send literally billions of digital commands per second, carefully timing these sequences of

hijacking commands with extraordinary precision, and potentially commanding multiple victims simultaneously just like an old-fashioned marionette show (or a bunch of malign Muppets). This careful timing and sequencing activate various brain addresses as necessary to achieve the desired hijacked result. The hijacked BRMT victim is completely unaware of these external signals which command the thought or action. This hijacking is experienced by the victim as the completely normal brain function it appears to be. Simply put, everything about these thoughts, actions, and body functions seems quite normal - except that they did not originate inside the brain of the victim, they were commanded from the outside by a remote operator.

20. Once a brain or central nervous system pattern is identified, and the command sequence to command that pattern is tested to confirm repeatability and reliability to generate a particular precise result in the hijacked victim, BRMT system artificial intelligence can take over and perform further prohibited medical experiments on the victim – testing, mapping and refining myriad tiny variations of that original command sequence to gradually learn to orchestrate other targeted acts. Over time, the command signal sequences needed to hijack and command nearly any thought and/or action desired by the BRMT operator, can be accumulated by the supercomputer's memory into a catalog of commands. The operator then simply has to organize these commands to achieve the desired results – be they benign or deadly. Just like the high-level command you use to manage the apps and functions on a smartphone.

21. The BRMT bioweapon operator (i) uses a computer control device to issue human understandable command sequences to the supercomputer, which (ii) translates them to machine understandable language, for (iii) transmission through the BRMT bioweapon delivery system, using common remote communications capabilities to (iv) communicate with a remote device,

which then (v) aims and physically delivers a precise command sequence to a precise location, to (vi) cause and create a particular biochemical reaction – thought, movement, etc., in the victim's brain .Location accuracy is typically enhanced by a location error correction device near the BRMT victim - a cell phone tower works for this ground-based enhancement as its location is very precisely known.

22.  Through this entire process, the BRMT operator interacts with the prohibited BRMT bioweapon and delivery system just like an Air Force or CIA drone operator sitting at a computer console in the United States. That drone operator uses live imaging, digital mapping resources, and/or field derived intelligence to seek out and identify the desired target, then fire a Hellfire missile into the rear window of the target's SUV through the billowing cloud of dust on a dirt road in Afghanistan, or anywhere else on earth. The operator chooses when to push the button, the technology delivers the weapon precisely on target.

23.  Since it is a globally prohibited weapon operated in secret and against US persons, among others, the prohibited BRMT bioweapon and bioweapon delivery system has long been, and is today an obviously illegal clear and present danger to its unwitting victims. BRMT operators can freely act on the victim's brain to directly alter human breathing patterns, heart rate, and other basic bodily functions – accelerating them or halting them entirely. BRMT operators can alter a person's state of consciousness directly and switch it off or on at any time for any length of time, inducing sleep, a lethal fall, or a motor vehicle crash. BRMT operators can alter moods and thought patterns. For good or ill effect, and the victim is none the wiser for being hijacked. The BRMT operator only needs to impact the brain and central nervous system in particular, the body already takes care of everything else anyway, so the victim is not a total

robot, "only" a hijacked person under the command and control of another. Kidnapped for all intents and purposes, for the use of another person, without even knowing it is happening.

24.  The prohibited BRMT bioweapon and bioweapon delivery system is used as an offensive weapon against the Lead Plaintiff and others to, for example, halt (victim consciousness), trip (victim's feet down the stairs), distract (victim injures themselves or can be struck by a vehicle), and harm (drive while asleep over a 100 foot sea cliff. Each of these experiences have been and continue to be the result of direct BRMT intervention against the Lead Plaintiff, though he did avoid, albeit barely, the double homicide attempt to induce an unplanned (at least by the Lead Plaintiff) sea cliff descent of 100 feet or more on a narrow British Columbia, Canada highway with no guardrail at 50 or 60 miles per hour in the early 1980s. See Complaint Subordinate Count L-1 at page 276 therein.

25.  Defendants have and do engage, direct, and act both individually and as an association-in-fact enterprise to (a) conspire and secretly force and perpetuate victims' on-going involuntary servitude and forced labor; (b) destroy victims' marriages and families; (c) induce fraudulent and exploitive personal relationships; (d) destroy businesses, and business and personal finances; (e) engage in continuing conspiracies to enmesh victims in legal entanglements and Defendants' criminal "investigations" for the purpose of endangering and entrapping direct victims including the Plaintiffs; and (f) to use Plaintiffs as a conduit to gather and analyze intelligence, in otherwise illegal operations. These and other criminal and civil violations of the rights of victims, including Plaintiffs, have and may continue throughout the victims lifetime, as they have and continue in the case of the Lead Plaintiff.

26.  These malign acts of Defendants include (a) attempted lethal "accidents," assassination and endangerment efforts; (b) attempted mass casualty events; (c) trafficking of victims to police jurisdictions known for their pattern of civil rights violations, corruption, and abuse of lethal force; (d) efforts to entrap and incarcerate, including sustained efforts to cause victims such as Plaintiffs to act out violently so Plaintiffs can be arrested and incarcerated; (e) abusing Plaintiffs' brain biochemistry with BRMT to create anxiety, panic, torturous physical and mental abuse patterns, and mental illness; (f) inducing physical illness through food and other poisonings and deprivation of needed vaccines and medications; and (g) endangering Plaintiffs by discrediting and destroying the victims' reputations, leading at times to vigilante acts against the Plaintiffs by others.

**F.  Plaintiffs' Prima Facie Case**

27.  These three basic claims – illegal deployment and use of BRMT against US persons; a broad array of racketeering acts to sustain involuntary servitude, forced labor and human trafficking; and on-going threats to life and liberty requiring Court action - are the fundamental bases of the Plaintiffs' prima facie case presented in this Complaint. There are 43 Principal Counts of violations and injuries incorporating numerous chapters of Title 18 and Title 42 Chapter 21 Civil Rights of the United States Code. Each Principal (triable) Count is supported by one to ninety-two Subordinate Counts (subcounts), each of those incorporating from one to thousands of predicate acts, each of which is dipositive and individually representative of myriad other such violations across five decades against the Lead Plaintiff alone. Direct evidence, including 10,000 pages documenting predicate acts and direct acts filed by Lead Plaintiff herewith, will be further supported by millions of pages of additional evidence on

discovery. The total number of such acts and violations against all Plaintiffs across five decades is currently unknown.

28.  The fourth fundamental issue requiring this Court to urgently address the three claims above is an unyielding truth about the historical pattern of unequal administration of justice in these United States:

> Defendant United States has never, in the entire history of the United States of America, acted criminally against collective and wide-spread abuse of police powers by its own federal departments and agencies. As a result Defendant United States has developed a tacit permission structure in its police powers operations by systematically abusing the principles of "state secrets" and "national security" to engage in a long series of programmatic abuses and cover-ups of its own violations of the Constitution, of ratified international treaties, and of the laws of the United States of America, against a wide variety of individuals, groups, and sovereign bodies, both within and outside the United States of America.

29. The prohibited BRMT bioweapon and bioweapon delivery system (prohibited by 18 USC § 175 et al at paragraph 19, page 62 above) has been used by Defendant United States against Plaintiffs for approximately five decades. This is more than three times longer than Defendant FBI's infamous Cointelpro (15 years) organized nationwide program of felonies against Constitutional and civil rights; and more than two times longer than Defendant CIA's MKUltra (20 years) criminal LSD distribution and surreptitious dosing program were actively pursued by Defendant United States, likely as America's largest single illegal drug dealer of that time. Both those programs required physical interactions with the victims. Both programs

involved tens of thousands to hundreds of thousands of specific felony violations of USC Title 18. BRMT does not require direct interaction with any victim, including any member of the class of injured Plaintiffs, so deployment, acts of abuse, and violations are vastly simpler. The supercomputer systems used in BRMT deployment perform three quadrillion operations per second (3,000,000,000,000) to deliver billions of BRMT biochemical brain hijacking instruction sequences each second. The scope of BRMT violations against the Plaintiffs vastly exceeds, likely by hundreds of thousands to billions of felonious events, the combined violations of Cointelpro and MKUltra.

30. Lead Plaintiff's historical and current experience and the sampling of evidence herein document Defendants' continuing pattern of criminal and civil violations of rights which involve illegal biomedical hijacking (BRMT), various financial and other frauds, asset stripping, destruction of relationships and inducement of fraudulent relationships, deprivation of benefits, and other abuses intended by Defendant United States and its co-conspirators to sustain victims' penury, mental instability, and to cover up and perpetuate the "state secret" BRMT program against the People, the very US persons which Defendants with intelligence and police powers are sworn to protect. These offenses and violations as elements of the "state secrets" pattern of operation of the prohibited BRMT bioweapon program commenced in the early 1970s and continue as this Complaint is written.

31. Time is of the essence as Defendants' efforts to suppress evidence, tamper with witnesses and evidence, and to retaliate against and intimidate, and even to eliminate witnesses, are on-going. For example, evidence has already been destroyed by acts of Defendants against the Lead Plaintiff's current personal computer, and suppressed, including an old hard drive filled

with evidence dating to the 1990s and recovered but no longer in his possession, and paper files

dating from the early 2000s evidencing prior acts of Defendants which was disposed of on

BRMT command in 2018. Other documents may have already been destroyed by Defendants,

continuing their past pattern of practice in other programs, such as MKUltra, to evade and

obstruct justice, and to evade accountability. There is also direct documentary evidence

presented herein that such obstructive actions (see Interline Exhibits 12 and 14, pages 120, 126-

128) may have already been undertaken within at least one Defendant's police powers

organization, Defendant City of New York Police Department (NYPD) during the 12 days

between the initial denial of the Lead Plaintiff's Freedom of Information Law request on

September 7, 2021, which acknowledged information and denied access; and a subsequent

Appeal Denial Letter on September 19, 2021, which stated no information could be located after

a diligent search. Defendant FBI promptly followed that action with their own "liar letter" to the

Lead Plaintiff on September 30, 2021. See Interline Exhibit 13, pages 121-124 herein.

32.  Defendant United States has a similarly dismal record of compliance with laws

regarding retention of evidence which may inculpate its departments and agencies. Criminal

destruction of evidence collected by Defendant CIA in MKUltra from 1953 to 1973 was never

prosecuted. That CIA Director was promoted to Ambassador. Defendant DOJ failed to prosecute

Defendant FBI, one of its own police powers agencies, for systemic abuses including FBI's

funding and directing a violent White supremacist militia. FBI Director Hoover and other sworn

agency personnel directed, ordered, and committed an extensive nationwide pattern of felonies in

Cointelpro between 1956 and 1971. An honor-filled retirement and speaking fees were the

Director's reward for loyal service in pursuit of White Supremacy, and of systemic and at times

violent violations of the Constitutional, civil, and human rights of US citizens. These are just two

examples of known long-running systemic criminal abuse and prejudicial self-exculpation by obstruction of justice by Defendant United States against US citizens, as documented by Congress.

**Defendant United States is a Serial Offender of Laws and Ratified Treaties Which Are Law**

33.  The Court must not lose sight of this critical fact - Defendants' physical and virtual violations of individual liberty and rights frequently incorporate simultaneous BRMT hijacking of human free will and autonomy, and creation of a psychologically coercive environment. Using basically unlimited budgets, the Defendants, such as Defendant United States and Defendant NYPD, conduct BRMT hijackings in public places, developing scenarios specifically intended to create oppressive physical and psychological impacts for the targeted victim(s) in that moment. These stage-managed scenarios, including their carefully managed settings and sequences of physical and psychological circumstances and BRMT bioweapon brain hijacking, can overwhelm the ability of the individual BRMT hijacking victim to choose for themselves a wise and reasonable course of action in the moment.

34.  Lead Plaintiff has experienced these provocations many times over the past twenty years in public places in the state of Washington, in Boston, Massachusetts, in New Jersey, Pennsylvania, California, Arizona, and in New York state and New York City, among many others. Lead Plaintiff has also voiced BRMT-driven intents and potential actions which he ethically opposes in practice, strenuously avoids, and has never undertaken. The clear and obvious goal of the perpetrators, these Defendants, was and is to cause the victim, any one of the class of Plaintiffs, to act out in public in a violent, incriminatory, or self-destructive way in reaction to a visible provocation and/or BRMT bioweapon driven brain hijacking.

35.   Through this creation of artificial physical, psychological, and BRMT driven virtual

circumstances, Defendants seek to turn the actual victim of the BRMT hijacking at that moment

into the active perpetrator of a violent or fraudulent act against themselves or others, perhaps an

innocent third party such as passerby, or a target specifically selected by Defendants, or even the

hijacked individual themselves as the victim of what is seemingly their own act, the act of a third

party, or a deadly police powers act justified by what those officers or agents perceive to be a

threat to themselves or others in that moment. Local police powers operators may harm, or arrest

and detain, the supposed perpetrator who acted physically or fraudulently, but involuntarily,

against the apparent victim. Independent witnesses then verify this violent or fraudulent act by

the hijacked BRMT victim in court.

36.   The true perpetrator, the BRMT bioweapon hijacker acting remotely, is nowhere to

be found – perhaps thousands of miles away, just like the drone pilot in a missile strike in

Afghanistan or Iraq. No trace of the remote BRMT bioweapon hijacking remains in the victim's

brain or at the crime scene. The waveforms used to hijack the actual BRMT victim's brain and

central nervous system, which can completely control the thought, voice, and action of the

moment, simply disappear, their energy transformed into the brain biochemical reaction which

generates that thought, act, or motion - just as radio waves are translated into sound and vanish

once received. Thus, the BRMT remote operator's contrived bioweapon commands fraud, injury,

or death, delivered through a hijacked victim, against themselves or any third party, leaving not a

single public trace. The perfect crime, never to be solved.

37.   The scope of these Defendants' criminal and civil violations include systemic abuse

under color of law by police powers operations, failure to protect, negligent supervision, and

continuing violations of Constitutional, civil, and human rights which are allegedly guaranteed to Plaintiffs by and under the United States Constitution, ratified international treaties, and laws.

38. Defendants' offenses against US persons and other innocents are extraordinarily grave, and particularly so when the Defendants' crimes are committed through BRMT managed Plaintiffs against the Plaintiff themselves or a third party. Defendant United States is fully capable of and has deployed the full BRMT toolset, including remote bioweapon hijacking, and ordinary criminal techniques, under color of law for the systematic, though not as yet lethal, destruction of the Lead Plaintiff and doubtless others in this class of Plaintiffs.

39. Deployment of the formidable array of BRMT bioweapon and other police powers tools under color of law is not based upon due process, upon rights, or upon law, any more than the selection of MKUltra or Cointelpro victims has been in the past. It is based upon arbitrary bureaucratic whim and operates unchecked outside the rule of law - but within the sphere of "state secrets" in a malicious manner never intended by our Founders or the Courts.

40. Simply put, Plaintiffs exist under this individual and collective peril which destroys free will and imperils the very definition of freedom itself because of the actions of Defendant United States and its co-conspirators. Virtually none of the Plaintiffs who are part of this class have ever known or have any reason to currently know of their victimization by BRMT brain hijacking at the hands of the Defendant United States and its co-conspirators. Numerous Plaintiffs may not comprehend the underlying technology, methods, and purposes for which they were and are manipulated by Defendants in ways which usurp and directly contravene protections of individual rights allegedly guaranteed by our Constitution and laws. Lead Plaintiff's experiences documented and described herein provide only a modest sampling of predicate acts over about one third of the BRMT program's life. While representative, they do

not fully incorporate the broad array of BRMT biomedical abuses and violations undertaken by Defendant United States against this class of Plaintiffs across time, space, and international boundaries.

**Defendants' Own Actions Defeat State Secrets and Qualified Immunity Defenses**

41.  Defendant United States is not entitled, nor are other Defendants entitled to, any valid assertion of "state secrets" protection, nor to "qualified immunity," as all these injuries and offenses were undertaken by these Defendants in their ordinary, daily, and self-proclaimed scope of agency, despite their sophisticated legal institutional knowledge that these institutionally tacitly permitted patterns of practice have been and are well outside their Constitutional and legal scopes of authority. The utter invalidity of any asserted "Government privilege against court-ordered disclosure of state and military secrets," is obvious from the language in *Totten v. United States, 92 U. S. 105, 107* (1876) at

> "Footnote 4*) 5 U.S.C. 22*: "The head of each department is authorized to prescribe regulations, **not inconsistent with law**, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it." Air Force Regulation No. 62-7 (5) {b) provides: "Reports of boards of officers, special accident reports, or extracts therefrom will not be furnished or made available to persons outside the authorized chain of command without the specific approval of the Secretary of the Air Force."

42.  The BRMT bioweapon and bioweapon delivery system violates (i) 18 USC § 175 (prohibited bioweapons and bioweapon delivery system), (ii) 18 USC § 178(2) (creates a toxin in humans, see paragraph 20, pages 30-31), (iii) 18 USC § 1385 (posse comitatus) as it is deployed

directly against US persons using military assets and personnel in the operation of technology

components of the BRMT bioweapon delivery system, (iv) is a prima facie violation of the

*Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, and (v) violates

*Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*,

as it has been and is used in violation of 18 USC § 2340 (torture), and (vi) has been used in

violation of 18 USC § 2331 (terrorism, see Complaint paragraphs 375-378 at pages 252-256 filed

herewith).

   43.  The profound hypocrisy and unquestionable legal invalidity of any assertion of "state

secrets" privilege under *Totten v. US 92 US 105, 107* (1876) is obvious based upon Defendant

United States' comprehensive and systematic suite of violations - for fifty years  - of all these

aforementioned US laws and ratified international treaties having force of law under our

Constitution. Defendant United States promulgated, negotiated, proclaimed to all nations and

peoples of the earth in a three capitals global signing ceremony, and duly ratified in 1972, the

*Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction*, as it simultaneously

engaged in, and as it continues to engage in, a duplicitous campaign to develop, deploy, and

operate the very form of bioweapon and bioweapon delivery system which it and other nations

explicitly agreed to prohibit by this treaty, and has and does use this prohibited bioweapon and

bioweapon delivery system against its own people, and others.

   43A.  The technologies used in the prohibited BRMT bioweapon delivery system are

classified and are commonly used in military and intelligence operations for other purposes.

There is no need for their detailed technical specifications nor alternative and legally permissible

operational purposes or uses to be disclosed. Slightly less sophisticated versions of each and every technological element of the BRMT bioweapon system – including its supercomputers, software, artificial intelligence, precision location, satellite communication; as well as neurology, biology, and medicine - are used daily in common, peaceful commercial operations from shipping to farming to medical devices, and for entertainment and information access purposes by children around the world, among others. And analogous lethal weapons systems which use these same technologies are currently in use in offensive operations by the CIA and military to operate drones, fire missiles, and effect other lethal consequences to targets very frequently under the world-wide authority of the 2001 authorization for the use of military force of September 16, 2001.

44.  "Qualified immunity" is a valid affirmative defense only if articulated by government officials and employees, including officers, agents, and other employees in good faith acts. In *Harlow v. Fitzgerald, 457 U.S. 800* (1982), the Supreme Court clearly articulated the standard which Defendants must meet to validly claim "qualified immunity" at IV B:

> Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo,* 446 U. S. 635 (1980). [Footnote 24] Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland, 420 U. S. 308, 420 U. S. 322* (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically, the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be

defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury. . . ."

44A.  Defendants knew, should have known, and could reasonably be expected to know that they and other participants were injuring, abusing, and violating the rights of plaintiffs under color of law, and/or with malicious intent, yet entered, agreed, participated in, and continued to participate, together with other Defendants, in one or more 18 USC § 1962(b) and/or 18 USC § 1962(c) associated-in-fact enterprises, engaged in conspiracy or conspiracies under 18 USC § 1962(d) in, with, and among one or more associated-in-fact enterprises, and participated in those enterprises' broad patterns of racketeering acts and civil rights violations, as documented in the 2,599 specific example violations incorporated in the 92 Subordinate Counts and 43 Principal Counts in the Complaint, and, subject to discovery, likely engaged in numerous additional acts, violations, and injuries through their active participation in these acts and/or their explicit and knowledgeable failures to protect, all under color of law.

44B. These acts were knowingly planned, conspired, and conducted by these persons and entities using knowledge developed through their color of law abuses of their official positions, and/or their access to confidential information, and/or their willful failure to reasonably consider the actual good faith patterns of conduct of the plaintiffs, and/or in willful disregard of rights and of the law in which they are particularly trained and experienced, and which any reasonable person would expect these Defendants to recognize and comprehend their purposeful and wrongful acts, thereby voiding any claim to be acting in accordance with the standards of conduct and/or state of mind required to make good faith invocation(s) of qualified immunity.

Rather, these Defendant persons and entities acted as if they were exempt from and above the law in their direct management and/or operational participation in and/or support of Defendants' long-running associated-in-fact enterprise(s), and/or in the repetitive patterns of long-cycle and short-cycle racketeering acts, injuries, and destruction by those associated-in-fact enterprises on plaintiffs, including without limitation all qualifying acts, injuries, and violations cited under 18 USC § 1961 herein.

45. These same Defendants further engaged in and/or engaged other participants in their conspiracies, acts, violations, and injuries of rights in violation of 42 USC §§ 1981 equal rights, and/or 1981(a) intentional discrimination in employment, and 1982 property rights, and 1985 conspiracy, and 1986 failure to prevent, and 1994 peonage. All these acts were and are willful and knowing acts, violations, and injuries, undertaken with malicious intent to deliberately violate, harm, injure, and exploit these plaintiffs to benefit their associated-in-fact enterprises and to personally benefit themselves and their close associates, relatives, and friends from these injuries. The acts and injuries by these Defendant are not entitled to the protections of qualified immunity as they were and are untaken as willful violations of rights and law and were and are undertaken with malicious intent to injure these plaintiffs.

46. This BRMT bioweapon and bioweapon delivery system explicitly violates 18 USC § 175(a): **"Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."**

46A. As defined at 18 USC § 178(2), **"toxin means the toxic material or product of ….
animals….a recombinant or synthesized molecule, whatever their origin and method of
production, and includes – any….biological product that may be engineered as a result of
biotechnology produced by a living organism; or… any…biological product…"** The BRMT
bioweapon is intended, designed, and operates to produce excessive or deficient quantities of
endogenous (naturally occurring) biologically based chemicals, such as dopamine
(neurotransmitter), nitric oxide (circulatory effects), and glutamate (neurotransmitter). The
presence or absence of these biological compounds are toxic through their out-of-natural balance
effects which produce a wide variety of symptoms such as halted breathing, disrupted
consciousness, heart attack, depression, suicide ideations, involuntary body movement (pull a
trigger when not naturally intended by the victim),  mental illnesses of varying degree, and deep
sleep (while operating a vehicle or equipment), among other symptoms and illnesses. These
imbalances also have long-term disabling effects when induced in persistently excessive or
suppressed amounts, such as in Alzheimer's, ALS, intellectual disabilities, and other permanent
disabilities.

46B.  Only this Article III Court stands in the breach between Defendant United States
acting with its co-conspirator Defendants, and each and every individual citizen, group, or
religion which ,may be disfavored, injured, or even destroyed or killed, by these same
Defendants as they seek to protect:

    a.   their on-going pattern of racketeering acts, violating 18 USC § 1962,

    b.   their de jure "privilege" to systematically and durably violate the rights of others,
         violating 42 USC 1981,

c.   their "state secret" use of the prohibited BRMT bioweapon and bioweapon delivery system – violating 18 USC § 175,

d.   their torturous acts and patterns of acts violating 18 USC § 2331, terroristic predatory abuses of US persons violating 18 USC § 2340, and their intertwined pattern of such predatory abuses in Article 3 grave war crimes from September 18, 2001 to the present, violating 18 USC § 2441.

e.   Former Chief Judge Lambeth presided in *Horn v Lambeth 94-1756,* providing case law precedent for handling attempted classification evasion by Defendant United States. See his memorandum opinions of August 26, 2009 and September 4, 2009, filed herewith at LP Evidentiary Exhibits pages 10781-10799.

47. An explanation of the BRMT system is at LP Evidentiary Exhibits pages 1-10.
Explanatory background information on the technologies which underlie BRMT are found in the
LP Explanatory Exhibits pages 6645-6884. A more complete independent history, origins, and
evolution of the pattern of racketeering acts and violations described herein is in the Facts
section below, and in the Lead Plaintiff (known as "LP") LP Evidentiary Exhibits filed herewith
at pages 6885-7466 and compared therein to Lead Plaintiff's direct experience at pages 237-271.

**PARTIES**

### I.    Plaintiffs

48. Dennis Sheldon Brewer, Lead Plaintiff, is an involuntary subject who was
involuntarily enrolled as a minor into the BRMT program. The BRMT program, an
unimaginably intrusive program which directly contravenes the very purpose for which the
United States was created and which vision of freedom and liberty he believed, was totally
hidden from him for four decades as its direct victim, while Defendant United States developed
BRMT's capabilities by hijacking the Lead Plaintiff's brain and those of others for involuntarily
servitude to Defendant United States, perhaps to and including death of the victim. A personal
statement and comprehensive profile of the Lead Plaintiff is provided at LP Evidentiary Exhibits
pages 140-236. Brewer is a resident of Edgewater, New Jersey.

### Other Plaintiffs

49. As with its direct lineal predecessor program, MKUltra, there is an extremely high
probability BRMT has been used to abuse thousands of innocent US persons and others around
the world over the past fifty years. The class of Plaintiffs likely includes a broad class of the
general public who have been and/or are presently directly injured US persons and indirectly
injured by these Defendants. The basis of this class size estimate is described in the Class

Allegations motion. Plaintiffs and their rights have been injured in a wide variety of ways, or even incarcerated or killed, as a result of the actions of the Defendants and their co-conspirators.

50.  The Lead Plaintiff's direct knowledge of likely BRMT brain hijacking victims includes only a very small number of the Plaintiffs likely injured as a result of the actions of the Defendants and their co-conspirators. Plaintiff class members very likely include members of the Lead Plaintiff's own family of origin, his two former spouses and their children, members of his extended family, as well as friends, former girlfriends, and others not identifiable at this time. Since BRMT leaves no direct evidentiary traces for its victims or nearby witnesses, other forensic means will be required, including production of Defendant United States' computer and operator log records.

**II.    Defendants**

51.  This action is brought against government officials, named at paragraphs 52 through 81, in their official capacity only, and their successors and assigns. Federal Defendants below, which may include as yet unidentified departments and agencies, are known collectively as Defendant United States in this Complaint, since they operate in secret, never identifying themselves. Most other police powers Defendants operate in this fashion nearly all the time as well. Some non-governmental Defendants are known and specifically identified.

**Federal Defendants:**

52.  Mr. Christopher Wray is Director, Federal Bureau of Investigation, an agency of the Department of Justice, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds

and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

53.  Mr. William Burns is Director, Central Intelligence Agency headquartered in Vienna, VA with field offices in the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff.  Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

54.  Ms. Avril Haines is Director, Office of the Director of National Intelligence, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers, confidential informants, and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

55.  Dr. Stefanie Tompkins is Director, Defense Advanced Research Projects Agency headquartered in Arlington, VA with field offices and personnel throughout the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used personnel and contractors, private personal medical and other information illegally acquired without consent, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

56.  Ms. Kimberly Cheatle is Director, United States Secret Service, an agency of the Department of Homeland Security, headquartered in Washington, DC with field offices throughout the United States and personnel within and without the United States, a nexus for

substantial acts against Lead Plaintiff. Defendants used undercover and other agents, officers, confidential informants and contractors, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.Defendants used undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

57. Mr. Lloyd Austin is Secretary, Department of Defense, headquartered in Arlington, VA, with departments, agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

58. Mr. Frank Kendall III is Secretary, United States Air Force and United States Space Force, headquartered in Arlington, VA, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

59.  Ms. Christine Wormuth is Secretary, United States Army, headquartered in Arlington, VA, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

60.  Mr. Carlos Del Toro is Secretary, United States Navy, headquartered in Arlington, VA, with agencies, operations, and personnel throughout the United States and the world, a nexus for substantial acts against Lead Plaintiff. Defendants used uniformed military officers and personnel, facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

61.  Mr. Alejandro Mayorkas is Secretary, Department of Homeland Security, headquartered in Washington, DC with agencies and field offices throughout the United States and personnel within and without the United States, a nexus for substantial acts against Lead Plaintiff. Defendants used facilities, contractors, undercover and other agents, officers and confidential informants, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against, and in failing to protect, Lead Plaintiff both separately and jointly.

62.  Ms. Janet Yellen is Secretary, Department of the Treasury, headquartered in Washington, DC with agencies and field offices throughout the United States and personnel

within and without the United States, a nexus for substantial acts against Lead Plaintiff.

Defendants used facilities, contractors, undercover and other agents, officers and confidential

informants, wrongful investigations lacking cause under color of law, assets and myriad frauds

and violations of civil rights in acting against, threatening, and retaliating against, and in failing

to protect, Lead Plaintiff both separately and jointly.

63.  Mr. Merrick Garland is Attorney General of the United States, manages the U.S.

Department of Justice, headquartered in Washington, DC, with agencies, operations, and

personnel throughout the United States and the world, a nexus for substantial acts against Lead

Plaintiff. Defendants used personnel, facilities, contractors, undercover and other agents, officers

and confidential informants, wrongful investigations lacking cause under color of law, assets and

myriad frauds and violations of civil rights in acting against, threatening, and retaliating against,

and in failing to protect, Lead Plaintiff both separately and jointly.

64.  Mr. Louis DeJoy is Postmaster General, United States Postal Service, headquartered

in Washington, DC with agencies, operations, and personnel throughout the United States, a

nexus for substantial acts against Lead Plaintiff. Defendants used personnel, facilities,

contractors, undercover and other agents, officers and confidential informants, wrongful

investigations lacking cause under color of law, assets and myriad frauds and violations of civil

rights in acting against, threatening, and retaliating against, and in failing to protect, Lead

Plaintiff both separately and jointly.

65.  John Doe defendants include public and private entities, groups, associations, and

individual persons. Unknown public entities include a variety of governments, their departments,

agencies, and special purpose entities in various states and in other nations.

**Known State and Local Defendants:**

66. City of New York, Attention: Georgia Pestana, Corporation Counsel, New York City Law Department, New York, a political subdivision of the State of New York, a nexus for substantial acts against Lead Plaintiff. Defendants used municipal assets and property, undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

67.  City of New York Police Department, Attention: Ernest F. Hart, Deputy Commissioner for Legal Matters, PALS Unit, One Police Plaza, New York, New York, a Department of the City of New York, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

68.  Colonel Patrick J. Callahan, State Police, State of New Jersey, West Trenton, NJ, a department of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used officers, wrongful investigations lacking cause under color of law, assets and myriad frauds in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

69.  Superintendent Kevin P. Bruen, State Police, State of New York, Albany NY, a department of the State of New York, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under

color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

70.  Mr. Rick Cotton, Executive Director, Port Authority of New York and New Jersey, an interstate agency of the State of New York and the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

71.  Mr. John Bilich, Chief of Security, Port Authority of New York and New Jersey Police Department, New York, NY, an agency of the Port Authority of New York and New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

72.  Mr. John Gay, Inspector General, Port Authority of New York and New Jersey Police Department, an agency of the Port Authority of New York and New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

73.  Bergen County Sheriff's Department, Attention: Sheriff Anthony Cureton, Hackensack, NJ, an agency of the County of Bergen, a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

74.  County of Bergen, Attention: Mr. James Tedesco, County Executive, Hackensack, New Jersey,  a political subdivision of the State of New Jersey, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

75. County of Maricopa County, Arizona, Attention: Maricopa County Attorney, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

76.  Maricopa County Sheriff's Department, Attention: Sheriff Paul Penzone, Phoenix, AZ, a department of the County of Maricopa, a political subdivision of the State of Arizona, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

77.  Ms. Amanda L. Ray, Commissioner, California Highway Patrol, Sacramento, CA, a department of the State of California, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

78.  Mr. Steven C. McCraw, Director, Texas Department of Public Safety, Austin, TX, a department of the State of Texas, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

79.  Colonel Kedrick Wills, Idaho State Police, Meridian, Idaho, a department of the State of Idaho, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

80.  Commissioner Jess Anderson, Utah Department of Public Safety, Salt Lake City, Utah, a department of the State of Utah, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

81.  Commissioner Mark Glass, Florida Department of Law Enforcement, Tallahassee, FL, a department of the State of Florida, a nexus for substantial acts against Lead Plaintiff. Defendants used undercover and other officers, wrongful investigations lacking cause under

color of law, assets and myriad frauds and violations of civil rights in acting against, threatening, and retaliating against Lead Plaintiff both separately and jointly.

**Known Private Defendants:**

82. Match Group, including all entities listed as Defendants above, headquartered in Dallas, TX hosts a series of dating websites used by Lead Plaintiff and abused by Defendants in violation of civil rights.

83. Bumble, Inc. headquartered in Austin, TX hosts a dating website used by Lead Plaintiff and abused by Defendants in violation of civil rights.

84. Walmart Inc., its subsidiaries, including Wal-Mart (China) Investment Co., Ltd., Bentonville, AR headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

85. Costco Wholesale Corporation headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

86. The Kroger Company, Blue Vine, OH offices, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

87. PPG Industries Inc. headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

88. Establish Inc. trafficked and employed Lead Plaintiff in New Jersey, and on false projects at Defendants PPG Industries Inc., Pittsburgh, PA, and Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA.

89. Dominick & Dickerman LLC New York City offices, personnel, and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

90.  Technology Sales Leads, Inc., Boston, MA headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

91.  WeFunder, including all entities listed as Defendants above, personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

92.  Blackpool Group, Inc. personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

93.  The Shefford Group, Inc. personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

94.  Shefford & Associates, LLC  personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

95.  Shefford Capital Partners, LLC personnel and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

96.  Loeb & Loeb, LLP headquarters, personnel, and email  were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

97.  Engleman Associates, Inc., formerly known aa SoftSelect Systems, headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff, and as part of a plan to entrap Lead Plaintiff for providing services in Iran,  a country subject to an embargo by Defendant United States at the time.

98.  Chardan CM Investments LLC headquarters, personnel, and email were used by Defendants as part of a series of interstate financing and contract frauds against Lead Plaintiff.

99. EarlyBirdCapital, Inc. headquarters, personnel, and email were used by Defendants as part of a series of interstate sales and contract frauds against Lead Plaintiff.

100. Arlon Group LLC provided email and telephone services for false personation by Mr. Daniel Weiner, Partner, Hughes Hubbard & Reed LLP as an Associate of Arlon Group LLC as part of a series of interstate financing and contract frauds against Lead Plaintiff.

101. Hughes Hubbard & Reed LLP deliberately mispersonated an employee of Arlon Group LLC as an Associate using email and telephone as part of a series of interstate financing and contract frauds against Lead Plaintiff.

102. Bay State Milling Co. is a corporation with offices in Boston, MA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

103. Briggs & Stratton Corporation is a corporation with offices in WI. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

104. Badger Meter, Inc. is a corporation with offices in WI. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

105. Raynor Mfg. Co. is a corporation with offices in IL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings,

actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

106. First Alert Holdings, Inc is a corporation with offices in IL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

107. Borg-Warner Corporation is a corporation with a manufacturing plant and offices in Muncie, IL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

108. Adtran, Inc. is a corporation with offices in Huntsville, AL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

109. Adtran Holdings, Inc. is a corporation with offices in Huntsville, AL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

110. Western Digital Corporation is a corporation with offices in CA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

111. Bio-Lab, Inc. is a corporation with offices in Lawrenceville, GA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

112. Brightstar Corp. is a corporation with offices in FL. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

113. Rockwell Collins, Inc. (2650152) is a corporation with offices in IA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

114. Rockwell Collins, Inc. (3359922) is a corporation with offices in IA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

115. Rocketdyne, Inc. is a corporation with offices and a manufacturing plant in Folsom, CA. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

116. Steel and Pipe Supply Company, Inc. is a corporation with offices in Manhattan, KS. Its offices and email addresses were used to present and conduct sales and marketing frauds

and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

117. Samsonite Corporation is a corporation with offices in Denver, CO. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

118. The Holland Group, Inc. (2225471) is a corporation with offices in Holland, MI. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

119. The Holland Group, Inc. (2404845) is a corporation with offices in Holland, MI. Its offices and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, requiring interstate travel and expense, and to interfere in interstate commerce.

120. Raymond F. Sullivan, LLC, Attorney, was introduced by Charles Jackson, allegedly a now deceased alumni of Defendant CIA, and, as a former investigator for Defendant Department of Homeland Security Customs and Border Protection, used email, phone, and in=person meetings to functionally provided intelligence to Defendant United States on interstate commercial activities and on personal information provided by Lead Plaintiff as an involuntary subject of the BRMT program operated by this Defendant at all times throughout.

121. ABT Trading Inc. is a corporation with offices in FL. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts,

including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

122. AGI Partners LLC is an LLC with offices in NY. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including meetings, actions, and correspondence, to interfere in interstate commerce.

123. Acme Markets, Inc. 1013755 is a corporation with a retail location in Edgewater, NJ. Its retail location was used to supply spoiled refrigerated foods to Lead Plaintiff from suppliers in various states, including spoiled milk, spoiled produce, and spoiled prepared meat products.

124. Acme Markets, Inc. 2112922 is a corporation with a retail location in Edgewater, NJ. Its retail location was used to supply spoiled refrigerated foods to Lead Plaintiff from suppliers in various states, including spoiled milk, spoiled produce, and spoiled prepared meat products.

125. Assure Group International, LLC is a corporation with offices in MD. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

126. Axial Networks, Inc. is a corporation with offices in NY. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including in-person meetings, wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

127. Banco Advisors, LLC is an LLC with offices in AZ. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts,

including wireline meetings, actions, and email correspondence, interstate travel and expenses, to interfere in interstate commerce.

128. Cornhusker Capital is a corporation with offices in NE. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

129. Crossroads Financial LLC is an LLC with offices in FL. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

130. DC International LLC is an LLC domiciled in WY. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

131. Fractal Advisors LLC is an LLC with offices in KS. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

132. Bibby Financial Services, Inc. is a corporation with offices in GA. Its offices, officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense, to interfere in interstate commerce.

133. Consumerbase LLC dba Exact Data is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

134. Insight Network Spain is a corporation with offices in NY. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including in-person meetings, wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

135. Madison Street Capital Advisors, LLC is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

136. New America Lending, LLC  is an LLC with offices in IL. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

137. Richard A. Miller Consulting, LLC is an LLC with offices in PA. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

138. Foshan Shunde XinJianHan Trading Co, Ltd is a corporation whose principal officer is a resident of New York.. Its officers, personnel, and email addresses were used to present and

conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate meetings and travel, to interfere in interstate commerce.

139. Sallyport Commercial Finance, LLC is an LLC with offices and/or personnel doing business in CA. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

140. Louis Skaar & Sons, Inc. is a corporation with offices and production facilities in ID. Its members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

141. Skaar Brothers, LLC is an LLC with offices and production facilities in ID. Its facilities, members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

142. Skaar Brothers Farms, LLC is an LLC with offices and production facilities in ID. Its facilities, members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

143. Sole Source Capital LLC is an LLC with offices in CA. Its facilities, members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense to interfere in interstate commerce.

144. Adamson Brothers LLC is an LLC with offices in NJ and FL. Its facilities, members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense to interfere in interstate commerce.

145. Adamson Brothers, LLC is an LLC with offices in NJ and FL. Its facilities, members, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, interstate travel and expense to interfere in interstate commerce.

146. Adamson Brothers Corp is a corporation with offices in NJ and FL. Its offciers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

147. Adamson Brothers Inc. is a corporation with offices in NJ and FL. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

148. Adamson Brothers, Inc. is a corporation with offices in NJ and FL. Its officers, personnel, and email addresses were used to present and conduct sales and marketing frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

149. Adamson Brothers Financial Corp is a corporation with offices in NJ and FL. Its officers, personnel, and email addresses were used to present and conduct sales and marketing

frauds and other acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

150. Ranch Creek Partners LLC is an LLC with offices in WA. Its managing member, personnel, and email addresses were used to fraudulently misrepresent itself as an interested investor and engage in other fraudulent acts, including wireline meetings, actions, and email correspondence, to interfere in interstate commerce.

**Known Personal Defendants:**

151.  Mr. Joseph Arpaio, both as Sheriff of Maricopa County, AZ and as an individual, acted individually and in conspiracy with others, impersonated a fresh produce industry consultant, Greg Crossgrove, and used email, phone and in-person meetings, and organized a team of false employees for Lead Plaintiff's companies engaged in interstate commercialization of organic produce, organic beef, and other products to major retailers, including Defendants Costco Wholesale Corporation, Walmart, Inc and subsidiaries, and The Kroger Company and subsidiaries, among others.

152. Mr. Dean T. Smith, a resident of CA, as an individual and acting in concert with others, invested funds for his own accounts, trust accounts, and entities, and as a nominee for unknown other persons and entities to perpetrate and perpetuate various investment, lending, financial, wire, email, bank and other financial frauds, sourcing, supply, sales, marketing frauds from 2015 to the present, and in litigation fraud and misrepresentation, all in interstate commerce.

153. Mr. Andy Altahawi, a resident of NJ and/or FL, acted individually and in conspiracy with others, in fraudulently misrepresenting himself and others as performing sourcing, sales,

and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud in the furtherance of these frauds and dishonest services in interstate commerce.

154. Mr. Jason Waseman a resident of TX, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing, sales, and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud and interstate travel in the furtherance of these frauds and dishonest services in interstate commerce.

155. Mr. Brad Kumin a resident of TX, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing, sales, and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud in the furtherance of these frauds and dishonest services in interstate commerce.

156. Mr. Jon Nickless a resident of N, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing and operations services for Lead Plaintiff and related business entities, and used wire and email fraud and interstate travel in the furtherance of these frauds and dishonest services in interstate commerce.

157. Mr. Michael Castro a resident of NM, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing and operations services for Lead Plaintiff and related business entities, and used wire and email fraud and interstate travel in the furtherance of these frauds and dishonest services in interstate commerce.

158. Mr. Paul Smith a resident of TX, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing financial and accounting services for Lead Plaintiff and related business entities, requested illegal backdating of stock options, and

used wire and email fraud and interstate travel in the furtherance of these frauds and dishonest services in interstate commerce.

159. Mr. Peter LeBlond a resident of OH, acted individually and in concert with ohers in fraudulently misrepresenting himself and others as performing sales, and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud and interstate travel in the furtherance of these frauds and dishonest services in interstate commerce.

160. Mr. Michael Callahan a resident of NJ employed in the State of New York, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing, sales, and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud in the furtherance of these frauds and dishonest services in interstate commerce.

161. Mr. Vito Perillo a resident of WA, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others to Lead Plaintiff at Pacific Pipeline, Inc, Kent, WA and fraudulently used corporate offices, plants and other facilities, in the illegal trafficking, fraudulent employment, forced labor, illegal termination against Lead Plaintiff, and used wire and email fraud and interstate travel in the furtherance of a pattern of trafficking, forced labor, and these other myriad frauds in interstate commerce.

162. Mr. Larry R. Cook a resident of WA, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others to Lead Plaintiff at C.N.A. Industrial Engineering, Inc, Kirkland and Bellevue, WA, and fraudulently used corporate offices, employees, client plants and facilities, in the illegal trafficking, fraudulent employment, forced labor, and theft of compensation, and other entrapment attempts against Lead Plaintiff, and used

wire and email fraud and interstate travel in the furtherance of a pattern of trafficking, forced labor, and these other myriad frauds in interstate commerce.

163. Mr. Michael Kurgan a resident of IL, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others at ShipNow, Inc to fraudulently presented unfunded and dishonored bank checks and drafts, abuse state court litigation in furtherance of these frauds and thefts of financial assets and real property of Lead Plaintiff and his entities, and used wire and email fraud and interstate travel in the furtherance of their pattern of trafficking, forced labor, and myriad other frauds in interstate commerce.

164. Mr. Darrell C. Pray a resident of CA, acted individually and in conspiracy with others in fraudulently misrepresented himself and others at Pacific Pipeline, Inc, C.N.A. Industrial Engineering, Inc and as co-managing member at Allegent LLC dba Performa to fraudulently represent himself, those entities, and others in presenting unfunded and dishonored bank checks and drafts, abuse state court litigation in furtherance of these frauds and thefts of financial assets and real property of Lead Plaintiff and his entities, and used wire and email fraud and interstate travel in the furtherance of their pattern of trafficking, forced labor, and myriad other frauds in interstate commerce.

165. Mr. Marc Chalom, a resident of NJ, acted individually and in conspiracy with other individual and interstate Defendants, known and unknown, in the theft of services, property, equipment, financial and other assets of Lead Plaintiff at an apartment building he owns at 282 Palisade Avenue, Cliffside Park, NJ, and used wire and email fraud and interstate travel in the furtherance of the pattern of trafficking, forced labor, theft, and other myriad frauds in interstate commerce.

166. Mr. William Drumm a resident of NJ, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as authentic officers, employers, and fellow employees of Lead Plaintiff at Establish, Inc and fraudulently presented project sales, project consulting services, and corporate offices, plants and other facilities, in the illegal trafficking, fraudulent employment, forced labor, illegal termination, and thefts of commissions and compensation against Lead Plaintiff, and used wire and email fraud and interstate travel in the furtherance of their pattern of trafficking, forced labor, and these other myriad frauds in interstate commerce.

167. Mr. Conrad Ross, a resident of NJ and NC, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as authentic officers, employers, and fellow employees of Lead Plaintiff at Establish, Inc and fraudulently presented project sales, project consulting services, and corporate offices, plants and other facilities, in the illegal trafficking, fraudulent employment, forced labor, illegal termination, and thefts of commissions and compensation against Lead Plaintiff, and used wire and email fraud and interstate travel in the furtherance of their pattern of trafficking, forced labor, and these other myriad frauds in interstate commerce.

168. Ms. Kristine J. Volk a resident of NV, acted individually and in conspiracy with others, in fraudulently misrepresenting himself and others as selling a farm and ranch property in Mohave County, AZ which was not actually listed and available for sale to the general public on a fabricated or spoofed website and used wire and email fraud in the furtherance of these frauds in interstate commerce.

169. Mr. Dennis and Mrs. Pamela Amsbaugh, residents of OR, acted individually and in conspiracy with others, in fraudulently misrepresenting themselves as selling a farm and ranch

property in Lake County, OR which was not actually listed and available for sale to the general public, was posted on a fabricated or spoofed website, and used wire and email fraud in the furtherance of these frauds in interstate commerce.

170. Mr. Brandon Hutchison, a resident of OR, acted individually and in conspiracy with others, in fraudulently misrepresenting himself and others as selling a farm and ranch property in Lake County, OR which was not actually listed and available for sale to the general public on a fabricated or spoofed website and used wire and email fraud in the furtherance of these frauds in interstate commerce.

171. Mr. David Choate Hughes, a resident of IL, acted individually and in conspiracy with others in fraudulently misrepresenting himself and others as performing sourcing, sales, and marketing services for Lead Plaintiff and related business entities, and used wire and email fraud in the furtherance of these frauds and dishonest services in interstate commerce.

172. John Does of unknown number. John Doe defendants include private entities, groups, associations, and individual persons, including, without limitation, unknown officers, agents, contractors, successors and assigns of governmental entities. Private entities include, without limitation, corporations, partnerships, LLC and LLPs, some of which are owned and controlled by known defendants, but many of which whose identities and principals are unknown. Numerous individual defendants, groups, and associations are also unknown.

173 through 299. Reserved.

## JURISDICTION AND VENUE

300. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1333, and 18 U.S.C. §§ 1962(a) through 1962(d) inclusive over Plaintiffs' claims, and over the federal

and ratified international treaty claims and related conflicts of law which arise under and pursuant to the laws and Constitution of the United States.

301.  The Court has jurisdiction over Plaintiffs' state statutory and common law claims because they are so closely related to the federal and international treaty claims conducted by an associated-in-fact enterprise of all Defendants which arose and arise out of the collective and individual acts of Defendant United States and its co-conspirator Defendants in their collective and individual acts and unconstitutional conduct against Lead Plaintiff and others in nearly all states (44 in the Lead Plaintiff's case alone) and from the extra-territorial actions of officers and agents of Defendant United States and of foreign intelligence and police powers departments and agencies. It also has jurisdiction over violations of state statutes because those offenses are directly intertwined with and arise from the original violations by Defendant United States both separately, as elements of, and within the pattern of conspiracy to commit and within the pattern of racketeering activity conducted in conspiracy with other Defendants.

302.  Venue is proper in this Court pursuant to the above named statutes because executive decisions, operation, and management of the associated-in-fact enterprise and other substantial conduct giving rise to Plaintiffs' claims occurred in the District of Columbia and at the executive direction of Defendant United States within the District of Columbia.

303.  This Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(a) through § 1965(d) inclusive, and pursuant to Fed. R. Civ. P. 4(k)(1)(C) and Fed. R. Civ. P. 4(k)(2)(B), because they and their agents caused injuries to Plaintiffs through their conspiracy in acts and omissions originating in, or having an effect in, the District of Columbia.

## FACTS

304.  The complete pattern of facts is complex, spans a considerable period of time, and can only be understood by (1) reviewing the entirety of the Lead Plaintiff's statement at LP Evidentiary Exhibits pages 140-189; (2) considering the patterns of practices of Defendant United States and its other co-conspirator Defendants at LP Evidentiary Exhibits pages 237-367; (3) reviewing the Lead Plaintiff's letters to the US Attorney for the Southern District of New York at LP Evidentiary Exhibits pages 368-793; (4) reviewing other explicit evidence shown in the balance of LP Evidentiary Exhibits; and (5) understanding the technologies and tradecraft practices which undergird Defendants' prohibited BRMT bioweapon and bioweapon delivery system as described in LP Evidentiary Exhibits pages 6645-6884.

305.  Once that is complete, a reasonable understanding of the extraordinarily broad scope of the Defendants' malign actions and violations against Plaintiffs can begin to be comprehended. The Lead Plaintiff alone has experienced every form of outcome save incarceration, permanent injury, or death, though Defendants have also earnestly engaged with intent to arrange those outcomes for the Lead Plaintiff. It is extremely probable those, and similar, disastrous outcomes have been experienced by other members of the class of Plaintiffs.

**Origins of BRMT Lie In Defendant CIA's Deadly MKUltra Mind Control Program**

306.  The Defendants' original violations of human, civil, and constitutional rights arise from a technologically and neurologically driven mind control program intended as the successor program to the failed CIA/ARMY MKUltra LSD and mescaline drugging programs, which itself arose out of a Nazi drugging program experimenting on prisoners in the Dachau Concentration Camp system, which itself was established for political and ethnic prisoners of Adolph Hitler's

Third Reich from 1933 to 1945. Nazi doctors and medical researchers were secretly brought to

the United States to work for Defendant United States on these matters between 1945 and 1959.

307.  As documented by the U.S. Senate (see LP Evidentiary Exhibits pages 237-271,

6885-7466), from 1953 through 1973, MKUltra violated the rights of US and Canadian citizens,

by illegally and without consent while secretly administering one hundred million (100,000,000)

doses of LSD and untold doses of mescaline to unknowing civilians and soldiers without their

consent. These unwitting drug dosed victims were never medically screened and were allowed to

participate in all normal activities while under the influence of these drugs, such as driving and

operating machinery, presenting immediate danger to themselves and to the public.

308.  MKUltra likely included the murder of an insider whistleblower in 1953 as the

program was ramping up, and undoubtedly resulted in deaths of unwittingly drugged citizens and

soldiers, as well as innocent bystanders who drove the same roads or were injured or killed by

drugged and hallucinating participants. CIA destroyed nearly all the MKUltra program evidence

as the program ended in 1973, obstructing justice so the true costs of the death, injuries, and

mayhem resulting from the program will never be unknown.

309.  Over the past five decades, participation in actions against BRMT (as it is named by

the Lead Plaintiff) victims has been steadily expanded to involve numerous domestic police

powers operations, political and commercial connections of knowledgeable insiders, and a

number of allied intelligence operations such as the United Kingdom's MI-6 and Canada's CSIS

as co-conspirators.

310.  Some of these Defendants are named Defendants and the identities of others are not

yet known, including some potential defendants or agents of defendants who may have appeared

in various scenarios over many decades. The true extent, including the precise date of initiation

of human, civil, serial RICO, and other rights violations, and the duration of the conduct by any specific named or unknown Defendant, cannot be reasonably ascertained by the Plaintiffs without extensive discovery. But Defendants' associated-in-fact enterprise has engaged in systematic and increasingly frequent lethal attempts (see examples at LP Evidentiary Exhibits pages 774-785 and Table 1 at pages 30-46 herein) to rid itself of the most visible participant, the Lead Plaintiff, as described in this Complaint. Defendants have doubtless caused harm to many other innocent and unwitting people throughout the United States across the five decades that BRMT has operated to date.

311.  Unlike MKUltra, we do not even know the number of times these BRMT brain hijacking instructions have been administered over the past fifty years. Given the accelerating pace of technological change and the speed of today's computer and communications technologies, we can be confident it has been far greater than the 100 million times MKUltra would have illegally provided the LSD doses it purchased from a Swiss pharmaceutical company. A single supercomputer installation of today can process three quadrillion instructions (3,000,000,000,000) per second. Defendant United States owns dozens of these supercomputer installations throughout its military, intelligence, police powers, and civilian agencies.

**Lead Plaintiff's Experiences With Various Classes of Defendants' Criminal Offenses Under Color of Law – A Sampling**

**A.  Lead Plaintiff's personal life is continually manipulated and has been episodically destroyed**

312.  Lead Plaintiff's personal life has been dominated by BRMT since at least his attendance at Washington State University beginning in 1974. This BRMT dominance may extend to his high school years beginning in 1970 at Decatur High School, a specialized high

school in the Federal Way School District, Federal Way, WA which graduated only 83 students in its first graduating class and was spun out of another high school in the district three years before the Decatur High School building was even completed in 1973, months after the Lead Plaintiff's high school graduation. Around 350-400 students were in each graduating class of the other two high schools in the district at that time.

313.  Since that time into the present, BRMT has been ever present, as have minders assigned by Defendant United States and posing as roommates, friends, fellow employees, romantic interests, realtors, bankers, and in other roles intended to provide Defendant United States' BRMT program management with continuous awareness and extremely powerful influence over many life choices. This included the carefully contrived selection of his second wife, and perhaps even his first wife. Since that time, dozens of fake police powers dates have been cycled through the Lead Plaintiff's life in 2005, 2008, and 2019-2021.

314.  In late 2004 and 2005, Lead Plaintiff was subjected to a series of approximately 15 to 20 online dates in the Seattle and Portland areas with Defendants' undercover police powers personnel. This pattern of personal interference, including online romance scams, hacking of online dating sites, and fraudulent matches with police powers personnel and police powers assignees has continued since late 2007 in the New Jersey/New York City region. While the overall New Jersey/New York City area population is about 15% Black, more than 90% of Lead Plaintiff's dates were Black females, a sure sign of police powers screening and selection of the dates which were able to respond to online matching invitations from the Lead Plaintiff, a White male. Except for two female agents or officers of Defendants, these outing lasted no more than two dates, mostly just one. Color of law honey trap sting operations have also been run on the Lead Plaintiff on city streets, shops, parks, performance venues, subways, buses, and all other

public places in New York City for approximately seventeen years, with accelerated intensity from November 2018 to the present in New York City on virtually every visit there.

**B. Lead Plaintiff's personal finances and assets are repeatedly subjected to forced liquidation**

315. Lead Plaintiff substantially improved five residences over the past 40 years, ranging from modest remodels and interior renovations to extensive landscaping to complete rebuilds and 60% square footage additions. Upon completion of each of these improvements, Defendant United States contrived a life event which forced the liquidation of these assets to a third party. Both divorces and indirectly forced removal due to financial or other circumstances "occurred" soon after those renovations and rebuilds were fully completed. The properties sold or were re-rented very quickly, indicative of Defendants' insider knowledge and advantage. Violations of Lead Plaintiff by Defendants have over time resulted in forced liquidation of all assets on multiple occasions, including the first family home he and his wife purchased for $184,340 around the age of 30 as shown below:

**Interline Exhibit 2: Redmond Residence – Add Rear Landscaping 14,000 Square Feet, Add In-ground Sprinklers Front and Rear Covering 28,000 Square Feet, Renovate Front Planting Beds**



17026 NE 133rd St. Redmond, WA 98052

$1,866,388    4    2.5    2,800
Redfin Estimate    Beds    Baths    Sq Ft



**Is this your home?**

Claim this home to track its value and nearby sales activity

316. Lead Plaintiff's second family home was liquidated after about ten years of labor and investments to rebuild from the back fence line to the front sidewalk. This second family home started as the reverse floor plan of the house first shown below. This house is on a lot which shares a southeast lot corner with Lead Plaintiff's second home and fronts on a neighboring street. Lead Plaintiff rebuilt its reverse floor plan twin as shown in the second set of photos below (all three photos are from Redfin.com on October 13, 2022),

**Interline Exhibit 3: Kirkland Residence -Rebuild and 60% Square Footage Enlargement**





317.  All of Lead Plaintiff's material possessions except for one rolling suitcase, and boxes left at his sister's house (nearly all of which were subsequently donated and likely collected by Defendant police powers personnel posing as charity workers for yet another illegally pretexted search and subsequent distribution to favored persons), were forfeited when Lead Plaintiff left Seattle for Boston in 2005. This cycle of physical possessions and improvements forfeiture was repeated again when Lead Plaintiff was removed from the apartment he furnished and improved in Cliffside Park, NJ in October 2010, shortly after filing litigation in Newark federal court and then forced into a psychiatric hospital for six months of confinement. After leaving the hospital in 2011, he lived in shared housing in Ramsey, NJ, and again spent considerable personal funds to furnish new furniture and appliances to a tired, outdated apartment, and within four months furnished a new residence yet again in 2018 as he was moved to Edgewater, NJ.

**C.  Lead Plaintiff's professional life and commercial enterprises repeated destroyed and defrauded by acts of or directed by Defendant United States**

318. Frauds and litigation have been used in each and every commercial enterprise of the Lead Plaintiff throughout his career to manage and control his professional path. Shortly before Lead Plaintiff graduated his MBA program in 1979, he returned to his university from a Spring Break recruiting trip to GTE in Stamford, CT, by detouring through Washington, DC. Then CIA Director Turner went out of his way, unknown at that time to the Lead Plaintiff, to surreptitiously and silently greet the Lead Plaintiff in the East Building rotunda at the National Gallery of Art. The moment stuck in the Lead Plaintiff's mind and was reverse engineered by Lead Plaintiff using visual memory in 2021.

319. In 1979, Lead Plaintiff was tracked into a consulting career at an international accounting and consulting firm with 16,000 US employees and partners, Deloitte (then known as Haskins & Sells) in Seattle, WA by a referral from his university advisor. There he met and became friends with the FBI agent husband of his audit manager, and, though unknown at the time, with CIA commercial cover officers and alumni contractors who worked on key projects in South Africa and Saudia Arabia which doubled as intelligence acquisition assets of US intelligence. He replaced one CIA contractor/commercial cover officer, David P. Moller the project manager on the South Africa banking system ATM project, at his next career move (assignment). He then moved on to a series of markedly unsuccessful business ventures and employment, each one impaired or destroyed by (a) substantial contract frauds; (b) money collections frauds; (c) malicious litigation strategies; (d) money-losing purposeful overstaffing of enterprises, (e) failed (purposely sabotaged) projects; (f) deprivation of government benefits enjoyed by the predecessor owners and immediately removed upon his assumption of ownership or control; and (g) carefully pre-texted involvement in national security projects and assets from

1995 onward at an engineering firm working on engineering and information technology projects for various rocket, satellite, and nuclear technology related projects and companies.

320. Perhaps intending to accentuate the psychological shock of the next programmed collapse into suicide ideation followed by homelessness as conducted by Defendants, Lead Plaintiff was allowed to be selected during the early 2000s as the volunteer regional Chair for the northwestern United States of AeA, the preeminent technology trade association representing Microsoft, Intel, Hewlett Packard and other multinational and smaller technology firms in Washington, DC and many state capitols. While there, he worked directly with Washington Governor Locke's staff and was asked by the Governor's Chief of Staff to accept a key appointed volunteer position as Chair of the state's Higher Education Coordinating Board. He also worked with key Democrat and Republican legislative leaders on higher education access and a variety of other state policy issues. See LP Evidentiary Exhibits page 10780.

**D. "National Security" pretexting of Lead Plaintiff by Defendant United States accelerated after 9/11 attack**

321. After the terrorist attacks of 9/11/2001, Lead Plaintiff's life become markedly worse as CIA, FBI and other federal agencies were rewarded with greater powers for their notable failures in the months preceding the attack. In 2002, Lead Plaintiff left CNA Industrial Engineering, formed a new enterprise Allegent, LLC dba Performa, which failed after Defendants actions involving, as in times past, check fraud, compensation fraud, and litigation expenses, combined with other fraudulent police powers color of law actions including commercial sales frauds were used to destroy this consulting partnership under color of law. During this period, Lead Plaintiff was systematically abused by Defendant United States' torturous use of BRMT brain hijacking and psychological operations to force him to the point of

suicide ideation, after which he was forced to quickly sell the home he had worked for years to improve in order to avoid foreclosure. When his funds ran out in late 2005, he was eventually forced into homelessness. More details are included in Table 2-0024, 0060, 0077, 0084, 0088-0097. Through this torturous process, Defendants again stripped Lead Plaintiff's assets.

322. Fleeing by Defendants' design as detailed at Table 2-0105 to 2-0115 to the next pretexted destination, Boston, on December 23, 2005 to avoid the possibility of adverse acts being directed at other family members to entrap the Lead Plaintiff, homelessness ensued in early 2006 when his remaining funds were exhausted. After seventeen months of homelessness in Boston he was next trafficked in August 2007 to 10 months of involuntary servitude and forced labor in faked employment at Establish, Fort Lee, NJ on two interstate projects. Lead Plaintiff performed a faked Sales and Operations Planning software selection project, ostensibly for PPG's Paint and Coatings Division at PPG headquarters in Pittsburgh, PA. He then "developed" and performed a faked project for Clipper Windpower in Carpinteria, CA and Cedar Rapids, IA. See LP Evidentiary Exhibits pages 8351-8352, 10305-10310, 10311-10364. The PPG project sequence included a tangential Pittsburgh hotel evening cameo with the Pitt Football team at one of their public fundraising meet and greets which coincided with Defendant FBI's investigation of the Pitt football assistant coach child sex scandal in late 2007-2008.

323. During this period, he was also placed under a carefully pretexted national security color of law investigation for terrorism by a Joint Terrorism Task Force in the New York City/New Jersey area and its own much greater intelligence and police powers operations in the region. Defendant United States has a much greater concentration of intelligence and police powers assets and a closely collaborating set of police powers agencies, such as Defendants Bergen County Sheriff, Port Authority of New York and New Jersey Police, New York State

Police, New Jersey State Police, and City of New York Police Department, some of whom have long histories of rights violations and extensive use of deadly force. A trip to London also dragged MI-6 into the mix again as Defendants had in Seattle in 1993-1994.

324. Defendant United States was the initiator of this entire sequence, was its pretexter from 1972, deliberately entangled Lead Plaintiff in national security, and was fully aware at all times that there was no basis in law for this suspicion nor for the highly intrusive and perpetual "investigations" but purposefully failed to act to quash and in fact fully participated in spreading disinformation to others in police powers agencies and the general public, conspired with and participated fully and knowingly in these perpetual pretexted "investigation" of the Lead Plaintiff plainly desiring an "extinction event" to rid itself of a visible "problem" citizen and the prime witness to this and other Constitutional and human rights crimes and violations of these corrupted police powers organizations and their series of associated-in-fact enterprises.

**E.  Defendants malicious acts against Lead Plaintiff AGAIN extend to torturous acts**

325. During late 2008 through the first months of 2010, Defendants engaged in extreme and continuous biochemical abuse. This abuse altered the Lead Plaintiff's brain biochemistry to the point of a second suicide ideation and included extended periods of physically torturous actions, muscle spasms, and sleep deprivation using BRMT very aggressively; a Secret Service drive-by of the Presidential limousine; removal of a supposed terrorist from his seven-unit apartment building by FBI; and other efforts to induce psychological and physical fear.

326. Upon completing his second attempted legal complaint, this time to the Federal District Court in Newark in June 2010, his apartment was rented out from under him to a third party and he was forced back into second episode of homelessness. The following day, the combination of stresses landed the Lead Plaintiff in a locked mental hospital ward for six

months. He was deemed "schizophrenic" and, early in the initial involuntary stay, placed in a padded cell with unexplained medications administered by a needle to his buttocks while held by two orderlies on at least two occasions. Lead Plaintiff continued his search for work, using a social worker's computer for the permitted 15 minutes per day during his last three months at this facility. These internet searches were also blocked by Defendants, as they continue to do to this day,

327. The ten months at Establish have been his only permitted source of earned income from 2002 (age 51) to the present (2023, age 67). All subsequent efforts, even as a night stocker at a Ramsey, NJ grocery store, have been blocked as have most personal contacts. Essentially, Defendant United States and its racketeering co-conspirators intended this as a final trip for the Lead Plaintiff – this time to the garbage disposal. Despite Lead Plaintiff's repeated diligent search efforts since August 2008, Defendants have employed mail fraud, wire fraud, and other acts to preclude all further employment, force the Lead Plaintiff to exhaust the five year limit on public assistance and live on Social Security retirement. His personal life has been similarly impacted and constrained as described above and in Table 2 from 2-0150 through the end under the column "Destroy Families and Personal Relationships…"

328. As shown below in Interline Exhibits 4-12, despite their sworn Constitutional and legal obligations, Defendants have for years engaged in conspiracy against rights, frauds and injuries to the Lead Plaintiff, directly interfered in interstate commerce, including corporate agricultural production for sale to large international retail companies, attempting to supply foreign entities with agricultural products, seeking farming land and enterprise purchases across state lines, attempting to raise financing in state, across state lines, and in other countries, making personal use of out of state websites to purchase commercial and personal goods and supplies

and commercial and personal services. See forty examples, most related to interstate commerce at Subordinate Counts C-1 through C-40 at pages 356-621 herein. See also LP Evidentiary Exhibits pages 140-189, 380-386, 616-765, 1076-6094, 8233-10613, for thousands of further examples. Additional examples prior to 2008 are currently in the hands of Defendants, and certain records from 2018 through 2020 are blocked from Lead Plaintiff's access at this time.

**Interline Exhibit 4: A Sample WinnettOrganics Organic Vegetable Arizona Business Plan:**



**Winnett Perico, Inc.**
**Arizona Operations**

**Business Plan**

**Interline Exhibit 5: $100,000 From Investor Dean T. Smith**



329. Agency Sourced Funds Used to Seed Finance WinnettOrganics Startup: Note this check is signed by a person named "Cook," the name used by the "owner" of CNA Industrial Engineering, Inc., one in a series of former intelligence acquisition platform "network capture" Defendant United States cover employers of the unwitting Lead Plaintiff which engaged in compensation fraud, forcing the Lead Plaintiff to waste financial resources on litigation expense, delaying legally due compensation, and damaging personal credit. These compensation thefts by network capture employers, as well as forced compromises of legally due sums to various businesses owned or managed, and deprivation of benefits such as access to SBA performance bonding and loan guarantees, have cost the Lead Plaintiff literally millions of dollars in lost revenue and at least hundreds of thousands of dollars in personal income over his active twenty year career. Further, the Lead Plaintiff was "network captured" by Defendant United States for involuntary servitude between 1979 and 2002, limiting his income and resulting in repeated continuity of employment issues, access to fair market compensation and other career and business opportunities available to all under law. No work has been permitted to Lead Plaintiff by Defendants since 2002, except for ten months of fake employment at Establish in New Jersey.

**Interline Exhibit 6: Adamson Brothers Private Placement Memorandum and SEC S-1 Consumes $40,000 and Raises $0, Consistent With Other Fraudulent Financing Activities Inside Defendants' Network Controlling Lead Plaintiff's Personal and Professional Life, Including in Interstate Commerce**

See also LP Evidentiary Exhibits pages 6095-6223, 8288-9901 for further documents and pages 1076-6094 for emails, all evidence of Defendants' interferences with interstate commerce from 2008 to present.

**Interline Exhibit 7: Kroger Corporate Email Account Hides True Identity of Defendant Personnel**

---

**Dennis Brewer**

---

From:        Krempel, Jacob A <jacob.krempel@kroger.com>
Sent:        Wednesday, October 5, 2016 9:12 AM
To:          dennis_brewer@winnettorganics.com
Cc:          Merced, Jose F
Subject:     FW: Organic Fresh Foods

Hi Dennis-

Jose (Buyer) and myself (Category Manager) handle our Fresh Organic business, and are open the week of November 7th to meet with you. Give us a couple options on date/times that you would prefer and we will get back to you with our availability.

Thanks,

*Jake*

Jacob Krempel | Produce Category Manager
Kroger Co. | 1014 Vine Street Cincinnati OH, 45202
☎(office): 513-562-5794 | ✉(email): Jacob.Krempel@Kroger.com

---

**Interline Exhibit 8: Walmart WinnettOrganics Produce Supply Contract Meeting at Bentonville, AR Home Office**



Walmart Organic Produce Contract Meeting Allegedly Includes Senior Vice President

and Other Key Decision Maker Subordinates:

From: Ronald G. McCormick [mailto:Ron.Mccormick@walmart.com]
Sent: Wednesday, January 11, 2017 12:29 PM
To: Ashley Kilgore <Ashley.Kilgore@walmart.com>
Cc: Julia Moore <Julia.Moore@walmart.com>; Dennis Brewer <dennis_brewer@winnettorganics.com>; Laura Himes <Laura.Himes@walmart.com>; Dan Irwin <Daniel.Irwin@walmart.com>
Subject: PLEASE SCHEDULE RE: Winnett Organics Strategic Partnership

Ashley, please send this planner

Title: **Winnett Organics Collaboration**
Purpose: To consider ways that Walmart and Winnett could work together to increase organic acreage and availability to meet future demand.
Time: 1:00 – 2:30 February 21st
Required: Shawn Baldwin, Ron McCormick, Laura Himes, Dennis Brewer, CEO WinnettOrganics, Inc. (dennis_brewer@winnettorganics.com (623) 207-520-549-6245
Optional: Michael Cochran, Mike Hancock, Yoshie Fuji, Jeff Thorpe, Victor Velage, and Dan Irwin.
Details:
- Dennis may want additional people from his company to join.
- Please schedule a WebEx and meeting room...I believe Dennis is coming in person, but other may wish to call in.
- We will want to show a PowerPoint so an enabled room is needed.
- Don't let the optional attendee's calendars be an issue because this Julia is holding this time on Shawn's calendar.
- Please include the agenda below without the parenthetical notes.

1

Agenda
- Introductions
- WinnettOrganics, Inc. Overview (Updated deck needed from Dennis)
- How Walmart sources and sells organics.
- Current and potential growing areas (Walmart GDC map with WO, Inc. growing areas added is needed)
- Crop priorities for Walmart and Winnett and where they intercept, and where greatest potential exists.
- Preferred Varieties and Resilient sourcing (need a summary slide if Victor feels we can share)
- Interest and Next Steps

**Interline Exhibit 9: Winnett Organics Organic "Produce Consultant" Greg Crossgrove is Defendant Sheriff Joseph Arpaio, Convicted Serial Civil Rights Violator**

**Gregory P. Crossgrove, Inc.**
**Agriculture Consultant**

**GREG CROSSGROVE**

Cell: 602-905-6457    Email: gpcrossm@yahoo.com
Website: www.crossgroveconsulting.com

**Joe Arpaio**



Arpaio in 2016

**36th Sheriff of Maricopa County**
**In office**
January 1, 1993 – January 1, 2017

## Contents

Early life
Tenure as sheriff 1993–2017
   Jail conditions
   Tent city jail
   Public relations actions
   Immigration posse
   Organizations criticizing Arpaio
   Claims that sheriff's office failed to properly investigate serious crimes
   Targeting of reporters
   Targeting of political opponents
   Election law violation
   Misspending analysis
   Misconduct and mismanagement memo
   Wrongful arrest and entrapment lawsuit and settlement
   Abuse-of-power allegations and investigation
   Immigration patrols
Federal class-action suit
Melendres v. Arpaio racial profiling class-action lawsuit
Litigation on jail conditions
   Graves v. Arpaio: federal court finding of unconstitutional jail conditions
   Braillard v. Maricopa County: wrongful death suit and settlement
Justice Department investigation on racial profiling
   United States v. Maricopa County
Birther movement
Conviction for contempt of court and presidential pardon
   Contempt of court
   Presidential pardon
Election results

https://en.wikipedia.org/wiki/Joe_Arpaio#:~:text=Arpaio and the Maricopa County Sheriff%27s Office %28MCSO%29 litigation against Ari

LP Evidentiary Exhibits Page 000273    10/057

**Interline Exhibit 10: Lead Plaintiff Subsequently Sued Individually For Alleged Misuse of Investor Funds Resulting From Police Powers Corporate Entity Conspiracy**



**Interline Exhibit 11: Lead Plaintiff Starts New Enterprise - Sheldon Beef Example**

**Business Plan**



**Interline Exhibit 12: Cover Page of Sheldon Beef Sales Contract Signed With Defendant Walmart Inc., subsidiary Wal-Mart (China) Investment Co., Ltd.:**



Walmart Contract Implementation Was Dragged Out by Insider Defendants Until Trump Started

China Trade War in 2018 and Countervailing Chinese Tariff Made Retail Pricing Excessive

330.  Defendant NYPD confirmed the earlier terrorism investigation on September 3, 2021 (Interline Exhibit 13 below) against Lead Plaintiff. On September 15, 2021 their reply to Lead Plaintiff's appeal of the prior information request which confirmed the earlier "investigation." Defendant NYPD stated there was absolutely no record of any contact with Lead Plaintiff nor any records indicating any such investigation, plainly a bald-faced lie. See Interline Exhibit 13 (page ??) below and LP Evidentiary Exhibits pages 354-367 and 10302-10304.

**Interline Exhibit 13: Defendant NYPD Confirms Pretexted Terror "Investigation," Denies Information Disclosure Request on Sep 3, 2021**



**Interline Exhibit 13A: Defendant NYPD Denies Existence of Same Pretexted**

**"Terror" Investigation on Sep 15, 2021**



**POLICE DEPARTMENT**
**Office of Deputy Commissioner,**
**Legal Matters**
**One Police Plaza, Room 1406A**
**New York, New York 10038**
**FOILAppeals@NYPD.org**

September 15, 2021

Dennis Brewer
dabrewer923@hotmail.com

RE:    **FREEDOM OF INFORMATION LAW**
       **REQUEST: FOIL-2021-056-13163**

Dear Mr Brewer:

    This letter is in response to your email, dated September 3, 2021, appealing the determination issued by the Records Access Officer (RAO) on September 3, 2021 regarding records requested from the New York City Police Department. Your request, pursuant to the Freedom of Information Law, was originally received by the FOIL unit on September 1, 2021 and subsequently denied pursuant to Public Officers Law §87(2)(e)(iv).

    Your appeal of that determination is denied because a diligent search has been conducted for the requested records based on the information provided; however, no records were located. The New York Court of Appeals has determined that "[w]hen an agency is unable to locate documents properly requested under FOIL, Public Officers Law § 89(3) requires the agency to certify that it does not have possession of a requested record or that such record cannot be found after diligent search . . . Neither a detailed description of the search nor a personal statement from the person who actually conducted the search is required." *Rattley v. New York City Police Dept.*, 96 NY2d 873, 875; 730 NYS2d 768 (2001).

    Furthermore, in 2009, the Appellate Division held that an agency cannot produce documents it does not possess or cannot disclose and that the Court cannot require respondents to produce documents that they certify they cannot find after a diligent search because petitioner "has received all that he . . . is entitled to under the law" *Bernstein Family Ltd. P'ship v. Sovereign Partners, L.P.*, 66 AD3d 1, 8; 883 NYS2d 201, 206 (1st Dept 2009).

    You may seek judicial review of this determination by commencing an Article 78 proceeding within four months of the date of this decision.

Respectfully,

Jordan S Mazur
Sergeant

COURTESY • PROFESSIONALISM • RESPECT

**Interline Exhibit 13A: Defendant FBI Sends "Liar Letter" Sep 30, 2021, Same Month**

**Defendant NYPD Confirms, Then Denies New York/New Jersey "Terror Investigation"**

**Which Followed Coercion/Torture in Washington State, 2006-2007 Trafficking to**

**Homelessness in Boston, MA, 2008 Trafficking to New Jersey Employment at Establish**



☐    Police departments should be aware that the search conducted was limited to FBI records. Requests for criminal history records or rap sheets should be directed to Criminal Justice Information Services (CJIS). Information regarding CJIS is listed in the enclosed FBI FOIPA Addendum General Information Section.

☐    Records potentially responsive to your request were transferred to the National Personnel Records Center - Civilian Personnel Records (NPRC-CPR). In order to obtain information on a file located at the NPRC, your request must be mailed to the following address:

> National Archives and Records Administration
> ATTN: Archival Programs
> P.O. Box 38757
> St. Louis, MO 63138

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. "Part 1" of the Addendum includes standard responses that apply to all requests. "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third party individuals. "Part 3" includes general information about FBI records, that you may find useful. Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448, or facsimile at 202-741-5769. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information
Dissemination Section
Information Management Division

Enclosures

### G. Defendants' lethality attempts on Lead Plaintiff have occurred repeatedly over four decades

331.  The first known attempt in a now long-running sequence of attempts by Defendant United States against the Lead Plaintiff 's life was an extra-territorial act of attempted double murder of Lead Plaintiff and his first spouse, Lynne, in British Columbia in the early 1980s as described at Table 1-001A and LP Evidentiary Exhibits page 181. The series of subsequent attempts to severely injure or kill the Lead Plaintiff occurred periodically throughout the 1990s, including during his second marriage to Jeanette from 1990 into 2005, and continued in the 2000s, 2010s, and 2020s into the current year. The complete sequence as recollected is shown at Table 1, pages 30-46, and Subordinate Counts L-1 through L-16,  pages 273-355 herein..

### H. Defendants have accelerated their pace of threatening behaviors, severe injury, and lethality attempts toward Lead Plaintiff in 2022

332.  A recent prohibited BRMT bioweapon innovation is another example of non-verbal threats. Lead Plaintiff began experiencing a slice like physical contraction of neck muscles across the neck which emulates the sensation of a guillotine slicing the neck in August or September 2022. Shortly thereafter, Defendant United States added an involuntary rapid twist of the neck which simulates a lethal neck twist like that used in lethal martial arts. This BRMT induced and very specific muscle sensation and mild pain pattern sequence had never been experienced prior to an indirect verbal threat delivered at what Lead Plaintiff believes to be an in-house theatrical production by Defendants directed specifically toward Lead Plaintiff, see LP Evidentiary Exhibits pages 542-547. Lead Plaintiff is unable to naturally replicate this specific pain sensation and believes it to be physically impossible for a natural person to be able to create

these BRMT induced nerve sensations simultaneously across the several neck muscles as a conscious, voluntary act.

333.   Threatening and potentially severe injury and lethality efforts accelerated in 2022 as information was communicated to the US Attorney for SDNY throughout 2022. Several severe but threatening acts involving a deliberately mistimed swallows to induce choking on meat, and numerous slips and trips were undertaken by Defendant United States using the prohibited BRMT bioweapon. These incidents are consistently planned and produced to appear as naturally occurring events, but Defendant United States consistently employs BRMT to orchestrate these events intended to tamper, retaliate, and intimidate. Other BRMT bioweapon related incidents include a hospital fall in April (Table 1-030) which nearly caused an injury to the vulnerable right temple area of Lead Plaintiff's skull. An indirect verbal threat was made in July. An carefully planned express train derailment attempt (terrorism) was executed on September 11 (Interline Exhibit 1 at page 47-55 and paragraph 334 below), a full somersault fall on the fourth flight of deliberately darkened stairs was orchestrated after sunset using BRMT in Morningside Park, New York City six days later (also at Table 1-049 and paragraph 335 below), a vehicle rundown threat sequence was run in mid-November in NYC and Bergen County, NJ (also at Table 1-055-057).

334.   The extent of Defendants' control of the Lead Plaintiff's environment is demonstrated by Defendants' sabotage of the Hudson Valley Line of Metro-North Railroad the evening of September 11, 2022 shown at LP Evidentiary Exhibits pages 786-793. The Defendants dropped a tree across three of four active rail lines as the Lead Plaintiff was returning from an excursion to Storm King Art Center. This incident occurred as the sun was setting in the southwestern sky. Since the general direction of travel was into the setting sun, it would have

been difficult for the train operator to see this dangerous track obstruction just after the sunset, an indication of the sophisticated planning which was used to determine the precise location of the tree to be toppled onto the tracks. All of the 300 or so passengers on that southbound express train and on any oncoming northbound train were at risk of derailment from the fallen tree totally or partially blocking the three eastern tracks of this four track section of the rail line. The emergency stop resulted in a modest collision with the upper story branches of the tree which was hit the by engine and several of the passenger cars. The collision resulted in a backing and rerouting detour and a service delay but, like the other such incidents, could have resulted in the derailment of the express train at relatively high speed, and severe injury or death to passengers and crew as it traveled about 30 feet from the Hudson River.

**Interline Exhibit 14: Lead Plaintiff Injuries in NYC Morningside Park Sep 16, 2022**



335. In Morningside Park in New York City at 7:29pm on September 17, 2022, Lead Plaintiff successfully navigated three flights of darkened stairs as his eyes continued to adjust from a bright environment to the darkened path, BRMT forced acceleration of the Lead Plaintiff's walking pace and locked his head at level vision rather than looking downward. As a result, Lead

Plaintiff was unable to detect the color change which indicated the first step in the next flight of stairs on the path. When the mid-arch of his foot hit the edge of the first lower step, he rotated forward and somersaulted to land on his back, injuring the right eye, right forehead, both hands and left knee. An interesting free to the public movie in Morningside Park was the attraction for Lead Plaintiff. Bright restaurant lighting, followed by the deliberately extinguished park path lighting, very dense tree cover of the unlit path, no ambient light, and BRMT manipulation were combined by Defendants to create this scenario which directly caused a full forward somersault and physical injury, creating a substantial risk of paralysis or death to Lead Plaintiff, see LP Evidentiary Exhibits pages 786-793 and Interline Exhibit 14 at page 127 above.

336.   The threat sequence run on November 18 and 19, 2022 infers the threat of BRMT hijacked induced inattention to opposing traffic in darkness. This sequence began with electric scooters traveling one-way streets in the wrong direction in New York City to distract attention away from the legal direction of travel while Lead Plaintiff crossed in sidewalks. It then progressed the following evening to the rapid acceleration of a car in a New Jersey shopping center parking lot. The car accelerated immediately after I turned my attention away from the vehicle toward my destination after determining the current speed of the car posed no threat of collision. It accelerated and rapidly braked, stopping about 5 feet short of Lead Plaintiff. He was rendered unable to move quickly out of the way by the remote commands of BRMT which first froze my attention directly forward, then precluded rapid movement to avoid a potential collision on November 19, 2022. This sequence is a rerun of numerous prior BRMT inattention threats which involved street crossings in daylight hours from 2020 forward.

337.   Defendants' recent actions present as clear, definitive, convincing consciousness of guilt. Described at length in this Complaint and accompanying evidence, these acts are the best

evidence that these Defendants understand the harsh reality of the prohibited BRMT bioweapon, its illegal use, and intend their actions to cover up their involvement by eliminating the Lead Plaintiff as a key witness. Defendant's malign and malicious behavior is completely consistent with their other and prior conduct noted by Lead Plaintiff in LP Evidentiary Exhibits pages 413-415, 473-507, 598-606, 613-615, 766-769 which document injuries to others.

### O. Other actions of Defendants evidence consciousness of guilt, including FOIA stonewalling and distortions; mail frauds and wire frauds

338.  Defendants continue their broad-based stonewalling, hacking, obstruction, and other tampering and retaliations even as this sentence is being typed. They have blocked, hacked, misled, and stonewalled every attempt by Lead Plaintiff to understand the facts and circumstance of their systematic pattern of practices, their misconduct and violations, even as they continue to actively violate a wide variety of Constitutional and statutory protections. Defendant NYPD has continued these operations even as they and other undercover Defendants tacitly acknowledge Lead Plaintiff's presence frequently at the street level in Manhattan.

339.  Defendant CIA has never acknowledged the Lead Plaintiff's FOIA and Privacy Act requests despite multiple requests and evidence of delivery as shown in LP Evidentiary Exhibits pages 387-412. Defendant Department of the Army did not do so until October 2022, 13 months after two sequential FOIA/Privacy Act requests for the same information by Lead Plaintiff and letters to the Secretary of the Army. Other Defendant United States departments and agencies also continue to stonewall, failing to meet their legal disclosure obligations required under FOIA, Privacy Act, and other mandatory disclosure laws. This is likely due to "state secrets" issues and restrictions of access to even the most benign information legally accessible which might acknowledge a tiny corner of their comprehensive pattern of racketeering acts, of civil rights

violations, and of criminal conspiracies used to hide the existence, duration and broader pattern of prohibited BRMT bioweapon abuses against Lead Plaintiff, other related persons and others in the personal network of Lead Plaintiff, thereby exposing the range and array of criminality of Defendants.

340.  Email communications with neuroscience experts in universities and the legal community have been blocked, false flag operations have mounted to attempt inculpatory connections with the Lead Plaintiff, US mail and parcels have been diverted, delayed, misdirected and "lost" while communicating with the US Attorney's office in Manhattan, attempting to communicate with various public interest law firms and legal organizations, (see LP Evidentiary Exhibits pages 378, 803-843);  police powers have continually interfered with personal relationship attempts (see LP Evidentiary Exhibits pages 378 and Table 2 – Destroy Family and Personal Relationships column), personal interests, with personal matters, hacked printers and computers (see LP Evidentiary Exhibits pages 473-507), directed Lead Plaintiff to specially organized in-house events not open to any other member of the public (see selected examples at LP Evidentiary Exhibits pages 441-459, 564-570) but presenting as ordinary exhibits, performances, and so forth – this list is virtually endless, and on-going for decades as Defendants stall, obfuscate, and lie. Attempts to seek justice are continually being hacked and stymied as Defendants now understand that the Lead Plaintiff finally understands the full pattern of depravity, the broad-based harms and risks of future harms to a broad class of victims

**P.  Abuse of international intelligence powers and relationships with foreign intelligence agencies to aid and abet frauds and cover-up**

341.  Lead Plaintiff has and continues to experience multiple daily prohibited BRMT bioweapon and bioweapon delivery system abuses. These abuses have occurred both inside and

outside the United States. Prior episodes were experienced in Canada, Mexico, and the United

Kingdom between the 1970s and 2008, and likely included France, Italy, Luxembourg, and

Switzerland in the mid-1980s. Lead Plaintiff has also operated internationally in other countries

without physically stepping into those jurisdictions as recently as 2022.

342.  Defendants CIA and FBI are among the defendants specifically known to have

foreign operations. Foreign intelligence agencies of allies have been and may continue to be

involved. Under 18 USC § 175, extra-territorial jurisdiction is appropriate as to US persons

impacted by biological weapons and delivery systems used for BRMT hijacking commands

These extra-territorial lethality acts began with the attempted double murder in British Columbia

in the early 1980 as described at Subordinate Count L-1, pages 276-277.

### Q. Defendants' current abuses of  Plaintiffs with BRMT - US Persons and Others

343.  The Lead Plaintiff came to understand in 2021-2022 the full scope of his life which

has been subject to the surreptitious control of Defendant United States and its co-conspirator

Defendants. The Defendants wittingly sustain the pattern of racketeering acts and civil rights

crimes and violations, and may have been unwitting as to the prohibited BRMT bioweapon. All

police powers Defendants are witting perpetrators and conspirators iin the pattern violations as to

civil rights and racketeering regardless of their knowledge level regarding BRMT, and have and

do directly conspire and participate in illegal and predatory acts against him and others in this

class of Plaintiffs under color of law.

344.  Lead Plaintiff and others similarly situated do not live as full and free citizens of the

United States regardless of alleged Constitutional guarantees. Based on the massive investment

required to develop and deploy the prohibited BRMT bioweapon and bioweapon delivery

system, and Defendant United States' long history of duplicitous constitutional violations and of

mass deployment of such programs under the guise of "state secrets," it is highly probable the scale of violations extends to all states, to foreign allies, and of course, to natural current adversaries. Legal prohibitions on paper (five treaties and the US Criminal Code at Title 18) are functionally meaningless due to the persistent history of failures to ever, much less consistently, hold institutional bad actor federal departments and agencies criminally accountable for broad-based wrong-doing under their tacit permission structures – FBI, CIA, DHS, and the rest. Instead, we have a persistent culture of public facing sanctimonious public relations, of periodic Secretary and Director apologies and firings for epic scale problems which go unsolved, and Lead Plaintiff's own experience over 50 years– on-going and systemic violations of law, of human rights, and of civil rights throughout. Lead Plaintiff has been dragged by Defendant United States and its co-conspirators on a grand tour of Title 18  - from prohibited bioweapons violations at 18 USC § 175, to myriad frauds at 18 USC § 1037, to racketeering patterns at 18 USC § 1962, to torture at 18 USC § 2340, to war crimes at 18 USC § 2441, all conspired, perpetrated, and enabled by the supposed protector to cover the criminal acts of Defendant United States as it seeks to defend the indefensible – violations of its international obligations under five distinct international treaties and of its own People in knowing and willful offenses against the Constitution. Its history of outrages has and does demonstrably extend to inhumane conduct, even without its direct employ of Nazi Dachau Concentration Camp doctors after World War II to inspire and direct some of these programs. BRMT is the direct descendant and "beneficiary" of this depraved heritage. Defendant United States owns both this internationally prohibited weapon system and its heritage as a weapon used against humanity.

**Table 2: Key Events 1972 to 2022 – Pattern of Racketeering Acts and Rights Violations**

I began using forensic reverse engineering to identify the basic medical and technological tools required and their effects on humans in 2021. At the time, I believed the first occurrences began in the early 2000s. This interpretation was far from complete.

BRMT bioweapon brain hijacking against me actually started in the 1970s, just as Defendant CIA was "terminating" the illegal MKUltra LSD program and Defendant FBI was "halting" Cointelpro. These 1950s programs were publicly "terminated" in the 1970s due to public exposure and outrage. There were absolutely no criminal consequences to these agencies or to any executive, manager, or agent, for their hundreds of thousands of felony law violations – drug distribution, prostitution, mail and wire fraud, accessory to assault and murder, funding of violent extremist militia, evidence destruction, and obstruction of justice, to name just a few. So, the behaviors simply went back underground, morphed to get around some new rules, and continued.

BRMT, including both the actual means of operation of the hijacking bioweapon itself, and the complex technological system which delivers it, were first reverse engineered by me in 2021. Using this knowledge and my recognition of Defendants' signature tradecraft woven into newly recognized past patterns of handler and minder tradecraft, and into psychological operations run against me. Particularly since the 9/11/2001 interdiction failures of Defendant United States, I was then able to begin to unravel the web of connections, methods, and techniques used, and the total extent of the abuses. That unraveling, beyond my own particular direct involvement as a victim, continues, as it must, until all victims are identified, and until justice is rendered to and on behalf of all those victims, both living and deceased."

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0001 | Primary Methods: Episodically intervene to destroy personal relationships, induce fraudulent and exploitive relationships, disrupt and destroy marital community, personal friendships and networks. | Primary Methods: Manage employment options using mail fraud, wire fraud, and insider recruiters directing employment options. Starve personal and corporate resources through financial frauds and legal partial settlements. Force expenditures of personal and corporate resources on expensive litigation. | Primary Methods: Induce illness through biochemical manipulation, food contamination, and BRMT brain biochemistry manipulation. Limit lifespan using BRMT to induce long-term health issues. Terminate liberty or existence of BRMT victims to perpetuate criminal acts against US persons and other innocents using "state secrets" cover as in Cointelpro and MKUltra. | Primary Method: Ostensibly protect "state secrets" while illegally experimenting on, manipulating, and depriving US persons of human and Constitutional rights. |
| 2-0002 | Purpose: To recycle, reassign, or isolate victims, including destroying relationships and family structures, to understand brain patterns in various life circumstances and stress conditions. To sustain involuntary servitude, forced labor, trafficking, incrimination, and disablement by managing and manipulating personal and | Purpose: To facilitate forced forfeiture of both personal and corporate entity real estate, financial, and personal property assets, and sustain control of BRMT victims through individual and family penury, involuntary servitude, forced labor, trafficking, and disablement, so as to further BRMT development cycle. | Purpose: To limit financial freedom of BRMT victims to make and sustain personal and professional choices inconsistent with BRMT research and development objectives. To cover-up and sustain corruptly classified criminal activity as "state secrets" subject to "national security" exemptions from disclosure to the Courts, Congress, and the public, protecting the political interests of government and other decision-makers and implementers, evade | Purpose: To avoid public scandals and evade accountability for executive branch institutional misconduct while appearing to "faithfully execute"…. And "preserve, protect and defend the Constitution of the |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | professional choices of victims. To sustain development cycle and implement BRMT generational improvements as technology and neuroscience advances. | | accountability and justice for institutional corruption and criminality. | United States." |
| 2-0003 **1972** **age 16** | Summer encounter with government agent posing as hitchhiker near Greenwater, WA. Neatly dressed, there is no obvious reason for this type of individual to be a hitchhiker in that location (no disabled vehicle or other sign of distress). Drive pickup with my cousin and agent in cab to Greenwater, WA, a tiny mountain tourist and logging town, where he asks to be dropped off. | This early pretexting in "national security" and "state secrets" matters will be a guiding premise of Defendant United States' actions against the Lead Plaintiff throughout the rest of the Plaintiff's life experiences into 2022.

This progression is used to sustain the development of BRMT from its early primitive forms in the 1970s, through its much accelerated development and deployment in the aftermath of the intelligence failures which  lead to the | | Pres, VP Nixon, Agnew; NS Adv Kissinger; DNI None; CIA  Dir Helms; FBI Dir Hoover, Gray; AG Mitchell, Kleindienst; SecDef Laird; Chmn JCS  Moorer Navy; NSA Dir Gayler |
| 2-0004 | Agent leaves his brown leather | successful attack on | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | briefcase in my pickup bed. After driving a few miles, I turn and notice the briefcase in the pickup box, about three to four feet behind the cab. | September 11, 2001, to the updated versions currently deployed against US persons and other innocents in systematic violation of human rights, civil rights, US law, the Constitution, The UN Charter ratified by the United States of America, ratified international treaties have force of law within the United States prohibiting all human experimentation without full knowledge and consent, protecting civil rights, outlawing torture and requiring civil remedies for the victims of torture, and the Geneva Conventions and Additional Protocols which preclude the willful violent, torturous, and reckless endangerment civilians and their personal assets, real property, finances, access to food, | | |
| 2-0005 | This is an unusual place to put a briefcase as most people would lay it directly behind the cab where it would not be seen by the driver until they exited the pickup cab. I stop, open the unlocked briefcase, and note an odd looking phone-like device inside. I would leave fingerprints on the lock latches indicating the case had been opened by me. | | | |
| 2-0006 | Many years later, I would deduce the odd handset and touchtone keypad were the visible elements of a briefcase-size | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | built-in satellite phone. Satellite telephones were unknown to the public and likely classified technology at that time. So, this was likely a purposeful pretext for my future surveillance and investigation under the color of law. | sanitation, and health care. | | |
| 2-0007 | My cousin, who was also with me on one of our usual Greenwater forest roads excursions, and I drove back to Greenwater, WA. The agent came out of the Greenwater Tavern as we drove up. I returned the briefcase. There was no discussion or change of expression, simply a perfunctory thanks from the agent. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0008 1973 age 17 | The family religion I was born into was considered non-mainstream. Their military service was as conscientious objectors, typically medics. Individuals in this religion were likely targets | Graduate Decatur High School with about 83 total graduating seniors. Two other District High Schools graduate 300-400 in class. Start Green River Community College. | Lead Plaintiff knowingly engaged in risk-oriented activities, including whitewater rafting, canoeing, rock climbing and other outdoor sports throughout college, and is very familiar with normal risks related to these outdoor activities. | Pres, VP Nixon, Agnew; NS Adv Kissinger; DNI None; CIA Dir Helms, Schlesinger, Walters, Colby; FBI |
| 2-0009 | of programs such as MKUltra due to collaboration and personnel crossovers between CIA Technical Services and Army Biomedical Lab illegal LSD drug dosing programs. Both my father and uncle served as Army medics in wartime but were stationed in the United States, primarily at Fort Lewis, WA and | | During and after pilot training, Lead Plaintiff planned and executed two off-airport non-emergency landings, and experienced and handled several emergencies, including a fog incursion, an accidental cloud incursion in mountainous terrain, a fuel contamination event requiring an inflight engine restart, a couple of near mid-airs, numerous difficult landings, and other incidents. | Dir Gray, Ruckelshaus, Kelly; AG Kleindienst, Bork; SecDef Laird, Richardson, Clements, Schlesinger; Chmn JCS Moorer Navy; NSA Dir Gayler, Phillips, Allen |
| 2-0010 | Fort Hood, TX, respectively. | | | |
| 2-0011 | Family members, and our extended family, were also likely targets of Cointelpro. This FBI program began | | All these risks and emergencies were handled calmly and successfully. Few of these risks present in any unusual way, so they are noted here but not explored. However, a series of potentially | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | in the Red Scare era and focused on fringe persons and groups, including civil rights and anti-war activists. It targeted non-mainstream, minority, and activist groups with tens of thousands of felony acts by FBI and the violent White Supremacist right-wing militia it funded. | | lethal, repetitive, anomalies, both incidents and patterns, have been noted since that time. Those are documented here. | |
| 2-0012 | Its targets included the evangelical Christian in-home church, one congregation of which my maternal grandfather hosted at his dairy farm home and where family history says he peacefully confronted FBI agents surveilling such a meeting from their car parked outside in one lane of the | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | country road which ran by his house when my mother was a teenager. | | | |
| 2-0013

1974 age 18 | Enter WSU Perham Hall. After semester starts, Resident assistant Brian on floor is replaced by Mike Cunha, USAF ROTC and "aspiring" psychiatrist. Also engaged in recreation program for canoeing, rafting, rock climbing during this period which is contra-indication of mild mood disorder. | Start sophomore year at WSU, Pullman, intending to graduate in chemical engineering. Poor calculus skills, weak study habits, and excessive alcohol-fueled socializing led to change of major, first pre-law, then to business administration. | Cliff face fall while rock climbing may be first high threat physical use of BRMT. Loss of balance during momentary blackout recollected. This led to a fall out of a 5.4 crack on the first move which pendulums me onto a 5.10 rock face in hiking boots which are unsuitable for the tiny holds which exist on a 5.10 rock climbing face. Use roped climbing harness belay support from my climbing partner as my lifeline to complete this climb and avoid a 70-100 foot fall to the base of the rock face. | Pres, VP Nixon, Ford then Aug 9 Ford, Rockefeller; NS Adv Kissinger; DNI None; CIA Dir Colby; FBI Dir Kelly; AG Bork, Saxbe; SecDef Schlesinger; Chmn JCS Moorer Navy , Brown AF; NSA Dir Allen |
| 2-0014

2-0015 | First serious girlfriend and breakup during this period. My lifecycle pattern beginning about | | This is a possible initial BRMT brain chemistry | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | this time has strong similarities with lifecycle pattern of my father's brother, the first to graduate from college in our family history. This lifecycle echo continued with his strong start at a Savings and Loan, (similar to mine at Haskins and Sells) followed by on-going lifecycle struggles over many subsequent years. | | intervention here to develop modest mood disorder and move me toward this type of counseling and training. | |
| 2-0016 1975 age 19 | Move to WSU student apartment with Page (likely minder), and Ng (British citizen of Hong Kong). Complete FAA private pilot license exam on 11-12-75. | | | Pres, VP Ford, Rockefeller; NS Adv Kissinger, Scowcroft; DNI None; CIA Dir Colby; FBI Dir Kelly; AG Saxbe, Levi; SecDef Schlesinger, Rumsfeld; Chmn JCS Brown AF; NSA Dir Allen |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0017 1976 age 20 | Apply to US Navy Aviation Reserve Officer Corps AVROC pilot training program very late 1975 or early 1976. Complete medical exam at regional induction center, complete spatial orientation test with very high score, complete | | Experience engine-out during climb out several minutes after from Billings, MT airport departure enroute to Pullman, WA. The normal fuel testing process was used after refueling at Billings. No water was noted in the fuel system during this routine test. | Pres, VP Ford, Rockefeller; NS Adv Scowcroft; DNI None; CIA Dir Colby, Bush; FBI Dir Kelly; AG Levi; SecDef Rumsfeld; Chmn JCS Brown AF; NSA Dir Allen |
| 2-0018 | pro forma interview at WSU by two young recruiting officers. Declined program admission during interview due to existing due to post-Vietnam pilot surplus, per Navy interviewers. | | Since this engine-out occurred at altitude several minutes after departure during the heavy fuel use of climb out, it was likely that water introduced to the fuel tank very late in the refueling process at Billings and then sank as a water bubble to the engine carburetor fuel inlet during the climb-out. This suggests | |
| 2-0019 | Remain in WSU student residential housing with Page (minder and roommate) through 1977 graduation. | | deliberate introduction of water contamination late in the refueling process. The line person doing the refueling was a middle-aged white male, not the young junior person typically employed in this role. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0020<br><br>1977<br>age<br>21 | At Sackville-West wedding, Page describes himself and I as looking like a pair of Secret Service agents (I have/had no such aspirations). Move to Coeur d'Alene, ID in summer to start job, quit job, return to Federal Way to apply for graduate school. | Graduate WSU, B.A. Business Administration. After short and markedly unsuccessful stint as Life Insurance agent in Coeur d'Alene, ID working for John Hancock Insurance agency in Spokane, WA, return to parents home and work as dairy delivery driver and take GMAT and apply to enter MBA program at WSU. | | Pres, VP Carter, Mondale; NS Adv Scowcroft, Brzezinski; DNI None; CIA Dir Bush, Knoche, Turner; FBI Dir Kelly; AG Levi, Thornburgh, Bell; SecDef Rumsfeld, Brown; Chmn JCS Brown AF; NSA Dir Allen, Inman |
| 2-0021<br><br>1978<br>age<br>22 | | Enroll WSU grad school in February. Share office space with Economics PhD candidates from Malawi and Iran. Meet Egyptian Economics PhD hired by State Department on graduation. Attend MBA classes and write MBA graduation exam with chemical engineer from Indian subcontinent. Work as teaching assistant to Prof. Irving Field, Prof. | | Pres, VP Carter, Mondale; NS Adv Brzezinski; DNI None; CIA Dir Turner; FBI Dir Kelly, Adams, Webster; AG Bell; SecDef Brown; Chmn JCS Brown AF, Jones AF; |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Paul Shaffer. Shaffer refers me in early 1979 to Deloitte Denver which refers me to Deloitte Seattle where I am hired. | | NSA Dir Inman |
| 2-0022 1979 age 23 | Spring Break Interview trip to GTE, Stamford, CT, then to DC. Cameo encounter with CIA Director Turner in National Gallery of Art East Building rotunda. CIA is prime mover since 1940s in mind control as a national security aspiration, which continues on as BRMT after MKUltra's 20 years of serial felonies as LSD and mescaline drug dosing program against unwitting US civilians and soldiers. Meet future spouse Lynne at work, Fall. | Graduate WSU with MBA degree. Start Haskins & Sells in August, then audit Safeco Mutual Funds at their Seattle headquarters. | | Pres, VP Carter, Mondale; NS Adv Brzezinski; DNI None; CIA Dir Turner; FBI Dir Webster; AG Bell, Civiletti; SecDef Brown; Chmn JCS Jones AF; NSA Dir Inman |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0023 1980 age 24 | Move from parents home to Kirkland area in 1980 to be closer to Lynne. Develop friendship with Safeco audit manager and husband, an FBI agent in Seattle office and Seafair pirate. Dinner dates, parties and an impromptu marriage counseling session with audit manager while agent-husband nearby and local police officer witnesses me putting hand to head to place drunken and distressed audit manager in back seat of our vehicle so she will not drive her own vehicle in this circumstance (likely a set-up scenario but considered authentic in that moment). | Pass CPA exam, transfer to Consulting unit. Firm's name changes to Deloitte, Haskins and Sells (DHS). Conduct strategy project with Farm Credit Banks – Spokane, among others. | | Pres, VP Carter, Mondale; NS Adv Brzezinski; DNI None; CIA Dir Turner; FBI Dir Webster; AG Civiletti; SecDef Brown; Chmn JCS Jones AF; NSA Dir Inman |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0024 1981 age 25 | At some point soon after my employment at Deloitte (Haskins & Sells), I am walking from an ATM in my office building to my parked vehicle to pay for parking to avoid the penalty or impoundment boot associated with non-payment in an unattended parking lot, in the morning hours, around 8:30 to 9:30 am. As I walk past along the lawn of the Federal Courthouse to cross Interstate 5 to the parking lot, two unmarked cars and a van sweep into the Courthouse's underground garage about 40 feet ahead, carrying a high-value prisoner facing domestic terrorism charges. I am the only pedestrian in the area. This class of | Begin working with DHS National Financial Institutions practice around this time. Conduct strategic planning training seminars for FDIC bank examiners in DC and at Bank Administration Institute CEO seminars nationwide. Earn DHS Financial Institution Specialist consulting designation. | | Pres, VP Reagan, Bush; NS Adv Brzezinski, Allen; DNI None; CIA Dir Turner, Webster; FBI Dir Webster; AG Civiletti, Smith; SecDef Brown, Weinberger; Chmn JCS Jones AF; NSA Dir Inman, Faurer |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | event will happen again later, more than once. | | | |
| 2-0025  1982 age 26 | Lynne passes out on bicycle ride and strikes head on pavement. After the ambulance ride to hospital which I follow in as passenger in Seppi's car, she insists on unsafe hospital release, falls again in adjacent parking lot on walk home from hospital. Stranger stops during our walk home while I am restraining her from unsafe behavior on sidewalk and gives us ride home after fire department ambulance demonstrates her irrational panic. Sequence is likely BRMT initiated. | IT Consulting Director Blair departs Seattle office to Honolulu, later to large scale Saudia Airline project, CIA commercial cover. | | Pres, VP Reagan, Bush; NS Adv Allen, Clark; DNI None;  CIA Dir Casey; FBI Dir Webster; AG Smith; SecDef Weinberger; Chmn JCS Jones AF, Vessey Army; NSA Dir Fareur |
| 2-0026 | | Westin Seattle Hotel profit improvement project lead brought | One of the most threatening early personal physical | Pres, VP Reagan, Bush; NS |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 1983 age 27 | | to my attention by another MBA graduate. I develop sales lead into project which begins shortly after Queen Elizabeth II visits Seattle Westin Hotel. Queen greets lobby visitors as I leave hotel around 5pm. All visitors would have been pre-screened for security purposes (first known indirect contact with MI-6). Queen and I are the only two people moving about the lobby at that time. | manifestations of BRMT occurs during this 1982-1986 period, though exact timing not recollected - a motor vehicle melatonin overdose (sleep hormone) assault in early afternoon on BC Sea-to-Sky Highway about ten feet from 100 foot high sea cliffs on the west side of this two lane highway with no guard rail, a few miles south of Squamish, BC just north of the Porteau Cove Overlook. | Adv Clark, McFarlane; DNI None; CIA Dir Casey; FBI Dir Webster; AG Smith; SecDef Weinberger; Chmn JCS Vessey Army; NSA Dir Fareur |
| 2-0027 | | Seattle Westin Hotel General Manager supervised the opening of the first Westin Hotel in Johannesburg, South Africa, the primary banking center for all of southern Africa, shortly before the South Africa ATM project is undertaken by Moller, a Consulting Manager in the Seattle office of DHS. After completion of Westin project, I am invited to a hotel industry conference in | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Vancouver, BC to make a presentation and receive an award (first known contact with CSIS). | | |
| 2-0028<br><br>1984<br>age<br>28 | Marry Lynne, adding two early teen stepdaughters. Ex-husband /father is King County Sheriff serial killer task force leader and later precinct commander. | Asked if I wanted to run consulting in Deloitte Honolulu office, decline. Sheldon-Lee develops scheduling software for Westin, which Westin declines after corporate CFO demo, $8K spent. Moller joins and departs a few months later to CIA commercial cover South Africa ATM project. | Experience overt BRMT symptoms by crying in presence of antique fire engine during July 4 Winslow, WA parade. Also note close observation by strangers in nearby arts and craft gallery prior to parade. | Pres, VP Reagan, Bush; NS Adv McFarlane; DNI None; CIA Dir Casey; FBI Dir Webster; AG Smith; SecDef Weinberger; Chmn JCS Vessey Army; NSA Dir Fareur |
| 2-0029 | | Join PCC Board of Directors for two years on referral from DHS Consulting administrative assistant. FBI used covert surveillance and management takeovers against consumer cooperatives during this and prior eras, as they did in Cointelpro. Typical members include people then outside the mainstream, such as consumers of organic | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | foods, mostly "hippies, " activists, and certain religious orders. Coops managements I met were consistently middle-aged White males, a profile completely at odds with typical cooperative membership during that era. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0030 1985 age 29 | Sell spouse Lynne's home in Kirkland, purchase Redmond home. Both stepdaughters in college. | Extensive travel, spend much of the year commuting to Amfac software deployment project in Folsom, CA and to San Francisco Schools administrative evaluation project. DHS national consulting reorganization consolidates Portland and Seattle with San Francisco, resulting in a new boss in Seattle. | A routine Stevens Pass ski trip with spouse includes an unusual public BRMT induced apres-ski anger flare by spouse, resulting in mild argument and accidental wine spilled which "triggers" a dangerous snow and ice nighttime walk by spouse down the Stevens highway. This BRMT episode held high risk potential for both of us. I loaded our skis and gear on the car and went in search of her, catching | Pres, VP Reagan, Bush; NS Adv McFarlane, Poindexter; DNI None; CIA Dir Casey; FBI Dir Webster; AG Smith, Meese; SecDef Weinberger; Chmn JCS Vessey Army, Crowe Navy; NSA Dir Fareur, Odom |
| 2-0031 | | Palau government enterprise accounting system project begins during this time to prepare for independence. Funded by the US Department of Interior, the project is conducted by a DHS Seattle office IT consulting manager and a consultant hired from WSU MBA program. They also work on Portland Power and Light project in Portland, Oregon. Both projects involved enterprise information systems, like the Saudia and | up after about 1.5 to 2 miles. I implored her to return to the vehicle, received a couple of irrational answers, but eventually persuaded her to return to the car to continue home safely. | |
| 2-0032 | | | Had my spouse disappeared on her lonely winter nighttime walk on a snowy mountain pass highway, I would have been immediately fingered as the key suspect, despite the total ignorance of both of us to BRMT hijacking. This risk has and does exist for any and all targets of BRMT. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | South Africa ATM projects (all are useful as broad-form intelligence acquisition or spying platforms). | Having experienced numerous attempted lethality events over nearly 50 years, as shown in Table 1 at page 30-46 of the Complaint, it is impossible to rule out this as a desired outcome of Defendant United States for this particular event sequence. | |
| 2-0033 | | These systems are also usable for broad-form intelligence gathering, similar to the NSA metadata program surfaced years later by Edward Snowden. This NSA metadata collection caused immediate public outrage but was not shut down until six years later, long after Congressional leaders and many public interest groups condemned it as systemic violation of Constitutional rights and the Fourth Amendment. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0034 | | Chair PCC Board for one year, then depart. | | Pres, VP Reagan, Bush; NS Adv |
| 2-0035 | | Leave Deloitte in Summer due largely to poor relationship with Henderson, new Seattle office senior consulting executive. My consulting practice extended nationwide due to my financial services industry specialization. Henderson instructed me to terminate all my out of region consulting. I refused this direction and resigned a few weeks later. | | Poindexter, Carlucci; DNI None; CIA Dir Casey; FBI Dir Webster; AG Meese; SecDef Weinberger; Chmn JCS Crowe, Navy; NSA Dir Odom |
| 1986 age 30 | | | | |
| 2-0036 | | Join LazerSoft as CFO. CEO "fired" about 75 days later, replaced by me with $10K left in bank, about 6 staff and 5-8 contractors, payroll due in 5-7 days. Raise about $500K additional funds for equipment and software development. Development delays force staff cuts and string out development process. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Pin-out sabotage of a channel interface device stalls urgently needed cash flow for weeks during Puget Sound Power and Light system implementation process. | | |
| 2-0037 | | This type of drag-out sabotage of projects and related frauds sequence was to become a very familiar pattern from this time forward into 2022. | | |
| 2-0038  1987 age 31 | In late 1987, spouse Lynne announces affair with co-worker, which was likely caused by BRMT oxytocin overdose in presence of a serial adulterer co-worker, though had no awareness of BRMT technology at that time. | Complete Lazersoft software development and system integration. Sell systems to electrical utility, airline, insurance company, others, between 1986 to 1989. Salesperson during this era is also a Colonel in the Washington Army National Guard, reporting directly to the Commanding General. | | Pres, VP Reagan, Bush; NS Adv Carlucci, Powell; DNI None;  CIA Dir Casey, Gates, Webster; FBI Dir Webster, Otto, Sessions; AG Meese; SecDef Weinberger, Carlucci; Chmn JCS |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | | | Crowe Navy; NSA Dir Odom |
| 2-0039  1988 age 32 | Divorce forces sale of Redmond home (April) in conjunction with divorce. Sale arranged approximately 10 days from listing, possibly deliberately underpriced to benefit a favored buyer. | Walden and 2 other VC firms, one US and Ventures West (second known inclusion of CSIS) in BC, Canada, make a $2.2 million financing offer. Walden then withdraws as lead investor during the due diligence process at direction of San Francisco partner to Seattle junior partner. | | Pres, VP Reagan, Bush; NS Adv Powell; DNI None; CIA Dir Webster; FBI Dir Sessions; AG Meese, Thorburgh; SecDef Carlucci; Chmn JCS Crowe Navy; NSA Dir Odom, Studeman |
| 2-0040 | Introduction to second spouse is arranged in late Spring or Summer by Waters (LazerSoft engineer) at supposedly spontaneous weeknight event at Greenwood Inn Bellevue with the two of us and a party including my future second spouse and some of her "co-workers" at First American Title | I fly to San Francisco, CA to seek another lead venture capital firm in San Jose, CA as lead investor but am declined, forcing sale to Pacer. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | Insurance, Bellevue, WA. | | | |
| 2-0041 1989 age 33 | | Ordered by LazerSoft Board of Directors to accept the very first offer proposed, a very uncommon negotiating technique. Sign Letter of Intent to sell LazerSoft to Pacer, Bothell, WA, a movie theater ticket systems company (another broad-form intelligence platform) after the "failed Walden VC deal." | | Pres, VP Bush, Quayle; NS Adv Powell, Scowcroft; DNI None; CIA Dir Webster; FBI Dir Sessions; AG Smith; SecDef Carlucci, Taft, Cheney; Chmn JCS Crowe Navy, Powell Army; NSA Dir Studeman |
| 2-0042 | | Months of pre-merger delay include the stress of several months of bank default on company loans guaranteed by shareholders, and six weeks without pay as Wembley PLC (UK) announces and acquires Pacer before the LazerSoft acquisition can be completed.  This is my first or second unwitting experience with a likely purposeful | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | business force-out and/or programmed failure, with many more to follow over subsequent years. | | |
| 2-0043 | | This is also my first unwitting involvement directly in a series of cross-border acquisitions of broad-form intelligence platforms usable by foreign intelligence services in a partner country. This method "permits" under color of law a foreign intelligence partner to legally acquire and share otherwise illegally acquired intelligence with an intelligence "cousin" or a police powers "partner" in the country where the spying occurs. Carefully scrubbed of its origins, it is otherwise known as a Fourth Amendment violation. | | |
| 2-0044 | | I am terminated by a Pacer senior executive as CEO of LazerSoft at merger closing, then | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | offered a return opportunity a few weeks later to an undefined role at Pacer, which I decline. Accept employment as COO at fax switch startup in Redmond, WA, (another broad-form intelligence platform). Resign that position very soon thereafter due to apparently strong dissension in the senior management team. | | |
| 2-0045 1990 age 34 | Remarry, one early teen stepson, then a sequence of approximately five separate toss-outs or move-outs by spouse through 2005, typically of 3-6 months duration. Move into spouse Jeanette's home, then overhaul backyard landscaping and deck using personal funds and labor. | Purchase Steve's Maintenance, which was SBA bonded. Denied SBA bonding shortly after purchase completed, greatly imperiling business viability. Staff are added, unbeknownst to me as new primary owner, before deal closes, adding to overhead costs. Rename as Alliance Environmental. Projects are primarily asbestos abatement at schools in western Washington. | | Pres, VP Bush, Quayle; NS Adv Scowcroft; DNI None; CIA Dir Webster; FBI Dir Sessions; AG Smith; SecDef Cheney; Chmn JCS Powell Army; NSA Dir Studeman |
| 2-0046 | Halt personal compensation from Alliance | Halt personal compensation months | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | about 4 to 6 months after business purchase and work for zero compensation through early 1993 as I attempt to save the company. | after purchase and work for zero compensation from about Q3 1990 through Q1 1993 as I attempt to save the company. | | |
| 2-0047 | Foregone compensation totals about $150,000 to $200,000 between mid-1991 and early 1993. | Commence $160K project cost recovery dispute with Steve's Maintenance former owners which settles at about 50% during pre-litigation conference. Alliance Environmental also loses its US Bank accounts receivable financing line due to early losses caused by overstaffing by former owner during the acquisition process. Former owner also misappropriates a $100K plus contract payment on a public sector project taken over from Steve's Maintenance, creating added legal expenses as the misappropriation is compromised to avoid litigation expense. | | |
| 2-0048 | | Complete Snoqualmie High School, Snoqualmie, WA, | | Pres, VP Bush, Quayle; NS |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 1991 age 35 | | asbestos abatement project, various other Western Washington schools asbestos abatement projects, including Sedro Woolley, WA, and Anacortes, WA high schools. | | Adv Scowcroft; DNI None; CIA Dir Webster, Kerr, Gates; FBI Dir Sessions; AG Smith, Barr; SecDef Cheney; Chmn JCS Powell Army; NSA Dir Studeman |
| 2-0049 1992 age 36 | | Sea-Tac Airport terminals expansion project asbestos abatement subcontract is awarded using Utah Insurance company as bonding company. Our start is delayed, likely deliberately, then we are forced to dramatically accelerate performance due to a general contractor scheduling error. | | Pres, VP Bush, Quayle; NS Adv Scowcroft; DNI None; CIA Dir Gates; FBI Dir Sessions; AG Barr; SecDef Cheney; Chmn JCS Powell Army; NSA Dir Studeman, McConnell |
| 2-0050 | | This is likely a deliberate orchestrated sabotage as we are forced to dramatically, quickly expanding our high- | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | performance 20 person team to about 80 people on two shifts. This is very expensive as we must sift through new staff to find productive employees among the mass of hires we add to accelerate the project. This creates substantial financial stress on our small company. | | |
| 2-0051 | | Bonding company is seized by Utah Insurance Commission (most likely this had occurred even before the SeaTac project is awarded to our company.) Empty company offices in Utah are then used as cover for Defendant United States, whose agents pose as company officers, and meet Lead Plaintiff in the empty former office building of the insurance company. | | |
| 2-0052 | | Defendants issue a fraudulent project performance bond to the project general contractor on our | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | behalf. This performance bond is subsequently revoked mid-project, imperiling our company. | | |
| 2-0053 | | I assign employees and project proceeds to Pacific Financial Services, so staff can continue to be paid. Alliance Environmental is also forced to retract $1.2 million FAA Auburn ATC Center renovation bid we were to be awarded due to this loss of bonding. I am forced to close/liquidate Alliance in the second quarter after financing search in Vancouver with funds finder Cornwell fails (second known inclusion of CSIS agents). | | |
| 2-0054  1993 age 37 | Personal bankruptcy filing in November due to $65K personal guaranty liability from Pacific Financial Services factoring. Zero compensation | Join PAN Environmental as COO in late Summer, Cornwell is CEO. Travel frequently to Ontario, CA as 2 subsidiaries are located there. Zero compensation | | Pres, VP Clinton, Gore; NS Adv Scowcroft, Lake; DNI None;  CIA Dir Gates, Woolsey, |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | throughout the year. | received throughout as await alleged Credit Lyonnaise Laing investment bank financing to be arranged by Managing Director Michael Kurtanjek (MI-6 using mining industry cover) who was allegedly referred by John Young, Vancouver, BC (third known inclusion of CSIS in a project I am unwittingly tasked to). $150,000 account receivable of PAN Environmental subsidiary is factored in southern California. All funds mysteriously disappear into the factor's bank after PAN CEO promise to pay me compensation from that receivable, but it is allegedly seized by the bank to repay an outstanding debt of the factor to the bank. PAN CEO Cornwell declines to take any action to collect the sum due from the factor, so I am once again strung out financially and the promise is broken. | | Studeman; FBI Dir Sessions, Clarke, Freeh; AG Barr, Gerson, Reno; SecDef Cheney, Aspin; Chmn JCS Powell Army, Jeremiah Navy, Shalikashvili Army; NSA Dir McConnell |
| 2-0055 | Receive about $22,000 of $40,000 Lazersoft bonuses related to 1989 Pacer/Wembley acquisition which were due on post-acquisition sales. Paid by Waters, a former co-worker upon settlement of work-for-hire case. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0056 | | The original bankruptcy case filed by me and two other individual former officers against LazerSoft during this period mysteriously results in absolutely no court action or notices from the bankruptcy. With the benefit of hindsight, this is likely due to Hibbs actual fraudulent failure to file this litigation while acting against my personal interests in this matter. | | |
| 2-0057 | | Extensive and expensive subsequent litigation includes a federal court hearing on the standing of Wembley, which federal court denies. The case is not resolved but yet another matter is allegedly filed, related to Waters ownership of the software work product, allegedly adding more litigation expense. Waters reports a $30,000 overbilling by Short Cressman Burgess | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | lead attorney Robert Hibbs. Most likely this too is an inside job, with my two remaining co-workers, Tarpley and Waters, actually operating as members of my minder team throughout the entire sequence. | | |
| 2-0058 | | Notably, Robert Hibbs was another in the trail of attorneys who did no legal work on the corporate clients I worked for or owned between 1986 and 2005. These included Lazersoft - Glen Garrison at Keller Rohrback; CNA Industrial Engineering - Mike Babcock (also spouse of co-worker Gwen Heathcote at Deloitte Haskins and Sells); Allegent, LLC dba Performa - Michael Larson - Larson Hart & Shepherd, later Pivotal Law Group (who was originally introduced by Jay Conte, a federal commercial cover agent specializing in | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | financial frauds, likely a FBI or IRS special agent). | | |
| 2-0059 1994 age 38 | Invited to join Board of Directors of Pacific Pipeline by Chuck LeFevre, who is the on-going CEO of NutraSource, a company I was involved in starting while on the Board of Trustees of PCC. Other Board members include Kit's Camera CEO Phil Lalji, and newly named CEO, who is the former CEO of Egghead Software. Both these retail platforms could plausibly be used to develop domestic intelligence outside of legal Fourth Amendment channels. | Credit Lyonnaise Laing (CLL) Kurtanjek investment banker (MI-6 agent using mining finance cover) is introduced to me by PAN CEO Cornwell in Summer at Los Angeles Airport Hilton. I make 3 financing trips to London to support alleged Kurtanjek/CLL financing efforts, which fails (a familiar pattern I do not yet recognize). | Experience severe flu-like symptoms immediately after returning from final three week trip to London for PAN. Then develop deep vein thrombosis from sitting upright for 30 hours to relieve pain after back injury immediately upon being able to resume normal life. Five day hospital stay results. | Pres, VP Clinton, Gore; NS Adv Lake; DNI None; CIA Dir Woolsey; FBI Dir Freeh; AG Reno; SecDef Aspin, Perry; Chmn JCS Shalikashvili Army; NSA Dir McConnell |
| 2-0060 | | Upon arrival on one of these three London trips, I am the only person in mid-afternoon in a Heathrow terminal expansion construction project tunnel and meet an anti-terror squad trotting through the tunnel into the passenger terminal area. Stay at Copthorne Tara in Kensington, commute by black cab or subway to City of | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | London offices for meetings and drinking lunches each weekday in a trading floor adjacent conference room at CLL London offices. | | |
| 2-0061 | | Named as Defendant as officer in freelancer suit against PAN, no other officer defendants show up for arbitration. No personal liability, but must expend $2200 legal fees to win arbitration. | | |
| 2-0062 1995 age 39 | About six months later, the new CEO is fired by the Founder Chairman having lost 50% of Pac Pipe's equity in six months and I am asked to become COO. (I would see this pattern repeat at my next move, CNA Industrial Engineering, just before being asked to take over as Managing Director but am still clueless and trying to pursue | Added as Pacific Pipeline COO. Rescue Pac Pipe from failed ERP implementation during Oct 95 - Feb 96 busy period which also adversely impacted hundreds of independent bookseller customers during this critical holiday sales period. Wholesale book sales information systems are another broad-form intelligence gathering platform for spying on rights, cannabis, and anti-war activists during this and prior eras. | | Pres, VP Clinton, Gore; NS Adv Lake; DNI None; CIA Dir Woolsey, Studeman, Deutch; FBI Dir Freeh; AG Reno; SecDef Perry; Chmn JCS Shalikashvili Army; NSA Dir McConnell |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | productive employment.) | | | |
| 2-0063 | Having no other employment options at the time, I accept. (Defendant United States is employing mail fraud and wire fraud to sustain control and keep me in their network of captive employers and spying platforms.) My $125,000 base Pacific Pipeline compensation is noted as surprisingly low by other Board of Directors members, but I am unable to bargain due to complete absence of compensation due to prior frauds of Defendants which left me with no compensation from mid-1990 and created extreme problems for household finances. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0064 | Expand master bedroom in late 1995 and early 1996 using about $20,000 of personal funds and labor. | | | |
| 2-0065 1996 age 40 2-0066 2-0067 | Stepson gradually develops schizophrenia after attending and almost completing alternative high school, then has a psychotic break, and over the next few years his behavior becomes increasingly problematic until he assaults his mother for the second choking episode, continues to refuse medication, and is told to leave. Spouse works overtime to secure alternate housing and treatment, very difficult. | Attempt Pac Pipe leveraged buyout as ERP system is stabilized. Terminated as COO Pac Pipe, Spring. Join CNA Industrial Engineering in Nov. General Manager is formerly from Nicaragua during Contra era. Within 18 months, the entire management team is removed, and I am "selected" as Managing Director. | During late 1995 or 1996, I experienced repeated DVT like symptoms during frequent commercial airline flights and at other times. Many years later, I am able to determine this is BRMT lighting up the nerve network but this prior brush with deadly potential outcome keeps me on edge for many years whenever this nerve network light up is induced by BRMT actuation. When I am referred to a specialist, the very attractive female technician examines my leg for nearly 25 minutes, and I experienced BRMT induced excessive testosterone activation. When she finds nothing, she calls in the male doctor who swiftly and | Pres, VP Clinton, Gore; NS Adv Lake; DNI None; CIA Dir Deutch, Tenet; FBI Dir Freeh; AG Reno; SecDef Perry; Chmn JCS Shalikashvili; NSA Dir McConnell, Minihan |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | | somewhat angrily concludes there is nothing wrong with my leg circulation. | |
| 2-0068 1997 age 41 2-0069 | Overhaul kitchen and family room using personal labor and approximately $20,000 of credit card debt and earned income. | My first CNA project at the Sony CD plant in Eugene, OR is a package handling automation project.<br><br>Greg Lins, CNA VP, "sells" a project for a Davidson/CUC software distribution warehouse systems design and sorter integration project in Torrance, CA. I am assigned to manage this project (slated to eventually fail) which uses an Accu-Sort sorter (the sabotaged single point of failure implemented by a prime USPS optical sortation system platform provider which detects barcodes and sorts mail). | | Pres, VP Clinton, Gore; NS Adv Lake, Berger; DNI None; CIA Dir Tenet; FBI Dir Freeh; AG Reno; SecDef Perry, Cohen; Chmn JCS Shalikashvili Army , Shelton Army; NSA Dir Minahan |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0070 | | I develop high-level design for the engineering and IT team on the project and manage implementation of an integrated system incorporating an order cubing innovation to pack direct to individual shipping cartons prelabeled for shipment. This eliminates the equipment and labor expenses and workflow steps related to warehouse totes and the recirculation system used to manage their return movement to the manual or automated product selection system. | | |
| 2-0071 | | This innovation saves millions of dollars on this project and at Nikken, a Japanese multi-level marketing firm we successfully complete later on. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0072 | | The officer and employee turnover cycle at Pacific Pipeline and this one at CNA would, long after the fact, be recognized by me as a rotation to other assignments of intelligence personnel. CNA Industrial Engineering's basic purpose was not to make money for the "owner," who seemed to care more about getting a project than about making money on any project. | | |
| 2-0073 | | The prior CNA engineering and IT team had also designed Oracle Corporation's physical software distribution system which incorporates the shipping system used to track distribution of Oracle software, which is also usable as a broad-form intelligence platform. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0074 | | CNA's purpose before I arrived was to engage in domestic intelligence gathering operations related to the "Japanese Miracle" which brought Nintendo, Sega, Sony, Pioneer, and other Japanese companies to the USA. CNA worked with those companies on the design and implementation of their products' physical distribution systems. | | |
| 2-0075 | | This same basic fact set is also true of the shipping system provider, Michael Kurgan, who was used at the suggestion of Darrell Pray (former CIO of Food Services of America, then NutraSource, then Pac Pipe CIO, then CNA IT Director, and finally Performa "business partner") on the CUC/Davidson project. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0076 1998 age 42 | Begin major residence transformation, adding new front façade and second floor. Experience first BRMT-induced backward statue fall from ladder during this period | CUC Accu-Sort sorter project fails after 16-18 months in Torrance, CA. (Accu-Sort senior technicians come on-site several times after implementation, tune the system, and the sorter would fail a little later. The phone support system is used to arrange this series of failures and to sustain the true intent of the project to keep me occupied and in Torrance.) | Begin experiencing statue falls from ladder while ascending to roof of residence and later on mountain trails throughout late 1990s and continuing into 2022 with BRMT induced stumbles and falls in dangerous locations such as bed rollout striking head on nightstand, Met Museum stairs, hospital recovery room, purposely darkened stairways in warehouse and NYC public park. | Pres, VP Clinton, Gore; NS Adv Berger; DNI None; CIA Dir Tenet; FBI Dir Freeh; AG Reno; SecDef Cohen; Chmn JCS Shelton Army; NSA Dir Minahan |
| 2-0077 | | Promoted to COO at CNA after departure of entire management team during first year. Extensive layoffs are required to stabilize finances. Principal projects are Boeing Delta IV rocket assembly plant in Decatur, AL, Media Arts Group, Morgan Hills, CA, and HomeGrocer multiple warehouses design and implementation on West Coast. | | |
| 2-0078 | | CUC sues CNA and Accu-Sort due to | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Accu-Sort sorter repeated fails, likely due to system sabotage through remote support system when off site, costing CNA all profits from this project. | | |
| 2-0079 | | Media Arts Group (MAGI) project manager (commercial cover CIA) returns to Thailand from temporary position at MAGI (Thomas Kinkade, artist) after approximately 6 months | | |
| 2-0080<br><br>1999<br>age<br>43 | | Join AeA, a trade association started by HP founders which represented Microsoft, Intel, HP, Motorola, and other tech firms. I form and chair Higher Education Task Force on higher education in Washington state, deliver report to Governor and various Legislative Committees.<br><br>Conduct extensive speaking engagements with current and former | | Pres, VP Clinton, Gore; NS Adv Berger; DNI None; CIA Dir Tenet; FBI Dir Freeh; AG Reno; SecDef Cohen; Chmn JCS Shelton Army; NSA Dir Minahan, Hayden |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | governors, other political and business leaders, college/university leadership, and legislative leadership throughout Washington state. Governor secures 750 additional high demand enrollment slots, including STEM degrees, from Legislature and Higher Education Coordinating Board approves a new electrical engineering program at Eastern Washington University. | | |
| 2-0081 2000 age 44 | Take voluntary 25% pay cut as cash flow becomes problematic and owner removes $100K from company cash and refuses to return it to company. | HomeGrocer owes approximately $500,000 to CNA, which we are forced to arbitration to settle for $250,000, dramatically reducing CNA cash flow and its ability to pay employees. | | Pres, VP Clinton, Gore; NS Adv Berger; DNI None; CIA Dir Tenet; FBI Dir Freeh; AG Reno; SecDef Cohen; |
| 2-0082 | | Requested by WA Governor Locke through his Chief of Staff to join Higher Education Coordinating Board replacing current | | Chmn JCS Shelton Army; NSA Dir Hayden |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Chair, a wealthy Costco co-founder. Also asked to join Board of Lake Washington Community College by its President. Decline both invitations due to 1993 Alliance failure. It had resulted in unpaid state worker compensation premiums, primarily due to SBA bonding refusal and original owner's funds misappropriation. | | |
| 2-0083 2001 age 45 2-0084 | Extensive street-level coercive psychological operations begin in aftermath of 9/11 and continue throughout all subsequent years to date with increasing intensity. | Begin term as Chair, AeA Pacific Northwest Council, succeeding Microsoft VP Government Relations in that position. Join AeA National Board. While attending the May AeA National Board meeting in DC, Vice President Cheney's limousine enroute toward the White House from the House side of Capitol Hill, crosses an intersection where I sit in a taxicab from Dulles enroute to the hotel meeting site for | | Pres, VP Bush, Cheney; NS Adv Berger, Rice; DNI None; CIA Dir Tenet; FBI Dir Freeh, Pickard, Mueller; AG Reno, Holder, Ashcroft; SecDef Cohen, Rumsfeld; Chmn JCS Shelton Army, Myers Navy; |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | the Board meeting that week. | | NSA Dir Hayden |
| 2-0085 | | I sit through an Adam Smith District Day meeting the next day. Then I attend a Congressional hearing with my escort, Rep. Adam Smith's District Director. | | |
| 2-0086 | | I unknowingly miss introductions to the two State of Washington Senators with other Board members during that time. | | |
| 2-0087 | | I meet for 90 minutes, an unusually long discussion, discussing higher education in a Capitol Hill Congressional office building office styled as a television studio style office with Rep. Jennifer Dunn (R-WA). Dunn represents the District which includes Microsoft and is a close political ally of Bush 43. | | |
| 2-0088 | | Tour White House West Wing one evening with a group | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | of AeA Board members and pose for a photo at Press Room podium. A Secret Service agent also shows us the old swimming pool below the Press Room which replaced it. | | |
| 2-0089 | | I am contacted in late Summer to support a Navy engineering subcontract at Puget Sound Naval Shipyard. We begin discussions on the project, then it is delayed due to the post-9/11 escalation of the shipyard's security alert status, which is common practice across military and other sensitive facilities at the time. | | |
| 2-0090 | | AeA November National Board meeting is moved to NYC in the aftermath of 9/11. Bush 43 revisits WTC site with Kofi Annan, UN Secretary-General, on November 11. That evening I attend a AeA National Award dinner at the | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Beekman Tower Hotel on the corner of East 49th and 1st Avenue, which is across East 49th from the northwest corner of the UN campus. | | |
| 2-0091 | | As I attempt to cross 1st Avenue to the Beekman Tower Hotel, 20 to 30 NYPD police vehicles which has escorted the Presidential limousine carrying Bush 43 through Manhattan, sweep south down 1st Avenue to the 1st Avenue tunnel entrance at 60 to 70 mph, do 180 degree turns at the tunnel entrance and park in echelon formation just north of 49th Street. | | |
| 2-0092 | | I attend the AeA National Board visit to the 9/11 WTC family viewing platform the following day, November 12th. | | |
| 2-0093 | | I now jump ahead briefly to 2007 to provide some additional context. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Bush 43 will still be in office until January 20, 2009. | | |
| 2-0094 | | In 2007, soon after I am trafficked from 17 months of homelessness in Boston to fake employment at Establish in Fort Lee, NJ, I would be accorded a similar "honor." I was met at the Port Authority Bus Terminal South Building by about 20-30 members of Defendant NYPD's submachine gun equipped tactical response unit standing in a block-wide line at the vehicle barriers along the 8th Avenue entrance. | | |
| 2-0095 | | By this time, I am the carefully pretexted subject of a counter-terror investigation by the regional Joint Terrorism Task Force for New York City and northern New Jersey, a completely undeserved "honor." | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0096 | | This "honor" was just the next step of Defendant United States, enlisting co-conspirators from around the United States in a very calculated escalation by Defendant United States. In the aftermath of 9/11, it uses newly acquired powers and funding to accelerate BRMT development and to perpetuate the ongoing "state secrets" coverup of this RICO criminal program against US persons. | | |
| 2-0097 | | Confirmation of the terror investigation by Defendant NYPD is shown at Interline Exhibit 13, page 121 provided in writing on September 3, 2021 in their denial of my New York State Freedom of Information Law information request. The investigation itself is then denied just 12 days later, and yet again following my Evidence Preservation | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; ~~Pretext, Entrap,~~ Incriminate | Actions: Destroy Physical and Mental ~~Health~~ | Executive Branch ~~Officials~~ |
|---|---|---|---|---|
| | | Letter of November 16, 2021 in a reply from the Defendant NYPD Police Department's PALS (law) unit on September 15, 2021. | | |
| 2-0098 | | Both these replies (which see) indicate Defendant NYPD has absolutely no information related to me or my presence at any time in or around New York City, despite the literally thousands of scenarios which play out in northern New Jersey, New York, and New York City beginning in August 2007 and continue through this writing in 2022. | | |
| 2-0099 | | This includes, among many other events from 2007 forward, a potential mass casualty express train derailment on September 11, an indirect BRMT assault which is supported by deliberately darkened municipal lighting in a park on September 17, and a two day | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | vehicle rundown threat on two streets in November 18 and 19, as discussed in detail in Table 1 at pages 30-46 of the Complaint and on the final pages of this timeline. | | |
| 2-0100 | | We return now to the timeline progression. In late November or early December 2001, AeA Pacific Northwest Region Executive Director mentions Bush 43 intends to visit Seattle or Portland in a few weeks. I am unable to quickly identify a suitable visit location, so Bush 43 goes to Portland on January 5th instead. | | Pres, VP Bush, Cheney; NS Adv Rice; DNI None; CIA Dir Tenet; FBI Dir Mueller; AG Ashcroft; SecDef Rumsfeld; Chmn JCS Myers Navy; NSA Dir Hayden |
| 2-0101 | Highly visible helicopter crawl and other very intrusive psychological operations begin in this period in Fall 2002. Due to loss of income, home remodeling is halted, complete except for main bathroom which is untouched. | | | |
| 2002 age 46 | | | | |
| 2-0102 | | On a pre-project tour at PSNS in Summer, I and Darrel Pray, the CNA IT Director, are abruptly left standing in the building housing the ship driveline turret lathe used for balancing ship drivelines, next to a tarp-covered and | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | highly classified nuclear submarine reactor cooling pump for 10-15 minutes without escort. | | |
| 2-0103 | | I experience no concern at that moment, but this raises extreme concern later in conjunction with undercover behaviors which are vastly escalated in late 2002 and beyond. | | |
| 2-0104 | | Pray and I resign CNA at the start of Labor Day holiday. My resignation is out of extreme concern for CNA company funding levels and the slow pay pattern typical for federal subcontractors, which include the pending subcontract at PSNS. My fear is of personal payroll tax liability exposure on this federal government project due to the "owner" Larry R. Cook's prior removal of $100,000, which is nearly all the of CNA's working capital | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | (available cash) at the time. | | |
| 2-0105 | | I start Performa w/ Pray in September, investing $25,000, and using Mike Larson (see my comments referencing the legal counsel pattern over the years near the end of year 1993 in this column of this timeline. | | |
| 2-0106 2003 age 47 | Drop then halt Performa pay to avoid adding to company debt given major non-payment problem with ShipNow. Legal process strung out to avoid court award of treble damages and costs at trial. | Business partner Pray begins ShipNow software project which accumulates about $80,000 of overdue receivables over several months. Partner Pray refuses to halt work after monthly progress payments are repeatedly missed. | | Pres, VP Bush, Cheney; NS Adv Rice; DNI None; CIA Dir Tenet; FBI Dir Mueller; AG Ashcroft; SecDef Rumsfeld; Chmn JCS Myers Navy; NSA Dir Hayden |
| 2-0107 | | I source sales leads from Defendant Technology Sales Leads, Boston, MA. All leads require extensive travel, cost, and time to conduct sales calls and prepare the numerous project proposals requested by the future client. All sales visits occur in | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; ~~Pretext, Entrap,~~ Incriminate | Actions: Destroy Physical and Mental ~~Health~~ | Executive Branch Officials |
|---|---|---|---|---|
| | | otherwise empty office and factory facilities. | | |
| 2-0108 | | These sales calls and proposal requests are eventually determined to have been part of a fraudulent scheme to starve my company, and me personally, of income as a repeat element of programmed destruction. I begin to experience of extreme fear as this cycle of starve-out process and eventual relocation/trafficking progresses through 2005. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0109<br><br>2004 age 48 | Receive net back pay from CNA pay settlement, net of legal fees. Legal process strung out by Defendant to avoid court award of treble damages and attorney fees. | Mass Casualty Potential: A few weeks after my Lawrenceville, GA sales visit, a May 25 Bio-Lab Conyers, GA warehouse fire burns through 250,000 pounds of chlorine pellets, generating huge plumes of extremely toxic phosgene and chlorine gases in this predominantly Black suburban area south of Atlanta. | | Pres, VP Bush, Cheney; NS Adv Rice; DNI None; CIA Dir Tenet, McLaughlin, Goss; FBI Dir Mueller; AG Ashcroft; SecDef Rumsfeld; Chmn JCS Myers Navy; NSA Dir Hayden |
| 2-0110 | | CNA litigation leads to an approximately $100,000 back pay settlement after an extended set of legal delaying tactics and maneuvers which drag this civil lawsuit out for 15 months, while requiring spending $50,000 on litigation costs. Treble damages, interest, and legal fees would be awarded at trial in this pro forma case, but I am forced by the lack of available cash flow to pay attorneys, to settle for the original amount of | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | compensation due, less attorney's fees. | | |
| 2-0111 | | Performa undertakes ShipNow litigation on approximately $80,000 of bad checks from ShipNow. ShipNow reincorporates in British Virgin Islands (BVI). This is a fraudulent conveyance of assets from the US domiciled corporation to the BVI corporation. The BVI corporation then sells its assets to Kewill PLC, a shipping software company headquartered in the UK. | | |
| 2-0112 | | Both these shipping software systems are also useful as broad-form strategic intelligence platforms and now the UK enterprise has access to information of US corporations which UK intelligence operations on foreign soil, the US can share with its US cousins as desired (a color of law functional Fourth | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Amendment evasion which can be sanitized prior to any use). | | |
| 2-0113 | | In a meeting at AeA headquarters in Washington, DC, Kewill's North America President insists Performa voluntarily dismiss this $80,000 ShipNow litigation with prejudice and refuses further discussions to resolve payment failures. | | |
| 2-0114 | | Repeats of this business wrecking cycle would include many variations - unpaid compensation, fake sales leads, fraudulent accounts receivable, failure to pay, uncollectible checks, and misappropriated funds fraud and litigation cycles. These types of frauds and sabotage began in-state at LazerSoft in 1986, and are recycled dozens of times across state, national, international, and | | |

| Year Age Jan. 1 | Actions: Destroy Families and ~~Personal~~ Relationships | Actions: Destroy Career, Businesses; ~~Pretext, Entrap,~~ Incriminate transnational boundaries, through 2022. | Actions: Destroy Physical and Mental ~~Health~~ | Executive Branch ~~Officials~~ |
|---|---|---|---|---|

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0115  2005 age 49 | Spouse moves out of our home of 15 years for the last time. Begin series of fake dates (fake element unknown) managed by police powers using Match.com site in Seattle/Portland areas. 100% white and similar | Sell Performa ownership to partner in late 2005 at cost to avoid liability for further debt. Secure personal guaranty release from community bank as guarantor at closing with Pray and bank officer in bank offices. | Continue period of extreme duress and stress from psychological operations, obvious surveilling, including vehicles, people, and helicopter crawls, and ongoing BRMT biochemical manipulations beginning in about 2002, which leads to first suicide ideation in approximately the summer of 2005 while still in Kirkland home. | Pres, VP Bush, Cheney; NS Adv Rice, Hadley; DNI Negroponte, first Dir as of April;  CIA Dir Goss; FBI Dir Mueller; AG Ashcroft, Ganzales; SecDef Rumsfeld; Chmn JCS Myers Navy, Pace Marines; NSA Dir Hayden, Alexander |
| 2-0116 | females screened in as dates. Experience first ED symptoms ever. | Deliver Federal Tort Claim Act (FTCA) Complaint letter to US Attorney for Western WA who conducts | | |
| 2-0117 | Another series of an estimated five marital separations, business and career wreckings, extensive home improvements completed, and starve-outs perpetuated, my | brief in-office interview, but there is no further follow up. Also deliver FTCA letter in person to Rep. Adam Smith after AeA Westin Hotel meeting, and to Rep Jay Inslee's district office. | I seek medical assistance immediately after this suicide ideation. My doctor is substituted by an alleged UW physician assistant, likely a police powers medical person in an otherwise virtually empty multi-doctor medical clinic. | |
| 2-0118 | marriage to Jeanette ends in divorce. The starve out cycle again forces home sale | Send FTCA letter to DC via USPS, FedEx, UPS using delivery tracking. | My "Doctor" sits at his workspace with back turned and never turns to greet me. My normal doctor was quite | |
| 2-0119 | in May to avoid foreclosure as another contrived business failure takes my income to zero. Allegent | Due to lack of proper evidence of receipt for some letters sent to DC, I borrow money from parents and travel to DC Sep | friendly, and otherwise unoccupied at the specific moment I left the examining room and would very likely have greeted me as I left. This | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | LLC dba Performa sales starve-out is facilitated by a series of fake interstate sales leads conducted in | 6-11 and hand deliver FTCA letters to IRS, DOJ, FBI, Executive Office of the President (EOP), and to offices of Senators Murray, | was the only time I had ever been seen by anyone other than the doctor in nearly 15 years with that clinic. | |
| 2-0120 | otherwise unattended offices and plants arranged by Technology Sales Leads, Boston, MA. | Cantwell, and Specter. No replies, ever, to any of these letters. | It is highly probable that the clinic was purposefully emptied and taken over for this specific appointment by police powers personnel. | |
| 2-0121 | Relocate to large scale Kirkland apartment complex in late May. Few signs of residents but many cars which never leave parking lot for work as this was former location of my BRMT detail which was disbanded. | | | |
| 2-0122 | FICO 8 credit score is rebuilt to 775 as of October. Unable to pay rent by late December, receive notice to pay or vacate, liquidate remaining furnishings and personal property. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | Stay at sister's house for 2 days in late December, then told must leave there. | | | |
| 2-0123 | Depart Seattle area to Boston on 12/24 abruptly out of concern for risk to other family members of very coercive and aggressive non-contact psychological operations by undercover agents and BRMT hijacking. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0124 2006 age 50 | Run out of funds for Boston MA area hotel and food around April 2006. Homeless and must relocate to City of Boston's Pine Street Inn homeless shelter, which uses a lottery system to determine who gets a bed each night. Spend one cold, rainy night at Boston Police Precinct D-4 station sleeping on the round lobby bench. During this | | While residing in Dorchester homeless shelter, I was subjected to daily migraine style headaches nearly every day. I went to the Boston Public Library every day except Sunday to have a sheltered place to exist, to read short story world history in travel guides, and to research the history of the Church Committee and the Rockefeller Commission and certain elements of the US Code. | Pres, VP Bush, Cheney; NS Adv Hadley; DNI Negroponte ; CIA Dir Goss, Hayden; FBI Dir Mueller; AG Gonzales; SecDef Rumsfeld, Gates; Chmn JCS Pace Marines; NSA Dir Alexander |
| 2-0125 | period, I use an upper level storage unit accessed by rolling ladder a few miles away on MBTA Green line "T" tram line at Sutherland road as my clothes storage and laundromat location. | | During most of this period. my time is spent in the second floor reading areas of the modern portion of the building. A guard circulates through this area. If an individual puts their head down or closes their eyes, they are subject to removal. Since this is my safe place, I want to avoid being removed or banned from the Library, so I continuously keep my eyes open and read despite the extreme pain. | |
| 2-0126 | After several months of daily uncertainty about shelter each night at Pine Street Inn and its overflow | | | |
| 2-0127 | | | I have access to medical care and am referred to | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | locations, I learn from a well-dressed homeless person (a minder) about, apply to, then move to Dorchester church basement homeless shelter location. During this move of items from the storage unit to the Dorchester shelter, my personal computer hard drive is damaged. | | a neurologist and examined. No anomalies are noted. The extreme pain persists for months after the examination. It stops shortly before I travel for two "consulting firm job" interviews in the Summer of 2007. | |
| 2-0128 | Several drug tests are required to apply for housing. This is followed by weekly permanent housing application sessions with a small-framed young woman in an isolated basement conference room of an assisted senior housing facility, apparently while I am being BRMT influenced but there are only polite, | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | professional interactions (as always, from prior such events dating back to 1980 when out oof town with female consultants and through 2021). | | | |
| 2-0129 | The homeless shelter requires me to conduct weekly job search from the date of my move to the Dorchester homeless shelter location until about one year later in July 2007 when I am interviewed by a Boston area Israeli-owned consulting firm and then soon after "recruited" online by Establish, ostensibly the North America branch of a Swedish logistics consulting firm, itself the subsidiary of a Swedish third-party logistics firm. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0130 | CNA had previously been engaged for a one-week long concept design seminar with Hudd Logistics, the recently purchased North American in-house landside logistics firm owned by Maersk, a large Danish ocean logistics firm. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0131 2007 age 51 | I visit Establish in Fort Lee, NJ using Amtrak and a cab from Penn Station in New York City and return to the homeless shelter, where I receive a recruiter email indicating a job offer from Establish a few days later. The recruiter, Joseph McKeon, MRI, reviews the offer with me on the phone and indicates that the salary and benefits are firm and recommends against any negotiation to ensure the offer is not withdrawn. | Join Establish, Fort Lee, NJ in late August. Primary faked projects undertaken in 2007 and 2008 at Establish are PPG Paint/Coatings in Pittsburgh, PA and Clipper Windpower, Carpinteria, CA and Cedar Rapids, IA. Empty plants again experienced are to become signature evidence of Defendants' frauds and involuntary servitude under color of law. | Experience BRMT-induced lymph node gland swelling under both armpits similar to classic symptoms of non-Hodgkin's lymphoma immediately after arrival, which completely disappear after a few weeks. As with DVT experienced in 1994, immediately after PAN London trip, this is another life-threatening health scare, though it disappears after a few weeks with no medical treatment of any kind. | Pres, VP Bush, Cheney; NS Adv Hadley; DNI Negroponte, McConnell; CIA Dir Hayden; FBI Dir Mueller; AG Gonzales, Clement, Keisler, Mukasey; SecDef Gates; Chmn JCS Pace Marines, Mullen Navy; NSA Dir Alexander |
| 2-0132 | | After a few weeks meeting in a PPG headquarters conference room, "PPG" moves its alleged VP Operations for Paint and coatings out of its Pittsburgh headquarters to a remote suburban Pittsburgh location just as that major division SVP announces his retirement, another signature of the fraudulent nature of this project. | | |
| 2-0133 | I verbally accept the offer and William Drumm, the hiring manager and general manager of the small office, emails me a written offer. This Fort Lee Establish office is housed in a former television | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0134 | production equipment space of Telemundo on the floor below their studios. My hiring manager is likely, unbeknownst to me, a long-serving former aide to Richard Cheney while Cheney served in Congress, DOD and the White House, before he left Cheney's employ to become a network legal | Establish hiring manager Drumm receives a copy of recovered image of my hard drive with comprehensive Performa and personal information from September 2002 through December 2005. Hard drive image contains detailed documentary evidence of the $80,000 ShipNow check fraud, litigation and legal expenses. | | |
| 2-0135 | reporter. (see also LP Evidentiary Exhibits pages 8351-8352, 10332, 10333, 10355. | It also documents the Technology Sales Leads agreement and payments which lead to nearly 20 fake sales | | |
| 2-0136 | I am then trafficked to Fort Lee to Establish Inc and this pre-arranged job. | leads in empty Defendant office and factory facilities, related travel expense documentation, and the sales call reports. This data includes the specific assumed | | |
| 2-0137 | I understand none of this at the time. I believe this might be an authentic opportunity though I am suspicious. | identities of each sales prospect and the results of each sales call.

This evidence documents the Defendants' financial | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0138 | In any case, who turns down $140,000 base compensation , 4% sales commissions, plus undefined annual bonus, all while living in a homeless shelter? | destruction of Allegent LLC dba Performa, which forces my quick sale of my Kirkland WA residence in May to avoid even greater financial losses due to foreclosure. | | |
| 2-0139 | So, I relocate from the Boston shelter to Cliffside Park, NJ in August using a HSBC credit card with a $350 limit I am able to secure to use for car rental to move my roller suitcase and shoulder bag containing all my personal assets. | This evidence remains in the custody of Establish and/or the police powers lab likely used to recover these contents. My lack of access to this evidence continues in 2022 as this timeline is being prepared. It limits my ability to provide specific dates and accounts of additional frauds from 2002 through 2005. | | |
| 2-0140 | I begin my (though not yet known to me as yet another fraudulently trafficked involuntary servitude assignment) VP-Consulting job at Establish, Fort Lee, NJ. I split the cost of recovering an image of my computer hard drive with | | | |

| Year Age Jan. 1 | Actions: Destroy Families and ~~Personal~~ Relationships | Actions: Destroy Career, Businesses; ~~Pretext, Entrap,~~ Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch ~~Officials~~ |
|---|---|---|---|---|
| | Establish so I can access the prior set of fake (not yet known as fraudulent) sales leads from Technology Sales Leads. | | | |
| 2-0141 | I move to a seven unit Cliffside Park, NJ apartment building. I repair and repaint the interior due to extensive plaster cracking and water damages in the poorly maintained unit which I had rented online sight unseen as it was on a bus line to my Fort Lee office about four miles north. | | | |
| 2-0142 | I repay estimated $7,500 first/last, security deposit/relocation loan from Boston non-profit and spend about $10,000 to furnishings the apartment over the next six months or so. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0143 | As is typical of the pattern of all prior residential improvement cycles, job loss or business closure comes shortly after all repairs, renovations, loan repayments, and furnishings expenditures are completed. This perpetuates Defendant United States' pattern of limiting my available financial resources and not allowing the accumulation of financial assets so they can sustain involuntary servitude. | | | |
| 2-0144 | It also likely facilitates insider sales (or in this case rental) of substantially improved real estate to favored people, as is likely to be proven through evidence of the identities of the subsequent | | | |

| Year Age Jan. 1 | Actions: Destroy Families and ~~Personal~~ Relationships | Actions: Destroy Career, Businesses; ~~Pretext, Entrap,~~ Incriminate | Actions: Destroy Physical and Mental ~~Health~~ | Executive Branch ~~Officials~~ |
|---|---|---|---|---|
| | beneficiary owners and tenants during discovery. | | | |
| 2-0145 | This pattern repeats that practice which began with my expenditure of thousands of dollars and labor to landscape my first home purchase in Redmond, followed by my second home complete rebuild and 60% square footage addition in Kirkland. | | | |
| 2-0146 | This pattern and Defendants'' careful timing to minimize my available personal financial resources will be seen again in Ramsey, NJ (2011-2018) with new appliances and furnishings purchased shortly before my relocation using a Section 8 voucher, to Edgewater, my current residence. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0147 | Once more, immediately after that renovation was complete in Summer 2018, I again purchase a complete set of new furnishings and kitchen accessories from scratch at Edgewater, NJ (2018-2019), my current residence. | | | |
| 2-0148 2008 age 52 | Brief relationship with Marinka Modderman, ostensibly a Canadian living in New York City, results from an online match. Lasts about 2.5 months, then terminated by Modderman. Experience persistent ED issue for the first time, successfully medicated. | Drumm "terminated," as GM, then I'm terminated about 3 months later in July about 4-6 weeks after I am asked but unable to invest $25,000 into money losing Establish. | | Pres, VP Bush, Cheney; NS Adv Hadley; DNI McConnell; CIA Dir Hayden; FBI Dir Mueller; AG Mukasey; SecDef Gates; Chmn JCS Mullen Navy; NSA Dir Alexander |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0149 | This "Gf" calls back weeks later, but I decline as I had just lost my Establish Vice President job in the meantime. Based upon previous and subsequent experiences, this was entirely pre-arranged. | | | |
| 2-0150 | Establish sales commissions are not paid as due while I am employed. When $700 is eventually paid, sales commissions due are shorted about $7,000 and company refuses to pay one month of termination pay agreed with executive recruiter (nearly $11,666) because despite verbal agreement it was not included in company offer letter, per terminating manager Conrad Ross. | | My second suicide ideation occurs during this late 2008-2009 period, resulting from extreme brain biochemical stress induced by BRMT and its torturous induced physical symptoms including (1) recurrent extreme headaches previously experienced in Boston homeless shelter and (2) extreme and threatening muscle and nerve spasms which cause me to cry out repeatedly over many days and nights. These extremely painful episodes continue day and night for months on end. | |
| 2-0151 | | | Food contamination, particularly in bagged | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | Initiate job search including networking, with no results. No further employment at any future date, not even as grocery clerk in Ramsey. No transportation so must secure employment using public transportation. 2008 Wall Street initiated financial collapse and recession contributes greatly to lack of available employment during the next several years. | | salads and other refrigerated products also contributes to health problems during this period. | |
| 2-0152 | | | Food contamination will recur in 2021-2022 when I must return to the same supermarket previously used while residing in Cliffside Park, about a mile away from my current Edgewater, NJ residence. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0153 2009 age 53 | Landlord informs me that a resident in my seven unit apartment building is removed by Defendant FBI and turned over to Immigration and Naturalization Service for deportation due to | US Airways 1549 emergency landing puts 155 people into the Hudson River on January 15, after a massed birds engines ingestion causes a twin engine jet flameout, turning it into a glider. | From late 2008 into 2010, BRMT is used nearly continuously for months on end in torturous abuse during all times of the day and night to inflict extreme physical pain, to reprise the daily extremely painful 90 to 120 minute vision impacting headaches BRMT brain chemistry manipulation, physical muscle spasms, and nerve spasms are of extraordinary strength and duration during this period and cause me to frequently cry out and yell in pain. Sleep deprivation and sleep disturbances also recur night after night. | Pres, VP Obama, Biden; NS Adv Hadley, Jones; DNI McConnell, Blair; CIA Dir Hayden, Panetta; FBI Dir Mueller; AG Mukasey, Phillip, Holder; SecDef Gates; Chmn JCS Mullen Navy; NSA Dir Alexander |
| 2-0154 | his pattern of threatening anti-American speech. | Precursor events including two flights of Canadian Geese and, likely, a BRMT induced visual nerve | | |
| 2-0155 | This indicates my apartment building is likely under surveillance during the lead up period to the US Airways 1549 flameout crash. It | image of a civil aircraft with open bomb bay doors in a nearly unimaginable flight configuration and position are recalled in May 2022 | | |
| 2-0156 | is possible there is surveillance video preserved in evidence related to the investigation of either that neighbor or of me which would show the two precursor flights of Canadian Geese crossing immediately above the eastern roof parapet of my | during my reverse engineering of external events which did not directly involve me. This strongly suggest the crash landing five days before the Presidential transition from Bush 43 to Obama was insider sabotage by persons using BRMT. BRMT was likely used to cause the relatively high altitude bird | During this period, Secret Service routes the "Beast" (Presidential limousine) past the kitchen window where I am called by a BRMT prompt immediately before it passes by. I spend very little time in the kitchen, well under 2% of my total waking hours. This awkward routing requires the "Beast" to navigate a narrow two lane city | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | top floor unit during the weeks leading up to the crash. See also the precursor event involving an aircraft image in the column to the immediate right. | strike (when compared to normal much lower migratory bird flight altitudes) bird strike. Further described in a May 16, 2022 letter to SDNY shortly after my realization of this sequence. | street. About 1200 feet to the east is a four lane road with 12 foot wide travel lanes to and from the same destinations. | |
| 2-0157 | At landlord's request, remodel Cliffside Park apt to avoid loss of unemployment eligibility, spend about $13,000 including my labor at $17/hour. My landlord informs me after the fact that NJ law requires a written contract for any such project over $5,000 and reimburses $5,200. This type of short pay is common practice, experienced repeatedly over many years. | | | |
| 2-0158 2010 age 54 | I compose and file a Newark US District Court Complaint on June 23. This is swiftly followed in July by | | Statue fall (rigid body falls over backward) at Thompson Lane and River Road northwest corner during winter likely occurred early in | Pres, VP Obama, Biden; NS Adv Jones, Donilon; DNI Blair, |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | a certified letter from my landlord terminating my month to month apartment rental. | | this year. These types of rigid falls in dangerous locations began in the 1990s. | Gompert, Clapper; CIA Dir Panetta; FBI Dir Mueller; |
| 2-0159 | I donate my clothes to charity. I leave the furniture, tools, other furnishings, and kitchen accessories, etc., with an original cost of about $15,000 behind. | | Homeless again on October 1. Completely out of other options, I call 911 on October 2nd. A South Hackensack Police officer and an ambulance respond. I am loaded to the ambulance after an interview by a paramedic. Without explanation, I am transported to an unfamiliar hospital location (Bergen Regional Medical Center in Paramus, NJ), where I am briefly examined and wait about 12 hours in the emergency room. | AG Holder; SecDef Gates; Chmn JCS Mullen Navy; NSA Dir Alexander |
| 2-0160 | I leave the Cliffside Park apartment on October 1 after one month overstay to become homeless again. I travel to the Bergen County homeless shelter in Hackensack. I am redirected to the street address of a nightly shelter a few blocks away. There is no shelter at that address only older family residences, and no such number between those residences. | | | |
| 2-0161 | | | While sitting in emergency room with police officer present outside, (where I am actually being held unbeknownst to me at the time) an involuntary commitment hearing is held without my knowledge or with no prior contact with the legal counsel who supposedly represents me. I am ordered | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0162 | I walk to the Hackensack Police station and wait | | involuntarily committed for 14 days. | |
| 2-0163 | for about 20-30 minutes for a not particularly busy desk sergeant to respond to my inquiry. He directs me to a South Hackensack motel about 2 miles away. One night in | | The first contact with the attorney is near the end of the fourteen day hold period. Since NJ state law says I can only be released to safe housing and I have no access to housing or funds, I "elect" to remain. | |
| 2-0164 | this low budget motel exhausts remaining funds and I call 911 the morning of October 2nd. | | This "decision" is the direct consequence of the sequence of police powers actions, the related starve outs, and the long sequence of color of law frauds of the Defendants. Defendants, led by Defendant United States in this conspiracy against rights and long-running RICO frauds sequence, are, in fact, the traffickers for whom I engage in the involuntary servitude which is the root cause of the array of circumstances leading to this moment (as well as most such "decisions freely made" from 1972 into 2022). | |
| 2-0165 | Advance Housing interviews me for housing placement | Begin organization of Winnett, write initial business plan, begin | | Pres, VP Obama, Biden; NS |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2011 age 55 | in early 2011. Staff and other patient interactions were quite ordinary and failed to induce any inappropriate behavior observable by the minders who rotated through the locked ward | work on funding attempts in May/June. Email hundreds of investors/funds through 2012. Fake investor contacts begin in 2011 and will continue through 2021. | | Adv Donilon; DNI Clapper; CIA Dir Morell, Petraeus; FBI Dir Mueller; AG Holder; SecDef Gates, Panetta; Chmn JCS Mullen Navy, Dempsey Army; NSA Dir Alexander |
| 2-0166 | during this six month period of locked indoor confinement with very few activity and exercise options. Exit from the locked ward and occasional outdoor access for a few minutes once per week was permitted only in the final two months of confinement for up to 30 minutes at a time. | These fraudulent interactions include (1) repeated international investor frauds and attempts using signed contracts which are allowed through my otherwise screened email contacts in and out, (2) domestic investment banker, private equity, and venture capital contacts spoofed by, or acting as confidential informants for, police powers. Defendants primarily use wire fraud to deliberately prevent my development of a private enterprise. They also continue to (3) stymie my job search with insider headhunter contacts | | |
| 2-0167 | After several months and answering inquiries from the attending hospital psychiatrist, I make two home visits to my new residence. I leave | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | locked psych unit confinement for an Advance Housing Ramsey, NJ shared apartment on March 31. | and fake and completely unsuitable career opportunities. | | |
| 2-0168 | My roommate suffers, for about the first 18 months, from extreme flatulence so we leave windows open year round until it is finally treated and immediately disappears. This specific housing assignment is likely arranged by Defendants expecting it would induce on-going stress and lead to conflict. There are no conflicts at any time. | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0169<br><br>2012<br>age<br>56 | Various online personal match efforts during this period result in a series of local NJ honey traps (wire-based sex solicitation offers which have no legal basis of reasonable suspicion) in combination with BRMT manipulation. Defendant police powers frequently and repeatedly invite me to a paid "massage" and to nearby hotels through early 2014. No matches, no results. | I continue business plan development and refinement, make hundreds of investor contact attempts online through funding platforms and cold email outreach. Occasional interactions, all with advance fee scammers are the only contacts which reach through the Defendant police powers color of law wire fraud screen. | | Pres, VP Obama, Biden; NS Adv Donilon; DNI Clapper; CIA Dir Petraeus, Morell; FBI Dir Mueller; AG Holder; SecDef Panetta; Chmn JCS Dempsey Army; NSA Dir Alexander |
| 2-0170<br><br>2013<br>age<br>57 | | | | Pres, VP Obama, Biden; NS Adv Donilon, Rice; DNI Clapper; CIA Dir Morell, Brennan; FBI Dir Mueller, Comey; AG Holder; SecDef |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | | | Panetta, Hagel; Chmn JCS Dempsey Army; NSA Dir Alexander |
| 2-0171 2014 age 58 | I am set up for online "dating" with a female allegedly in Ghana, known to me as Laura Akoto, with BRMT oxytocin manipulation which leads me to advance over $14,000 between 2014 and first half of 2018, mostly in later years. Defendants use this combination of BRMT oxytocin hormone manipulation and online correspondence to sustain effective financial and mobility control. | Initial contract made online by Charles Jackson regarding locating seed investment investments and loans. Charles self introduces as an ex-Merrill Lynch investment banker assigned to Mexico City/Latin America for many years. Pay $700 front fee, with no results over several years despite repeated "investor" introductions. Jackson introduces Ray Sullivan as ex-Customs and Border Protection investigator with international trade law private practice, who becomes corporate counsel through 2021. | | Pres, VP Obama, Biden; NS Adv Rice; DNI Clapper; CIA Dir Brennan; FBI Dir Comey; AG Holder; SecDef Hagel; Chmn JCS Dempsey Army; NSA Dir Alexander, Rogers |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0172<br><br>2015<br>age<br>59 | | First encounter in late 2014 with Greg Crossgrove as "expert produce consultant" for organic produce production. Finally identified on March 22, 2022 as Maricopa County Sheriff Joe Arpaio is a well-known violator of civil rights responsible for over $100 million awarded against his department during his tenure. | | Pres, VP Obama, Biden; NS Adv Rice; DNI Clapper; CIA Dir Brennan; FBI Dir Comey; AG Holder, Lynch; SecDef Hagel, Carter; Chmn JCS Dempsey Army, Dunford Marines; NSA Dir Rogers |
| 2-0173 | | Raise $125,000 for Winnett on EquityNet soon after listing. Those funds are expended on travel, further financing efforts. As CEO of this startup, I build a management team using headhunters and add personnel (likely all screened in) which are eventually (2022) recognized as signature police powers, intelligence operative, and international commercial cover operators in Latin America. | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0174 | | Arpaio, posing as produce expert Greg Crossgrove, engaged in sustained reach outs and attempts to engage me with others from his team and other police powers agencies from December 2014 until late 2017. | | |
| 2-0175 | | It is likely the entire team is captive to the program intended to surround and try to incriminate me, as are various industry experts he introduces over time. Several attempts are made, ranging from options backdating to financial frauds inducements, all unsuccessful. | | |
| 2-0176 | | Arpaio connects himself through an alleged brother to the Nunes farming family in California. Devin Nunes (R-CA) is Chair of the House Intelligence Committee from 2015-2019. As of 2022, Nunes is currently CEO of | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | Trump Media. Arpaio receives a federal pardon from Trump in 2017 for a month-old criminal contempt conviction. | | |
| 2-0177 | | Arpaio also engages the support of others inside and outside his department throughout his term which ends January 1, 2017. It further appears he enlisted others to continue these constructive frauds under color of law as he continued his undercover work as Greg Crossgrove for most of 2017. | | |
| 2-0178 | | Similar commercial covers and faked sales opportunities are encountered yet again in investor, investment banking, and international sales development through 2022. These cover signatures are related to and trace back to prior experiences as early as high school or college days and include likely | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | morphological comparables across the years involving domestic and international military, police powers, and intelligence minders and fraudsters, as well as confidential informants. | | |
| 2-0179 2016 age 60 | BRMT causes me to look at one of a type of online personal profile I had previously consistently ignored - a non-facial image of a female I then believed lived in the greater NYC/NJ area. This sets up a long-distance "online relationship" with female who allegedly lives in Ghana. BRMT oxytocin manipulation leads me to advance over $14,000 | Bank of America Bestwick Cardone Group Natural Food Symposium results in an introduction to Dominick and Dickerman, old line New York City investment bankers, including two people morphologically similar to people I met at WSU in 1975, one of whom has deep domestic connections, the other deep international connections, both in investment banker commercial cover positions. | | Pres, VP Obama, Biden; NS Adv Rice; DNI Clapper; CIA Dir Brennan; FBI Dir Comey; AG Lynch; SecDef Carter; Chmn JCS Dunford Marines; NSA Dir Rogers |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | between 2014 and 2018 using Western Union and other remittance services. | | | |
| 2-0180 2017 age 61 | Turn 62 in September. Social Security retirement payments begin in November. | I am refused hourly labor employment in a local supermarket which was desperately seeking cashiers and night stocking personnel. This is the product of on-going police powers intervention under color of law both online and in person. This denial of employment is facilitated with a faked on-premises interview conducted by the on-site assistant store director at Ramsey Shop-Rite, likely actually a leader of the security team detailed to surveil and protect me as a codename asset of BRMT. | | Pres, VP Trump, Pence; NS Adv Rice, Flynn, Kellogg, McMaster; DNI Clapper, Dempsey, Coats;  CIA Dir Park, Pompeo; FBI Dir Comey, McCabe, Wray; AG Lynch, Yates, Bonte, Sessions; SecDef Carter, Mattis; Chmn JCS Dunford Marines; NSA Dir Rogers |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0181 2018 age 62 | I finally become suspicious and use facial recognition on the "Ghana" female and determine the images are actually a stolen photo set of a Florida resident. | | | Pres, VP Trump, Pence; NS Adv Mcmaster, Bolton; DNI Coats;  CIA Dir Pompeo, Haspel; FBI Dir Wray; AG Sessions, Whitaker; SecDef Mattis; Chmn JCS Dunford Marines; NSA Dir Rogers, Nakasone |
| 2-0182 | Replace Ramsey appliances and furniture, fund addition of electrical circuit in Summer, spending about $6,500 to $8,000. | | | |
| 2-0183 | Notified of a Section 8 voucher award shortly after completing renovation (as usual, see this timing in all residence force outs and other moves above). | | | |
| 2-0184 | Move to Edgewater in November using a Section 8 voucher, while adding another $2,000 of debt to fund my Edgewater | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | security deposit to avoid losing the unit after a stereotypic delay of "United Way" security deposit loan funds. | | | |
| 2-0185<br><br>2019 age 63<br><br>2-0186<br><br><br><br><br><br><br><br>2-0187 | I search (the carefully screened-in) online dates. The first "interest" is from a White female from Georgia (Europe) probably Defendant NYPD, followed by long string of 100% Black dates, including one who returns for second date and asks indirectly about money and intimacy, probably also Defendant NYPD or their informant. | Complaint 19-cv-01918 filed in US Eastern District of CA, by alleged investor of six figure equity and loans, most likely actually sourced from Defendant police powers agency funds.<br><br>This entire sequence from funding to litigation is yet another color of law fraud and destruction cycle. This litigation cycle starts in late 2014. It is still a threat in 2022 as a case voluntarily dismissed with prejudice, despite its complete lack of veracity.<br><br>I am named in 19-cv-01918 as a corporate officer, and personally due to a BRMT induced personal guaranty. I have | Together with recurring financial manipulations and various fee requirements to secure debt and equity "funding sources, noted above" BRMT oxytocin overdoses and other biomedical manipulations are used to continue to consume available funds and to transfer funds from me to others, so they are unavailable. | Pres, VP Trump, Pence; NS Adv Bolton, Kupperman, O'Brien; DNI Coats, Maguire; CIA Dir Haspel; FBI Dir Wray; AG Whitaker, Barr; SecDef Shanhan, Esper, Spencer, Esper; Chmn JCS Dunford Marines, Milley Army; NSA Dir Nakasone |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | | never previously provided a personal guaranty to any entity except for financial institutions, and factoring and bonding companies for my owned businesses. | | |
| 2-0188 2020 age 64 2-0189 2-0190 | Fake dates (Defendant NYPD most likely) end early in the year. Shortly after Covid pandemic closures are announced in March, one of these women, (Norelle Dean aka Tine Rinehart and Gia Shakur with screenname Shay) abruptly identifies a strong interest to which I respond. Acting as my girlfriend (gf), she engages in a pattern of date busts, and progressive delays, eventually ending the "relationship." No interpersonal conflicts result. | | Experience BRMT and erectile dysfunction (ED) manipulation as Defendant United States and co-conspirator, likely Defendant NYPD, seek a violent act-out due to frustration during relationship run. No such acts occur despite a wide variety of attempts.

This ED progression indicates that this form of BRMT manipulation has been e developed from its crude disruptions of function in 2008 to much greater granularity in 2020-2021. As of 2021, BRMT can disrupt specific nerve and muscle interactions to a very specific and fine-tuned degree of progressive dysfunction on command. | Pres, VP Trump, Pence; NS Adv O'Brien; DNI Maguire, Grenell, Ratcliffe; CIA Dir ; FBI Dir Wray; AG Barr, Rosen; SecDef Esper, Miller; Chmn JCS Milley Army; NSA Dir Nakasone |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0191 | | | Illegal searches are likely conducted during my absences from the premises by this ostensible girlfriend. | |
| 2-0192  2021 age 65 | Make trip to New Orleans, LA (NOLA) with my "girlfriend" Norelle Dean in March. This arranged "girlfriend" departs a few weeks later. She calls weeks later to demand a solo NOLA trip as I had no taken her on | I file US DC District Court Complaints in September, October, November as directed in the instructions for pro se, in forma pauperis litigants. All are dismissed as frivolous. | During late 2021 and into 2022, I note over a dozen episodes of food contamination, mostly milk and one sausage product. This is a reprise of the bagged salad contaminations experienced dozens of times between 2008 and 2010 at the same grocery store location. | Pres, VP Biden, Harris; NS Adv O'Brien, Sullivan; DNI Ratcliffe, Shiao, Haines; CIA Dir Cohen, Burns; FBI Dir Wray; |
| 2-0193 | another promised trip and seriously inconvenienced her, allegedly causing cancellation of another trip in the process. I pay for airfare and hotel in NOLA. She follows | | Two colonoscopies are required due to bowel cleanout failure on the first attempt. Blocking is caused by BRMT forced continuous muscle closure of my bowel exit, which continues into late 2022. | AG Rosen, Wilkinson, Garland; SecDef Miller, Norquist, Austin; Chmn JCS Milley Army; NSA Dir |
| 2-0194 | up this trip with insults regarding my deficient funding of her trip and a variety of other personal insults. | | During recovery from the 210412 (yymmdd date) colonoscopy I experience another in the series of statue falls. I barely miss a head strike penetration of my right temple, a weak point oof the skull, on the roller stand base of the bed tray. | Nakasone |
| 2-0195 | Defendants' episodes of | | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0196 | systematic wire frauds, related to sales opportunities and financial starve outs, wreck my credit. Due to still being overextended with accounts in collection, only ultra-high interest rate loans are accessible to me. | | An irregular heartbeat (BRMT manipulation is probable) is noted during my exit exam after this fall. A cardiologist is contacted for a consultation prior to my being given permission to be released. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0197 | I am misdirected to fake voting rights march and rally on DC National Mall adjacent National Archives after traveling to DC on August 28 for the 58th anniversary of Dr. Martin Luther King, Jr's "I Have A Dream" speech at the Lincoln Memorial. Fewer than 200 participants in the march show up at that final rally site in the 20 minutes after I arrive, despite the thousands present | | Follow-on cardiology appointments result in cancelled tests due to alleged heartbeat instability, then due to camera failure before a stress test. These two alleged heart test failure incidents are followed by failure of handheld equipment in the cardiologists office which registers heart rate at 38 beats per minute (about one-half the normal rate for most people). An in-office EKG (or ECG) shows an added heartbeat immediately after the fifth or sixth beat which will shorten lifespan. | |
| 2-0198 | at the initial rally point where this march began. | | Also experience a functionally paralyzed bowel exit muscle requiring excessive use of laxatives to effect defecation. | |
| 2-0199 | There is no coverage of the nationwide voting rights rallies in my | | | |
| 2-0200 | online edition of the New York Times on the following day, August 29. (A now familiar routine disinformation | | Both heart and bowel dysfunction are suggestive of on-going BRMT use in a sustained effort to reduce lifespan, increase personal stress, and accelerate a lethal outcome. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0201 | wire fraud by Defendants.)<br><br>I later receive a fraudulent National Park Service FOIA information request reply on September 22, 2021, which states that the original August 28, 2021 Lincoln Memorial rally site permit, where Martin Luther King spoke in 1963, had been cancelled. See Interline Exhibit 22 at page 259. | | This is a reasonable interpretation in light of the substantial acceleration of physical lethality events as 2021 and 2022 progress. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0202  2022 age 66 | As 2022 progresses, the Walmart grocery orders I rely on for monthly groceries become less reliable and more prone to shortages.  Two online clothing orders in a row are fulfilled, with the identical undersized waist on the Wrangler jeans I have worn for decades, | I close all Chase Bank accounts to eliminate personal and business monthly service charges, all of which I am paying personally.  I also shut down several business websites and unused email accounts to reduce the cash burn rate related to business activities due to Defendants' ongoing blocking and the sales frauds continuing to be | A mass casualty attempt which includes me is made on a MTA Hudson Valley express train on September 11 at sundown as the train is operating at 50-60 miles per hour. I miss a step in a BRMT induced somersault fall on deliberately darkened stairs in Morningside Park, which results in physical injuries, on September 17. | |
| 2-0203 | forcing in-person returns. The sequence of events related to the first in-person return, including a | perpetrated by bogus international traders who are ostensibly based in Virginia and Florida. | On Friday, November 18, electric scooters travel two very unlit one-way streets in the wrong direction while I am walking enroute to/from 23rd Street subway to Atlantic Theater event at 20th Street on Friday evening. There is no other traffic on these streets in either direction. Later, car traffic flows in the proper direction. There are streetlights on both the streets I crossed (West 22nd and West 21st), so most likely deliberately extinguished as at Morningside Park on September 17, 2022. | |
| 2-0204 | vehicle rundown threat, are shown in the 2022 portion of the Physical and Mental Health column to the right in this timeline. | A series of deposit account hacks at Discover, Chime, Blue Vine, and American Express functionally force my return to Wells Fargo after attempting to use those accounts. | | |
| 2-0205 | Personal relationship development efforts using online resources continue to be | A CapitalOne ACH system security breach demonstrates Defendants' have the ability to modify account numbers in | | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| 2-0206 | subject to a 17 year police powers freezeout. In-person street-level efforts to enmesh in some new controversy lacking a digital trail continues. | the transmission process between the Capital One web site I use on my personal computer, Wells Fargo and CapitalOne for an $8 payment, which results in a late charge penalty. | The following day, Saturday November 19, I return to New York City for an afternoon theater performance, followed by a bus to rail to bus trip to Walmart, North Bergen, NJ to shop and return a pair of Wrangler jeans as mentioned in the 2022 block of Families and Personal Relationships to the left in this timeline. | |
| 2-0207 | Phone number for Addy, a past contact of prior personal interest, and supplied to SDNY in July 5, 2022 letter is used | NACHA system security has been demonstrably compromised by this hack as communicated to SDNY in a subsequent letter on 220812. | While standing in the Customer Service line, I note a very attractive female approach. Her mother hands over a male child about 3 to this woman, the boy's mother. | |
| 2-0208 | by an unidentified person or entity to deliver a health care related business voice mail from Braven Health, my health plan provider, to me. | | | |
| 2-0209 | Defendants manipulate cut and paste commands in MS-Word on personal computer to attempt to delete three counts from draft Complaint: (1) witness tampering, (2) witness retaliation, and (3) | | Shortly thereafter, a nearby woman loudly complains to what appears to be her Case Manager about slow service. She is then mimicked in tone and phrase by the child in line in front of me. The loud woman smiles and looks directly at me, indicating the entire set-up is bogus, including the "Case Manager." This is yet another pre-planned | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | misuse of official documents. This manipulation is caught during review which was undertaken due to prior experiences with document tampering by Defendants. | | scenario which often plays out in front of me, part of the hybrid set of public and police powers performances I have seen on virtually every daily grocery store outing in NJ and every NYC and other NY/NJ outing since my arrival in the NYC/NJ region in 2007. | |
| 2-0210 | I identify indications of tampering with the SDNY | | | |
| 2-0211 | delivered letters on my personal computer. SDNY folders containing letters and enclosures are missing from that subdirectory, but copies exist in my LP Evidentiary Exhibits | | Upon exit from Walmart, I cross parking lot diagonally to drive in front of Wendy's fast food. A compact white sedan is about 150-200 feet north in the drive aisle in front of Wendy's. I determine there is no threat of collision and cross. | |
| 2-0212 | subdirectory which is being used for civil litigation preparation at this time. | | Once I turn my head ahead and slightly right toward the Wendy's entrance door, the car rapidly but quietly accelerates toward me. It brakes hard and the front end lurches | |
| 2-0213 | Evidence of time gaps in accessibility to business accounts emails between 180304 and | | downward as it comes to a quick stop 15 feet to my left. Through this sequence, BRMT freezes my head looking forward and slightly to the right | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | 200709 noted, though access appears to be currently blocked rather than those emails being deleted. Evidence of extensive missing email conversation | | toward Wendy's entrance as the car approaches rapidly from left. I am unable to move quickly out of the way as BRMT dictates my walking pace. | |
| 2-0214 | strings related to certain individuals and entities outside of this | | After eating at Wendy's, I encounter a male appearing to vomit into the men's restroom sink. | |
| 2-0215 | blocked period was also noted. | | A reasonable interpretation of tradecraft leads me to conclude this is yet | |
| 2-0216 | As noted above, I also have no access to existing data contained on the hard drive from 2002-2005 and from a box of BRMT-induced disposed evidence which was shipped back and forth between NJ and WA on at least two occasions and likely photographed by federal police powers personnel during those shipments. Access to these records would provide | | another in the accelerated threat sequence which began in Summer 2022. | |

| Year Age Jan. 1 | Actions: Destroy Families and Personal Relationships | Actions: Destroy Career, Businesses; Pretext, Entrap, Incriminate | Actions: Destroy Physical and Mental Health | Executive Branch Officials |
|---|---|---|---|---|
| | additional detailed evidence of fraud under color of law, further witnesses, and to further perpetrators of color of law frauds as well. | | | |

345. The harsh reality of the Lead Plaintiff's life and that of other Plaintiffs of the class is that Defendant United States seeks primarily to protect itself from legal and political consequences and to preserve its research investment in the Lead Plaintiff and others so long as Plaintiffs do not threaten the continued functioning and "state secrets" status of the BRMT program, which status itself in turn protects the exploitive and abusive pattern of racketeering of criminal and rights violations of executives, managers, and operators of the BRMT program. For example, as described in Table 2, each and every real estate and residential improvements personal financial and do-it-yourself labor cycle of Lead Plaintiff since the 1980s has been completed by the Lead Plaintiff shortly before the Lead Plaintiff experiences an adverse life events sequence and is forced from the residence where the improvements were recently completed. This pattern is also true of personal relationships from marriage to business networks; and of career and business options, opportunities, and destruction cycle of Defendants; to and including divorces and personal bankruptcy.

346. The neuro-technological madness of BRMT is that it is a prohibited biological weapon and biological weapons delivery system which hijacks the brain and free will of its

victim - in a country founded upon and ostensibly dedicated to liberty and freedom of choice in a wide variety of personal matters so long as those choices do NOT harm others. Yet it is those sworn to protect who are doing the harm. This perverse system of institutional misconduct is being "protected" as "state secrets" and "national security" apparatus while employing a pattern of racketeering acts and crimes to directly violate the very definition of liberty - a citizen exercising free will. BRMT demonstrates yet again most clearly Defendant United States' contempt for the Enlightenment era concepts applied by the Founders as they created our nation. BRMT demonstrates yet again most clearly Defendant United States' operationalized contempt for the Constitution and the laws of the United States of America. BRMT demonstrates yet again most clearly that Defendant United States holds itself above the People by abusing its "state secrets" privilege to evade accountability, embarrassment, and humiliation for its malicious actions against US persons.

347.  BRMT program termination and accountability are the primary purposes of this litigation against Defendant United States and all other Defendants who have been or are culpable and have and do fail to act to prevent injury and who have and do fail to protect rights as required by our Constitution. This Court holds in its hands the key to liberty in these Plaintiffs' virtual imprisonment in BRMT by Defendant United States and its Defendant co-conspirators.

**United States Official History and Current Medical, Military, and Commercial Technology Applications Validate These Extraordinary Allegations**

348.  These extraordinary allegations by the Lead Plaintiff may strike the court as angry, unfounded, bizarre, and delusional. But the official history of the United States, including Congressional Committee and Presidential Committee reports, informs this view of the conduct

of the Defendants. This history confirms our view as rational and fact-based. Current applications of biomedical, computing and communications technology lend weight to these allegations. Five key fact sets weigh strongly against the Defendants' likely loud denials and protests:

**349. A. First: Lead Plaintiff's personal history, education, professional experience, and psychological soundness strongly confirm these allegations**. See LP Evidentiary Exhibits pages 140-236 for a full report and a sampling of indications of psychological fitness below.

**Interline Exhibit 15: Lead Plaintiff's Psychological Fitness**



**Conscientiousness**

within the average

quite easygoing                              quite disciplined

easygoing                                        disciplined

11%    29%    20%    29%    11%

You are here

60% of the population are more easygoing            11% of the population are more disciplined

Level of Neuroticism



350. B.  Second: The first FDA approved commercial implant of a brain-computer interface occurred in July 2022. The implant is a key component of a substantially less sophisticated system than BRMT which is being commercially developed as described at LP Evidentiary Exhibits pages 11-25.

351. C.  Third: The Defense Advanced Research Program Agency (DARPA), an agency of Defendant Department of Defense, has pursued research in the technologies and neuroscience used in BRMT development since the early 1970s and openly displays these types of research projects on its website.

Interline Exhibit 16: Relevant Categories of Defendant DARPA Projects



- Rethink Complex Military Systems: To help enable faster development and integration of breakthrough military capabilities in today's rapidly shifting landscape, DARPA is working to make weapons systems more modular and easily upgraded and improved; assure superiority in the air, maritime, ground, space and cyber domains; improve position, navigation and timing (PNT) without depending on the satellite-based Global Positioning System; and augment defenses against terrorism.

- Master the Information Explosion: DARPA is developing novel approaches to deriving insights from massive datasets, with powerful big-data tools. The Agency is also developing technologies to ensure that the data and systems with which critical decisions are made are trustworthy, such as automated cyber defense capabilities and methods to create fundamentally more secure systems. And DARPA is addressing the growing need to ensure privacy at various levels of need without losing the national security value that comes from appropriate access to networked data.

- Harness Biology as Technology: To leverage recent breakthroughs in neuroscience, immunology, genetics and related fields, DARPA in 2014 created its Biological Technologies Office, which has enabled a new level of momentum for the Agency's portfolio of innovative, bio-based programs. DARPA's work in this area includes programs to accelerate progress in synthetic biology, outpace the spread of infectious diseases and master new neurotechnologies.

- Expand the Technological Frontier: DARPA's core work has always involved overcoming seemingly insurmountable physics and engineering barriers and, once showing those daunting problems to be tractable after all, applying new capabilities made possible by these breakthroughs directly to national security needs. Maintaining momentum in this essential specialty, DARPA is working to achieve new capabilities by applying deep mathematics; inventing new chemistries, processes and materials; and harnessing quantum physics.

**352.  D.  Fourth: Defendant United States has never renounced Defendant CIA's goal to achieve mind control of humans.** Defendant CIA's predecessor, Office of Strategic Services, as part of the War Department, and the US Army began this search for mind control even before the end of World War II. Adolph Hitler pursued research to develop super-soldiers who could fight on through all conditions and even injuries by taking medical stimulants. Defendant United States pursued Hitler's quest for "super-soldiers" through its espionage programs in Europe. That goal persisted through the disaster of MKUltra to become BRMT.

**Interline Exhibit 17: Defendant CIA Mind Control Objective**



AUTHOR INTERVIEWS

## The CIA's Secret Quest For Mind Control: Torture, LSD And A 'Poisoner In Chief'

September 9, 2019 · 1:50 PM ET
Heard on Fresh Air

 

FRESH AIR

▶ **37-Minute Listen**   + PLAYLIST



During the early period of the Cold War, the CIA became convinced that communists had discovered a drug or technique that would allow them to control human minds. In response, the CIA began its own secret program, called MK-ULTRA, to search for a mind control drug that could be weaponized against enemies.

MK-ULTRA, which operated from the 1950s until the early '60s, was created and run by a chemist named Sidney Gottlieb. Journalist Stephen Kinzer, who spent several years investigating the program, calls the operation the "most sustained search in history for techniques of mind control."

Some of Gottlieb's experiments were covertly funded at universities and research centers, Kinzer says, while others were conducted in American prisons and in detention centers in Japan, Germany and the Philippines. Many of his unwitting subjects endured psychological torture ranging from electroshock to high doses of LSD, according to Kinzer's research.

"Gottlieb wanted to create a way to seize control of people's minds, and he realized it was a two-part process," Kinzer says. "First, you had to blast away the existing mind. Second, you had to find a way to insert a new mind into that resulting void. We didn't get too far on number two, but he did a lot of work on number one."

Source: https://www.npr.org/2019/09/09/758989641/the-cias-secret-quest-for-mind-control-torture-lsd-and-a-poisoner-in-chief. See full text at LP Evidentiary Exhibits pages 9679 - 9685.

**353. E. Fifth: Defendants' pattern of racketeering acts and rights violations against Plaintiffs clearly violates dozens of sections of United States Code Chapter 18 (Crimes, Prisons, and Criminal Procedure), are undoubtedly illegal, and many acts likely indictable as criminal acts under color of law.** By way of example of conduct against the entire class of Plaintiffs, the pattern of racketeering acts of the Defendants' associated-in-fact enterprise impact all dimensions of the life of the Lead Plaintiff. This is clearly demonstrated by the evidence, which is briefly highlighted in the Facts section and referenced in detail in each Subordinate Count of this Complaint.

**This Direct Evidence of Injuries to Lead Plaintiff Presents a Prima Facie Case**

354. Lead Plaintiff's direct evidence, derived from decades of personal experiences with Defendants' violations under law, is fully sufficient to prove a prima facie case with regard to the Defendants' violations under federal law, state statutes, and under the statutory effects of international treaty obligations in the *International Covenant on Civil and Political Rights* and the *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. The Complaint and accompanying evidence demonstrate beyond reasonable doubt that Defendants knew and/or should have known that:

1. Defendants have definitively created the risks which resulted in the Lead Plaintiff's harm from BRMT and their related conspiratorial acts as shown at LP Evidentiary Exhibits pages 237-865, and have failed to cease and desist or otherwise mitigate the injuries they cause.

2. Defendants with intelligence and police powers at all levels of government have a well-established legal duty under law to protect from harm. Defendants explicitly harmed and continue to harm the personal relationships, personal finances, income,

businesses, property, and physical and mental health of Lead Plaintiff and other Plaintiffs. Defendants United States, Central Intelligence Agency, Federal Bureau of Investigation, New York Police Department, Maricopa County (AZ) Sherriff's Department, and Joseph Arpaio, the former Maricopa County Sheriff, have each been found civilly and/or criminally liable for violations of individual rights and liberties. See LP Evidentiary Exhibits pages 237-367, police powers and intelligence services patterns of practice, including relevant Congressional findings on CIA and FBI.

3.  These are the <u>completely voluntary actions of the Defendants,</u> and include a sweeping variety of violations of law, such as wire fraud and mail fraud; fraudulent investments as pretext for perpetuation of involuntary servitude; deliberate harm to interstate commerce, business, and property; aggravated assaults, numerous attempts to injure or murder; other direct and indirect violence including physical abuse, psychological abuse; and BRMT brain hijacking. A sampling of a few dozen of these incidents is included in the fifty-six Counts, ninety-two sub-counts relating to specific predicate acts already in evidence, and in more than 10,700 pages of LP Evidentiary Exhibits incorporated herein by reference.

**Elements of Prima Facie Case Are Proven as to Lead Plaintiff**

355.  <u>The three principal elements of Defendants' continuing actions,</u> 1) voluntary creation of risks to plaintiffs by Defendants, 2) voluntary continuation and conspiratorial actions by Defendants in harming rights, business, and property, despite their clear and contrary legal duty to protect, and 3) willful and completely voluntary actions which perpetuate and conceal the actions of Defendants, <u>fully satisfy and are legally sufficient under law to prove the Lead Plaintiff's prima facie case against the Defendants</u>.

**Large Class of Similarly Situated Plaintiffs Is Not Yet Identified**

356. The identities and specific extent of injuries of virtually all members of the class of injured Plaintiffs is currently only known to those Defendants directly responsible for the management and operation of the prohibited BRMT program and system over the past five decades. Key reasons for this reality are the extreme difficulty to detect the modern version of BRMT, a lack of public awareness due to the unique nature of the system, and the protection afforded by "state secrets" to Defendant United States.

**A. Mere recognition of BRMT was immensely difficult for Lead Plaintiff**

357. The primary reasons the Lead Plaintiff was eventually able to unravel BRMT and reverse engineer the entire development sequence is because of:

1. Defendants' repeated abuses and manipulations, some of which are impossible for the human mind to produce on its own such as the guillotine sensation across the neck described at paragraph 332, and others physical and verbal manipulations by BRMT which provided direct responses to contradict a verbal or non-verbal assertion by the Lead Plaintiff. This is very sloppy tradecraft but highly effective confirmation to the Lead Plaintiff as it could only have been provided directly by the Defendant United States' BRMT operators.

2. Eventual recognition of the long cycle sequences of adverse outcomes to Lead Plaintiff provided the insights needed to reverse engineer the stages of BRMT's development and its increasing sophistication over the decades.

3. Defendant United States field operations personnel, who functionally trained the Lead Plaintiff in tradecraft without intending to do so, left the occasional breadcrumb clue from the time he was in high school (first glimpse of a

satellite/cell phone in a brief case near Greenwater, WA in 1972), graduate school ("Keep in touch, I like to know famous people" a completely mystifying statement at the time by one of his college professors, Dr. Paul Shaffer), and as a consultant ("A physician invented a cure for which there was no disease, his assistant caught the cure and died," by John Hagopian, National Community Banking Senior Manager at Deloitte, on the Federal Deposit Insurance Corporation project and Lead Plaintiff's co-instructor for Bank Administration Institute seminars).

4.    Those few key insights, combined with Lead Plaintiff's unique range of experiences in (a) many kinds of government (legislative, executive, department, agency, bureau, office) and private sector operations (startups to global leaders), (b) his systems development and integration project experience, and (c) his relatively unusual combination of systems design, technology literacy, and science background, were critical to his eventual insight that BRMT was even possible, to understanding the functional concealment of BRMT, and grasping operant conditioning with, and magnification of, its effects by psychological associations and coercion during Defendants' malign field operations.

5.    Lead Plaintiff used the methodical process of hypothesis development, researching, and testing, widely known as the scientific method, to eventually understand BRMT. This methodical approach and the forensic reverse engineering which followed is how the Lead Plaintiff came, with great difficulty, to understand and integrate his long chain of experiences which helped reverse engineer BRMT and its wide range of adverse impacts. Then Lead Plaintiff had to

research the neuroscience basics of brain function, and reverse engineer the

system components required to implement the BRMT system for remote

operation on a global scale. BRMT is explained in summary at LP Evidentiary

Exhibits pages 1-10.

### B.  Myriad challenges to identify members of the class of injured Plaintiffs

358.  Most other Plaintiffs in this class who are similarly situated would find it virtually

impossible to detect BRMT hijacking intrusions. BRMT signals penetrate the skull and hijack

the natural biochemistry of the brain at specific addresses, so the nerve sensation, thought,

speech, or action feels entirely normal to the BRMT victim. Since there is no need for the BRMT

operator to be anywhere near the victim, the visual clues normally present with any normal

police powers operation are simply not there. Neither the victim nor any police powers officer or

agent would detect prohibited BRMT operation during or after a BRMT sequence. There are

simply no clues.

359.  The BRMT signal sequence travels virtually anywhere in the world from a

supercomputing center through a global constellation of satellites owned and managed by

Defendant United States to the BRMT victim in the blink of an eye. No local trace of the BRMT

hijacking remains as the energy of the BRMT hijacking instruction is the stimulus which the

brain uses to create the biochemical reaction, which is the thought, act, verbalization, etc.,.

360.  It is also very difficult for US persons educated from childhood to believe in the

concepts of free will and liberty as guaranteed by our Constitution to even conceive of such a

monstrous program conducted by Defendant United States against its own children, adults,

families, anyone. But even if an unidentified member of the class of BRMT hijacked plaintiffs

were able to understand it is possible for Defendant United States to conduct this kind of

indifferent and depraved abuse against a US persons, they would still need many repetitions of BRMT induced behaviors which are well outside their normal range of behaviors to catch a glimmer of this biological and behavioral hijacking by Defendant United States. And their typical first instinct would naturally be to blame themselves, rather than any malicious intimate intervention.

361.  This type of violence, the biochemical hijacking of the human brain, has never been experienced in the two million year history of human beings, much less at the hands of a supposedly democratic government, proclaiming itself to be the shining light of democracy to the world. So, why would a reasonable person even suspect it? It was simply never possible.

**C. Scale of research, development, and deployment expenditure required is a vital clue to likely number of BRMT victims**

362.  Accomplishing the current highly sophisticated stage of prohibited BRMT bioweapon development has been extremely expensive and daunting, probably requiring secret expenditures on a scale similar to developing the first nuclear weapons, or to engineering the first orbits of the Earth by U.S. astronauts. It certainly took vastly more effort to develop BRMT n secret than it did to drugging victims with 100 million purchased doses of LSD during MKUltra, which used a drug already developed by a Swiss pharmaceutical company.

363.  Both history and the fifty year experience of the Lead Plaintiff make it very highly probable that many other innocent Americans and other innocent persons have been victimized and violated by Defendant United States, perhaps to and including their natural appearing death, permanent disability, or incarceration. This reality and the evidence presented here provide strong circumstantial evidence that the Defendants' violations of human, civil, and Constitutional rights have been and likely continues to be on a scale which is nearly incomprehensible.

**D. Estimated Size of Plaintiff Class**

364. BRMT's total class of Plaintiff victims is currently known only to the protected executives, managers, and operators hiding behind their delusional belief in "state secrets" for a prohibited program which violates the *Totten* standard which requires their acts to be within the law. who authorized and conducted these criminal violations of rights and coordinated with other Defendants in field operations. To provide some context for the Lead Plaintiff's estimated range of Plaintiffs, we below consider Defendant CIA's MKUltra and Defendant FBI's Cointelpro programs, then attempt to estimate the likely range of potential Plaintiffs in the class.

365. MKUltra directly impacted millions of people over twenty years (1953-1973). Though most records were destroyed by Defendant CIA to obstruct justice and hide the program's injuries from the American people and Congress, the ten year CIA brothel drugging project alone likely involved well over 650,000 contacts. There were more than 140 other projects conducted under the MKUltra program umbrella while the 100 million LSD doses and untold mescaline doses were administered by what was then likely the world's largest drug dealer, Defendant CIA's MKUltra, operating against US and Canadian citizens and soldiers. The total US population in that era grew from 155 million in 1953 to over 205 million in 1973.

366. Cointelpro was another program of comparable scale of Defendant United States. The FBI, which is Defendant DOJ's largest police powers agency, operated as a White Supremacist police powers organization and a co-conspirator with and funder of violent far right radical extremists over 15 years (1956-1971) to violate the constitutional and civil rights of American citizens across the entire United States. It also funded and directed a violent far-right White Supremacist militia group. While FBI's activities were focused most intensely on people like Dr. Martin Luther King, Junior, SNCC leaders like John Lewis, Malcolm X, and other

prominent leaders and activists, its impacts were felt broadly in the Black community and among anti-war activists of the time. The confidential files detailing prime targets and measures to be taken were burgled by activists from a tiny two-person FBI office in Media, PA in March 1971, so the program was obviously very wide-spread across the United States. The Black population alone grew from about 16.5 million in 1956 to 23.6 million in 1972, though the impact was more widespread as Cointelpro's FBI agent and paid informant infiltrations, operations, and sabotage included acts against people of color, anti-war activists, alternative lifestyle advocates, and other "fringe" persons and groups who promoted ideas, notably including many now mainstream and well accepted concepts and rights. These "fringe" groups included many majority Whites (such as non-mainstream Christian evangelicals, like my grandparents who were openly surveilled by Defendant FBI), and other ethnicities.

367.  To calculate the potential number of BRMT victims, we must consider (1) BRMT's fifty years of direct and indirect malign impacts ranging from lethal events to perversion of justice to systematic manipulation of free will for the benefit of another; (2) the extreme difficulty any US person or other innocent would have in detecting and confirming that their own brain is being biochemically hijacked by the BRMT bioweapon and bioweapon delivery system; (3) the incredible 3 quadrillion operations per second computing power of a single supercomputer installation – Defendant United States has dozens of supercomputer centers; and (4) the ability of Defendant United States communication, satellite, and precision location technologies to reach sub-pinpoint locations (likely ranging as small as 5,000 nanometers or so in the brain, around the size of a single cell in a human body which typically has about 37 trillion cells) virtually anywhere on the globe with a stream of BRMT biochemical hijacking instructions within 0.3 seconds after transmission (about one short eyeblink).

368.  Over fifty years to date, it would have been possible to impact every single citizen of the United States for literally hours of BRMT hijacking over the course of each year, though the Lead Plaintiff is confident these acts and the related pattern of racketeering acts of Defendants were restricted to some select minority of the total population. Assuming the development cycle proceeded very slowly in the early stages (1970s and 1980s) and each new generation of the technology took two to three years to troubleshoot and correct flaws in the BRMT bioweapon itself before field deployment using the BRMT bioweapon delivery system, it is likely the number of US persons who are injured direct Plaintiff victims is quite large as shown at the Class Allegations motion submitted with this Complaint. This estimate relies on currently unverifiable assumptions due to "state secrets." Defendant United States must be forced by this Court to produce this information to determine the actual identities of the Plaintiffs and the precise duration and extent of injuries to all Plaintiffs. In the absence of such a remedy, the Constitution is itself, for all practical intents and purposes a moot document of no particular significance, as it is only a matter of funding, to deliver this bioweapon by, for, and on behalf of Defendant United States to any and all US persons at any future point for any reason or no reason whatsoever based upon Presidential order or, simply, arbitrary bureaucratic whim with no regard for due process. Our country's history informs this view, including, without limitation, Cointelpro and MKUltra, which demonstrated the power of "state secrets" and functionally unimpeded bureaucratic or Presidential whim in light of Defendant Department of Justice's durable and repeated unwillingness to criminally prosecute such violations, thereby providing an unparalleled Executive branch permission structure.

**Plaintiffs' Injuries**

**A. Lead Plaintiff's injuries are representative of, and stand in as proxy, for injuries likely sustained by Plaintiffs as a class**

369.  Lead Plaintiff's civil rights injuries range from extreme annoyances and aggravations to personal humiliation, from extreme psychological trauma leading to suicidal ideations, and near death experiences, including physical injury. Lead Plaintiff's financial injuries extend over fifty years, including (1) three decades of involuntarily servitude and managed income, (2) businesses losses, loss of income, forced forfeiture of real property and financial assets, (3) deprivation of government benefits to commercial enterprises resulting in lost profits, lost revenue from sale of the businesses, (4) fraudulent takings and sales contracts, loss of honest services; all followed by (5) two decades of total loss of income and assets, and will be calculated at trial.

370.  Other Plaintiffs' injuries will include deceased family members, wrongfully incarcerated people, mentally and physically disabled people, permanently injured people, and victims of all variety of heinous criminal actions from induced and fraudulent personal relationships to theft of assets to induced third party deaths.

371.  These are all the criminal acts of Defendants against the individual comprising the class of Plaintiffs while these Defendants hide behind "national security" and "state secret" exemptions, "qualified immunity," and other statutory subterfuges which defeat the very concept of "justice under law" and fail to meet even the most basic standards of ratified international treaty obligations.. A sampling of the range, scope, and scale of five decades of offenses against the Lead Plaintiff only are described in the following paragraph.

371.  These injuries of Lead Plaintiff by Defendants have over time cost him, (1) two wives and families, one after the other, (2) his career and entrepreneurial options, including decades of involuntary servitude, (3) the first family home he and his wife purchased for $184,340 around the age of 30 as shown below, and

**Interline Exhibit 18: Redmond Residence of Lead Plaintiff Acquired at Age 29 (1985)**



17026 NE 133rd St, Redmond, WA 98052

$1,866,388       4         2.5        2,800
Redfin Estimate    Beds      Baths      Sqft



**Is this your home?**

Claim this home to track its value and nearby sales activity

(4) his second family home, after laboring and investing for about ten years to rebuild and improve it. This second family home started as the reverse floor plan of the house first shown below. This house is on a lot which shares a southeast lot corner with Lead Plaintiff's second home and fronts on a neighboring street. Lead Plaintiff rebuilt its reverse floor plan twin as shown in the second set of photos below (all three photos are from Redfin.com on October 13, 2022),

Interline Exhibit 19: Reverse Floorplan of Kirkland Residence of Lead Plaintiff (1990) and

Actual Condition and DIY Improved Floorplan at Forced Sale in 2005 (below)





(5) nearly all his material possessions except for one rolling suitcase, and some boxes left at his

sister's house, when he left Seattle for Boston in 2005, and then (6) again when removed from

the apartment he furnished and improved in Cliffside Park, NJ in October 2010, (7) all his financial resources and creditworthiness developed over years, in 2005, (8) again in 2010, (9) expose him to foreign intelligence services and corrupt international intelligence horse-trading among "friendly" intelligence services as a means of inculpating him in foreign surveillance as a US citizen, (10) extreme physical abuse by indirect means including years of manipulation through BRMT brain hijacking and infliction of extreme and torturous physical symptoms and mental abuse while homeless and later while again unemployed by design, (11) make him homeless twice, (12) cause him to be locked up and drugged without consent in a mental healthcare ward for six months, (13) have his career and business opportunities destroyed repeatedly over 25 years, (14) his earning power reduced repeatedly from a top ten percent income level to nothing, (15) have his reputation savaged and destroyed by Defendant officials sworn to protect and defend and by political hacks who conspired with those officials, (16) be wildly and wrongly accused and pretexted for many criminal actions which have absolutely no basis in fact, (17) have his personal and romantic interests turned into dysfunction and sexual abuse by Defendants' willful actions, (18) have his private life portrayed publicly in the most corrupt and reprehensible manner, (19) turn his community service and relationships with legislators and political executive staff to trash, (20) be permanently resigned to the use of anti-depressants by years of BRMT biochemical abuse of his brain and contrived allergic reactions, (21) be subjected to psychological and physical sabotage, abuse, and violence in a long series of attempts to humiliate, discredit, injure, and/or end his life by indirect lethal means. These efforts have recently intensified, even involving other innocent people in (22) a potential rail transit mass casualty event on September 11, 2022 (Table 1-047), (23) an indirect physical assault in a New York City park (Table 1-049), and a vehicle rundown sequence in mid-November 2022..

372.  Defendants, including departments and agencies of the Defendant United States, conduct ongoing operations against Lead Plaintiff together with other jurisdictions' Defendant police powers operations and other co-conspirator defendants. These continue as of the date of Lead Plaintiff's signature on this Complaint.

**B.  Injuries and intrusions of BRMT have become more refined over the succeeding generations of BRMT**

373.  As each succeeding generation of BRMT is deployed, Lead Plaintiff has sustained and continues to sustain injury to his business and property and ability to freely pursue these goals as guaranteed by the Constitution and by law; to his physical, mental, and emotional health; continued risk to life; to his rights to freely associate and communicate, among other impaired and infringed rights; to be free from physical harm and risk of death on a day-to-day basis; to his career and financial opportunities; and his general health and well-being. Defendants have impaired each and every aspect of human rights, though they have failed thus far to end the Lead Plaintiff's life, despite their careful arrangement of harmful and prejudicial events and outcomes.

374.  Other named and unnamed Defendants have and continue to pursue, hound, harass, intimidate, and engage in other destructive and harmful acts, some while acting under color of law. All Defendants have and do act with intent to harm using malign political, personal, psychological, and economic abuses as described herein and as the discovery process will further and still more clearly evidence. As before, these injuries have likely been sustained to a greater or lesser degree by other members of the class of Plaintiffs who must be identified.

## C. Injurious and likely lethal abuses of other innocent people

375. Lead Plaintiff has made mass casualty and individual homicide federal criminal referrals in recent months to the Defendant Department of Justice and to its US Attorney for the Southern District of New York as documented in LP Evidentiary Exhibits letters at pages 368-793. Lead Plaintiff is hopeful these will result in justice for those victims and help lead to the termination of BRMT use against innocent persons everywhere.

376. These two mass casualty event attempts, and the two likely relevant homicides reported to Defendant DOJ and to SDNY are convincingly and directly connected to the prohibited BRMT bioweapon program. The Bio-Lab fire at their Conyers, GA plant and warehouse in May 2004, likely arson caused, is shown at Interline Exhibit 21, page 255. This massive poisonous phosgene and chlorine gases fire was not witnessed by the Lead Plaintiff but occurred in a heavily populated area near Atlanta soon after he visited their Lawrenceville, GA headquarters. US Airways Flight 1549 landed in the Hudson River a few minutes after it struck a flight of Canadian Geese during climb out from LaGuardia Airport in New York City. Defendants' use of common intelligence non-verbal tradecraft signaling which indicates to Lead Plaintiff their foreknowledge of this mass casualty event in January 2009. These events happened five and one-half months before the November 2004 Presidential election, and five days before the 2009 Presidential inauguration of Obama. The Lead Plaintiff was at least one target of a September 11, 2022 mass casualty event against an express train operating at 50-60 miles per hour north of New York City. See Interline Exhibit 1B at page 48, and Subordinate Count L-14, pages 340-345.

**Interline Exhibit 20: US Airways Flight 1549 LGA to CLT Hudson River Landing Site on January 15, 2009 Follows Tradecraft Signatures Precursor Events**



*Above: US Airways Flight 1549, LGA to CLT, January 15, 2009, with 155 passengers and crew downed by a dual engine flame-out during initial climb to altitude by a BRMT directed flight of Canadian Geese. Defendants' pre-crash tradecraft signaling is completely consistent with the tradecraft of prior and subsequent tradecraft which is indicative of a planned sabotage event, using both the prohibited BRMT bioweapon system and bioweapon delivery system as the Lead Plaintiff has reversed engineered in 2021-2022. In late 2007 or early 2008, Lead Plaintiff observed an out of flight configuration BRMT induced visual nerve stimulus image of an out-of-configuration commercial aircraft above the Palisades on the west side of the Hudson River. The physical visual portion of this was and is consistent with other physical tradecraft witnessed both before and after the actual event which was witnessed by Lead Plaintiff on January 15, 2009 from his Cliffside Park, NJ apartment window which overlooked the Hudson River. See SDNY letter at LP Evidentiary Exhibits pages 413-415, 419-426 for more detail of this pre-planned terror event five days before the Presidential transition to President Obama.*

**Interline Exhibit 21: Bio-Lab Chemical Warehouse Poison Gases Incident on May 25, 2004**

**Follows Lead Plaintiff's Headquarters Visit Weeks Earlier**



**OFFICIAL PHOTOGRAPH NO. 1**
**U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Subject:** | Smoke plume originating from Plant Warehouse 14. Note: Old Covington Highway is in the lower right portion of the photograph. |
| **Location:** | Bio-Labs, Inc. Conyers, Rockdale County, Georgia |
| **Orientation:** | Northwest |
| **TDD Number:** | 4T-04-05-B-006 **Date:** May 25, 2004 |
| **Photographer:** | John Spink, Atlanta Journal Constitution Online |

*Above: Bio-Lab Warehouse Phosgene Gas and Chlorine Gas Fire, May 25, 2004. Lead Plaintiff visited this company's headquarters in Lawrenceville, GA during the preceding months. The fire was very likely arson-caused as part of an internal sabotage campaign by persons aware of the Lead Plaintiff's movements through the BRMT involuntary servitude program of Defendant United States.*

377.  The second attempted mass casualty event (Bio-Lab poison gases arson fire above) provided other clues which are strongly indicative of intimate indirect involvement, likely using

BRMT. An element of Defendant United States likely engaged in direct remote participation using BRMT in one of the homicide events in New York City in 2022, assuming press reports received by the Lead Plaintiff were accurate. Its location, timing, and precursor behavior were signature style indications of BRMT use in the event. The other New York City likely homicide involved a very unusual set of injuries if the incident was accurately reported in the press. This homicide was preceded by distinctive but oblique front-runner intelligence tradecraft signaling to the Lead Plaintiff in a very unique circumstance. The nature of the communication indicates explicit foreknowledge of the specific target by those who initiated the signaling.

378.  See also LP Evidentiary Exhibits pages 413-415, 416-418, 419-426, 548-563, 598-606.

### D.  BRMT direct impacts on its innocent victims

379.  US persons who are BRMT victims ARE the involuntary servants and vassals of Defendant United States. We are subject to whatever egregious or lethal behaviors the national security and police powers operations choose to inflict, directly and indirectly.

380.  The evidence presented here is gathered from Lead Plaintiff's direct experience, from his contemporaneous notes of incidents as shown in the LP Evidentiary Exhibits, and from reliable independent sources. Among other things, this evidence demonstrates Defendants' clear consciousness of guilt. Defendants' increasing threats and violence toward the Lead Plaintiff evidence both impunity and clear hints of desperation as Defendants try to sweep the criminal reality they have created under the rug.

381.  Even given the depth of direct evidence of injuries, and of Defendants' documented historical patterns and practices, this evidence barely scratches the surface of the Defendants' depravity. At best, it is an incomplete description of fifty years of violations directly experienced

by only one victim, a catalog of abuses which is not even close to being comprehensive. And that is the reason Defendants relentlessly pursue the Lead Plaintiff to this day.

**<u>Strong Likelihood of Future Injuries to Plaintiffs</u>**

### A. Systematic Administrative Failures To Identify and Correct Abuses

382.  Both MKUltra and Cointelpro injured or killed some of the millions of US persons they directly and indirectly impacted[7]. Both programs' lawless acts against US persons by Defendant United States ended in the early 1970s only after public exposure and outrage. Both programs were criminally indictable under the RICO Act of 1970, among other applicable federal and state statutes. But nothing was done.

383.  The inspection functions, which supposedly assure the public of internal compliance and accountability to law and regulation report to the same people (Cabinet Secretaries and Agency Directors) who are responsible for deciding to implement and who oversee the programs. Institutional non-compliance with law ordered, directed, or silently assented to by senior management to cover up senior managers its own current or prior misconduct may never see the light of public disclosure, be ignored, or swept under the rug. Congress rarely acts on any scandal which does not raise extraordinary outrage among the public, and the President's usual answer (whoever it is at the moment) is to fire some one person, which typically has no impact on the other thousand or thirty thousand people involved in creating and sustaining the illegal and non-complaint conduct.

384.  The Inspectors General took years to find the illegalities of MKUltra, the crimes committed. CIA operated MKUltra in a "need-to-know" silo supposedly only known to the CIA Director while a parallel program ran in the Army. But thousands of people were employed in both of these programs, as government and contract "researchers," as program assistants and

accountants, as paid employees and contractors of three CIA bordellos, as officers and agents, and so forth. An insider whistleblower died on the sidewalks of New York City after a fall from the tenth story window of a hotel room he shared with the MKUltra Program Director's personal assistant just as the program was ramping up in 1953. MKUltra did not end until the 1970s.

385.  FBI's Cointelpro was directed and supervised by an Assistant Director in the DC headquarters who reported across the hall to Director Hoover. The program was widespread across the United States, involved burglaries, break-ins, wiretapping without court order, frauds, and all manner of other criminal acts by FBI field agents. It began around the same time FBI agents were surveilling the Lead Plaintiff's grandfather's dairy farm, where he led evangelical Christian church services as an elder in his church. FBI funded far right White Supremacist militia and other right wing extremists, and directly and indirectly spied for fifteen years on American citizens trying to exercise their civil and Constitutional rights, engage in free speech and assembly, and protest malicious and indifferent police powers and White Supremacist misconduct and crimes against them.

386.  As for actual consequences for these criminal acts, CIA destroyed nearly all MKUltra program evidence, obstructing justice and accountability for lives lost and lives destroyed. The CIA Director who ordered the evidence destruction was then promoted to Ambassador and confirmed to that post by the US Senate. FBI's Cointelpro was exposed by the *Citizens' Commission to Investigate the FBI* burglary of files in the FBI's Media, Pennsylvania Field Office. They passed the burgled information to the press after the March 8, 1971 burglary. After Cointelpro was exposed, notably not by either DOJ or FBI, FBI Director Hoover retired, not to criminal RICO indictment, but to great acclaim, including the naming of the FBI's DC

headquarters building in his name in 1973, and a memorial book published in 1974 by Congress in his honor.

388. This tradition of Defendant United States violating rights is alive and well. One modest example: Lead Plaintiff traveled to the District of Columbia from New York City on Friday, August 27, 2021, and was purposefully misdirected to a faked alternate voting rights rally near the National Archives building on Saturday, August 28, 2021, the 58th anniversary of Martin Luther King's "I Have A Dream" speech at the Lincoln Memorial in 1963. The New York Times online version viewed by the Lead Plaintiff the next morning was doctored by Defendants so there was not one single mention of even one of these voting rights rallies, which were held across the nation on August 28th.

389. Then Defendants lied about the actual location of that event to Lead Plaintiff in their September 22, 2021 response to Lead Plaintiff's FOIA request. See LP Evidentiary Exhibits pages 509, 516, 532-534 and letter below. This kind of wire fraud has been experienced hundreds of times over decades to misinform, harass, and discredit the Lead Plaintiff.

**Interline Exhibit 22: 58th Anniversary of MLK "I Have A Dream" Speech Lincoln Memorial Permit Allegedly Cancelled by Organizer – FOIA Response Received From Department of Interior to Lead Plaintiff After First Amendment Violation**



## United States Department of the Interior

NATIONAL PARK SERVICE
Interior Region 1- National Capital Area
1100 Ohio Drive, S.W.
Washington, D.C. 20242

FOIA 2021-6105

September 22, 2021

Mr. Dennis Brewer
1210 City Place
Edgewater, NJ 07020
dsbrewer923@hotmail.com

Dear Mr. Brewer:

Subject: Freedom of Information Act Request Dated September 20, 2021
National Park Service (NPS) re: *National Mall and Memorial Parks*

This letter is in response to your Freedom of Information Act (FOIA) request dated September
20, 2021, in which you requested: "On August 28, 2021, I attended a voting rights related event
on the National Mall adjacent to the National Archives Building. I am making a FOIA request to
identify the sponsors of that event. This event occurred at the same time as another voting rights
event at the Lincoln Memorial. Please let me know if you require other information from me
prior to fulfilling my FOIA request. Thank you."

The following response was prepared by the National Capital Area through consultation with the
division of Permits, National Mall and Memorial Parks. The FOIA, 5 U.S.C. § 552, generally
provides that the Government shall make documents available to the public for inspection and
copying to the widest extent possible. However, certain classes of documents may be exempt.
The FOIA does not require that new records be created in response to a request and only applies
to records in existence at the time the request is received. Additionally, because the NPS creates
and maintains law enforcement records, we are required by the Department of Justice to provide
the following information, even though it may or may not apply to your specific request:
Congress excluded three discrete categories of law enforcement and national security records
from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those
records that are subject to the requirements of the FOIA. This is a standard notification that we
are required to give all our requesters and should not be taken as an indication that excluded
records do, or do not, exist.

We have enclosed 2 pages of records that are responsive to your request which are being released
to you in full.

We have classified you as "other" requester. However, we do not bill requesters for FOIA
processing fees when their fees are less than $50.00, because the cost of collection would be

INTERIOR REGION 1 • NORTH ATLANTIC-APPALACHIAN

**B.  Defendant DOJ's Repetitive Failures to Administer Criminal and Civil Justice on Behalf of Victims**

390.  The Justice Department has an uninterrupted 152 year history of failures to fairly and impartially administer justice against Defendant United States executive branch departments and agencies for their <u>institutional</u> violations of the Constitution and laws of the United States**.** For example, a search for criminal prosecutions by Defendant DOJ of the institutional criminality and corruption of CIA's 20 year MKUltra secret LSD and mescaline drugging program; and of FBI's Cointelpro 15 year White Supremacist campaign against civil rights activists, both turn up completely empty. No criminal consequences ever for decades of felonies directly committed such as break-ins, burglaries, assaults, defamation, druggings, violence through proxies, and numerous other crimes.

391.  No civil case brought by direct victims withstood the national security exemption used to hide these myriad crimes. The agencies suffered no consequences. No accounting was ever made to the families or to the American People for the lives lost and people destroyed.

392.  These Defendant United States departments and agencies get this oft-repeated message about consequences from Defendant DOJ and the Courts, from our dysfunctional justice system. Consider the following evidence responding to the Lead Plaintiff in 2022:

**Interline Exhibit 23: Defendant Department of Justice Declines Investigation of Defendant FBI and Lead Plaintiff's Reply**

November 9, 2021

U.S. Department of Justice
Office of the Inspector General
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

Good day:

I have filed a civil Complaint against DOJ and FBI, among others, related to a long-running series
of civil and constitutional rights abuses by the United States. This Complaint relates an on-going
series of manipulations by the Defendants and other law enforcement agencies acting in witting
or unwitting cooperation with the United States. A copy of this Complaint, filed in US District
Court of the District of Columbia is included herewith. I have also attached a list of cooperating
and likely cover entities used by Defendants in their pursuit and manipulation of me as Plaintiff.

I will also note that I complained about this matter to Defendants beginning in 2005 with the
U.S. Attorney's Office for Western Washington, and during a personal trip (after documents to
be delivered by U.S. mail, UPS and FedEx did not reach their destinations or were missing
required proofs of delivery) with a member of the legal team at FBI Headquarters, by hand
delivery to DOJ Headquarters, and to the Executive Office of the President, among others.
Further, immediately after filing a Complaint in U.S. District Court for New Jersey at Newark in
2010, I was removed from my residence and rendered homeless. That same six unit building
had been under FBI surveillance and an alien tenant was removed and deported.

I note that the FBI OIG is conducting a review of undercover entities, some of which may be
related to my Complaint and the Defendants' pattern of manipulation and harassment. I am
also providing a copy of an NYPD response to my FOIA request under New York State law for
your evaluation. Please feel free to share this information with FBI OIG or other OIG operations
as you wish.

Kindly review the Complaint and the ongoing series of events and consider careful review of
this matter as it is highly likely that similar undertakings against other persons may have
resulted in incarceration, injury, destruction of families and businesses, and the death of U. S.
persons and others.

Thank you,



DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

January 28, 2022

Dennis Brewer
1230 City Place
Edgewater, NJ 07020

Dear Mr. Brewer:

This is to acknowledge receipt of your recent correspondence and to thank you for contacting the Department of Justice Office of the Inspector General with your concerns.

Sincerely,

Office of the Inspector General
Investigations Division

950 Pennsylvania Avenue, NW, Washington, DC 20530-0001 | (202) 514-3435



**DEPARTMENT OF JUSTICE I OFFICE OF THE INSPECTOR GENERAL**

March 22, 2022

Dennis Brewer
1210 City Place
Edgewater, NJ 07020

Dear Mr. Brewer:

Thank you for your recent correspondence. The U.S. Department of Justice (DOJ), Office of the
Inspector General, investigates allegations of misconduct by employees and contractors of DOJ, as
well as waste, fraud and abuse affecting DOJ programs or operations.

The matters you raised are outside our investigative jurisdiction, therefore no action can be taken by our
office. You may wish to consult the following web page for information on where to submit certain
complaints that do not fall within the DOJ OIG's investigative authority: https://oig.justice.gov/
hotline/non_doj_complaints.

Please be advised that this is the only correspondence you will receive from our Office regarding this
matter. Of course, if you obtain new information that involves other allegations or issues regarding DOJ
employees, contractors, programs or operations, please feel free to submit that information to us.

Thank you for giving us the opportunity to review your concerns.


Sincerely,


Office of the Inspector General
Investigations Division

*Rec'd*
*3/24*

950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

March 25, 2022

Assistant Inspector General for Investigations
Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Good day –

I received your letter of March 22, 2022, indicating the subjects raised in my complaint were outside your investigative domain. On knowledge and belief, the entire sequence of events involving the financial destruction of Performa, a company I owned in partnership, between 2002 to 2005 was undertaken by FBI. The agency was further involved in improper police powers activities in Boston and New York metropolitan areas summarized below.

The conduct in question is not individual misconduct which can be handled by the agency. Rather, it is **institutional misconduct by an agency within the Department of Justice**. So, I am requesting official answers to the following three direct and specific questions for potential use in civil litigation already filed against the Department of Justice.

1. **Is your office stating officially for the record that institutional misconduct by the FBI is outside the jurisdiction of DOJ OIG?**

A copy of the revised Complaint 22-cv-00592, now pending before the DC District Court, is attached for your convenience.

For your further investigative development, I offer the following if you wish to proceed to investigate institutional misconduct by FBI. The following sales leads have a common thread beyond TSL, they occurred across state lines in the jurisdiction of numerous field offices and in plants that had no employees present (other than faux employees, all FBI field agents upon knowledge and belief).

This fact, the complete absence of hourly and other managerial employees, is unlike any other period of sales activity I had undertaken between August 1979 and September 2001. During that period, I was a consultant who conducted and managed hundreds of projects on behalf of management consulting firms and an engineering firm, in a very wide variety of enterprises, as well as an executive in startup and mid-size commercial enterprises.

In other words, I have vastly more experience and knowledge of the customs and habits of such enterprises than any government employee would reasonably be expected to have. I know and understand the territory of commercial enterprises. Kindly refer to my resume in Complaint 22-cv-00592 for more information.

Upon knowledge and belief, FBI Boston arranged the set up of a dummy company, known to me as Technology Sales Leads (TSL), which I visited in downtown Boston during the period that Performa was in business. TSL provided a series of bogus sales leads in the 2003/2004 period for the unstated purpose of conducting a financial starve-out of the company, which resulted in the loss of my personal residence in Kirkland, Washington in the fall of 2005. The residence itself may well have been subsequently

internally destroyed by FBI in a search for some non-existent phantom. Kindly see lines 224 to 248 of the Complaint originally provided to your office.

Sales leads provided by TSL are shown below. None ever closed and converted to revenue projects, unlike my prior 20 year history of 60% to 80% converting to sales revenue while selling and conducting projects and technological products in large scale, mid-size, and startup enterprises.

1.  Bay State Milling, Boston, MA, software improvement
2.  Briggs Stratton, Midwest location, information technology
3.  Badger Meter, Milwaukee, WI
4.  Raynor Garage Door, Dixon, IL
5.  First Alert, Aurora, IL, plant operations improvement
6.  Borg Warner transfer case plant, Muncie, IN, information technology
7.  Alabama telecom, sales discussion including manufacturing cell visibility system requirement
8.  Western Digital (CA), manufacturing cell visibility system demo by an alleged VP using the username "Guest"
9.  Grocery wholesaler, Midwest location
10. Orange City IA beef plant, purchasing efficiency
11. BioControl, Zoe Schumaker, Lawrenceville, GA, information technology
12. Brightstar, Miami, FL, information technology
13. Rockwell Collins, Cedar Rapids, IA financial planning
14. Rocketdyne Folsom, CA, F-35 e-procurement
15. Steel and Pipe Supply, Manhattan, KS, information technology
16. Samsonite, near Denver
17. Holland Group, Holland, MI

A series of fraudulent checks was also proffered to Performa for work conducted, or at least allegedly conducted during this time period by my partner, or a carefully disguised substitute as he allegedly relocated to Tucson with his wife and subsequently reappeared in the Seattle area, totaling about $160,000. Perhaps FBI, being so closely engaged with my company through TSL, was unaware of this, or perhaps they were fully engaged. I am unable to investigate this matter further until the discovery phase of my civil complaint, though perhaps it will offer further evidence of institutional misconduct as part of this overall package of destruction.

**2.  Has FBI officially and categorically stated to your office they had no involvement with the Technology Sales Leads Boston boiler room sales leads development and the series of subsequent sales calls involving me and Performa in 2003/2004?**

FBI was also involved during my time in Boston as a homeless person in 2006 and 2007, and in the New York City metro area from 2007 to present. I was trafficked by a police powers network I am currently working to identify and subjected to investigation as a terrorist as confirmed by NYPD. This would strike most people as peculiar, given my previous consideration by the Governor of the State of Washington to Chair the Higher Education Coordinating Board for the State of Washington. This Board oversees an agency which has various regulatory authorities over all institutions of higher education in the state. Also, my tenure as the regional Chair of a high technology trade association and personal familiarity to and with members of the leadership of the state's House and Senate may strike some as a bit contradictory to the concept that I was inclined toward terrorism.

3. Has FBI officially and categorically stated to your office that it was in no way involved in any investigation of me as a terror suspect in the state of Washington, the Boston metropolitan area, the New York City metropolitan region, or any other location within or without the United States, between 2001 and the present?

That would stretch credulity well beyond the point of disbelief. I will note again that the landlord of my building informed me that an individual was removed from my seven unit apartment building in Cliffside Park, New Jersey by FBI and handed over to DHS for deportation due to anti-American statements or sympathies while I was a resident there.

Finally, I recommend you carefully review the full extent of my Complaint 22-cv-00592 to determine if you can truly disregard any and all institutional misconduct possibilities by any and all agencies, offices, bureaus of the Department of Justice.

I look forward to your reply to my three specific questions above and to other matters as you wish. I clearly understand your investigations are the confidential domain of the Department. Thank you very much for your attention to this matter.

Sincerely,


Dennis S. Brewer
1710 City Place
Edgewater, NJ 07020
201-887-6541


Cc:     Inspector General
        Department of Justice
        950 Pennsylvania Ave NW
        Washington, DC 20530

Enclosures:

        Complaint 22-cv-00592

        Letter to SDNY dated December 6, 2021 (later forwarded to DOJ OIG DC and acknowledged in January 28, 2002 reply)

        Letters to SDNY and OIG – Investigations

                February 16, 2022

                February 28, 2022

                March 2, 2022

                March 21, 2022

                March 25, 2022



Enclosures continued:

Letters from DOJ OIG

January 28, 2022

March 22, 2022

Page 4 of 4

Lead Plaintiff has never received a reply to the letter above dated March 25, 2022.

393.  Simply put, the lesson Defendant United States has learned is that criminal liability for institutional criminal acts never happens. Evidence is destroyed and executive branch criminality goes unpunished. This lawless conduct IS the rule of law for the victims so long as Defendant United States invokes "national security" and declines to pursue its own felonious acts under cover of the functional national security exemption from court review as implemented under *United States v. Reynolds, 345 U.S. 1 (1953)*.

394. This is not the biased perspective of an imbittered Plaintiff. It is simply historical reality, how our current system actually works. It is also the actual pattern of practice since *United States v. Reynolds, 345 U.S. 1 (1953)*. That 1953 opinion works to the extreme convenience of Defendant United States in any cover-up or knowing violations of the Constitution, of rights, and of the ratified treaties and laws. It requires only a suitable certification by Defendant United States. No examination of evidence is necessary. The incentive to mislead the Court is powerful and palpable, and the track record is clear. By way of example, the FISA Court has documented and excoriated various agencies of Defendant United States in recent times for perjurious statements to that Court.

395.  As with any group of co-conspirators intent on lawless evasions, Defendants' conduct will continue and the pattern will progressively degenerate toward ever increasing depravity and violence until there are real consequences for the Defendants, including criminal consequences, convictions, and incarceration. The Dachau, MKUltra, and Cointelpro progressions illustrate this truth perfectly. There simply have not been any impactful consequences in 152 years of criminal prosecutions by Defendant Department of Justice, as the record clearly shows.

396. The twenty attempted lethal acts against the Lead Plaintiff from the 1980s to 2022 at Table 1 (pages 30-46) directly demonstrate this truth about human and organizational behavior in the absence of consequences. The Lead Plaintiff has a legitimate fear for his life and safety. So, the logical questions for any victim, and for the Court, are - Who else? What other programs? How many US persons are there - dead, disabled, incarcerated, destroyed? How many more will be discovered under cover of "state secrets?" Who will suffer tomorrow? We simply do not know.

397. Based upon this history of acts against Plaintiffs and of failures to act by elements of Defendant United States, this civil litigation is literally the only option for the Lead Plaintiff and other victims of BRMT and similar institutional criminality to escape Defendants' depravities and for those inculpated to be held liable for this depraved operation. The only response ever received from any element of Defendant United States to any petition by the Lead Plaintiff are the formal declinations to act by Defendant DOJ's OIG in Interline Exhibit 23 at pages 261-268.

**C. Failures to Enforce Legal Obligations Under International Treaties Ratified by United States and Conflicts of Law**

398. All governments within the United States are obligated under the Constitution to fully enforce each and every provision of treaties ratified by the United States. Defendants have systematically failed to do so in this case and under the provisions of federal law which directly conflict with and deny rights of action guaranteed by two ratified international treaties. The United States Code explicitly violates provisions of *International Covenant on Civil and Political Rights* Articles 7 and 8.2, as ratified, which obligate the United States to enforce under law the following:

"Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

Article 8

2. No one shall be held in servitude.

See the full text of this ratified international treaty at LP Evidentiary Exhibits pages 895-920.

**Interline Exhibit 24: Senate Ratification of *International Covenant on Civil and Political Rights***

**INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS**
Senate Consideration of Treaty Document 95-20

| TREATY DOCUMENT | Hide Overview ✕ |
| --- | --- |

**Formal Title**
The International Covenant on Civil and Political Rights, signed on behalf of the United States on October 5, 1977.

**Date Received from President**
02/23/1978

**Originating Organization**
United Nations

**Latest Senate Action**
04/02/1992
Resolution of advice and consent to ratification agreed to in Senate by Division Vote

399. Further, 18 U.S.C. § 2340B violates the United States' legal obligation under its ratification of the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* Article 14, which requires it to permit recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including

the means for as full rehabilitation as possible. In the event of the death of the victim as a

result of an act of torture, his dependents shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to

compensation which may exist under national law."

See the full text of this ratified international treaty at LP Evidentiary Exhibits pages 921-933.

**Interline Exhibit 25: Senate Ratification of *Convention Against Torture and Other Cruel,***

***Inhuman or Degrading Treatment or Punishment***

CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT
Senate Consideration of Treaty Document 100-20

TREATY DOCUMENT    Hide Overview X

Treaty Topic:
Human Rights

Formal Title
The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the United Nations General Assembly on December 10, 1984, and signed by the United States on April 18, 1988.

Date Received from President
05/20/1988

Originating Organization
United Nations

Latest Senate Action
10/27/1990
Resolution of advice and consent to ratification agreed to in Senate with amendments by Division Vote.

400.  The 43 Principal Counts below relate to BRMT brain hijacking, psychological

violence, and physical violence by Defendants against the Lead Plaintiff alone. These Counts

include (1) only a very few examples of the true range of lethal and sub-lethal injuries, (2) do not

begin to capture the extreme mental cruelty and psychological damage inflicted on victims (as

members of the class of Plaintiffs) and those who love them, and (3) cannot portray the

devastating financial, reputational, and emotional impacts which have been experienced by the

Lead Plaintiff and others of this class.  The 43 Principal Counts do not include the full range of

outcomes other Plaintiff victims in this class have experienced while being injured by the

Defendants' malicious and criminal actions. But these Counts are fairly representative of the

range of adverse circumstances and outcomes experienced by other injured or deceased plaintiffs and their heirs.

## CLAIMS FOR RELIEF

401. The following claims for relief are stated as Principal Counts and Subordinate Counts. This permits efficient presentation under each of the 43 Principal Counts of a number of specific examples of typical types of acts, violations, and injuries) from the 92 Subordinate Counts, without making the Complaint an exceedingly lengthy document. For clarity of presentation, to avoid undue repetition in each Principal Count, and in accordance with Federal Rules of Civil Procedure Rule 10.(b), the specific circumstances described in each Subordinate Count also reference various paragraphs, interline exhibits, and tables in the Facts section of this Complaint (these are cited as Complaint paragraph, Interline Exhibit, or Table) and the LP Evidentiary Exhibits, which are cited by that title and incorporated by reference.

**402. Subordinate Counts:** The 92 Subordinate Counts are presented before the Principal Counts for ease of reference. Tables and paragraphs cited in each Subordinate Count ("subcount" herein) refer to the contents of this Complaint document. LP Evidentiary Exhibits refers to those separately named and paginated documents. More on this below.

**403. Principal Counts:** Under the 43 Principal Counts, only a representative sampling of the actual number of occurrences of the violation named, as directly experienced by Lead Plaintiff, are being cited and plead with particularity as Subordinate Counts (subcounts). Discovery, including (i) recovery of documents previously prepared by Lead Defendant, and (ii) the unblocking of Lead Plaintiff's business related emails from the period from March 4, 2019 through July 9, 2020, which are currently rendered inaccessible by a third party presumed to be a

police powers operation, will result in numerous additional Subordinate Counts, and may require additional Principal Counts be added to properly and fairly adjudicate justice for the entire class of Plaintiffs.

404. In accordance with Federal Rule of Civil Procedure 8.(a)(2), and to avoid the lengthy and undue repetition of common text and assertions at each Principal Count and every related Subordinate Count in this Claims For Relief section, the common text and allegations are only included at the Principal Count and are incorporated by reference in all related Subordinate Counts.

**405. Page Numbering, Tables, Interline Exhibits:** All page number references herein relate to the RED colored Bates numbering at the bottom of each page. Table 1 begins at page 30. Table 2 begins at page 133. These two Tables are numbered with paragraph references 1-xxx or 2-xxxx. Twenty-five Interline Exhibits are found throughout the Complaint.

**406. Exhibits:** Exhibits filed with this initial complaint are identified as LP Evidentiary Exhibits. Most exhibits are identified and located by the RED page number at the bottom of each page. However, emails are identified and located by the **date of the email** in YYMMDD format. They are filed in the LP Evidentiary Exhibits in this YYMMDD sequence. The short title of each email relates to the Lead Plaintiff's principal contact's name and the subject matter of the email, not necessarily the topic indicated in the subject line of the specific email. The emails submitted are only a sampling of key emails and may not indicate the volume of total emails which are related to the contact or the subject. The misspellings in the original email descriptions are shown to avoid ambiguity when referencing those emails.

**407. Compendium:** A compendium which includes (i) glossary of names and brief descriptions of selected key entities and individuals; (ii) listings of selected key emails,

documents, and disbursements, all in both date and alphabetic order, is included at LP Evidentiary Exhibits pages 934-1075.

408. Note that crucial evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, but is likely to be available upon discovery. This impacts the Plaintiffs' ability to still more thoroughly document Defendants' pattern of acts and violations as presented at the time of this filing. Discovery will be required to access and plead these injuries with particularity.

409. Subordinate Counts (subcounts) begin on page 276, the next page. Principal Counts begin on page 850. Principal Counts are the triable Counts under law. Principal Counts incorporate the subcounts by reference using the subcount prefix and number, such as L-xx, C-xx, P-xx, and N-xx. The 92 subcounts are referenced as needed in each of the 43 Principal Counts. These subcounts are a representative sampling of the injuries suffered by Lead Plaintiff and other members of this class of plaintiffs. Both Principal and Subordinate Counts are referenced by their prefix and suffix. The prefix is followed by a subparagraph letter (suffix), such as Principal Count 5C which indicates subparagraph C of Principal Count 5. There are no sequential complaint paragraph numbers in any of the Principal Counts or Subordinate Counts.

**SUBORDINATE COUNTS**

Note there are spelling errors in the emails referenced throughout these ninety-two subcounts. These have not been corrected to maintain 100% traceability. An indexed listing of all subcounts is shown in the Table of Contents, see Complaint pages 21-28.

**L-1 Lethality**

**Events:**

**British Columbia Sea to Sky Highway**

**BRMT Melatonin Overdose**

A. Plaintiff is deliberately overdosed with melatonin to induce sleep while driving on the Sea-To-Sky highway south of Squamish, British Columbia, Canada near Porteau Cove by Defendant United States or its agents in approximately 1983. The Lead Plaintiff and his first spouse are together in the vehicle traveling south at about 50 to 60 miles per hour approximately eight feet from the unguarded edge of an 80 to 110 foot cliff adjacent to Howe Sound. Both would be severely injured or killed if the Lead Plaintiff fails to stop before being overtaken by the BRMT melatonin overdose in early afternoon after a full night of sleep. The evidence as to the specific date, time, and remote BRMT instructions which provide specific evidence of this event are likely to be available upon further investigation and discovery against Defendants. See Complaint paragraphs 332, 333, 371 (21) through (24), 396, 400, Table 1-001E, Table 2-0026, LP Evidentiary Exhibits pages 140-189 paragraphs 1-4, 109; pages 419-426, 774-785, 9679-9696.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through

(24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189

paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-

418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-

793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3

through P-20.

     C. Discovery will provide further evidence of extensive

correspondence and documentation of exchanges by and/or with the

Defendants using email and other electronic means; recovery of Lead

Plaintiff's own records currently in the hands of Defendants; as well as

relevant information, documents, and items conveyed by US Mail, and private

mail and express carriers. Such detailed information needs to be retained both

to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research

process used to further develop Defendant United States brain hijacking

bioweapon and its deployment system, collectively known as BRMT, as each

succeeding generation of BRMT technology is developed and deployed

against US persons and other innocents.

     D. These violations by Defendants are key elements of their

intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**L-2 Lethality Events: Washington State BRMT Falls**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. While a resident of the state of Washington, Lead Plaintiff is subject, between approximately 1990 and 2005, to a series of unexplained falls which are caused and created by Defendant United States or its agents. These falls cause the Lead Plaintiff to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and creating a serious risk of severe injury or death. These falls are initiated while the Lead Plaintiff is hiking alone near Stevens Pass, climbing a ladder to the roof of his home in Kirkland, standing on a scaffolding during construction, and under other circumstances not currently recalled. The evidence as to the specific

date, time, and remote BRMT instructions which are given to initiate each event are likely to be available upon discovery against Defendant United States. See Complaint Table 1-001C, 1-030, Table 2-0076, 2-0158, 2-0194, LP Evidentiary Exhibits pages 140-182 paragraphs 1-4, 118; pages 419-426, 774-785.

   B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

   C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both

to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations

of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation**

A. In the aftermath of the precursor and successor events related to the 9/11/2001 terrorist attack described at subcounts N-2 and C-1, which destroy Lead Plaintiff's income and marriage while a resident of the state of Washington, Lead Plaintiff is subject between approximately 2003 and 2005 to intense, torturous BRMT manipulation of brain biochemistry and to on-going psychological abuse by visual and electronic means which Defendants use to drive Lead Plaintiff to suicide ideation. This sequence of high stress events and manipulations induce severe brain biochemical imbalances, caused and created by Defendant United States and/or may directly involve other Defendants and their respective agents. This creates a very high risk of severe injury or death. The evidence as to the specific date range and sequence of the remotely commanded BRMT instructions which drive this sequence are available during

discovery against Defendants. See Complaint Table 1-023; paragraphs 321, 322, 325, Table 2-0116, 2-0117, 2-0150; 369, LP Evidentiary Exhibits pages starting 140 paragraphs 1-4, 78, 113; pages 419-426, 598-606, 774-785, 9679-9696.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of

America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-4 Lethality Events: Inciting Public Vigilantism**

A. Defendants with police powers hack and manipulate Lead Plaintiff's personal computer to make his actions, plans, and movements a matter of public viewing sometime after he joins CNA Industrial Engineering in 1996. This leads to and inspires violent acts against third parties, ranging from commercial enterprises to individuals. Defendants use BRMT, tradecraft signaling, and direct action against third parties to create and sustain a public mythology about Lead Plaintiff, which directly endangers his life, well-being, personal prospects, employment, and entrepreneurial activities to further their illegal scheme to employ public vigilantism, along with their direct acts against Lead Plaintiff, and harm third parties while engaged in this corrupt process.

B. These direct acts range from mass casualty attempts to individual acts against innocent third parties with lethal and potentially lethal outcomes. This fraudulent scheme, running to the present, primarily uses BRMT to control certain of Lead Plaintiff's movements, public and private activities, words, expressions, and brain chemistry; induces on-going brain biochemical depression and indices suicidal ideations at times; uses wire frauds and email frauds to control Lead Plaintiff's digital and online environment, and to make his actions and reactions to the Defendants' on-gong harassment public; and systematically disrupt Lead Plaintiff's private and commercial actions.

C. Defendants' overriding purposes are, without limitation, to sustain and perpetuate the Defendants' ability to control Lead Plaintiff, and his moment-to-moment environment and actions across years, perpetuate Lead Plaintiff's involuntary servitude, forced labor, in violation of the Fourth, Thirteenth, and Fourteenth Amendments, and other civil, Constitutional, and human rights; to subject him to public sensationalism, greatly enhance the risk of direct violence and vigilantism against Lead Plaintiff; and create the circumstances for public harassment of Lead Plaintiff creating risks and circumstances which they could not legally conduct directly, and which could not otherwise occur in or to the Lead Plaintiff. These acts are intended to discredit, damage, or harm the health and well-being of the Lead Plaintiff through all feasible means, be it entrapment, intimidation, an act of lethal

public vigilantism, or a natural appearing lethal sequence or event. See Complaint paragraphs 27, 326, 345, LP Evidentiary Exhibits pages 1-10.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

E. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking

bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

G. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional

Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

H. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

I. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

J. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation**

A. While a resident of the state of New Jersey, Lead Plaintiff is subject between approximately August 2008 and June 2010 to severe BRMT manipulation of brain biochemistry and psychological abuse which Defendants use to drive Lead Plaintiff to a suicide ideation. This sequence of high stress events and manipulations of brain biochemical imbalance are caused and created by Defendant United States and/or may directly involve other Defendants and their respective agents. This creates a very high risk of severe injury or death. The evidence as to the specific date range and sequence of these remote BRMT instructions which are given to sustain the event are available upon discovery against Defendants. See Complaint Table 1-023; paragraphs 321, 325, Table 2-0116, 2-0117, 2-0150; LP Evidentiary Exhibits pages 140-189 paragraphs 1-4, 78, 113; pages 419-426, 598-606, 774-785, 9679-9696.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each

succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages

10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

   F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. While a resident of the state of New Jersey, Lead Plaintiff is subject between approximately 2008 and 2010 to a series of unexplained falls which are caused and created by Defendant United States or its agents. These falls cause the Lead Plaintiff to tip backwards while remaining in a completely erect posture, tipping him as if a statue, and creating a risk of severe injury or death. One of these falls is triggered while the Lead Plaintiff is walking alone at the northwest corner of Thompson Lane and River Road. The back of the Lead Plaintiff's head strikes the sidewalk, missing the base of a streetlight and a broken neck by approximately 24 inches. The evidence as to the specific dates, times, and remote BRMT instructions which are given to initiate each event are likely to be available upon further investigation and discovery against Defendants. See Complaint Table 1-001C,

1-030, Table 2-0076, 2-0158, 2-0194; LP Evidentiary Exhibits pages 140-189 paragraphs 1-4, 118; pages 419-426, 774-785.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418, 419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking

bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional

Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | | | |

| | | Degrading Treatment, ratified 1990 | |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. While a resident of the state of New Jersey, Lead Plaintiff is subject from approximately 2008 to the present to a series of near falls in New Jersey and New York on staircases inside, for example, the Metropolitan Museum of Art ground floor entrance near the southeastern corner of the main building; at various times on stairs n his residential building; in the building housing the third floor New School theater space, and numerous other locations. Defendant United States deliberately uses BRMT to misplace a foot on the stair, either by hitting the heel, or by misplacing the foot on the stair tread behind the toes causing a fall. These loss of balance disturbances are easily created. BRMT is used to divert or distract attention and keep the head upright and eyes looking forward instead of down; by momentary interruption of central nervous system muscle control which drops the descending foot too early; and/or by momentary loss of consciousness.

Each and every loss of balance event creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to initiate each event is available upon discovery against Defendant United States and the co-conspirators participating in the set-up of that specific event. See Complaint Table 1-001D, Table 2-0076, LP Evidentiary Exhibits pages 1-10, 11-139, starting page 140 paragraphs 1-4, 122; pages 419-426, 564-574, and 786-793.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418, 419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as

Each and every loss of balance event creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to initiate each event is available upon discovery against Defendant United States and the co-conspirators participating in the set-up of that specific event. See Complaint Table 1-001D, Table 2-0076, LP Evidentiary Exhibits pages 1-10, 11-139, starting page 140 paragraphs 1-4, 122; pages 419-426, 564-574, and 786-793.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 18, 31, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as

relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project

introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 |  |  |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 |  | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 |  | 17.1, 17.2, 23 |
| Religion | 3(1), 27 |  | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 |  | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-8 Lethality Events: New Jersey Hackensack BRMT Fall**

A. While a resident of the state of New Jersey, Lead Plaintiff is subject in approximately 2017 to a BRMT induced fall in a County of Bergen, NJ office building while leaving a housing interview appointment. This fall is caused and created by Defendant United States purposefully locking the Lead Plaintiff's eyes to the horizon rather than toward the stair he is descending at that moment, causing Lead Plaintiff to trip and fall forward. Lead Plaintiff's heel strikes the edge of the stair tread, and he stumbles to his knee, abrading and injuring that knee. This event creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions given to

trigger the event are available upon discovery against Defendants. See

Complaint Table 1-001C, 1-030, Table 2-0076, 2-0158, 2-0194, LP

Evidentiary Exhibits starting page 140 paragraphs 1-4, 118; pages 419-426,

774-785.

B. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through

(24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189

paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-

418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-

793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3

through P-20.

C. Discovery will provide further evidence of extensive

correspondence and documentation of exchanges by and/or with the

Defendants using email and other electronic means; recovery of Lead

Plaintiff's own records currently in the hands of Defendants; as well as

relevant information, documents, and items conveyed by US Mail, and private

mail and express carriers. Such detailed information needs to be retained both

to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of

America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-9 Lethality Events: California BRMT Induced Extreme Eye Watering**

A. While traveling for business between Pico Rivera, CA and Los Angeles International Airport, Defendant United States and/or its agents, produces extreme eye irritation and watering of Lead Plaintiff eyes while he is driving a freeway traveling approximately 65 to 70 miles per hour. This creates a substantial risk of loss of vehicle control and collision with another vehicle or obstacle, creating a severs risk of injury or death. This is not an allergic reaction to any airborne substance. Lead Plaintiff previously spent years in this part of California under the same conditions and had driven this same freeway through this same area without incident a very few hours earlier while traveling toward his meeting in Pico Rivera. See LP Evidentiary Exhibits page 1074V (10/31/2017 entry).

B. Lead Plaintiff has subsequently experienced these symptoms periodically while using over-the-counter eye drops at home, likely due to a deliberate BRMT induced manipulation of the pH of the eyes. These symptoms also correlate with extreme headaches and blurry vision induced on occasion during 2021 and 2022 and experienced with extreme pain and blurred vision for months on end in Boston, MA and in Cliffside Park, NJ, occurring at the same time each day, abruptly appearing and later abruptly disappearing with no clear medical reason. A neurological examination in Boston, MA, and two brain scans in New Jersey provide no explanation for these symptoms or for the long-duration irregular recurrence.

C. The evidence as to the specific date, time, and remote BRMT instructions given to initiate the event are available upon discovery against Defendants. See also LP Evidentiary Exhibits pages 1-10, starting page 140 paragraphs 1-4, 117; pages 419-426, 774-785.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

E. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal

and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

      G. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

H. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |

| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |
|---|---|---|---|

I. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

J. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses

**L-10 Lethality Events: New Jersey**      A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. In two instances in 2019, Lead Plaintiff is rolled out

**Edgewater**

**Bedroom**

**BRMT Falls**

of bed like a log and strikes the floor. These falls are initiated while the Lead Plaintiff is sleeping alone in his residence in Edgewater, NJ. These falls are caused and created by Defendant United States or its agents using BRMT. One of these falls causes a visible head injury to the right side of the forehead as the head strikes a nightstand as the rest of the body is falling to the floor, torquing the neck and spinal cord. This injury is noted several months later and again over a year later by medical professionals during routine head examinations at dental hygiene appointments at the Bergen Community College Dental Hygiene Clinic. This fall creates a risk of severe injury or death. The evidence as to the specific dates, times, and remote BRMT instructions given to initiate these falls are available upon discovery against Defendants. See Complaint Table 2-0076, LP Evidentiary Exhibits pages starting 140 paragraphs 1-4, 119; pages 419-426, 774-785.

  B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon

delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties -- human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |

| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |
|---|---|---|---|

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-11 Lethality Events: Website**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. On 149 occasions from late January to March 24, 2021,

| | |
|---|---|
| **Hacks to Eliminate or Delay Covid Vaccination** | Defendants hack or spoof Lead Plaintiff's access to www.bergencountycovidvaccine.com so an appointment cannot be made to receive the Covid-19 vaccine he is eligible for as a 65 year old, creating additional risk of hospitalization, severe injury, or death. On occasion, he gets to the appointment setting step before being denied, at other times he is told there are no appointments available. He emails with the Bergen County Executive's office about these issues and emails the Bergen County Council members but receives no response from any of them (likely blocked by Defendants who may also have spoofed both the only site then accessible to Lead Plaintiff and the email responses received).  See Complaint Table 2-0188, LP Evidentiary Exhibits pages starting 140 paragraphs 1-4; pages 419-426, 794, 9875, 10187-10250. |

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon

delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

F. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |

| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-12 Lethality Events: New Jersey**    A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. While a resident of the state of New Jersey, Lead

| | |
|---|---|
| **Edgewater** | Plaintiff is subject between approximately December 2021 and August 2022 to |
| **BRMT Falls** | unexplained tripping events. These events are caused and created by |

Defendant United States or its agents using BRMT to momentarily cause

blackouts, and contract or relax muscles of Lead Plaintiff, leading to a loss of

control and balance. These events cause the Lead Plaintiff to trip and very

nearly fall near the southwest corner of the Edgewater Commons south access

road at River Road and while crossing River Road near Penny Lane, both in

Edgewater, NJ. Failure to quickly regain balance by stumbling forward to an

upright posture could end with the Lead Plaintiff falling to this heavily

traveled street. Such an outcome could cause severe injury or death in traffic.

Evidence as to the specific date, time, and remote BRMT instructions given to

initiate each event are available upon discovery against Defendants. See

Complaint Table 1-001D, 333, LP Evidentiary Exhibits pages starting 140

paragraphs 1-4, 118; pages 419-426, and 774-785.

   B. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through

(24), 396, 400,  LP Evidentiary Exhibits pages 1-10, 11-139, 140-189

paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-

418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-

793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 |  |  |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 |  | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 |  | 17.1, 17.2, 23 |
| Religion | 3(1), 27 |  | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 |  | 17.1 |

| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |
|---|---|---|---|

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-13 Lethality Events: North**     A. While a resident of the state of New Jersey, Lead Plaintiff is subject in April 2022 to a BRMT induced fall in Palisades Medical Center, North Bergen, NJ. This fall causes the Lead Plaintiff to tip to the right while

**Bergen Hospital Fall**

remaining completely rigid, tipping him as if a statue. His head narrowly misses striking the vulnerable right temple on the 4 inch tall metal base of a rolling bed table. This fall is caused and created by Defendant United States or its agents use of BRMT and creates a risk of severe injury or death. The evidence as to the specific date, time, and remote BRMT instructions which are given to initiate the event are available upon discovery against Defendants. Medical evidence which documents this event and the follow on medical tests required before a doctor will release the Lead Plaintiff is also available. See Complaint Table 1-001C, D, E, 1-030, paragraph 333, Table 2-0076, LP Evidentiary Exhibits pages starting 140 paragraphs 1-4, 120; pages 419-426, 774-785.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418, 419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory

obligations by their acts against the Lead Plaintiff and other Plaintiffs of this

class. These acts therefore comprise 18 USC § 2441 war crimes against this

class of plaintiffs - protected civilians in time of war. Defendant United States,

including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-14 Lethality Events: New York Metro North Mass**

A. While a resident of the state of New Jersey, Lead Plaintiff boards a Metro North Hudson Line express train from Beacon, New York to Grand Central Terminal in New York City on Sunday evening, September 11, 2022. The express train is traveling approximately 50 to 60 miles per hour when the engineer urgently brakes the train during an emergency stop. The train collides

**Casualty**

**Attempt**

with a portion of the tree which had fallen to block tracks at that point, including the southbound express track the train is traveling on at the time.

B. This incident occurs shortly after sundown and could not be made any more difficult to see than it is. The timing of the strike is carefully selected by those who plan the strike for this moment just after sunset as the train engineer's eyes are adjusting from the bright sunlight of the setting sun to moonless darkness. The location is a remote track section with no nearby structures or inhabitants so there are no ambient light sources in the area. If the tree had been larger, the train could have contacted a more substantial portion of the trunk of the tree. The tree's full weight and its root ball, still wedged in the ground could exert enough lateral force to derail the train at a relatively high speed. This creates a very significant risk of injury or death to the Lead Plaintiff and several hundred other passengers.

C. There is a specific sequence of follow-on events, including a reportedly stalled train, which results in the Lead Plaintiff's exit from the train at Yankee Stadium, one stop from his destination, and use the subway to travel to Grand Central Terminal in New York City. This sequence includes signature tradecraft events, details available from Defendants upon discovery, indicating their knowledge and planning of this sequence by Defendants under command authority of Defendants with police powers. Evidence of the specific Defendants who conspire and/or cause this event are available upon discovery. See this event and other relevant lethal and potentially lethal events, including

other mass casualty attempts, at Complaint Table 1-032, 1-041, 1-047, 1-048,

Interline Exhibit 1, 334, Table 2-0202; LP Evidentiary Exhibits pages 413-

415, 416-418, 542-547, 564-574, 598-606, 766-769, 772-773.

      D. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through

(24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189

paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-

418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-

793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3

through P-20.

      E. Discovery will provide further evidence of extensive

correspondence and documentation of exchanges by and/or with the

Defendants using email and other electronic means; recovery of Lead

Plaintiff's own records currently in the hands of Defendants; as well as

relevant information, documents, and items conveyed by US Mail, and private

mail and express carriers. Such detailed information needs to be retained both

to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research

process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

G. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police

and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

H. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

I. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

J. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have

any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-15 Lethality Events: New York Morningside Park BRMT Fall**

A. While a resident of the state of New Jersey, Lead Plaintiff is subject on September 17, 2022 at 7:29PM to a fall from the top step of a deliberately darkened staircase in a series of park pathway stairs in a New York City Park which is caused and created by Defendant United States acting in coordination with individuals employed by Defendants City of New York and/or NYPD. This BRMT induced fall causes the Lead Plaintiff to misplace his left foot on the top stair, lose his balance, and forward somersault on the stairs, landing on his back on the set of stairs, and injuring his head, knees, and hands. This fall creates specific risk of severe injury or death. Further evidence corroborating the specific date, time, and remote BRMT instructions given to initiate this event are available upon discovery against Defendants. See Complaint paragraph 335, Interline Exhibits 1C and 14, Table 2-0076, 2-0099, 2-0202, 2-0203, paragraph 333, 335, 371, LP Evidentiary Exhibits pages starting 140

paragraphs 1-4, 97, and 121; pages 419-426, 542-547, 564-574, and 786-793, 10302-10304.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through (24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189 paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

C. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking

bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the September 2001 Congressional

Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
|  |  |  |  |

| | | Degrading Treatment, ratified 1990 | |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown**

A. A vehicle rundown sequence, intended to harm and/or intimidate the Lead Plaintiff is conducted in New York City and North Bergen, NY on November 18 and 19, 2022. Two streets being crossed by Lead Plaintiff in New York City have their streetlights extinguished in both directions from Eighth Avenue, and electric scooters run in the wrong direction after dark. No other vehicle traffic is on either street at this time. About 90-110 minutes later, normal vehicle traffic in the proper direction is allowed on these streets as the Lead Plaintiff returns to the same subway station. The following night BRMT is used, his attention is distracted toward a bright light, his peripheral vision limited by angle, and his walking pace fixed as a white compact car is raced toward him in the parking lot of the North Bergen, NJ Walmart, stopping very abruptly within 15 feet from the Lead Plaintiff and coming to a final stop about 5 feet away. As he visits a restroom in the shopping complex after a meal, there is a male vomiting into the restroom sink. There is no injury from this event sequence, but this pattern of practice is completely consistent with other

collaborative BRMT and physical violence directed toward the Lead Plaintiff

as further described at Complaint paragraph 333, Table 1-001, 1-057, Interline

Exhibit 1D, and Table 2-0099, 2-0204.

B. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 325, 332, 333, 371 (21) through

(24), 396, 400, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189

paragraphs 1-4, 78, 97, 109, 113, 117, 118, 119, 120, 121; pages 413-415, 416-

418,419-426, 542-547, 564-574, 598-606, 766-769, 772-773, 774-785, 786-

793, 9679-9696, 9875, 10187-10250, 10302-10304.While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3

through P-20.

C. Discovery will provide further evidence of extensive

correspondence and documentation of exchanges by and/or with the

Defendants using email and other electronic means; recovery of Lead

Plaintiff's own records currently in the hands of Defendants; as well as

relevant information, documents, and items conveyed by US Mail, and private

mail and express carriers. Such detailed information needs to be retained both

to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research

process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

D. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

E. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police

and intelligence powers in the aftermath of the September 2001 Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

G. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

H. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**C-1**

**Commercial**

**Frauds: Theft**

**of**

**Receivables,**

**Check Frauds**

A. Defendant United States conspires with other Defendants, both named and not yet identified, plans and conduct thefts of property and legally due accounts receivable and to purvey fraudulent unfunded checks to Lead Plaintiff and his in-state and interstate commercial businesses. Defendants systematically conspire and act to deprive Lead Plaintiff of personal and business' financial resources, force litigation for recovery or partial recovery, and force arbitration to compromise amounts due, and engage in outright theft, including passing bad checks, to perpetrate these frauds. This set of wire and mail frauds total about $930,000 and directly costs the Lead Plaintiff approximately $220,000.

B. These check, mail, and wire frauds are used by Defendants to control Lead Plaintiff through involuntary servitude and forced labor in what are supposedly the Lead Plaintiff's private enterprises owned and controlled by him and an "investor" or "partner," (who is actually preselected as part of this conspiracy by Defendants who place police powers officers, agents, and confidential informants in these positions by systematically screening out all other options) between 1990-1993, and 2002-2005, as well as during his employment at LazerSoft from 1986 to 1990, and P.A.N. Environmental Services, Pacific Pipeline, and CNA Industrial Engineering between 1993 and 2002.

C. Other than 10 months of fraudulent employment at Establish in 2007-2008, Defendants have never allowed further employment by the Lead

Plaintiff nor allowed any enterprise he has attempted to run to actually begin to operate. See Complaint paragraph 398, LP Evidentiary Exhibits pages 140-189 paragraphs 44-59, 64-68, 124-126, 145-146; pages 566, 8291-8293, 8351-8352, 10445-10506.

D. Lead Plaintiff is subject at all times from 1979 to the present, to involuntary servitude and forced labor while being trafficked to various assigned employment "options" and immediate termination on whim as determined by Defendant United States and co-conspirator Defendants for their convenience. He is forced to accept the compensation the Defendants indirectly specify using mail fraud, wire fraud, and their internal illegal intelligence operations and enterprises, as he is unable to access any private employment opportunities, and his businesses are repeatedly defrauded to failure using various means including deprivation of SBA loans, guarantees, and bonding, and access to private investor financing or the public investor markets.

E. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-31, P-16 through P-21. At all times Defendants also use these and other fraudulent methods to effectively reduce legally due compensation of Lead Plaintiff which directly costs the Lead Plaintiff more than $400,000 as will be proven at trial.

F. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-2**

**Commercial**

**Frauds:**

**Fraudulent**

**Financial**

**Services – Ex-**

**CIA Latin**

**America Case**

**Officer –**

**International**

**Investment**

**Banker Cover**

A. Charles Jackson, (allegedly deceased at the time if this Complaint) is a former Merrill Lynch Mexico City investment banker who likely operated for many years under commercial cover throughout Latin America as a CIA officer, is paid $750 from Lead Plaintiff's personal funds and contracted by Winnett Perico, Inc., owned by Lead Plaintiff, for investment banking services. These services are fraudulently provided in bad faith to perpetuate the involuntary servitude of Lead Plaintiff. Lead Plaintiff expends an additional $700 of personal funds for travel for Phoenix area investor development meeting with Jackson, his spouse, and John Tyler, Cherry Creek Partners, and a supposed major investor, as well as to tour potential organic farming sites with Jack Doughty, Three Rivers Ag, a real estate broker. All elements of this swindle are completely fraudulent representations made in person and using email and phone calls. See Complaint Table 2-0171, LP Evidentiary Exhibits pages 383-384, 431, 440, 8370, 8371-8373, 8378, 8411, 9902, 9905, 9923, 10528-10565.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

     Jackson Initial Contact 130311,

     Jackson ibanker deal agreed 130809,

     Jackson retainer pymt 130903,

     Jackson re Blackpool Term Sheet and BP fail 131015,

     Jackson intro to Sullivan 131125,

     Jackson re Alberts Organics as customer 140114,

     Jackson investor status inquiry 140115,

     Jackson re new cust 2 3 140115,

     Jackson reply on investor questions 140128,

     Jackson Hurwitz on 25MM loan 140206,

     Jackson Hurwitz verbal Relay 140206,

     Jackson Pru Ag Reed Mitchell referral 140207,

     Jackson Reed Mitch Pru Ag Loans self intro 140207,

     Jackson on Alberts contract update 140218,

     Jackson re 140226 Sullivan mtg Ramsey 140219,

     Jackson re Sullivan face mtg 140219,

     Jackson Domeier Prudential Ag referral 140224,

     Jackson re Zayid alleged investment 140303,

     Jackson re Attorney retainer wire on Zayid deal 140304,

Jackson re Zayid Attny Retainer Xfr 140304,

Jackson re Burstein call FL 140307,

Jackson re Sherbrooke Capital 140404,

Jackson connects Skye Root 140407,

Jackson re circular referral to Resource Land Byron Lekulvich 140627,

Jackson re Tyler 140629,

Jackson re Tyler Eager to Raise 200MM 140701,

Jackson Contract 140707,

Jackson re 55% MS investor 140827,

Jackson on 3 London closings 140902,

Jackson re 3 London Closings 140902,

Jackson re Tyler Doughty Maricopa County mtg 140909,

Jackson Maricopa County Visit Details 140917,

Jackson re PHX trip 141101 Tyler mtg 140917,

Jackson re personal BofA acct number 141015,

Jackson VanDeGraaf likely Maricopa Rabo poser 141024,

Jackson 700 for Maricopa trip 141027,

Jackson VanDeGraaf likely Maricopa Rabo poser 141027,

Jackson re Burstein Miami update 141204,

Jackson re Burstein mtg and Hain 141210,

Jackson re Hain Celestial interest 141210,

Jackson Gail on Charles Death 150209,

Jackson Tyler re PPM review by Sullivan 150806,

Westchester Mgmt Skye Root re farm acq parameters 140407.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraph 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156, 10528-10565. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial

and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Invest or**

A. Defendant Jonathan Cross, representing himself as an officer or principal of various entities using the various Defendants sharing the names Blackpool and Shefford while acting as a Defendant agent, officer, and as a part of this on-going conspiracy, and represents his firms legally named in the caption of this Complaint, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role from approximately 2013 to 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of investment and authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial

resources of Lead Plaintiff and his business entities in the bad faith

perpetuation of Defendants' long-running schemes, frauds, swindles, and

pattern of racketeering acts. See Complaint paragraph 328, LP Evidentiary

Exhibits pages 8454-8467, 8939-8955, 9053-9059, 10138-10156, 10528-

10565, 10566-10613.

      B. See further evidence related to this subcount in LP Evidentiary

Exhibits emails. A compendium of key entities and individuals; and of selected

emails, documents, and disbursements listed in both date order and alphabetic

order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page

number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the

following:

      Blackpool First Hit 110815,

      Blackpool IC Approval 120919,

      Blackpool decl Podzemny to Dalhart Realty130201,

      Blackpool Cross early hook 140120,

      Blackpool Persists Example 150707,

      Blackpool IC Approval 150821,

      Blackpool on PHX trip 150825,

      Blackpool Persists Example 151103,

      Blackpool merge anncmnt 161101,

Blackpool PPM process 161122,

Blackpool 1MM Bridge Loan Contract 161129,

Blackpool WF wire advice 161130,

Blackpool Term Sheet proposal email Smith Petersen 170126,

Blackpool re TIAA-CREF (Skye Root Jackson tieback poss) 170131,

Blackpool email Term Sheet Signed 170201,

Blackpool re other investors rejected 170201,

Blackpool tour Stckton Hill Farm LV realtor contact 170202,

Blackpool re Stckton Hill Broadway Volk connection 170203,

Blackpool Stockton Hill tpour fup 170210,

Blackpool Stockton Hill dataroom access 170213,

Blackpool Stockton Hill offer status 170214,

Blackpool Saul Barings Stockton Hill LOI 170215,

Blackpool Stockton Hills Farm Tour Final Logistics 170217,

Blackpool re Stockton Hill Saul Barings LOI response 170221,

Blackpool re delay 170225,

Blackpool xmit detail financial info 170227,

Blackpool re investment to date 170228,

Blackpool to fund fup 170301,

Blackpool re Saul Barings Deadline Stockton Hill 170303,

Blackpool stringout 60MM financing 170303,

Blackpool Cmte Mtg 170307,

Blackpool re possible loss Stockton Hill Farm 170307,

Blackpool more questions string out 170308,

Blackpool stringout 60MM financing 170308,

Blackpool recvs CFO Smith resume during IC mtg 170308,

Blackpool re DB personal bkgrnd 170310,

Blackpool re former counsel Seattle 170310,

Blackpool to request firm commit on 60MM 170310,

DD Callahan on Blackpool funding 170202,

DD Callahan re Blackpool Term Sheet 170202,

DD Callahan update Blackpool 170227.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T, 1074U, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156, 10528-10565, 10566-10613. While all subcounts throughout

this Complaint are driven by Defendants' conspiracy to commit and comprise

an integrated pattern of racketeering acts, the most directly relevant subcounts

include, without limitation, C-2 through C-20.

      D. Fraudulent commercial sales opportunities, and the business

necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they

have no intention be completed, and as elements of a pattern of commercial

and police powers frauds and conspiracies of Defendants in commerce and

interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls,

and/or manages.

      E. Relevant emails providing further evidence and incorporated herein

by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

      F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-4**

**Commercial**

      A. In June 2015, Defendants undertake a complex interstate and international funding fraud across several weeks. A $10 million financing

| | |
|---|---|
| **Frauds:** | commitment is made by email. This fraud and swindle uses BRMT and check |
| **BRMT** | fraud to cause fraudulent checks to be deposited in the Winnett Perico |
| **Assisted** | corporate account by mailing a check to the Lead Plaintiff ($9,826 as |
| **Check Fraud** | deposited) and by an agent of Defendants who uses the Lead Plaintiff's |
| **Entrapment** | identity and live automated teller assistance at an ATM in New York City |
| **Attempt –** | ($26,430 as deposited). Lead Plaintiff transfers $9,125 to a third party |
| **Top US** | (Defendant United States' BRMT influenced mental process at work). Both |
| **Financial** | deposits from two different parties are dishonored, and the business account is |
| **Institution** | overdrafted by $9118. The Ramsey, NJ Bank of America branch where these |

accounts can be serviced is closed for the day as Lead Plaintiff receives this emailed notice of dishonor, so he calls Bank of America's customer service line. He is unable to reach live customer assistance despite several long periods on hold. This inability to reach a responsive customer service agent is a new experience which becomes quite familiar to Lead Plaintiff over the next 15 years into 2022, as a result of the Defendants' direct control of his finances and financial relationships, most likely by Defendant FBI or Defendant Secret Service.

B. Lead Plaintiff receives a check drawn on a Canadian company and addressed to him personally around this same time, deposits this check and receives an overdraft notice mailed on July 7, 2015 for $180,000 against his personal account days later.

C. These Bank of America accounts are soon closed by the bank. The Ramsey, NJ branch refuses to accept a cashier's check made out to Bank of America from Wells Fargo, forcing the Lead Plaintiff to transport about $9,200 in cash between the two bank branches in Ramsey, NJ.to pay off the overdraft and fees on the closed account. This is yet more evidence which Lead Plaintiff reverse engineers, years later in preparation of this Complaint, indicating the Defendants' efforts to cause and create circumstances of non-payment of this overdraft to the Bank, exposing the Lead Plaintiff to potential criminal liability as one instance of an on-going series of nearly perpetual entrapment attempts across his personal and professional life. See LP Evidentiary Exhibits pages 1686, 1699-1700.

D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Tissiman first hit 140519,

Wells Oliver Tissiman 419pm acct info150612,

Wells Oliver Tissiman 654pm 150612,

Wells Oliver Tissiman 150613,

Wells Oliver Tissiman 2015 150615,

Wells Oliver Tissiman 1 655am 150616,

Wells Oliver Tissiman 2 713am 150616,

Wells Oliver Tissiman 3 141110 to 1120am 150616,

Wells Oliver Tissiman 3 BA Deposit Slip 1120am 150616,

Wells Oliver Tissiman 4 439pm 150616,

Wells Oliver Tissiman 5 619am 150617,

Wells Oliver Tissiman 6 818am 150617,

Wells Oliver Tissiman 7 1207pm act fast on 150617,

Wells Oliver Tissiman 8 105pm 150617,

Wells Oliver Tissiman 9 343pm 150617,

Wells Oliver Tissiman 9190 150622,

Wells Oliver Tissiman 150616R BA 180K NSF 150707,

Wells Oliver Tissiman P BA 180K NSF 150707,

Wells Oliver Tissiman Q re bank fraud 150715.

E. Simply put, this is a multi-layers entrapment attempt and a modified and more predatory reprise of his experience with "Washington Mutual Savings Bank," and his complete inability to understand their method of balance calculation. This difference between his checking account balance as calculated (paper checks are still quite common at this time) by him and by the "Bank" leads to literally thousands of dollars of $25 overdraft fees being

illegally drains from his account for NSF fees over several years. This repetitive pattern of strong circumstantial evidence leads Lead Plaintiff to believe his finances are the subject of direct government control by Defendant United States and have been for decades. More color of law RICO and Fourth Amendment violations by Defendant United States and its co-conspirators.

F. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20, C-27, C-36, P-22 through P-27.

G. Fraudulent commercial sales opportunities, and the business
necessity to expend time and financial resources to locate and secure
financings thereof arose as a result of, and have been continuously interfered
with, by Defendants through their offering of fraudulent pending sales they
have no intention be completed, and as elements of a pattern of commercial
and police powers frauds and conspiracies of Defendants in commerce and
interstate commerce. The overriding intent of Defendants, with regard to these
violations, was and continues to be, to consume the financial resources and
management time of Lead Plaintiff and the entities he legally owns, controls,
and/or manages.

H. Relevant emails providing further evidence and incorporated herein
by reference are shown at each relevant subcount listed above. Note that
relevant evidence is currently blocked, or hacked and deleted, from various
Lead Plaintiff's email accounts, including virtually all business and personal
emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead
Plaintiff as this Complaint is being written. Discovery will provide further
evidence of extensive correspondence and documentation of exchanges by
and/or with the Defendants using email and other electronic means; recovery
of  Lead Plaintiff's own records currently in the hands of Defendants; as well
as relevant information, documents, and items conveyed by US Mail, and
private mail and express carriers. Such detailed information needs to be
retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and trafflick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-5**
**Commercial**
**Frauds: False**
**Personation –**
**NYC Forbes**

A. Defendant Daniel Weiner, a practicing attorney in New York City, engages in mispersonation, fraudulently misrepresent himself as a Defendant Arlon employee to further the Defendants' scheme, thereby coordinating with and playing an on-going role from 2013 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related

**200 Captive Corporate Investment Firm**

entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts. See LP Evidentiary Exhibits pages 386.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Arlon Weiner intial hit 130202,

Arlon update to WO team 130203,

Arlon Declines 130207,

Arlon Weiner reprise 170510,

Arlon Webel DD Callahan phone call set 170530,

Arlon Webel from Weiner 170530,

Arlon Danl Weiner 170826,

Weiner Arlon 130202.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and trafficck Lead Plaintiff. Defendants

perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans**

A. Defendant Dean T. Smith responds to online EquityNet.com solicitation of accredited investors and makes an initial investment of $100,000 in August 2015, then makes a series of additional investments and loans from personal finds and personally controlled trusts and entities. These funds are used to perpetuate this four year episode of involuntary servitude from August 2015 to September 2019, adding still more years to Defendants' perpetual string out and subjugation while they and other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using wire fraud and police powers operations in, without limitation, Maricopa County and other locations in Arizona, in New York, including in New York City, New Jersey, Nebraska,

Arkansas, Missouri, Washington state, as well as international conspirators, and explicitly screened-in domestic and international bad actors.

B. Meanwhile, other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual interstate commerce activities, primarily by using wire fraud and police powers operations in Maricopa County, Arizona, the state of New York, and the state of New Jersey, as well as others including international co-conspirators, and explicitly screened-in bad actors. See Complaint Interline Exhibits 4-12, LP Evidentiary Exhibits pages 140-189 paragraphs 44-45, 46-47, 48-49, 51-52, 58, 66, 84-87, 126;  380, 382, 430, 8472-8473, 9642, 9645, 9646-9647, 9907, 9925, 9926, 9997, 10004, 10157, 10164, 10165-10171.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Smith adds investment 160326,

Smith 5K View Wire Transfer Detail - U.S 170126,

Smith Active Air Freight LLC USbank wire 1000 170315,

Smith adds 1000 170315,

Smith avail escrow funds 170531,

Smith VP Fin intvw and connect DSmithPDX 150826,

Smith on expenses Vindiola 160114,

Smith on BA pers acct scam wire xfrs 160125,

Smith on Jabor wire fee scam 160125,

Smith on potential financing network intro 160217,

Smith on development costs per acre 160406,

Smith sales intro call in AZ 160704,

Smith re Oliver Term Sheet 160707,

Smith re fine tuning on Oliver financial proposal 160720,

Smith re IT traceability budget add Oliver Hyder 160731,

Smith re Status Report Detail on Hyder Oliver et al 160818,

Smith Triple Fresh Contact on Sales Prospects 160907,

Smith status 160908,

Smith Triple Fresh passes setback on sales 160915,

Smith re WMT prior sales agents failures 161011,

Smith re continuation 161012,

Smith re 2500 add 161022,

Smith re avocdos sales hook and PACA 161102,

Smith re Blockpool Funding 170202,

Smith re backup plan 170322,

Smith re Shefford Active Air Frt LLC 170322,

Smith re collateral support for loan 170323,

Smith re prior lost orders and funding level 170427,

Smith re investor lead development 170504,

Smith re trip 170506,

Smith worried 170510,

Smith escrow lender fail 170603,

Smith complains 170712,

Smith referred investor 170719,

Smith re WMT 170811,

Smith on 7500 loan and cattle rotation 170914,

Smith re 7500 loan and cattle rotation 170914,

Smith update WMT ND investor 171106.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T-1074V, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902,

9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027
second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118,
10138-10156. While all subcounts throughout this Complaint are driven by
Defendants' conspiracy to commit and comprise an integrated pattern of
racketeering acts, the most directly relevant subcounts include, without
limitation, C-2 through C-20.

    E. Fraudulent commercial sales opportunities, and the business
necessity to expend time and financial resources to locate and secure
financings thereof arose as a result of, and have been continuously interfered
with, by Defendants through their offering of fraudulent pending sales they
have no intention be completed, and as elements of a pattern of commercial
and police powers frauds and conspiracies of Defendants in commerce and
interstate commerce. The overriding intent of Defendants, with regard to these
violations, was and continues to be, to consume the financial resources and
management time of Lead Plaintiff and the entities he legally owns, controls,
and/or manages.

    F. Relevant emails providing further evidence and incorporated herein
by reference are shown at each relevant subcount listed above. Note that
relevant evidence is currently blocked, or hacked and deleted, from various
Lead Plaintiff's email accounts, including virtually all business and personal
emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead
Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-7**

**Commercial**

**Frauds:**

**Fraudulent**

**Investor**

**Personation**

**and**

**Investments**

A. Defendant Doug Petersen (CEO of Worker's Credit Union, New Hampshire) responds to online EquityNet solicitation of accredited investors and invests $25,000 in 2015, plus additional funds over following years, from personal funds and retirement trusts. These funds are used to perpetuate this four year episode of involuntary servitude from August 2015 to September 2019, adding still more years to Defendants' perpetual string out and subjugation while they and other Defendants block Winnett Perico, its subsidiaries, and Lead Plaintiff from actual, legitimate interstate commerce activities, primarily using wire fraud and police powers operations in, without limitation, Maricopa County and other locations in Arizona, in New York, including in New York City, New Jersey, Nebraska, Arkansas, Missouri, Washington state, as well as international conspirators, and explicitly screened-in domestic and international bad actors. See LP Evidentiary Exhibits pages 9653, 9917, 9923.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Petersen Stock Cert Issued 150927,

Petersen Status comments 160107,

Petersen adds 2500 170102,

Petersen re backup financing plans 170315,

Petersen stock for cash infusion 170420,

Petersen adds 2500 170516,

Petersen re investor options 170516,

Petersen stock cert 170519,

Petersen FL agent on funds xfr 170913,

Petersen FL agent stock cert 170914,

Petersen re WMT China 171016,

Petersen extends 171024,

Petersen re funding next steps WMT 180301,

Petersen re WMT China 180301.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373,

8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system

(known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO**

A. Defendant Adamson Brothers (with Defendant Andrew Altahawi, CEO) of New Jersey offers investment banking services to Winnett Perico including a $22 million private placement shown at Interline Exhibit 5, to be followed by a public offering to provide those investors with future liquidity, a classic financing process legitimately use by smaller companies when investment market conditions are favorable. See Complaint paragraph 328, Interline Exhibit 5, LP Evidentiary Exhibits pages 8507-8514, 9923.

B. Winnett Perico expends $40,000 of invested funds from Dean T. Smith of California for this fraudulent private placement and for legal fees to Defendant I-Bank Attorneys of Illinois to prepare a SEC Form S-1 public stock offering registration statement for the promised public offering which is to follow for Lead Plaintiff's company Winnett Perico. The alleged interstate private placement raises zero dollars after an extended delay, as has been previously experienced in other prior Defendant scenarios and as will be experienced by Lead Plaintiff again as "sponsored" by a small but highly prestigious old line Wall Street brokerage firm in 2017.

C. During the preparation of the SEC S-1 statement, Defendant Adamson's CEO Altahawi delays the required financial statement audit by

delaying his auditor recommendation, so Lead Plaintiff's company is unable to file audited financial statements with the S-1 public offering statement for timely SEC review. In the meantime, other actions are taken by Defendants in their captive environment of Lead Plaintiff to exhaust company and personal funds, so Lead Plaintiff is unable to pay auditors so they will provide the signed audit opinion within the required SEC filing period, which then expires as to the S-1. See Adamson Brothers evidence at Complaint Interline Exhibit 5, Table 2-0039, 2-0053, 2-0054, 2-0059, 2-0173, LP Evidentiary Exhibits pages 8507-8514, 8565-8626, 9923.

D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

AJSH Jain re xmit audited fin stmts 151205,

Altahawi re S1 PPM fees 150909,

Altahawi 40K and info for S1 PPM 150910,

Altahawi re PPM corrections150919,

Altahawi re any progress S1 PPM 150928,

Altahawi re auditor ref 150929,

Altahawi PPM progress 151001,

Altahawi re auditor engagement ltr 151001,

Altahawi S1 PPM progress 151005,

Altahawi PPM connection 151007,

Altahawi re Jabor MEC fee 151028,

Altahawi Tracy re 100mm debt PPM 151203,

Altahawi Jain re auditor consent 160108,

Altahawi re auditors 160111,

Altahawi on status 160115,

Altahawi on status 160126,

Altahawi on status 160324,

Altahawi on status 160401,

Altahawi on investor search fail 161122,

Altahawi re status 161122,

Altahawi re Dropbox Access to Blackpool 170202,

Altahawi Auditors popup 171114,

Ibankattny S-1 update email 161022,

Kunsak re Altahawi Adamson Contract 160108,

WO Status Report Adamson PPM 150917,

WO Team re PPM S-1 processes 150921.

E. A similar sequence of actions began in late 1992 or early 1993 at Lead Plaintiff's company, Alliance, when an alleged financial services broker, Gerald Cornwell, confirms funding from a "known reliable source" in Vancouver, BC. Reviews financial statements are required. This financial statement preparation sequence also suffers protracted delays when an outside accountant quits in the middle of a compilation after being paid for all work to date, and the Lead Plaintiff is forced to spend days straightening out her mess instead of bidding projects to sustain his company's critically important sales and cash flow. The financial statement review process is further dragged out as Alliance, already lacking the SBA bid and performance bonding it is legally entitled to access as a small business, is starved out of existence due to this lack of bonding, and resultant cash flow from projects.

F. This 1992-93 sequence involves two local "accounting firms," one of whom is run by an individual who is "related" to a Deloitte Seattle office alumni who worked with Lead Plaintiff there, and a fake SBA representative (likely Defendant FBI), a fake factoring company Pacific Financial Services in Bellevue, WA, a previously seized Utah bonding company used as a false front for a fraudulent performance bond later cancelled by Defendants in mid-project, and a deliberately delayed start and rapid acceleration of work leading to a requirement to rapidly add employees to Alliance on a federally funded project at Sea-Tac Airport, which causes further financial stress to the small company.

G. Cornwell later became CEO of P.A.N. Environmental Services (PAN), a SEC pink sheet company which in 1994 also deprives Lead Plaintiff of compensation due through yet another fake factoring fraud. This particular episode of the pattern of racketeering acts occurs while Defendant United States, unbeknownst to Lead Plaintiff, is using PAN as a platform for a cross-border investigation of financial frauds involving US persons and the Vancouver Stock Exchange, its brokers, agents, and others, while looping the Lead Plaintiff unknowingly into this international investigation, a theme Defendant United States will use repeatedly (among other still worse patterns of acts at other subcounts) in the coming years to ensnare, ensnarl, and attempt to entrap Lead Plaintiff.. See Complaint paragraph 398, LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 383, 398, 420, 463, 566, 767-768.

H. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 101, 321, 398, Interline Exhibits 5, 10, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027

10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

I. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

J. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

K. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-9**

**Commercial**

**Frauds:**

**Fraudulent**

**Financings –**

**International**

**CFIUS**

**Pretexting,**

**Fraudulent**

**Financing**

A. Lead Plaintiff's company, Winnett Perico, pays $9975 by wire transfer to an account in the United Kingdom after Defendant Sullivan consults a third party to assist in determining the veracity of a Qatar ministry document from the Ministry of Economy and Commerce required to secure a license to processed with a USD $52,000,000 investment by Jabor International Investment QSC, controlled by members of Qatar's al-Thani royal family. See LP Evidentiary Exhibits pages 754-765, 10108-10118.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Jabor Funding Due Diligence151012,

Jabor dilution and free trading share plan 151014,

Jabor investor team info to Sullivan 151020,

Jabor Due Diligence Info Sullivan 151021,

Jabor Funding Agreement 151021,

Jabor investor wire xfr date 151021,

Jabor Funding Stock Adj Petersen 151022,

Jabor Funding wire tomorrow 151026,

Jabor Funding MEC fee and agreement sig page 151027,

Jabor MEC fee wire xfr record TD Ameritrade 151028,

Jabor Funding MEC fee wire MIA 151030,

Jabor Funding Cinfirm to Belli Salinas 151105,

Jabor Funding MEC License Rcvd 151105,

Jabor Funding Bust 151119.

C. Lead Plaintiff takes a copy of the signed agreement with him to an
October, 2015 organic vegetable packing plant construction design meeting at
Willmeng Construction's otherwise empty Maricopa County, AZ headquarters
building and shows the signed document to Crossgrove (aka Defendant Sheriff
Joseph Arpaio), who sits to Lead Plaintiff's immediate left as they face the
large video conference viewing screen in the conference room. See LP
Evidentiary Exhibits pages 1740, 8489-8506.

D. A comprehensive set of relevant pre-discovery evidence and
information which relates this subcount to other relevant subcounts includes,
without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12,
Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and
LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386,
398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T-1074V, 8370,
8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-
8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-

9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to conspire and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities**

A. Defendant Sallyport, a commercial financing company domiciled in Texas, is paid an application fee of $2,000 for Accounts Receivable and Purchase Order financing services which arise as a result of and are interfered with by Defendants through their offering of fraudulent immediately pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce, to consume financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages. See LP Evidentiary exhibits pages 9312-9313, 9271-9272, 9281-9283, 10005.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027

10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

C. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

     E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-11**

**Commercial**

**Frauds:**

**Fraudulent**

**Financing**

**Fees**

A. Lead Plaintiff business entities pay fees to alleged financial services providers in April, August, and October of 2018 totaling $14,950. Access to the accounting detail which identifies these potential Defendants is currently blocked and in the hands of the Defendants or other third parties, so the payees identities and the exact amounts of these payments are currently unknown. See LP Evidentiary Exhibits pages 10027 second line, 10028 second line, for the currently accessible recordation of these expenditures.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

C. Fraudulent commercial sales opportunities, and the business

necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they

have no intention be completed, and as elements of a pattern of commercial

and police powers frauds and conspiracies of Defendants in commerce and

interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls,

and/or manages.

D. Relevant emails providing further evidence and incorporated herein

by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be

retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

      E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

| | |
|---|---|
| **C-12**<br><br>**Commercial**<br><br>**Frauds:**<br><br>**Fraudulent**<br><br>**Financial** | A. Defendant New America Lending, a Illinois domiciled LLC owned and managed by David Hughes, which engages in commercial financing and broker/finder of private investors for commercial enterprises company is paid fees totaling $7,500 to arrange or complete financing for the Lead Plaintiff's company, to be supplied by Defendant using its own internally controlled loan |

**Services –**

**Domestic**

**Debt Broker**

and equity investment funds, and those of third parties which are to be raised by Defendant, to finance general working capital, specific assets, and/or sales opportunities of the Lead Plaintiff's commercial entities. See LP Evidentiary exhibits pages 9314-9318, 9328-9337, 9394-9401, 9653, 10011, 10021. Relevant emails are currently blocked as this Complaint is being prepared.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

C. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

| | |
|---|---|
| **C-13** **Commercial** **Frauds:** **Fraudulent** **Financial** **Services -** | A. Winnett Perico expends $4,950 with PPM Experts in Europe for the preparation of a Private Placement Memorandum required for fraudulent private placement services by Defendant Insight Networks, legally named above, which thereupon engages in pretending to work to place $100 million of debt with investors and submits false and misleading progress reports by email and phone. Exactly zero dollars are raised in this fraudulent scheme, another in the long-running series of investor and investment finder/banker |

**International Debt Broker**   agreements frauds failing to provide honest services. In the meantime, other actions are taken by Defendants in their captive environment of Lead Plaintiff to exhaust personal and business entity funds. See LP Evidentiary Exhibits pages 8563-8564, 8627-8714, 9923.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Insight Keiser Intl Debt placement 100mm 151028,

Insight Ovcar Intl Debt placement 100mm 151029,

Insight Keiser Terms for Intl Debt placement 100mm 151104,

Insight Verbal Commit by WO 151104,

Insight PPM Winnett Perico 151201,

Insight status inquiry 160112,

Insight status report 160113,

Insight status report 160122,

Insight re lack of progress 160418,

PPM Expert Invoice 145.11-2015 Winnett Perico, Inc 151117.

C. A comprehensive set of relevant pre-discovery evidence and
information which relates this subcount to other relevant subcounts includes,
without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-
0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP
Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386,
398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378,
8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714,
8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-
9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917,
9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line,
10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156.
While all subcounts throughout this Complaint are driven by Defendants'
conspiracy to commit and comprise an integrated pattern of racketeering acts,
the most directly relevant subcounts include, without limitation, C-2 through
C-20.

D. Fraudulent commercial sales opportunities, and the business
necessity to expend time and financial resources to locate and secure
financings thereof arose as a result of, and have been continuously interfered
with, by Defendants through their offering of fraudulent pending sales they
have no intention be completed, and as elements of a pattern of commercial
and police powers frauds and conspiracies of Defendants in commerce and
interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants

perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank**

A. Defendant Madison Street Capital's various officers and employees, while Defendant police powers agents, officers, and/or confidential informants, and as a part of this on-going conspiracy and pattern of racketeering acts, represent themselves and their firm as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's business entities, thereby coordinating with and playing an on-going role during 2015 through 2018 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce. This scheme requires and consumes the time and financial resources ($1,950 per a signed agreement on April 5, 2018) of Lead Plaintiff and his business entities in the bad faith

perpetuation of Defendants' long-running schemes, frauds, and swindles. See LP Evidentiary Exhibits page 9270, 9722.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Madison St Capital 160328,

Madison St outreach 170726,

Madison St Ibanker Madison St Capital initial hit 170727.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905,

9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line,

10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156.

While all subcounts throughout this Complaint are driven by Defendants'

conspiracy to conspire and comprise an integrated pattern of racketeering acts,

the most directly relevant subcounts include, without limitation, C-2 through

C-20.

D. Fraudulent commercial sales opportunities, and the business

necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they

have no intention be completed, and as elements of a pattern of commercial

and police powers frauds and conspiracies of Defendants in commerce and

interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls,

and/or manages.

E. Relevant emails providing further evidence and incorporated herein

by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator

Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-15**

**Commercial**

**Frauds:**

**Fraudulent**

**Financial**

**Services -**

**International**

**Financial**

**Services**

**Institution**

A. Defendant Bank of America Bestwick Cardone Group Senior Vice President Robert Bestwick and Vice President Andrew Cardone hold a Natural Foods Symposium in New York City in May2016, inviting Lead Plaintiff for the purpose of screening, acquiring intelligence, and introducing Lead Plaintiff to Dominick and Dickerman investment banker Michael Callahan, thereby aiding and abetting the fraudulent scheme and swindle, as summarized in sub-count C-16.  See Complaint Table 2-0179, LP Evidentiary Exhibits pages 1074T, 8805-8812, 9094.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

BA Bestwick Cardone Axial Nat Food Symposium 160415,

BA Bestwick Cardone on my BA history160502,

BA Bestwick Cardone Fake Food Symposium 160531,

BA Bestwick Cardone on RAM CS sales contract 160608,

BA Bestwick Cardone referes Callahan DD 160707,

BA Bestwick Cardone re intro at DD 160712,

BA Bestwick Cardone progress report DD 160808,

BA Bestwick Cardone lunch pre DD mtg 160927,

BA Bestwick Cardone sked Kiely call 161024,

BA Bestwick Cardone NYC Keily trust ref call161102,

BA Bestwick Cardone on Kroger uptake agreed 161110, (see also LP Evidentiary Exhibits page 1074T, entry 11/9/2016)

BA Bestwick Cardone update 170227,

BA Bestwick Cardone on Balckpool fail new search DD170323,

BA Bestwick Cardone on Blackpool Shefford 170324,

BA Bestwick Cardone Fake Food Symposium 170516,

BA Bestwick Cardone Fake Food Symposium 170609,

BA Bestwick Cardone alt ibanker intro 171130,

BA Bestwick Cardone re Skaar alt ibankers intro offer 171130.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328 Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,

8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These

violations of rights also serve to conceal the illegal acts of co-conspirator

Defendants, as they have from BRMT program inception, in approximately

1972, to the present.

**C-16**

**Commercial**

**Frauds:**

**Fraudulent**

**Financial**

**Services –**

**Wall Street**

**Investment**

**Bank**

A. Defendants Michael Callahan and Mark Gross, while acting as

Defendant agents, officers, or confidential informants, as part of this on-going

conspiracy and pattern of racketeering acts, represents themselves and their

firm, Defendant Dominick and Dickerman, as capable of and sincerely

interested in, securing financing on behalf of Lead Plaintiff's business entities,

thereby coordinating with and playing an on-going role during 2016 and 2017

in a complex sales, production, operations, and financing scheme to deprive

Lead Plaintiff and his related entities of authentic opportunities to engage

interstate commerce. This scheme requires and consumes the time and

financial resources of Lead Plaintiff and his business entities in the bad faith

perpetuation of Defendants' long-running schemes, frauds, and swindles.

B. Other Defendant bad faith actors and co-conspirators in this

fraudulent scheme and swindle include Defendants legally named above and

commonly known as Joseph Arpaio, both as Maricopa County Sheriff and

individually after leaving office; Double K Farming and Ricky King, as an

associate of Arpaio; Walmart; Kroger; Willmeng Construction; RAM

Consulting; Liquid Capital of Arizona; Sean Lyle and David Hinson, together

and separately, and their related entities; and fake employees known to Lead

Plaintiff as Bruce Blitch, Michael Castro, Rafael Gomez, Peter LeBlond, Jon

Nickless, Paul Smith, Mark Vindiola, and Jason Waseman. See Complaint Table 2-0179, LP Evidentiary Exhibits pages 622-623, 632-635, 639, 642-643, 651-652, 656-658, 659-661, 1074T (Michael Callahan, Richard Miller, RAM Consulting), 1074U, 8770-8787, 8788-8804, 8805-8812, 9193, 9207-9214, 9277, 9280.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

AltaVista Investment Commitment- Winnett Perico, Inc.161010,

AltaVists faked fin 161017,

AltaVista fup 161018,

AltaVista key personnel intro 161018,

AltaVista Sullivan re bad actor 161018,

AltaVista WP due diligence on AV 161018,

AltaVista fake followon funding anncmnt 161025,

AltaVista update 161026,

Centerboard Grp as Investor 170517,

Centerboard Grp as Finder DD 170526,

Centerboard PE intro 170526,

DD Callahan on Holistic Impact Partners 140417,

DD on Oliver Term Sheet 160711,

DD Callahan re engement ltr 160714,

DD Callahan re cancelled Oliver mtg 160812,

DD on Oliver Hyder resurrection 160824,

DD re Revolution intro 160825,

DD for Revolution WinnettOrganics Presentation 160910,

DD Callahan 160914,

DD on Revolution VC presentation 160919,

DD on Nielson organic foods outlook 160920,

DD on DelMorgan intro 160925,

DD mtg fup 160929,

DD Sep Discussion Document 160929,

DD re work Wakefern connection 160930,

DD Commitment Cmte pkg to Callahan 161006,

DD re Kingman acquisition 161007,

DD Gross on other fin options 161014,

DD re Alta Vista involvement 161014,

DD Callahan re AltaVista 401pm 161017,

DD notes on AltaVista offer 161017,

DD Callahan 2 re AltaVista 161018,

DD Callahan re AltaVista 1107am 161018,

DD Callahan re AltaVista739pm 161018,

DD Gross on Alta Vista2 161018,

DD Gross re AltaVista 161018,

DD on Alta Vista play out 161018,

DD on Smith CFO Hyder Stall 161105,

DD Hinson on production volumes 161106,

DD Callahan on proposed WMT revision 161114,

DD Callahan re investor interest 161115,

DD on WMT Swisslog 161230,

DD re 5 yr plan to WMT 161231,

DD Callahan re 170124 Swisslog mtg 170109,

DD Callahan re Swisslog mtg 170109,

DD Callahan re lending DD name to WMT presentation 170126,

DD Callahan re Swisslog mtg fup 170126,

DD Callahan on Blackpool funding 170202,

DD Callahan re Blackpool Term Sheet 170202,

DD Callahan update Blackpool 170227,

DD Callahan continue working 170328,

DD update to outside bridge potential investor 170410,

DD revised Bus Plan adds cattle 170417,

DD re Rabo ID Skaar 170503,

DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,

DD Transom re Skaar 170512,

DD on Skaar fert option 170513,

DD Skaar Barns Detail Site Opt 8 170523,

DD Fleming on DD Finl Model 170526,

DD Callahan re PE dilutive 170531,

DD on Skaar Organic Fertilizer Mkt Size 170531,

DD on Skaar Organic Fertilizer Plant Ops 170531,

DD on Skaar Organic Fertilizer Plant Concept Plan 170601,

DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604,

DD Skaar Site Plan 170605,

DD Skaar Site Plan Ammonia Recovery Manure 170605,

DD Skaar Organic Fertilizer Effectiveness 170607,

DD Skaar Organic Fertilizer Pricing 170607,

DD Skaar PE Investor Bid email 170607,

DD Skaar PE Investor Bid form 170607,

DD re Centerboard Housing Solution WO 170608,

DD WCC teaser draft 170608,

DD Skaar Organic Fertilizer Production Cost 170609,

DD Callahan re funding sked 170612,

DD Skaar Organic Fertilizer Advantages 170614,

DD WCC Pitch Deck Skaar etal 170614,

DD Callahan on DeSai 170616,

DD Skaar Biiding Process to Sanders 170616,

DD Callahan on Axial lead Chatham 170619,

DD Skaar Site Plan Mods 170619,

DD NGEN fake NYC investor 170622,

DD NYC Van Brakel 170622,

DD Callahan re AGIS NDA cmu not credible 170628,

DD Skaaar AgIS Boston 170628,

DD Skaar Advantage NDA 170628,

DD Skaar AgIS Boston 170628,

DD Callahan re Skaaar visit sked 170726,

DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,

DD Skaar BDO Auditor SLC Gordon 170804,

DD Skaar BDO Auditor SLC Gordon 170807,

DD NYC Callahan connects to BDO SLC 170808,

DD Skaar Callahan Update 170809,

DD LaBelle Teton County 240 Tour Pass 170810,

DD Skaar Cost per pound gain 170811,

DD Skaar LOI xmit 170811,

DD Skaar LOI signing 170821,

DD Skaar past contacts 170821,

DD Skaar Teton River Farm Feeney email 170822,

DD Skaar rcv Alt Offer 170828,

DD Skaar Teaser 170905,

DD Callahan re no progress 170906,

DD Skaar Kritser 170907,

DD Skaar Kritser to WO team 170907,

DD Skaar Sanders tours Frank Maughan BDO 170913,

DD Skaar Sanders on Kritser alt structure 170915,

DD Skaar Kritser re adjusted LOI 170919,

DD Callahan on failure to date and breach 170920,

DD Skaar Kritser 170921,

DD Skaar Sander re Kritser 170921,

DD Skaar Sanders on revised structure 170929,

DD Skaar Kritser 171002,

DD Skaar Kritser string out 171004,

DD Skaar Sanders Update 171013,

DD Skaar Sanders re Kritser Friona Ind ExCEO call 171022,

DD Skaar WMT China ND Rep Sr Legislator Banco Advisors 171024,

DD Skaar Kritser dragout decline to WO team 171110,

DD Skaar Revised Buyout 171112,

DD Termination Notice 171114,

DD Callahan Disappears 171115,

DD Callahan acks Termiantion 171117,

DD Skaar Sanders revised LOI 171128,

DD Skaar WMT China procurement 180817,

Gross re Korea beef pgm finance 210115,

Gross re Big Sandy finance 210506,

Gross re grainfed organic taste difference 210513,

Gross 210514,

Gross re Big Sandy rewrite Bus plan 210517,

Gross re mkt research to demo our case 210519,

Gross on organic mkt update 210522,

Gross re organic beef proof of concept 210603,

Gross re WMT Redfield US Grocery SVP 210618,

Gross re Lake County tax advantages opptny zone 210630,

Hartman re Gross organic mkt research inquiry 210520,

Hartman re refs and experience 210525,

Hartman Group re Organic Mktg Study for Gross Mark 210603,

M Gross re Korea contract finanaicn g et al 210119,

Swisslog automation Jennings NYC in house 161101,

Swisslog automation Jennings NYC in house 161107,

Swisslog automation Jennings NYC in house 161205,

Swisslog to Waseman re automation 161228,

Swisslog Jennings re DD mtg and progress 170113,

Swisslog re NYC meeting notes and fup 170126,

Swisslog Deck DD mtg to WO team members 170128,

WMT initial hit on cold email 161002,

WMT fup Baldwin 161010,

WMT McCormick ref from Balwin 161011,

WMT sales news to WO team 161011,

WMT McCormick Webex 161014,

WMT McCormick call tomorrow email 161017,

WMT McCormick call fup 161018,

WMT McCormick call fup production volumes 161020,

WMT McCormick call 161109,

WMT McCormick re DD discussion 161114,

WMT McCormick resked and participant list 161114,

WMT McCormick call fup 161116,

WMT McCormick call fup 161118,

WMT McCormick re investors ibankers 161121,

WMT McCormick on contract outline 170108,

WMT McCormick Bentonville Mtg Attendees 170111,

WMT McCormick 170224 Bentonville mtg Present Draft 170123,

WMT McCormick email Bentonville Mtg Presentation 170123,

WMT McCormick Bentonville Mtg Attendees 170216,

WMT McCormick Bentonville Mtg Invite 170216,

WMT McCormick Bentonville Mtg Location 170216,

WMT McCormick Bentonville mtg fup 170222,

WMT McCormick re post Bentonville Mtg Rev 170222,

WMT McCormick nonreply fup 170328,

WMT Baldwin re decision next week 170403,

WMT McCormick re mktg plans 170403,

WMT McCormick on price drop 170412,

WMT McCormick buyer contacts 170425,

WMT China Beef ref from McCormick 170703,

WMT connects China on beef 170703,

WMT China Zheng initial contact 170704,

WMT China Zheng merch support 170707,

WMT China Zheng ROM pricing 170708,

WMT China beef Higaki intro 170718,

WMT China beef Higaki pricing 170811,

WMT China Higaki price quote 170811,

WMT China Hgiaki Quotes Specs 170821,

WMT China Higaki adding WO factory id 170821,

WMT China Higaki request factory number add 170821,

WMT China Higaki quote fup 170822,

WMT China WO Status Report WMT China Beef 680 ton order 170921,

WMT Chna Higaki re WMT contract 170924,

WMT China Higaki re process steps 170926,

WMT China Preferred Freezer initial hit 170926,

WMT China Americold initial hit 170929,

WMT China Cargill contact punt 171002,

WMT China Higaki Executed WMT Contract 171010,

WMT China Update WO Team 171012,

WMT China Higaki China visit and update 171023,

WMT China Higaki re contract signature rqmt 171023,

WMT China Higaki re JBS Specs 171026,

WMT China Higaki on revised order pricing 171208,

WMT McCormick on China status 171220,

WMT China re labeling 180110,

WMT China xmit manually signed contract copies 180112,

WMT China order processing timeline 180115,

WMT China Higaki re sked 180116,

WMT China order timing Apr 180116,

WMT China Higaki re factory flow charts trial shipment 180122,

WMT China Higaki orig signed contracts sent 180123,

WMT China CA OWB Packers delay 180131,

WMT China Higaki intro of SCS process 180201,

WMT China Higaki re OWB approval 180201,

WMT China Higaki SCS 180201,

WMT China Hgiaki re Cargill Tyson on China 180202,

WMT China Higki re OWB SCS audit 180202,

WMT China OWB stringout 180206,

WMT China OWB stringout 180207,

WMT China OWB stringout 180214,

WMT China OWB stall 180223,

WMT China OWB stall continues 180223,

WMT China SamsClub China dragin 180227,

WMT China Higaki email sig page xmit 180228,

WMT China LiqCap AZ update 180228,

WMT China Petersen re signed contract evidence 180301,

WMT China re post OWB to JFO 180301,

WMT China JFO inquiry 180302,

WMT China re retail link 180302,

WMT China status on China 180302,

WMT China re local China ofcs 210130,

WMT China re China ofc and contact history 210202,

WMT China Liao re China ofc details 210204,

WMT China on packaged cuts 210222,

WMT China docs needed 210312,

WMT China Liao re new ofcs in China 210407,

WMT China re beef purchase embargo in China 210415,

WMT China SAmerica Quote 210422,

WMT China rejects BR Tradimpex case ready pricing 210426,

WMT China intro to RMC China rep Jason 210428,

WMT re US organic beef pgm 210605,

WMT Redfield on domestic organic beef 210607,

WMT Lehr Organic Beef Intro 210610,

WMT re organic beef partner pgm 210615,

WMT Lehr video mtg 210616,

WMT Lehr re comp organic price premiums on ther products 210617,

WMT Redfield cc Lehr video mtg 210617,

WMT Lehr alt sales ramp 210618,

WMT Lehr Baskin video mtg to come 210702,

WMT Hutchins mtg set 210713,

WMT Baskin Lehr call fup on pricing 210729,

WMT Baskin Lehr video call 210729,

WMT Partnering Zoom Call 210729,

WMT Baskin on pricing 210810,

WMT Baskin status inquiry 210816,

WMT Baskin pass 210818,

WMT Organic Beef pass 210818,

WMT Organic Beef pgm not established 210823,

WMT Baskin re pass pricing other issues 210824,

WO Plant Kickoff Salinas Mtg 150916,

WO Plant Willmeng ref from Sayre 150917,

WO Status Report Adamson PPM 150917,

WO Team re PPM S-1 processes 150921,

WO Plant Kickoff Salinas Mtg 150922,

WO Plant Willmeng contract draft 151012,

WO Plant Willmeng kickoff meet Oct 27 151019,

WO Plant Willmeng cost workup status 151021,

WO Status Report Jabor and Sales 151022,

WO Hyder Farm Castro on Oliver 151028,

WO Weekly Status Report reaction Petersen 151029,

WO Hyder Farm Terminal Estimate to Oliver 151030,

WO Sales Fresh Express Smith contact 151104,

WO Grt Western Bk local takeover visit 151117,

WO Team on Jabor Funded on Time 151117,

WO Team re Jabor snag  151118,

WO Team on financings 151120,

WP Paypal Acct Detail Sep-Dec 151231,

WO Team on 179mm Financings 160101,

WO Status Financings 160121,

WO Financings deal status to team 160208,

WO Status Kingman Startup Financings 160209,

WO Status Report financings 160421,

WO Status re Oliver Term Sheet Verbal 160719,

WO Status Final Oliver Hyder present sked 160804,

WO Status Hyder Oliver rework 160818,

WO Status DD Fin Sales 160929,

WO Status Report on Hyder Oliver new pitch status 161006,

WO on WMT progress 161018,

WO Status financings 161103,

WO Status Financings WMT Kroger 161115,

WO Status Kroger projection incl 161226,

WP Great Western 2016 DDA Account 161231,

WO Org Chart 170111,

WO Blitch re ofc space tour 170118,

WO Status Report Reed Wood join 170119,

WO Team re Gerlach soi tests 170201,

WO Blitch re Stockton Hill Famr tour w Blackpool 170203,

WO Smith CFO re Revolution VC pass 170203,

WO Status Rpt Stockton Hill Update 170209,

WO Status Rpt incl WMT status 170223,

WO Team re Blackppol to fund 170301,

WO Team re Blackpool no reply stringout 170309,

WO Team re Blackpool deadline miss 170310,

WO Status Report DD retainer need 170320,

WO also Cardone on Status WMT others 170403,

WO Team WMT dead Alb on track others 170404,

WO Status Skaar 170504,

WP Executive Summary Bus Plan 170507,

WO Status Report Skaar Investor Interest 170515,

WO Team Smith CFO Termination Notice 170612,

WO Team Smith CFO Termination 170613,

WO Team on DD Funding Skaar Acq Date 170615,

WO Status Report Skaar nothing from Alberts 170706,

WO Status Report re DD potential investors 170713,

WO Status Report Skaar deal progress LOI 170727.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T-1074V, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564,

8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

     E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

     F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be

retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate

neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and

deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their

intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead

Plaintiff of free exercise of will and rights guaranteed under the United States

Constitution and ratified international treaties having force of law. By denying

Lead Plaintiff's right to pursue a free and ordinary life, under their color of law

fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon

delivery system (known herein as BRMT) against US persons and other

innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-17**

**Commercial**

**Frauds:**

**Fraudulent**

**Financings**

**and**

**Representatio**

**n, Online**

**Referral**

**Services**

A. Defendant Axial.com holds an annual investor conference in New York City in Fall 2015, inviting Lead Plaintiff as an interested party. Defendants use this conference, open to the public, to arrange meetings with Madison Street Capital, Perella Wasserstein Partners, and Young America Capital, among others. Most of these meetings are carefully arranged for the purpose of screening, acquiring intelligence, and introducing Lead Plaintiff to other Defendant police powers officers, agents, and confidential informants to further Defendants' fraudulent scheme and swindle by portraying themselves as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2015 through 2018 in the continuation of their decades long complex sales, production, operations, financing and litigation scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. Defendants also later reintroduce themselves using Axial email addresses and phone calls to refer Lead Plaintiff to other similar fraudulent contacts and to cut out any contact between Lead Plaintiff and any serious investor interest from the real business and investor community. This scheme requires and consumes the time and financial resources of Lead Plaintiff and

his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles, and pattern of racketeering acts.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

AGI 1 NYC Investor hit Axial 170515,

AGI 1 Lee Mtg Set 170517,

Axial Investor Interest 150904,

Axial to Altahawi connect 150910,

Axial NYC re Investor Referrals 171108,

Axial re Paine Schwartz 171113,

Axial NYC Fractal Intro 171116,

Axial NYC Fractal stall 171129,

Axial NYC Fractal stall 171204,

Axial NYC Fractal drag out 171206,

Axial fake investor leads 180302,

Fractal re initial contact 171117,

Fractal progress 171206,

Fractal on status and nterest 171221,

Fractal intro Black Lake Chad Scripps 180117,

NYC Investor Axial Conf Intro PWP Growth Schectman 151028,

NYC Investor from Axial Formanek 151027.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626, 8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907, 9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-18 Commercial Frauds: Fraudulent Financings and Financial Representatio**

A. Fraudulent commercial financing opportunities require the Lead Plaintiff and his related business entities to expend time and financial resources to locate and attempt to secure these alleged but fraudulent financings, and occur in conjunction with both fraudulent sales opportunities and fraudulent property acquisitions arranged by Defendants in conspiracy with other Defendants, including, among others, individual persons and marital

**n, Fraudulent Solicited Responses**

communities as owners; various forms of commercial enterprises, some as direct co-conspirators and others who are being spoofed by Defendants.

      B. Defendants make common use of interstate wire fraud, mail fraud, in-person visits, entertainment, travel, and other means requiring expense or efforts by the Lead Plaintiff on his own behalf and for his business entities. These individuals and entities include, without limitation, all named Defendants in various schemes as experienced by Lead Plaintiff and these various business entities, dating from 1986 to 2022. These Defendants include domestic and international entities and individuals legally named above in this Complaint when known, and named as commonly known herein, and/or spoofed as the authentic entity by Defendants with police powers, their officers, agents and confidential informants and other bad actors carefully screened-in by these Defendants, including many entities for which there is no available pre-discovery evidence that disbursements have been made. These individuals and entities include, without limitation, the following 220 plus domestic and international entities and individuals: Bank of America BA Bestwick Cardone; Dominick and Dickerman; Alta Vista; EarlyBird Capital; Chardan; NGEN; US Bank; Rabo Bank; JP Morgan Chase; New America Lending; Intrepid Capital; Jabor; NHIG; JCXL; Alfardan; RJ Lumba; William Hoyle; Worldwide Financial; Stratos Commercial, Tessina Painter; Warren John, Borgenson; Kabah family;  Liberty West Regional Center; Vision Partners; Trinity; Blumberg; Whitestone, Lex Gubsky; Ken Shepherd;

Multifunding; Utica Leaseco; Reich Bros; Viking Equipment Finance, Jim

Buckingham; RAM Consulting, Richard A Miller; DelMorgan, Robert

Finkelstein; Moise Anglade; Fiera Comox; Barings; Fractal Advisors; Black

Lake Capital; Summit Partners; Summit Investment; NBH Banks; Great

Western Bank; Currency Capital; Dynamic Capital; Al Mal; Kennedy

Financial; Commercial Finance Partners; Capital Source Group; Ag America;

World Business Lenders; Axos Bank; Patriot Funding/David Antonelli;

Capital Markets Expert; Johnston-Todd; Business Capital; SouthStar;

AgAmerica; Capstone Trading; AAY Panama; Credit Lyonnaise

Laing/Michael Kurtanjek; Coco Capital; Sole Source Capital; Mayfield VC;

Legendary VC; VII Capital; Vendome Bond; Songbird UK; Liquid Capital;

Lantern Capital Advisors; Key and Company, David Key; JCXL; Jack

Burstein; Zayid Mohammed; Isaac Capital; Interstate Capital; Insight

Network; Holistic Impact Partners; Harvest Returns; Fisher Enterprises;

Equilibrium Capital; Centerboard Group; Farm Enterprises, Margie

Costamanga; Brereton Hamilton; Elkehereiji; HIG Capital; Riverside;

Armonia, Jasper Van Brakel; Manna Tree; Crystal Lands Resources;

Crestnorth Capital; Conterra; Correlation VC; Ethan Blum; Charles Blair; Big

Path Capital; Banco Advisors; Auctus Capital; Armgold Harmony; Arlon;

Alam Junaid; Hurwitz Financial; Silverwood Partners; Firelake Capital;

Fountain Partners; Ridgestone; Chess Capital Partners; Endeavor; Republic

Business Credit; Loan Whisperer; LeaseQ; Falcon Investments; CFA Omaha;

Hawthorne Equity Partners; LNK Partners; MSTCPT; KLC Financial; Land O

Lakes; BBVA; Ranch Creek; Hillstar Capital; AGR Partners; High Street

Capital; C6 Capital; MetLife; Ag Lending Group; BMO; Arizona Bank and

Trust; Bank of Tucson; Wells Fargo; Liquid Capital Express; FSW; Paramount

Payment; Grand Canyon RC (EB-5); Prudential; United Financial Investment

Group; Broadmark Capital; Zions Bank; Green Card Fund; TTM Capital;

London Manhattan; Crucible Capital; Roth Capital Partners; Trianz; Citi

Financial Group; Clarke Advisors; Noble Business Lending; Funding

Merchant Source; Crowd Fooding; AgFunder; Prosperity Funding; Business

Backer; YA Capital; Altima Partners; Jackson Consulting Group; IPO Capital

UK; Premier Financial Services; Commerce Bank Arizona; Merchant Finance;

GUD Capital; Lynwood Capital; Headwaters Merchant Bank; Pinnacle

Ventures; LGV Partners; New Star Financial; SJF Ventures; Farwest Capital;

Resource Land Holdings; VN Partners; Cobank; Huron Capital; BLC Lending;

Brickell Financial; Siena Lending; FCP Capital; DB Capital Solutions; First

Capital Business Finance; Midland American Capital; Black Coral Capital;

Olin Capital; US Capital Partners; SuperG Funding; Modern Capital Solutions;

Brightway Financial Group; Sherbrooke Capital; WGIM Global; FS Equity;

Point Financial; Clarion Partners; Biltmore Bank; Wall Street Strategic

Capital; Nations Equipment Finance; MARV Capital; Fire Lake Capital;

Perella Wasserstein Partners; Lycom Financial Group; Farwest Capital;

Comerica; Mainstreet Capital; TDP Fund; Farmland LP; Blue Leopard LLC;

SCS Dynamics; Don L Wood; Open Prairie; Chase Winters; New Seed Advisors; Bahraini Investment Group; Biz2Credit; American United Capital; Vertex Financial; Phoenix Global Finance; Brahma Lending; West Monroe Partners; Lucid Solutions; Popular Commercial; ITBMS Global; Bibby Financial; Bradley Gibson; Crossroads Financial; MB Financial; and various unknown Canadian broker and investment banker entities, typically doing business related directly or tangentially to the Vancouver Stock Exchange and with offices in the Vancouver, British Columbia area.

C. See Complaint paragraph 328, Table 2-0047, 2-0053,2-0054, 2-0059, Table 2-0039, LP Evidentiary Exhibits pages 616-617, 1074T-1074V, 8359, 8363, 8180-8232, 8364, 8380-8384.8412-8414, 8415-8418, 8419-8451, 8719-8769, 8770-8787, 8788-8804, 8805-8812, 8813-8854, 8855-8894, 8899-8905, 8937-8938, 8939-8955, 9066-9067, 9095-9145, 9146-9180, 9182-9186, 9223-9227, 9261-9264, 9265, 9266-9269, 9284, 9319-9326, 9401-9404,9562-9565, 9566, 9593, 9594-9597, 9598-9600, 9608-9609, 9616, 9617-9618, 9612-9613, 9619-9621, 9678, 9700-9701 9668-9677, 9722, 9791-9813, 9814-9819, 9824-9830, 9821-9823, 10158-10163.

D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the

following:

AgAmerica Reiten Big Sandy loan re pers gty issues 210304,

AgAmerica attempt Miles Reiten Big Sandy pers gty 210322,

AgAmerica Miles Reiten 210415,

AgAmerica Reiten sked call 210707,

AgAmerica Carson re WMT organic sales progress 210716,

Alam Junaid ibanker too busy AZ 160419,

Alfardan Carr ref investor Prince Omar Alfardan160404,

Alfardan loan proposal accepted 160512,

Alfardan decline due to advance fee rqmt 160627,

AltaVista Investment Commitment- Winnett Perico, Inc.161010,

AltaVists faked fin 161017,

AltaVista fup 161018,

AltaVista key personnel intro 161018,

AltaVista Sullivan re bad actor 161018,

AltaVista WP due diligence on AV 161018,

AltaVista fake followon funding anncmnt 161025,

AltaVista update 161026,

Anglade FL investor 150811,

Anglade FL investor update PHX trip date 150817,

Anglade FL investor cancel PHX trip date 150910,

Armgold Harmony Vusimile on seed funds investor 141211,

Armgold Harmony Vusimile funds notice email 141215,

Armgold Harmony Vusimile funds notice recvd 141215,

Armgold Harmony Vusimile funds notice 141216,

Armgold Harmony Vusimile delay discussion 141218,

Armgold investor interest 160412,

Armgold affirms investor interest 160418,

Armonia Van Brakel re poss SLC mtg 170807,

Armonia Van Brakel 170810,

Armonia NYC Van Brakel on grass fed other options 170822,

Armonia NYC vanBrakel MacGill mtg 170926,

Armonia Mtg Delay 171016,

Armonia NYC mtg 171107 invite 171021,

Armonia Van Brakel on Rabo referral 171204,

Armonia Van Brakel Rabo referral 171204,

Auctus on Skaar DD 170822,

Banco Advisors ref from Gottesman 171011,

Banco Advisors Nov 1 mtg w Nicholas 171021,

Banco Advisors 171101 mtg Blitch re pitch 171024,

Banco Advisors 171101 busted mtg fup Nickless 171102,

Banco Advisors Blitch Vindiola Waseman invite 171114, (see also LP Evidentiary Exhibits page 1074V, entries 11/1/2017)

Banco Advisors re other intl investors 171130,

Banco Advisors China drag out 171206,

Bankers Capital ref to Riverside Marcks 210624,

Big Path ping MA D Patrick Bain 170823,

Big Sandy Ranch sub debt RFQ 210314,

Bk Tucson Lender re S-1 and banker due diligence 151025,

Bk Tucson Lender re Brewer bio red flag issues for lenders 151030,

Bk Tucson Lender re Brewer bio red flag issues for lenders 151102,

Bk Tucson Lender re S-1 and banker due diligence 151103,

Black Lake Capital ref Fractal perhaps 180216,

Black Lake Capital re capital rqmts 180227,

Blair bogus lender 170418,

Blair 17mm fin proposal 170419,

Blair bogus lender 170419,

Blair bogus lender 170420,

Blum re mtg to discuss finders fee arrangement 130327,

Blum Signed Agreement Blum 130620,

Brickell Fin FL referred to Adamson 150910,

Broadmark WA 150717,

Broadmark re Lake County fin 210704,

Broussard re Lake County fin 210710,

Caasmailaffairs Morocco Investment for Williams R 140918,

Capital Source S Gordon 210316,

Capital Source S Gordon 211015,

Capstone Trading re fin 210831,

Capstone Trading re fin 210901,

Case Champoin rep re funding options 170328,

Case intro Dickens PVG Global re financing 170328,

Centerboard Grp as Investor 170517,

Centerboard Grp as Finder DD 170526,

Centerboard PE intro 170526,

Cerebro Capital on Big Sandy Ranch 210317,

Chase phone intro appt 210402,

Chinese money laundering scam email 161219,

Chinese AR money laundering scam attempt 220218,

Coco Capital 2 LA NYC re sub debt 151002,

Coco Capital LA NYC re sub debt 151002,

Coco Capital on loan availability 161015,

Coco Capital on status 161130,

Coco Capital on status incl WMT 170103,

Coco Capital connects others 170104,

Coco Capital Strasser re connect results pass 170104,

Collins ref by Sullivan on Bridge Loan 150629,

Conterra IA brdige loan term sheet Skaar 170509,

Correlation VC are followon investors 170328,

Crestnorth Capital disbursement instruction 140327,

Crystal Lands Resources 150924,

Crystal Reosurces Xfr 150928,

Crystal Resources Xfr Fail 150928,

Crystal Resources XFR Fail to Smith 150928,

Crystal Resources Fee Scam 150929,

DD re Rabo ID Skaar 170503,

DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,

DD Transom re Skaar 170512,

DD Fleming on DD Finl Model 170526,

DD Callahan re PE dilutive 170531,

DD Skaar Site Plan 170605,

DD Skaar PE Investor Bid email 170607,

DD Skaar PE Investor Bid form 170607,

DD re Centerboard Housing Solution WO 170608,

DD WCC teaser draft 170608,

DD Skaar Organic Fertilizer Production Cost 170609,

DD Callahan re funding sked 170612,

DD Skaar Organic Fertilizer Advantages 170614,

DD WCC Pitch Deck Skaar etal 170614,

DD Callahan on DeSai 170616,

DD Skaar Biiding Process to Sanders 170616,

DD Callahan on Axial lead Chatham 170619,

DD Skaar Site Plan Mods 170619,

DD NGEN fake NYC investor 170622,

DD NYC Van Brakel 170622,

DD Callahan re AGIS NDA cmu not credible 170628,

DD Skaaar AgIS Boston 170628,

DD Skaar Advantage NDA 170628,

DD Skaar AgIS Boston 170628,

DD Callahan re Skaaar visit sked 170726,

DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,

DD Skaar BDO Auditor SLC Gordon 170804,

DD Skaar BDO Auditor SLC Gordon 170807,

DD NYC Callahan connects to BDO SLC 170808,

DD LaBelle Teton County 240 Tour Pass 170810,

DD Skaar LOI xmit 170811,

DD Skaar LOI signing 170821,

DD Skaar past contacts 170821,

DD Skaar Teton River Farm Feeney email 170822,

DD Skaar rcv Alt Offer 170828,

DD Skaar Teaser 170905,

DD Callahan re no progress 170906,

DD Skaar Kritser 170907,

DD Skaar Kritser to WO team 170907,

DD Skaar Sanders on Kritser alt structure 170915,

DD Skaar Kritser re adjusted LOI 170919,

DD Callahan on failure to date and breach 170920,

DD Skaar Kritser 170921,

DD Skaar Sander re Kritser 170921,

DD Skaar Kritser 171002,

DD Skaar Kritser string out 171004,

DD Skaar Sanders re Kritser Friona Ind ExCEO call 171022,

DD Skaar WMT China ND Rep Sr Legislator Banco Advisors 171024,

(see also LP Evidentiary Exhibits page 1074V, entries 11/1/2017)

DD Skaar Kritser dragout decline to WO team 171110,

DD Skaar Revised Buyout 171112,

Deeken re financing 200710,

DelMorgan re intro 160925,

DelMorgan email WP proposal 160928,

DelMorgan fup DD declines to share 160929,

DelMorgan update WMT 170106,

DelMorgan 170110,

DelMorgan re DD engagement 170308,

DelMorgan re alt retainer arrangement 170324,

DelMorgan revised docs170324,

DelMorgan re alt firm retainer avail 170327,

DelMorgan nogo on alt fee provider 170404,

DelMorgan on DD Callahan telcon 170822,

Dooley Hook to EB-5 110922,

Edgar Wood on Dubai Trip Sched 150626,

Elkhereiji Assistant referral 150410,

Elkhereiji Loan 150412,

Elkhereiji Reponse 150412,

Elkehereiji Increased Loan Amount 150421,

Elkhereiji Agreement Meeting150430,

Elkhereiji Wood Edgar on trip cancelled 150626,

Energy Bank Ghana Kabah xfr bank info 170425,

Equilibrium Capital cold email on online article 170628,

Equilibrium Capital referral to Haladay 170706,

Equities dot com Financing Proposal 160623,

Equities dot com Financing contract 160630,

Equities dot com implementation sked 160708,

EquityNet Profile Interest 150520,

EquityNet Profile up 150520,

Factoring Rec Financing Fees 160217,

Fargotrust Investor ND interest in PPM 151010,

Fiera Comox Corbett initial hit 210511,

Fiera Comox Corbett Big Sandy structure revision 210519,

Fiera Comox Corbett Big Sandy returns issues 210520,

Fiera Comox Corbett decline 210520,

Figdor Drew Paris investment banker 160712,

Fisher Ent NYC re 60MM funding 160701,

Flores on funds raise 160705,

Flynn re additional capital 200730,

Flynn re Lake County fin and DB prior WMT China issue 210714,

Fractal re initial contact 171117,

Fractal progress 171206,

Fractal on status and nterest 171221,

Fractal intro Black Lake Chad Scripps 180117,

Fundable re fin after zero leads dev for WO 171211,

Funding options Patriot Antonelli  200720,

Gaines Ira AZ first contact ref by Sayre Tappen 150311,

Gomez Dir Food Safety Intvw 150829,

Gomez refers Brereton Hamilton 160407,

Gomez re investor call request 160408,

Gomez re investor interest 160427,

Gomez on Costamanga mtg plan 160429,

Gomez update on CA investor progress 160506,

Gomez Costamanga mtg request 160508,

Gomez re new investor leads 160512,

Gomez investor update 160525,

Gomez re Japanese Inv Lead sales progress 160616,

Gomez update Kevin investor 160704,

Gomez re Costamanga mtg 170203,

Gomez re Brereton has organic cattle in TX 171228,

Gross re Korea beef pgm finance 210115,

Gross re Big Sandy finance 210506,

Gross re grainfed organic taste difference 210513,

Gross 210514,

Gross re Big Sandy rewrite Bus plan 210517,

Gross re mkt research to demo our case 210519,

Gross on organic mkt update 210522,

Gross re organic beef proof of concept 210603,

Gross re WMT Redfield US Grocery SVP 210618,

Gross re Lake County tax advantages opptny zone 210630,

Grt Western Bk local takeover visit 151117,

GWB Pagel re Financing 160216,

GWB Pagel re 7500000 LOC 160222,

GWB line announcement to team 160223,

Harvest Returns Debt Opptny Zone 210623,

Harvest Returns  210701,

Harvest Returns Cattle Notes Decline 210709,

Harvest Returns Lake County Due Diligence 1of2 210709,

Harvest Returns Lake County Due Diligence 2of2 210709,

Harvest Returns 1 cattle notes 210720,

Harvest Returns 2 Cattle Notes 210720,

Harvest Returns Cattle Notes SBI team email 210721,

Harvest Returns checkin 210909,

Hillcrest PE IL interest 180112,

Hillcrest pass IL 180115,

Holistic Impact intro 170404,

Holistic Impact fup 170415,

Holistic Impact fup on prospectus distn 170503,

Hoyle Finl Intro 140216,

Hoyle Fee Agreement Signed 140221,

I banker BreretonHamilton 160407,

I banker BreretonHamilton 160412,

I banker BreretonHamilton 160718,

Interstate Commerce WMT KR emails 170403,

Intrepid Capital DC reprise 221011,

Investor Commitment Crystal Resources 150924,

Investor Commiment Fail to Smith re Ukraine Xfr Fail 150928,

Investor Commitment Crystal Resources  Xfr 150928,

Investor Commitment Crystal Resources Xfr Fail 150928,

Investor Commitment Crystal Resources Fee Scam 150929,

Investor Contact List Sent to Wyly 130712,

Investor Lead Gomez re CA 160322,

Investor Lead fup Gomez 160331,

Investor Prince Omar Alfardan 160404,

Isaac Capital Grp NYC investor interest 170515,

JacksonCG Frambes TX 161205,

JCXL Advance Fee Scam Barrister140602,

JCXL Term Sheet 10MM 140609,

JCXL Term Sheet 10MM Jackson Sullivan 140609,

JCXL Advance Fee Scam 140611,

JPM Aberbach ref to another unit 210604,

JPM Kolleng re China LC monetization 210131,

Kabah scam resurrection 140424,

Kabah first hit 140526,

Kabah funds xfr 140605,

Kabah Energy Bank Ghana 180K 170425,

Kabah Energy Bank Ghana 180K 170426,

Kabah Energy Bank Ghana Govt Doc Forged 180K 170426,

Kabah Energy Bank Ghana 180K 170427,

Kabah re Energy Bank xfr 170428,

Kabah Energy Bank Ghana 180K 170502,

Keiser 100MM Debt Raise Terms Summary 151104,

Kennedy Orrego intial hit 141110,

Key NYC ibanker reconnect 170821,

King Trade Capital re WMT order thru JBS 170824,

Kofi on Ghana Akoto contact via Yahoo Messenger 170314,

Kolleng JPMorgan prob cutout 210115,

Krapf Bank Tucson Land Financing Inquiry 160213,

Kritser re Lake County OR Organic Finishing Op 220621,

Lantern Capital Advisors Risey re raise financing 111007,

Lease Co Van Tassell 161102,

Liberty EB-5 initial hit 141027,

Liberty Keller Carter mtg thanks 141103,

Liberty EB-5 WinnettOrganics LOI 11-12-14 141112,

Liberty Carter ref request services matrix request 141114,

Liberty re CADC TEA eligibility 150106,

Liberty backout excuse sent to UFIG 150505,

Liberty EB-5 LOI to WP 221105,

Liquid Capital AZ Gottesman initial hit 170928,

Liquid Capital AZ Gottesman signed app 171012,

Liquid Capital AZ Gottesman on underwriting info request 171012,

Liquid Capital AZ Gottesman underwriting info complete 171013,

Liquid Capital AZ Gottesman email DLC sample 171017,

Liquid Capital AZ Gottesman 171101 mtg request 171024,

M Gross re Korea contract finanaicn g et al 210119,

Maggard TX re Abdelsayed 200722,

Maggard TX re Abdelsayed start date 200817,

Maggard TX status 201015,

Maggard re Korea Angus pgm etc 210118,

Maggard re 26 Ranch and Abdelsayed 210221,

Maggard on Abdelsayed positive connect 210222,

Maggard re Abdelsayed 210302,

Maggard re Abdelsayed to Egypt 210304,

Maggard on loan docs PFS need 210306,

Maggard re gty and PFS 210307,

Maggard re Big Sandy BAFO 210322,

Maggard re Big Sandy reprise 210505,

Maggard re investors and Big Sandy 210519,

Maggard re Lake County LOI 210701,

Maggard re Lake County 210702,

Maggard re 500k loan 210703,

Maggard enroute Lake County 210707,

Maggard re Lake County enroute 210707,

Maggard re Lake Copunty tour and plus minus issues 210709,

Maggard re Lake County and pers FICo improvement 210715,

Maggard re Lake County 210719,

Maggard Loan to DB improving FICO 210721,

Maggard re Lake County 3559 LOI 210721,

Maggard on Lake County Fin snags 210725,

Maggard on WMT Wagyu comp price and other status 210804,

Maggard re startup sequencing plan 210816,

Maggard re status web dev sales 210816,

Maggard re add subs WeFunder 210817,

Maggard re GAAP fin need 210818,

Maggard re mkt gap 210818,

Maggard 5k GPR loan 210826,

Maggard re 4500 loan recvd 210826,

Maggard Revised GPR Startup Plan 210830,

Maggard re DB overadvance 210901,

Maggard re loan not pursued 210903,

Maggard re 26k loan 210909,

Maggard re ICPO LOI-FM-LZ-210913,

Maggard re Terminating Trader efforts 210916,

Maggard re status 211104,

Maggard re 700 211221,

Manna Tree update WMT organic beef pgm sales progress 210702,

Mbazock Kelvin French Investment firm 140219,

Mbazock Kelvin 140220,

Montminy Les Allan re investors 200724,

Mubadala Capital UAE Investment 140624,

Mubadala Sullivan on FCPA violation 140715,

Multifunding initial hit 141215,

Multifunding Paul Avery initial contact 141215,

Multifunding Sullivan re referral to David Hughes 150130,

Multifunding Dan Krewson initial contact 150915,

MultiFunding referral Shepherd 161018,

MultiFunding referral Shepherd has target 161208,

MultiFunding referral Shepherd refs Lex 170120,

Multifunding re Whitestone Lex Gubsky Phil 170123,

Multifunding Shepherd Whitestone Gubsky email 170125,

Multifunding re eqpt loan 170126,

Multifunding Shepherd Intro Whitestone Lex Gubsky 170127,

Multifunding Whitestone Lex Gubsky term sheet deadline 170130,

Multifunding Conf call fup 170131,

Multifunding Whitestone Lex Gubsky confirms interest 170131,

Multifunding Whitestone Lex Gubsky casting doubt on other deals 170201,

Multifunding Shepherd Whitestone Gubsky update email 170206,

Multifunding re Utica eqpt leasing 170210,

Multifunding re broker fee on Utica eqpt leasing 170222,

Multifunding re Utica eqpt lease LOI 170222,

MultiFunding Shepherd Blackpool progress delay 170309,

Multifunding re Moore defame Whitestone Lex Gubsky 170310,

Multifunding Moore defame Whitestone Lex Gubsky 170311,

MultiFunding re Blackpool fail DD retainer needed 170323,

National Livestock cattle financing 170820,

Natnl Livestock re fin MO organic cattle 200817,

New World FL 170410,

New World FL 170428,

Newman 2014 Master DRF Completed 140424,

Newman AA NDA GNA Signed 140424,

Newman Gerald agreement via Inder Singh 140424,

Newman Gerald Inder Singh re Bridges not confirm orders 140425,

Newman re 2MM proof of concept 140425,

NGEN Grubstein re Organic beef pigs 210521,

NGEN and Correlation VCs 210522,

NGEN update 210604,

NGEN next round 210607,

NHIG Firm Insurance re payment bond 140821,

NHIG Songbird Niles re bond invoice nonpayment 140917,

NorthwestFCS Rayl re Lake County fin 210712,

NYC Investor Axial Conf Intro PWP Growth Schectman 151028,

NYC Investor from Axial Formanek 151027,

NYC Investor Seth investors 150818,

NYC Investor Seth re eqpt 150901,

NYC Investor Seth re eqpt detail 150911,

NYC Investor Seth re eqpt losn progress151001,

NYC Investor Seth proposal 151016,

NYC Investor Seth re Jabor and 300mm loan terms 151019,

NYC Investor Seth re fee waiver 151021,

NYC Investor Seth signed MARV capital agreement 151023,

NYC Investor Seth on status 160203,

NYC Investor Seth on equity investor  interest 160208,

NYC Investor Seth on closing 7MM investment 160219,

Oppy Vancouver BC broker re financing rqmts 170331,

Paine Schwartz contact 171116,

Painter TX earlier ref from WorldWide Fin 200730,

Painter TX on WCC collapse 200730,

Painter TX wants exclusivity also WWF cc on this email 200803,

Painter re Abdelsayed gty 200811,

Painter re Ibdelsayed gty 200811,

Painter TX re loan fail income 200825,

Painter re Galkin telcon 200831,

Painter re Korea finance 210115,

Painter re Lake County 550K need and WMT progress 210703,

Painter re Lake County 500k loan purpose 210705,

Paris I Bank interest 160712,

PDX Investor cold email on online article 170628,

PDX ref to Haladay 170706,

PE reaction1 to Big Sandy offer 210525,

PE reaction2 to Big Sandy offer 210525,

PE reaction3 to Big Sandy offer 210525,

PE reaction4 to Big Sandy offer 210525,

Perer Super G Funding 151020,

Pitch Deck to RAM WinnettOrganics Notes 160328,

PLM coop fin for beef 200821,

Pruska investor 161128,

Pruska investor 161129,

PWP update 160928,

RaboAg Kemp re Arlon Podzemny Perico 130203,

Rabo on Oliver Direct funding 160721,

Raboag Pitcher re Skaar review 170429,

Raboag Wilson TX 170531,

Rabo on organic fruits and veg mkt outllok 170822,

RAM initial meeting set 160325,

RAM private placement interest 160326,

RAM mtg sked 160330,

RAM Call Summary re financing strategy 160425,

RAM investor progress 160426,

RAM on Olin engagemeent ltr 160427,

RAM Olin update 160430,

RAM re sales POs 160430,

RAM re Maines 160503,

RAM call to update RAM progress 160505,

RAM contract redline draft 160509,

RAM update 160526,

RAM re progress and concerns 160527,

RAM re progress and sales lead 160604,

RAM re sales leads progress 160609,

RAM re accredited investors 160612,

RAM on financing progress 160629,

RAM inital referrer reconnect 160708,

RAM on CS sales mtg 160711,

RAM Olin Termination Notice 160718,

RAM inital referrer reconnect 160720,

RAM Olin Capital Accepts Termination 160722,

RAM re DD Clark Mckenzie 160809,

RAM temriantion no results 160907,

RAM continues work 160911,

RAM Investment Priorities 160911,

RAM connects Arpaio ACTS freedom farms 160913,

RAM on Hinson ACTS Freedom Farms 160914,

RAM re ground lease and beef investor iinterest 160914,

RAM re CS apptmt attempt 161027,

RAM CS reqmts 161028,

RAM CS 161103,

RAM CS stall 161108,

RAM stall family emergency 161109,

RAM conv produce fail 161121,

RAM on conv produce contractual issues 161205,

RAM re conv produce agents sales progress 161215,

RAM failure on conv produce and lack of notice 161221,

RAM litigation threat 170228,

RAM demand notice 170401,

RAM final demand 170401,

RAM on final demand from Sullivan 170406,

Resorce Land Holdings CO reconnect 180213,

Revolution VC Interest Hughes 160825,

Revolution VC Feedback Hughes 161019,

Revolution VC Feedback Hughes2 161019,

Richards Sarah DB Headhunter 080630,

Riverside re investment opptny 210607,

Riverside founder Kohl re investment opptny 210611,

Riverside Kohl CoCEO re financing turndown 210611,

RJ Capital Flynn re additional capital 200730,

RJ Capital Flynn re Lake County fin and DB prior WMT China
210714,

RJ Lumba CV 12.2012 121201,

RJ Lumba Starbucks Ramsey following day 121211,

RJ Lumba Ramsy Xmas Deutsche Bank Ibanker fup 121216,

RJ Lumba no response 130208,

Roth on S-1 160124,

Salm Ben Promissory Note 131204,

Seth MARV Capital xmit of PPM S1 151124,

Sherbrooke re LA organic mkt 140409,

Sherbrooke re sales backlog 140411,

Sole Source cold email hit 171219,

Sole Source feedback 171222,

Sole Source call 171226,

Sole Source NDA Double D feedyard 171227,

Sole Source Turner phenom news HEC etc 180105,

Sole Source TX feedyard options 180105,

Sole Source Turner mtg invite StRegis NYC 180108,

Sole Source Turner re NYC mtg 180108,

Sole Source mtg fup NYC 180109,

Sole Source mtg in NYC 180109, (see also LP Evidentiary Exhibits page 1074V entry 1/9/2018)

Sole Source Turner at mtg StRegis 180109,

Sole Source mtg results to Nickless 180110,

Sole Source 180111,

Sole Source update TX 180119,

Sole Source 180121,

Sole Source Check by outsider 180122,

Sole Source re WMT China added opptntys 180123,

Sole Source on string out 180125,

Sole Source hold cmu to Gearn 180126,

Sole Source repeat decline 180228,

Sole Source Turner on Big Sandy 210507,

Sole Source Turner on feed price sensitivity 210601,

SPAC Early Bird 170626,

SPAC Chardan 170627,

SPAC Chardan ref Loeb Nussbaum 170629,

SPAC Nussbaum Loeb atty 170629,

SPAC Nussbaum Loeb appt reset to 170711,

SPAC Chardan mtg fup 170712,

SPAC EB mtg fup 170712,

Summit Partners on Skaar 170511,

Summit on CO feedyard 171223,

Summit connects NBH Ag bank 180111,

Summit re distressed deal E-6 feedyard 180215,

Summit on E6 distress sale 180223,

Summit own capital must have 180228,

Trinity AZ expression of interest 160930,

Trinity re AltaVista 161014,

Trust Capital re bridge loan 210719,

Turner on Feedyards and Deloitte Earnings review 180111,

Turner re TX feedyards status 180121,

UFIG Loan conf call 141107,

UFIG LOI Adding Eqpt to Loan Amt 150107,

UFIG Fin Inquiry Land for Stock Kingman Rhodes 160216,

US Capital Partners Ritter 150409,

VC Legendary 210115,

VC in-house fake pitch Blumberg 210817,

VC in-house fake pitch Mayfield 210817,

VC Mayfield 210817,

VC Blumberg 210818,

VC Mayfield feedback 210818,

Vendome Bond  re financing interest 130513,

VII Capital reply 210506,

Vision AZ re Lake County fin 210709,

Vision AZ re Lake County fin 210728,

Vision AZ re Lake County fin 210813,

Warren John intial hit 140827,

Warren John London 150403,

WHoyle Fee Agreement Signed 140221,

Winters Referral from Wyly 111101,

Winters on Earnout 111123,

Winters on Fund Closing 120225,

Winters extends 120601,

Winters re set bridge loan appt time 130104,

WO Status Report Adamson PPM 150917,

WO Team re PPM S-1 processes 150921,

WO Grt Western Bk local takeover visit 151117,

WO Team on Jabor Funded on Time 151117,

WO Team re Jabor snag  151118,

WO Team on financings 151120,

WO Team on 179mm Financings 160101,

WO Status Financings 160121,

WO Financings deal status to team 160208,

WO Status Kingman Startup Financings 160209,

WO Status Report financings 160421,

WO Status re Oliver Term Sheet Verbal 160719,

WO Status Final Oliver Hyder present sked 160804,

WO Status Hyder Oliver rework 160818,

WO Status DD Fin Sales 160929,

WO Status Report on Hyder Oliver new pitch status 161006,

WO on WMT progress 161018,

WO Status financings 161103,

WO Status Financings WMT Kroger 161115,

WO Org Chart 170111,

WO Blitch re Stockton Hill Famr tour w Blackpool 170203,

WO Smith CFO re Revolution VC pass 170203,

WO Team re Blackppol to fund 170301,

WO Team re Blackpool no reply stringout 170309,

WO Team re Blackpool deadline miss 170310,

WO Status Report DD retainer need 170320,

WO also Cardone on Status WMT others 170403,

WO Status Report Skaar Investor Interest 170515,

WO Team on DD Funding Skaar Acq Date 170615,

WO Status Report Skaar nothing from Alberts 170706,

WO Status Report re DD potential investors 170713,

WO Status Report Banco Advisors busted mtg 171101,

WO Status Report re Banco ND Investors Skaar WMT 171116,

WO Status Report new investors Banco ND pass 171118,

WO Status Report re WMT China Sole Source 180104,

Wyly re Winters Delay Response 111114,

Wyly re bridge need Blackpool 120921,

Wyly early contact 130716,

YieldStreet re Lake County fin 210711,

Zayid email cc Hewitt London 121008,

Zayid Hewitt re Investor Zayid 121008,

Zayid email re funds transfer 121014,

Zayid Corp JV Agreement 121018,

Zayid Signed Subscription Agreement Cancelled 121018,

Zayid Inv Banco Santander App 121115,

Zayid FIRST AMENDMENT TO JV 140220,

Zayid on attny funding request 140227,

Zayid re BofA checking account number 140228,

Zayid Attorney Tawfeek Chaing re fee 140301,

Zayid re Malaysian Attny Not Confirmed 140305.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 1074T-1074V, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

F. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

  H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-19**

**Commercial**

**Frauds:**

**Fraudulent**

**Financings**

**and Litigation**

  A. Defendant Reginald McGaugh, acting as a Defendant agent, officer, or confidential informant, and part of this on-going conspiracy, represents himself and his firm, Defendant Cornhusker Capital, as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role during 2019 in a complex sales, production, operations, and financing scheme to deprive Lead

**-Cornhusker, Auctus**   Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

      B. This color of law swindle requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, swindles and pattern of racketeering acts. Lead Plaintiff recollects the $2,500 retainer required by Cornhusker is delivered directly from investor Dean T. Smith to Cornhusker and is counted as a portion of a loan from Smith to Winnett Perico. As frequently occurs in his interactions with Defendants, the Lead Plaintiff signs the agreement first and never receives a fully executed copy of the agreement, though the retainer is represented as received and acts required of Defendant under the agreement are represented as being conducted in good faith through communications between the Lead Plaintiff and the Defendant(s) as counterparty. But there are absolutely no tangible results as usual. See LP Evidentiary Exhibits pages 10119-10124, 10125, 10158-10164. Relevant emails are currently blocked as this Complaint is being prepared.

      C. Further, Defendants are ostensibly conducting litigation in Cook County, IL between Defendant Auctus and Defendant Cornhusker for client poaching by Cornhusker of Lead Plaintiff's company, Winnett Perico, from Auctus. This requires extensive efforts to comply with a Cook County, IL court subpoena served on the Lead Plaintiff and his company, to spy upon and

consume time and resources in this color of law fraud. See LP Evidentiary Exhibits pages 10126-10131, 10158-10163.

D. This is a variation on the usual direct litigation theme Defendants use frequently when attempting to run up expenses and reduce cash flow to plaintiffs of this class. Defendants also attempted this specific approach in the Tower Books bankruptcy case around 2003, in an effort to arrange the Lead Plaintiff's potential avoidance of a lawful subpoena, which can lead to criminal charges for failure to appear and cooperate. And, of course, color of law discovery in "litigation" is an alternate method of spying without warrant.

E. This is an element of the now quite the familiar pattern of "sources and methods" used by Defendant police powers who violate the Fourth Amendment by alternate means, using pretexted email fraud and wire fraud under color of law to engage in illegal searches, later sanitized as legitimate searches developed through informants and so misrepresented to secure legally require warrants to support criminal prosecutions, which themselves are not necessarily based in reasonable suspicion, but rather on targeting and headhunting specific individuals and entities, as they have repeatedly engaged against the rights and interests of Lead Plaintiff.

F. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4 through 12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179;

LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

       G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's

right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-20 Commercial Frauds: Fraudulent Financings, Online Platform**

A. WeFunder and its officer and employees, through the various entities legally named above, whether acting on its own behalf or as spoofed by other Defendants with police powers representing themselves as WeFunder personnel and as the actual website while acting as a Defendant agent, officer, and as part of this on-going conspiracy, represent themselves, their firm, and their web platform as capable of and sincerely interested in, securing financing on behalf of Lead Plaintiff's entities, thereby coordinating with and playing an on-going role in 2021 in a complex sales, production, operations, and financing scheme to deprive Lead Plaintiff and his related entities of authentic opportunities to engage interstate commerce.

B. This series of frauds and swindles requires and consumes the time and financial resources of Lead Plaintiff and his business entities in the bad faith perpetuation of Defendants' long-running schemes, frauds, and swindles. Among their bad faith acts are the refusal to permit the level of return to individual investors proposed for the offering by the Lead Plaintiff; and their

role in knowingly recommending an auditor who, after gathering key financial information on their behalf from Lead Plaintiff's company, refuses to issue any form of the professional auditor Opinion letter required to complete the financial statements, so the fund raising process could be undertaken as planned in conformance with SEC Regulation A+. This scenario plays out almost identically to Defendants' previous frauds and swindles in subcount C-8 undertaken by Defendant Adamson Brothers.

  C. This pattern of practice repeats prior fraudulent acts of Defendants and effectively kills any possibility of this public financing, thereby, once again, sustaining control of Lead Plaintiff while interfering in interstate commerce.

  D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

   WeFunder Maggard as sponsor 210719,

   WeFunder Solicitation fup example 1of55 sent 210719,

   WeFunder Maggard re 2k 210720,

WeFunder LaBelle re mandatory signup to vouch 210803,

WeFunder GAAP Acctnt Cheng 210902,

WeFunder start sequence 210903,

WeFunder GAAP Acctnt Cheng Delays 210907,

WeFunder re Cheng auditor delay 210908,

WeFunder GAAP Acctnt Cheng 210909,

WeFunder GAAP Acctnt refuses Opinion 210909.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, Interline Exhibits 4-12, Table 2-0039, 2-0047, 2-0053, 2-0054, 2-0059, 2-0171, 2-0173, 2-0179; and LP Evidentiary Exhibits pages 1-10, 11-139, 140-189, 380, 382, 383-384, 386, 398, 420, 430, 431, 440, 463, 566, 754-765,767-768, 8370, 8371-8373, 8378, 8411, 8454-8467, 8472-8473, 8507-8514, 8563-8564, 8565-8626,  8627-8714, 8939-8955, 9053-9059, 9271-9272, 9281-9283, 9312-9313, 9314-9318, 9328-9337, 9394-9401, 9642, 9645, 9646-9647, 9653, 9902, 9905, 9907,  9917, 9923, 9925, 9926, 9997, 10004, 10005, 10011, 10021, 10027 second line, 10028 second line, 10157, 10164, 10165-10171, 10108-10118, 10138-10156. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-2 through C-20.

F. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-21**

**Commercial**

**Frauds:**

**Fraudulent**

**Sales Leads**

A. Lead Plaintiff's co-owned consulting company, Allegent LLC dba Performa, funds travel and other expenses in 2002-2004 to call upon and submit consulting services proposals to numerous Defendant Technology Sales Leads fake sales opportunities across the United States from California to New York to Florida and many states in between. These fraudulent sales calls

typically occur in otherwise empty offices, plants, and warehouses, and require travel, printing, and mailing expenses to respond to fraudulent and non-existent consulting project opportunities presented by Defendants. Performa spends well over $10,000 for travel, proposal preparation, office overhead expenses, and provides below market compensation to Lead Plaintiff and his "insider" partner using their own and borrowed funds. Unknown to Lead Plaintiff at the time, his "partner" is actually directly associated with Defendants in this "partner" role and his prior roles while employed with Defendant to various predecessor firms (including cover operations). See Complaint Table 2-0107, 2-0120, 2-0135, 2-0141, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126; pages 6085, 8290.

B. Other evidence is currently inaccessible to Lead Plaintiff but is available on discovery on a computer hard drive image shared with the Defendant known as William Drumm while General Manager of Establish for North America, unless destroyed by Defendants in the meantime to obstruct litigation and justice.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline Exhibit 12, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290,  8379, 9068-9078, 9093,  9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-

9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9839, 9840, 9890-9896, 9897-9901, 9926, 9984, 9985, 9989, 9997, 10000, 10002, 10004, 10007, 10014, 10015, 10017, 10023, 10332, 10333, 10355.

. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal

Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator

Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-22**

**Commercial**

**Frauds:**

**Fraudulent**

**Sales Lead**

**Solicitation**

**Services**

A. Defendants fraudulently fail to or prevent the distribution of email correspondence services purchased from Exact Data, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity. This list and related services are purchased to solicit grocery industry executives or retail customers, and, as usual, accomplishes no legitimate sales solicitations or results due to Defendants' frauds. Other such services were also purchased from various online services and also accomplished no authentic results. This specific $1065 expenditure in interstate commerce is shown at LP Evidentiary Exhibits page 10017.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

SBI Team Startup Sequencing Plan 210808,

SBI Team on further web slowness ABT sales 210910.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 371 (13) and (14) Interline Exhibit 12, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290,  8379, 9068-9078, 9093,  9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391,  9392-9293, 9406-9534,  9538, 9539-9545, 9547, 9548-9561, 9568-9572,  9573-9591, 9839, 9840, 9890-9896, 9897-9901. 9926, 9984, 9985, 9989, 9997, 10000, 10002,  10004, 10007, 10014, 10015, 10017, 10023. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and trafick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free

exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services**

A. Defendants fraudulently fail to or prevent the distribution of email correspondence services purchased from EGM, a marketing list and email deployment service, by a Lead Plaintiff owned and managed entity which are purchased to solicit grocery industry executives or retail customers, and, as usual, accomplishes no legitimate sales solicitations or results due to Defendants' frauds. Other such services were also purchased from various online services and also accomplished no authentic results. This specific $4342 set of expenditures in interstate commerce is shown at LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; 10000, 10002, 10014, 10015.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page

number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the

following:

> Manner Influencer Contract 210901,
>
> Manner Influencer Status 210909,
>
> Manner Influencer re web progress status 210910,
>
> Manner Influencer Hold 211101,
>
> Perimeter Sales Mktg re brokered LA regional mkt coverage 140408.

C. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline

Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129;

pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290, 8379, 9068-

9078, 9093, 9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-

9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293,

9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591,

9839, 9840, 9890-9896, 9897-9901, 9926, 9984, 9985, 9989, 9997, 10000,

10002, 10004, 10007, 10014, 10015, 10017, 10023. While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, C-21 through C-28.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and trafffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-24**
**Commercial**
**Frauds:**
**Fraudulent**
**Sales Lead**

A. Defendant TradeKey, a Pakistan domiciled company, conspires with other Defendants to provide fraudulent contracted sales leads, and submit false sales lead progress reports using wire fraud and contract fraud. This swindle is an element of the pattern of racketeering act against Lead Plaintiff and his business entities to strip financial resources and authentic international sales

**Development**   opportunities of the company, perpetuating Defendants' control and trafficking

**Services**   of Lead Plaintiff in involuntary servitude, forced labor, and other violations of

rights under law and ratified international treaties having force of law at all

levels of government in the United States.. These fraudulent services cost the

company $6,000 and nearly two years lost for legitimate sales opportunities.

See LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; 8290,

9219-9222, 9241-9248, 9275-9276, 9300-9306, 9307-9310, 9340-9391, 9406-

9534, 9926, 9984, 9989, 9997, 10004, 10007.

   B. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline

Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129;

pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290, 8379, 9068-

9078, 9093, 9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-

9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293,

9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591,

9839, 9840, 9890-9896, 9897-9901. 9926, 9984, 9985, 9989, 9997, 10000,

10002, 10004, 10007, 10014, 10015, 10017, 10023. While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, C-21 through C-28.

C. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-25 Commercial Frauds: Fraudulent Sales Lead**

A. Weblink, domiciled in India, initiates useless web services development in lieu of the actual sales lead development services requested by Winnett Perico, and $639 is expended before the improperly provided services are cancelled. See LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; 9985, 10023.

**Development**
**Services**

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290,  8379, 9068-9078, 9093,  9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391,  9392-9293, 9406-9534,  9538, 9539-9545, 9547, 9548-9561, 9568-9572,  9573-9591, 9839, 9840, 9890-9896, 9897-9901. 9926, 9984, 9985, 9989, 9997, 10000, 10002,  10004, 10007, 10014, 10015, 10017, 10023. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

C. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free

exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-26 Commercial Frauds: Fraudulent Sales Opportunities, International**

A. Fake international sales and sourcing opportunities in the Middle East, China, southeast Asia, Australia, South America, Russia, United Kingdom, and various countries throughout Europe, involve several Defendants posing as international traders between 2018 and 2022 including, without limitation Defendants named legally above in the Complaint caption and known here by their common names Assure Group International, ABT Trading, DC International, Todd Craft, Leverstone, Tradeimpex, and Tradimpex. Defendants provide fraudulent international sales leads and fruadulent sourcing opportunities, using wire fraud and contract fraud. These fraudulent services cost Lead Plaintiff owned and managed business entities extensive time and resources, and result in lost time and business development options for legitimate sales opportunities. See LP Evidentiary Exhibits pages

140-189 paragraph 125-126; 9260, 9547, 9548-9561, 9568-9572, 9840, 9890-9896, 9897-9901.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

ABT inquiry 200731,

ABT Pork 6 way China 201008,

ABT Pork 6 way China Referral Contract 201008,

ABT Pork 6 Way Referral 201008,

ABT FL Quote 210105,

ABT re Korea Angus pgm 210118,

ABT FL Quote 210123,

ABT re Euro price quote request 210428,

ABT China Utility Grade 210610,

ABT re deboning labor costs and pricing 210613,

ABT quote request for Houston TX delivery 210616,

ABT re WhatsApp and Houston 210626,

ABT Partner re China quotes 210902,

ABT Partner re Freelancer label delay 210907,

ABT re Lan Zhou ICPO LOI-FM-210913,

ABT re pending contract 210914,

ABT sends Lan Zhou ICPO-FB4-LZ-210914,

ABT re further deadline extension request 210915,

ABT re termination 210915,

ABT Trader Liu Intl Termination 210916,

ABT quote request 211223,

AGI pork heads 200916,

AGI Uruguay beef sale 210414,

AGI RFQ non-GMO soybeans 210421,

AGI nonGMO Soybeans 210527,

AGI non-GMO soybean supplier quote reply to SBI 210528,

AGI non GMO soybeans 210531,

AGI beef utility wrapped qtrs 210714,

AGI re Q421 pricing 211017,

AGI Trader quote request 211227,

AGI coal handling inquiry 220622,

AGI Quote Request 220701,

AGI SBI unable to reply AGI disappears 220701,

BR Packer Quote Request FOB Indonesia 210203,

BRF China re contact info for RMC China rep 210125,

BRF Brazil re pymt terms for new customers 210127,

BRF Quote Authentication Request 210127,

Caviness CS Cattle re finishing contrct potential 200901,

Caviness on plant availability for slaughter pending order 210617,

Caviness re salughter availability 210915,

Cho Trader 200911,

Cho Trader re pricing 210104,

Craft sourcing agent and network on pork products 201014,

Craft re bogus chicken part ref photos and doc set 210123,

Craft re bogus chicken part ref photos and doc set2 210123,

Craft re bogus supply network 210127,

Craft re bogus suppliers prev provided 210128,

Craft re quote request 210227,

DC International Daleuski re Kumin intro 200902,

DC Intl Intro Kumin Galkin 200902,

DC Intl re export mkt dev 201214,

DC Intl re export pgm 201214,

DC International Daleuski re pricing 201221,

DC Intl re Korea Angus pricing 210118,

DC Intl Beef Pricing Quote 210203,

DC Intl beef quote request 210712,

DC International Daleuski re pricing 211020,

DC Intl pricing avail ability 211020,

G3 Vancouver BC Terminal Transit for AGI Quote Request 211130,

Manning Beef CA quote request 210226,

Manning Beef CA quote request reply 210302,

Manning re contracts in process 210330,

Manning China case ready 210405,

Manning Beef re slaughter avialability 210914,

Mercaimpex ES initial hit180301,

Sadia BR re quote request 210124,

Tradeimpex fup prior Insight Network domicile 180301,

Tradeimpex re Madrid air frieght 180301,

Tradeimpex re Madrid air frieght differential 180302,

Tradekey intro 170825,

Tradimpex BR re retail prepack 210319,

Tradimpex BR re quote 210325,

Tradimpex BR re case ready retail prepack 210406,

Tradimpex BR re China beef quotes 210423,

Tradimpex BR soybean availability 210423,

Tradimpex re prices quotes and competitiveness 210521.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290, 8379, 9068-9078, 9093, 9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9839, 9840, 9890-9896, 9897-9901. 9926, 9984, 9985, 9989, 9997, 10000, 10002, 10004, 10007, 10014, 10015, 10017, 10023. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

      D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's

right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-27**

**Commercial**

**Frauds:**

**Fraudulent**

**Sales**

**Opportunities**

**, Domestic**

A. Lead Plaintiff expends company and personal funds to prepare sales materials, develop sales leads, and secure sales for various entities he owns, controls, and manages as a result of Defendants' fraudulent sales opportunities from 1985-1993, and from 2002-2005, and from 2015 to 2022. While the records documenting this travel, and other direct and overhead expenses, and the related loss of sales revenue and personal income are not currently accessible to Lead Plaintiff, and are controlled or maintained by Defendants, all these instances of interstate travel require expenditures of personal and company funds and are the subject of future discovery in this case.

B. Initial entrepreneurial efforts began in late 1983 with the personal expenditure of hundreds of hours and about $4,000 of Lead Plaintiff's personal funds invested in software development for a hotel industry scheduling system, which is purposefully rejected by an agent of Defendant United States posing as the CFO of Westin Hotels in the Westin Corporate Headquarters in Seattle, WA. This meeting and rejection occur a few months after the Seattle Westin

cost reduction project, developed and managed by Lead Plaintiff, is completed. This innovative first of its kind services industry software system, similar to those now broadly used in services industries such as hotels, banks, and retail stores to control labor costs and manage customer service levels, is declined, unknown to Lead Plaintiff at the time, to sustain the trafficking, involuntary servitude, and forced labor of the Lead Plaintiff by Defendant United States.

C. Defendants collectively engage in contributing to this conspiracy through the use of their facilities, websites, personnel, email addresses, and other means to conspire in and facilitate these extended series' of constructive frauds which are intended to perpetuate, deprive, and entrap Lead Plaintiff while starving his various enterprises of legitimate commercial opportunities to engage in interstate commerce. These Defendant commercial business entities as legally named elsewhere in this Complaint include, without limitation, the twenty-four named Defendant entities commonly known as Walmart and Walmart China, Bentonville, AR; Kroger, Cincinnati and Blue Vine, OH; Alberts Organics, Los Angeles ,CA; Costco, Issaquah, WA; Vendorco, San Diego, CA; various Defendant Skaar Livestock and related entities, Lewistown, ID; BDO, Salt Lake City, UT; Bay State Milling, Boston, MA; Briggs & Stratton, Wauwatosa, WI; Badger Meter, Milwaukee, WI; Raynor Garage Door, Dixon, IL; First Alert, Aurora, IL; Borg Warner, Muncie, IN; Adtran, Huntsville, AL; Western Digital, San Jose, CA; currently unidentifiable grocery wholesaler in the midwestern states; Orange City Beef,

Orange City, IA; Bio-Lab, Lawrenceville, GA; Brightstar, Miami, FL; Rockwell Collins, Cedar Rapids, IA; Rocketdyne, Folsom, CA; Steel and Pipe Supply, Manhattan, KS; Samsonite, Denver, CO; Holland Group, Holland, MI; PPG, Pittsburgh, PA; Clipper Windpower, Cedar Rapids, IA and Carpinteria, CA; various Canadian firms with offices in Vancouver, British Columbia, Canada. Other co-conspirators will be identified through recovery of Lead Plaintiff's own records from Defendants as well as through Defendants' discovery disclosures. These Defendants conspire with and sustain, together with other known and as yet unknown Defendants, the abuses and violations of law and rights in this long-running conspiracy and pattern of racketeering acts and rights violations.

D. See Complaint Interline Exhibit 12, paragraph 321, Table 2-0107-0109, 2-0114, paragraphs 371 (13) and (14), LP Evidentiary Exhibits pages 140-189 paragraph 126; pages 427, 430, 463, 518, 616-618, 693, 1074T-1074V (including 10/18/2016, 11/9/2016, and 2/21/2017), 711-740, 8379, 9068-9078, 9093, 9193, 9194-9206, 9240, 9277, 9278-9279, 9280, 9392-9293, 9538, 9539-9545, 9547, 9573-9591.

E. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Alberts Organics first hit 140115,

Alberts buyer re free freight 140218,

Alberts Organics Argiros and Pres phone mtg 170516,

Alberts Organics as Customer 170516,

Alberts Organics as Customer 170517,

Alberts Organics as Customer 170619,

Alberts Reorg replace Pres 170707,

Annies General Mills Cross Marketing Discussion 210818,

Bay State Milling RFQ 220328,

Bridges re organic produce PNW and Costco sales 140410,

Bridges re production update 160922,

Costco Padilla on Craves 161110,

Costco initial review 170630,

Costco Huskey re China ofcs 210130,

Costco Huskey re China ofcs 210207,

Costco Huskey Update 210604,

Costco Huskey on organic beef 210616,

Costco Huskey re pricing organics 210617,

Costco GC reply to verficiation request 211102,

CrowdCow organic beef intro 210426,

DD re 5 yr plan to WMT 161231,

DD Callahan re lending DD name to WMT presentation 170126,

Earthbound Kodet re cust commitment and timing 140327,

EMN Europe Sales Network 180228,

EMN Euro unapproved 180301,

General Mills outreach re Annies 210806,

Hive re non-std product line 210914,

Kroger cold email initial hit 161005,

Kroger re mtg plan 161010,

Kroger re coming mtg 161107,

Kroger mtg contact info 161109,

Kroger mtg fup 161109,

Kroger Frys Avg Utilization Jose Merced 161221,

Kroger Demand Projection Merced 161223,

Kroger cust ltr request 170426,

Kroger re organic pork availability 210426,

Liu Markk re ICPO-FB4-LZ-210914,

Natural Grocers New Item Submission 210811,

NYC Ace Produce Hit 150724,

Pruska investor 161128,

Pruska investor 161129,

PWP update 160928,

RaboAg Kemp re Arlon Podzemny Perico 130203,

Rabo on Oliver Direct funding 160721,

Raboag Pitcher re Skaar review 170429,

Raboag Wilson TX 170531,

Rabo on organic fruits and veg mkt outllok 170822,

RAM initial meeting set 160325,

RAM re sales POs 160430,

RAM re Maines 160503,

RAM call to update RAM progress 160505,

RAM contract redline draft 160509,

RAM update 160526,

RAM re progress and concerns 160527,

RAM re progress and sales lead 160604,

RAM re sales leads progress 160609,

RAM inital referrer reconnect 160708,

RAM on CS sales mtg 160711,

RAM inital referrer reconnect 160720,

RAM Olin Capital Accepts Termination 160722,

RAM re DD Clark Mckenzie 160809,

RAM temriantion no results 160907,

RAM continues work 160911,

RAM re CS apptmt attempt 161027,

RAM CS reqmts 161028,

RAM CS 161103,

RAM CS stall 161108,

RAM conv produce fail 161121,

RAM on conv produce contractual issues 161205,

RAM re conv produce agents sales progress 161215,

RAM failure on conv produce and lack of notice 161221,

Safeway Rayburn decline 210614,

SBI Team on WMT mtg plan 210702,

Sirk re selling product 210115,

Smith sales intro call in AZ 160704,

Smith Triple Fresh Contact on Sales Prospects 160907,

Smith Triple Fresh passes setback on sales 160915,

Smith re WMT prior sales agents failures 161011,

Smith re avocdos sales hook and PACA 161102,

Whole Foods Weening organic beef decline 210610,

WMT initial hit on cold email 161002,

WMT fup Baldwin 161010,

WMT McCormick ref from Balwin 161011,

WMT sales news to WO team 161011,

WMT McCormick Webex 161014,

WMT McCormick call tomorrow email 161017,

WMT McCormick call fup 161018,

WMT McCormick call fup production volumes 161020,

WMT McCormick call 161109,

WMT McCormick re DD discussion 161114,

WMT McCormick resked and participant list 161114,

WMT McCormick call fup 161116,

WMT McCormick call fup 161118,

WMT McCormick re investors ibankers 161121,

WMT McCormick on contract outline 170108,

WMT McCormick Bentonville Mtg Attendees 170111,

WMT McCormick 170224 Bentonville mtg Present Draft 170123,

WMT McCormick email Bentonville Mtg Presentation 170123,

WMT McCormick Bentonville Mtg Attendees 170216,

WMT McCormick Bentonville Mtg Invite 170216,

WMT McCormick Bentonville Mtg Location 170216, (see also LP

Evidentiary Exhibits page 1074U, entry 2/21/2017)

WMT McCormick Bentonville mtg fup 170222,

WMT McCormick re post Bentonville Mtg Rev 170222,

WMT McCormick nonreply fup 170328,

WMT Baldwin re decision next week 170403,

WMT McCormick re mktg plans 170403,

WMT McCormick on price drop 170412,

WMT McCormick buyer contacts 170425,

WMT China Beef ref from McCormick 170703,

WMT connects China on beef 170703,

WMT China Zheng initial contact 170704,

WMT China Zheng merch support 170707,

WMT China Zheng ROM pricing 170708,

WMT China beef Higaki intro 170718,

WMT China beef Higaki pricing 170811,

WMT China Higaki price quote 170811,

WMT China Hgiaki Quotes Specs 170821,

WMT China Higaki adding WO factory id 170821,

WMT China Higaki request factory number add 170821,

WMT China Higaki quote fup 170822,

WMT China WO Status Report WMT China Beef 680 ton order 170921,

WMT Chna Higaki re WMT contract 170924,

WMT China Higaki re process steps 170926,

WMT China Preferred Freezer initial hit 170926,

WMT China Americold initial hit 170929,

WMT China Cargill contact punt 171002,

WMT China Higaki Executed WMT Contract 171010,

WMT China Update WO Team 171012,

WMT China Higaki China visit and update 171023,

WMT China Higaki re contract signature rqmt 171023,

WMT China Higaki re JBS Specs 171026,

WMT China Higaki on revised order pricing 171208,

WMT McCormick on China status 171220,

WMT China re labeling 180110,

WMT China xmit manually signed contract copies 180112,

WMT China order processing timeline 180115,

WMT China Higaki re sked 180116,

WMT China order timing Apr 180116,

WMT China Higaki re factory flow charts trial shipment 180122,

WMT China Higaki orig signed contracts sent 180123,

WMT China CA OWB Packers delay 180131,

WMT China Higaki intro of SCS process 180201,

WMT China Higaki re OWB approval 180201,

WMT China Higaki SCS 180201,

WMT China Hgiaki re Cargill Tyson on China 180202,

WMT China Higki re OWB SCS audit 180202,

WMT China OWB stringout 180206,

WMT China OWB stringout 180207,

WMT China OWB stringout 180214,

WMT China OWB stall 180223,

WMT China OWB stall continues 180223,

WMT China SamsClub China dragin 180227,

WMT China Higaki email sig page xmit 180228,

WMT China LiqCap AZ update 180228,

WMT China Petersen re signed contract evidence 180301,

WMT China re post OWB to JFO 180301,

WMT China JFO inquiry 180302,

WMT China re retail link 180302,

WMT China status on China 180302,

WMT China re local China ofcs 210130,

WMT China re China ofc and contact history 210202,

WMT China Liao re China ofc details 210204,

WMT China on packaged cuts 210222,

WMT China docs needed 210312,

WMT China Liao re new ofcs in China 210407,

WMT China re beef purchase embargo in China 210415,

WMT China SAmerica Quote 210422,

WMT China rejects BR Tradimpex case ready pricing 210426,

WMT China intro to RMC China rep Jason 210428,

WMT re US organic beef pgm 210605,

WMT Redfield on domestic organic beef 210607,

WMT Lehr Organic Beef Intro 210610,

WMT re organic beef partner pgm 210615,

WMT Lehr video mtg 210616,

WMT Lehr re comp organic price premiums on ther products 210617,

WMT Redfield cc Lehr video mtg 210617,

WMT Lehr alt sales ramp 210618,

WMT Lehr Baskin video mtg to come 210702,

WMT Hutchins mtg set 210713,

WMT Baskin Lehr call fup on pricing 210729,

WMT Baskin Lehr video call 210729,

WMT Partnering Zoom Call 210729,

WMT Baskin on pricing 210810,

WMT Baskin status inquiry 210816,

WMT Baskin pass 210818,

WMT Organic Beef pass 210818,

WMT Organic Beef pgm not established 210823,

WMT Baskin re pass pricing other issues 210824.

F. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 371(13)(14)Interline Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 1074T-1074V, 711-740, 8290,  8379, 9068-

9078, 9093, 9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9839, 9840, 9890-9896, 9897-9901, 9926, 9984, 9985, 9989, 9997, 10000, 10002, 10004, 10007, 10014, 10015, 10017, 10023. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These

violations of rights also serve to conceal the illegal acts of co-conspirator

Defendants, as they have from BRMT program inception, in approximately

1972, to the present.

**C-28**
**Commercial**
**Frauds:**
**Fraudulent**
**Sales and**
**Marketing**
**Representatio**
**n**

A. This pattern of sales lead development frauds and fraudulent lead

reports repeats yet again in 2019-2021 as conducted by Defendant RMC. RMC

is alleged to be a commercial trading operation domiciled in New York City,

with a dedicated agent allegedly operating from Shanghai, China to solicit

customers in China, with progress  as reported by that China-based sales agent.

Lead Plaintiff also assigns sustainment of Lead Plaintiff's business entity

Sheldon Beef's relationship with Walmart China so RMC can earn

commissions through that relationship. Defendant RMC provides fraudulent

sales leads and reports, facilitated by wire fraud and contract fraud. Defendant

RMC conspires with other Defendant for the fraudulent purpose of stripping

authentic international sales opportunities of Sheldon Beef. These fraudulent

services cost the company nearly two years lost for legitimate sales

opportunities.

B. See further evidence related to this subcount in LP Evidentiary

Exhibits emails. A compendium of key entities and individuals; and of selected

emails, documents, and disbursements listed in both date order and alphabetic

order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page

number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

RMC Lonergan re agent quals 200811,

RMC Lonergan Poon mtg 200812,

RMC Lonergan re contract 200812,

RMC Lonergan contract agreement 200813,

RMC Lonergan Poon collaboration agreed 200814,

RMC Lonergan re sales activity 200830,

RMC Lonergan re co-venture details 200831,

RMC Poon coventure orgzn options 200902,

RMC Lonergan 200903,

RMC Lonergan re pricing 200908,

RMC Lonergan re China Mktg 201207,

RMC Lonergan re Poon mktg direct support 201207,

RMC China direct mktg pgm 201230,

RMC Poon re BRF contact inside China 210126,

RMC re BRF info request 210128,

RMC Lonergan re Costco WMT on China ofc 210130,

RMC Poon on BRF China mtg results 210203,

RMC re China contract mod 210225,

RMC Lonergan on RMC sales strategy doc China 210226,

RMC Lonergan re Berkshire pork 210307,

RMC Lonergan re Berkshire cuts cherry picking 210311,

RMC Lonergan re China sales progress 210311,

RMC Lonergan Berkshire Trial Order Pricing 210312,

RMC Lonergan re Berkshire volumes 210312,

RMC Lonergan 210316,

RMC Lonergan sales prospect report 210316,

RMC Lonergan Yao Quote 210316,

RMC Lonergan China sales quotes 210326,

RMC re signed modified contract 210331,

RMC Lonergan beef sales quote 210413,

RMC China sales report 210430,

RMC Poon on Big Sandy investment potential 210507,

RMC Jason on WMT China Intro mtg 210511,

RMC Poon on status 210518,

RMC China pricing 210520,

RMC Jason on scam beef request 210525,

RMC China sales pgm conversion attempts reqd 210622,

RMC Jason re sales efforts 210628,

RMC Jason Sales Advice 210628,

RMC Jason Omasum No Quote 210703,

RMC Poon re status and future pymt opptnys 210731,

RMC Jason re status 210816,

RMC Poon re status 210816,

RMC re 60 day notice terminating 210902,

RMC Lonergan re repay advances 210903,

RMC payment plan request 210903,

RMC Poon re pricing guidleines 211015,

RMC Raymond re status 211220.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 321, 371 (13) and (14), Interline Exhibit 11, LP Evidentiary Exhibits pages 140-189 paragraphs 125-126, 129; pages 290, 427, 430, 463, 518, 616-618, 693, 711-740, 8290, 8379, 9068-9078, 9093, 9193, 9194-9206, 9219-9222, 9240, 9241-9248, 9260, 9275-9276, 9277, 9278-9279, 9280, 9300-9306, 9307-9310, 9340-9391, 9392-9293, 9406-9534, 9538, 9539-9545, 9547, 9548-9561, 9568-9572, 9573-9591, 9839, 9840, 9890-9896, 9897-9901. 9926, 9984, 9985, 9989, 9997, 10000, 10002, 10004, 10007, 10014, 10015, 10017, 10023. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-21 through C-28.

D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

   E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

      F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web**

      A. ENVOTEC, a website developer, located by Lead Plaintiff in Pakistan through a Defendant spoofed or otherwise controlled version of Freelancer.com and while acting or posing as its employees and contractors, is paid for web development services. Defendants, as an element of their on-going pattern of racketeering acts, never intend to allow these web development services to be completed and for this on-line store to be permitted to offer products for retail sale. This is a repeated instance of this type of fraud against an online store which was previously developed by Lead Plaintiff

himself to launch product sales to beef wholesalers and was the subject of a

launch meeting with fake employees Jason Waseman, Chris Canchola, and

Lori Alvarez in Avondale, AZ, as documented in other subcounts C-34 and C-

37 herein, as well as in email evidence stripped and/or currently inaccessible

as this Complaint is being written.

B. This fraud and swindle is an element of Defendants' on-going

conspiracy to sustain, among other offenses, involuntary servitude, forced

labor, and trafficking using repeated cycles of delay and financial starvation of

Lead Plaintiff's business entities, and used to further their intent to exhaust the

personal financial resources of Lead Plaintiff, who regularly invests personal

funds and extensive amounts of personal time and professional talent in each

of these entities. These expenditures in international commerce are shown at

LP Evidentiary Exhibits pages 10093, 10094. See also Complaint paragraph

371. See further evidence related to this subcount in LP Evidentiary Exhibits

emails. A compendium of key entities and individuals; and of selected emails,

documents, and disbursements listed in both date order and alphabetic order; is

at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found

at bottom of page). Relevant individual emails are listed below, alphabetically

by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary

Exhibits pages 1076-6094. Relevant emails include the following:

GPR website developer re feeedback 210814,

GPR Website stall 210819,

GPR Website product load begins 210820,

GPR website further delays 210824,

GPR Startup Plan Rev 210829,

GPR website closer but not functional 210903,

GPR website slides again 210907,

GPR website added dev fees 210909,

GPR web dev re project hold 211026,

GPR Web contacts zero response rate note 221117.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440,  473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612,  616-661, 642-643, 651-652, 770-771, 783, 8351-8352,  8370, 8371-8373, 8378, 8411, 8474, 8479,  8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona destinations and locations,  10176-10178, 10179-10186. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-29 through C-37.

D. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal**

A. Defendant Raymond Sullivan is introduced to Lead Plaintiff by a former commercial cover "investment banker" known as Charles Jackson. Defendant Sullivan is an international trade attorney and former federal Customs and Border Protection investigator. Defendant Sullivan bills entities owned and controlled by Lead Plaintiff approximately $400,000 for legal services between November 2013 and April 2021. He receives $10,000 paid for legal services from the funds invested by "Dean T. Smith" in August 2015 and continues his services billing at $600 per hour despite Winnett Perico's inability to pay as Winnett Perico and Lead Plaintiff are continually strapped for cash flow and being stripped of resources by Defendants' actions. See Complaint Table 2-0171, LP Evidentiary Exhibits pages 383-384, 430-438, 440, 8370, 8371-8373, 8474, 8378, 8411, 9249-9255, 9285, 9311, 9820.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Burges Salmon 1 re London Closing 140917,

Burges Salmon 1 re London Closing 140918,

Collins ref by Sullivan on Bridge Loan 150629,

Sullivan re Benibo fake 131202,

Sullivan Intro from Jackson 140219,

Sullivan on 140225 mtg 140226,

Sullivan re Zayid investment 140304,

Sullivan re Zayid as former Customs Investigator 140305,

Sullivan re Mubadala Commission reqmt and FCPA violation 140715,

Sullivan WO sends $10K 150828,

Sullivan appointed Corp Counsel 151110,

Sullivan on financings 160111,

Sullivan on financing lead from Castro 160206,

Sullivan on MARV Capital drop 160401,

Sullivan re Insight scam Argold, Brereton status 160419,

Sullivan re RAM Olin contract 160426,

Sullivan on Oliver Term Sheet to Contract 160707,

Sullivan on Akoto Brewer Fund creation 160710,

Sullivan on Akoto Brewer Fund creation 160727,

Sullivan Draft for Oliver Funding 160728,

Sullivan re Blackpool CAP 161128,

Sullivan re Arpaio Palmeri Gerlach Black Rock Farms 161220,

Sullivan Arpaio Palmeri Black Rock Farms Jack Palmeri 161222,

Sullivan re WMT Bentonville visit Feb 161229,

Sullivan re Smith 5K loan 170126,

Sullivan re Whitestone Lex Gubsky Moneywise  170126,

Sullivan Marvel re Black Rock Gerlach 170301,

Sullivan re Black Rock Marvel 26 Ranch reappears 170301,

Sullivan re Marvel Black Rock retainer review 170303,

Sullivan re pea harvester lease 170303,

Sullivan re RAM demand notice 170401,

Sullivan re prospective escrow lenders 170602,

Sullivan re CFO Smith termination 170608,

Sullian re FATCO re title for Skaar 170613,

Sullivan TX HEC feedyard contract 180118,

Sullivan review of E6 docs okay 180223,

Sullivan re sales contract review 200804,

Sullivan re Abdelsayed 2mm loan gty shares grant 200822,

Sullivan re RMC contract mod 26 Ranch sked 210225.

C. Upon knowledge and belief, Defendant Sullivan is fundamentally

detailed, as are prior attorneys referred by trusted sources to Lead Plaintiff and

used by his business entities, for the actual purpose of spying upon and sustaining functional control of Lead Plaintiff and his related business enterprises, and to interfere and surveil all contracts and business opportunities. These acts under color of law are another element of Defendants' overall scheme and pattern of frauds and racketeering acts used to perpetuate their trafficking, involuntary servitude, forced labor, and invasions of human autonomy and rights.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Interline Exhibit 4-12, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440,  473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612,  616-661, 642-643, 651-652, 770-771, 783, 8351-8352,  8370, 8371-8373, 8378, 8411, 8474, 8479,  8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona destinations and locations,  10176-10178, 10179-10186, 10528-10565, 10566-10603. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-29 through C-37.

E. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal**

A. Lead Plaintiff businesses and intertwined personal interests are repeatedly deprived of honest legal services at various law firms. This trail of attorneys who do no legal work for the corporate clients Lead Plaintiff owns or works for between 1986 and 2005 include: Lazersoft - Glen Garrison at Keller Rohrback;  Alliance Environmental Services - Robert Hibbs AT Short Cressman & Burgess; CNA Industrial Engineering - Mike Babcock (also spouse of co-worker Gwen Heathcote at Deloitte Haskins and Sells); Allegent, LLC dba Performa - Michael Larson - Larson Hart & Shepherd, later Pivotal Law Group. Larson is introduced by Jay Conte, a federal commercial cover agent specializing in financial frauds, likely an FBI agent or IRS special agent.

Examples include:

1) The original bankruptcy case filed by two other individuals (Waters, Tarpley) and Lead Plaintiff against LazerSoft mysteriously results in absolutely no bankruptcy court actions or notices. With the benefit of hindsight, this is likely due to Hibbs' actual fraudulent failure to file this litigation while acting against Lead Plaintiff's personal interest in this matter.

2)  Extensive and expensive subsequent litigation includes a federal court hearing in the US District Court for Western Washington on the standing of Wembley in this matter in 1994 or 1995, in which the Court denies standing. The case is not resolved but yet another matter is allegedly filed, related to Waters' ownership of the software work product, adding more litigation expense. Waters reports a $30,000 overbilling by Short Cressman & Burgess lead attorney Robert Hibbs. Most likely this too is an inside job, with Lead Plaintiff's two remaining co-workers, Tarpley and Waters, actually operating as members of his minder team throughout the entire sequence.

3)  The $150,000 account receivable of a P.A.N. Environmental subsidiary is discounted with a commercial factor in southern California. These funds mysteriously disappear into the factor's bank, First Interstate Bank, after P.A.N.'s CEO promises to pay Lead Plaintiff compensation from that receivable, allegedly seized by the bank to repay an outstanding debt of the factor to the bank. P.A.N. CEO Cornwell declines to take immediate action to legally notify the bank of the actual provenance of the payment within seven days as required under California law to retain its ownership interest in the payment, so the Lead Plaintiff is once again strung out financially as the promise of legally due compensation being paid after another delay is broken yet again by the purposeful, deliberate, and conspiratorial acts of Defendants.

B. A comprehensive set of relevant pre-discovery evidence and
information which relates this subcount to other relevant subcounts includes,
without limitation, Complaint paragraphs 371, Interline Exhibit 4-12, Table 2-
0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits
pages 371, 383-384, 386, 427, 430-438, 440,  473, 474, 486, 544, 549, 566-
573, 575-576, 599, 602, 603, 609-612,  616-661, 642-643, 651-652, 770-771,
783, 8351-8352,  8370, 8371-8373, 8378, 8411, 8474, 8479,  8489-8506,
8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255, 9256-9259, 9285,
9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-
9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona
destinations and locations,  10176-10178, 10179-10186, 10445-10506, 10507-
10527, 10528-10566, 10566-10613. While all subcounts throughout this
Complaint are driven by Defendants' conspiracy to commit and comprise an
integrated pattern of racketeering acts, the most directly relevant subcounts
include, without limitation, C-29 through C-37.

C. Fraudulent corporate officers, employees, consultants, legal and
professional service providers were and are furnished without consent of the
Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff
access to alternative sources of qualified personnel, as elements of their
conspiracy to and pattern and practice of  acts depriving Lead Plaintiff and his
related entities of their right to pursue and benefit from commerce and
interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

      D. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

      E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-32**

**Commercial**

**Frauds:**

**Deprivation of**

**Honest**

**Professional**

**Services,**

**Maricopa**

**County, AZ**

A. Defendant Joseph Arpaio, as Sheriff of Maricopa County, Arizona, and as a private individual after his term in office expires, is instrumental in orchestrating his own introduction to Lead Plaintiff as Greg Crossgrove, an organic produce farming and packing expert with prior organic farming experience. Defendant Arpaio (as Greg Crossgrove) allegedly worked with Captiva Verde, an organic grower in California with a farm in Arizona funded by investors associated with the Vancouver Stock Exchange, in Vancouver, British Columbia, Canada. Mr. Crossgrove (Arpaio) also claims an association with the Nunes family agriculture operations in California through his brother as President of a Nunes family fresh produce enterprise. Notably, Representative Devin Nunes, closely aligned with President Trump and House Minority Leader Kevin McCarthy, chairs the House Intelligence Committee around this time.

B. Mr. Crossgrove (Arpaio) assists Lead Plaintiff with production methods, staffing, and locating investors. He introduces a fellow consultant, Ricky King, Double K Enterprises, who assists the Lead Plaintiff in identifying and touring an abandoned farming property in Hyder, Maricopa County. AZ, then currently leased by Barry Oliver, a wealthy investor. Arpaio (Crossgrove) also allegedly argues about production methods and costs with another Defendant police powers agent or officer, Mike Castro, after Castro is selected to become the VP Operations for WinnettOrganics, a Lead Plaintiff business entity.

C. Lead Plaintiff takes a copy of a signed $52 million investment agreement with a Qatari company with him to an October 2015 organic vegetable packing plant construction meeting at Willmeng Construction's otherwise empty headquarters building in Maricopa County and shows the signed document to Crossgrove (Defendant Sheriff Joseph Arpaio) sitting to his immediate left as they face the video conference screen at the other end of the conference room. See LP Evidentiary Exhibits pages 8489-8506.

D. Eventually, this fraud and swindle come crashing down, by design as usual, with the Lead Plaintiff having been run through another years-long sequence of false starts, false promises, and failures which begins in 2013 and continues with Arpaio's direct involvement from late 2014 and his periodic outreaches to sustain his involvement with Lead Plaintiff until a final email exchange on August 17, 2017, around the time of his conviction on criminal contempt charges about a week before he is pardoned by President Trump.

E. This years-long sequence includes numerous visits to Arizona by Lead Plaintiff for meetings and tours; for processing plant design meetings in Salinas, CA and Maricopa County, AZ;  to meet investors; to gather with fake employees; as well as sales trips to Walmart in Bentonville, AR, and Kroger in Cincinnati, OH; attendance at conferences and referrals by agents or officers posing as investment firms and their officers or employees in New York City; among other events. This elaborate and wildly expensive multi-jurisdiction, multi-level of government fraud and swindle by Defendants is completely

fabricated, systematically fraudulent, and involves thousands of emails, phone calls, and expenditures for travel, entertainment, proposals, samples, and mailings. It is a comparable sequence to those previously undertaken by Defendants to control and traffick the Lead Plaintiff since he began directly engaging as an "independent entrepreneur" in 1986, and it is a markedly similar process to his prior business and career experiences to 2005 and to the subsequent ten month stint in 2007 to 2008, the final employment and earned income permitted by Defendant United States and its co-conspirators.

F. See documentary and disbursements evidence which dates from December 2014 to August 2017 in Complaint Interline Exhibit 9, Table 2-0172, 2-0174, 2-0176, 2-0177, LP Evidentiary Exhibits at pages 383, 386, 427, 431, 602, 616, 632-635, 8351-8352, 8489-8506, 8813-8854, 8937-8938, 8956, 10132-10137, noting entries for Arizona destinations and locations.

G. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Arpaio Truitt inital hit connects to B Oliver 141108,

Arpaio Crossgrove first hit 141212,

Arpaio Crossgrove Persist Example 150707,

Arpaio from Brewer on startup plan 150810,

Arpaio intro Oliver 150902,

Arpaio on Project Progress Oliver 150906,

Arpaio on Plant Design Rqmts 150916,

Arpaio Castro Leases to do forgoteen during telcon 151007,

Arpaio availability 151014,

Arpaio tours Gerra Plug Power 151018,

Arpaio announces Captiva Salome Farm Availability 160210,

Arpaio on Oliver Hyder 160321,

Arpaio on involvement 160427,

Arpaio on greenhouses and financing arranged 160430,

Arpaio on lack of investor contact other updates 160505,

Arpaio King update 160511,

Arpaio on Oliver as poss investor 160513,

Arpaio on Oliver and Hyder layout 160520,

Arpaio on status and prior Captiva Verde involvement 160624,

Arpaio on Brother as Nunes exec 160627,

Arpaio on Oliver proposal 160703,

Arpaio on Oliver Term Sheet Clarification 160707,

Arpaio on Oliver Direct Funding 160721,

Arpaio on Proposed budget Oliver Hyder project 160729,

Arpaio on temp cooler Cowley Kodiak Produce PHX 160730,

Arpaio on Hyder Oliver per acre costs Castro 160801,

Arpaio info request 160805,

Arpaio on grow plan fin projections 160809,

Arpaio on Oliver deal collapse 160809,

Arpaio King re Hyder Oliver 160812,

Arpaio re Hyder Oliver resurrection 160813,

Arpaio on Oliver Hyder structure 160816,

Arpaio on Oliver Hyder 160819,

Arpaio on spring lettuce season 160819,

Arpaio on Oliver Hyder prep and Buckeye 160902,

Arpaio on acre reallocation 160906,

Arpaio on Oliver proposal and conv cropping 160911,

Arpaio connects RAM ACTS Freedom Famrs 160913,

Arpaio intro ACTS Freedom Farms 160913,

Arpaio on Oliver Hyder son objection 160913,

Arpaio ACTS Freedom Farms and Hinson 161005,

Arpaio on brother at Nunes and Sprouts open AZ 161008,

Arpaio CFO Smith re plan for Hyder Oliver presnetation 161026,

Arpaio on Oliver pitch date 161026,

Arpaio on Western Growers Assn Pricing 161027,

Arpaio CFO Smith re plan for Hyder Oliver presnetation 161102,

Arpaio re WMT Kroger 161215,

Arpaio on Gerlach NV 161216,

Arpaio refers Gerlach Black Rock 161216,

Arpaio re Sprouts 161230,

Arpaio re Sprouts Kroger Costco WMT 161230,

Arpaio Sheriff Term Ends 170101,

Arpaio ref grower shipper interest 170115,

Arpaio ref RWood Offer Letter 170115,

Arpaio on new VP Growing referred 170117,

Arpaio on Buckeye Greenhouses 170211,

Arpaio on Freedom Farms reconnect 170211,

Arpaio re phone appt avail 170216,

Arpaio on investor closing and startup 170303,

Arpaio re land avail and deadlines 170303,

Arpaio 170309,

Arpaio VP Grow comments 170309,

Arpaio as land rep announcement 170316,

Arpaio Prader Integrted Ag re Hyder Farms 170526,

Arpaio on status inquiry 170707,

Arpaio 170724,

Arpaio on land and mkt conditions 170724,

Arpaio 170817,

Arpaio Prader IntegratedAG AZ hangs in 180207,

Castro CA VP-Ops Intvw 150825,

Castro CA re Mota Dir Ops add 150901,

Castro introduces Gerlach to DB Arpaio 151106,

Castro re financings 151120,

Castro re Hyder Water Quality 151126,

Castro on Dole Gerlach 160125,

Castro on lettuce production detail 160214,

Castro on Kingman Farms status 160304,

Castro progress report 160427,

Castro re Hinson Lyle proposal via Arpaio 160513,

Castro on Aqua 4D saline water trmt 160608,

Castro re personnel rqmts 160705,

Castro re Aqua 4D Giora bkfst miss and Oliver mtg 160719,

Castro on Aqua4D in Oliver Hyder budget 160731,

Castro on budget format Oliver Hyder 160801,

Castro on resignation 160810,

Castro Separation Agreement 160811,

Castro Separation Agreement to Sullivan 160811,

Castro connection Aqua 4D Giliad email samples 161101

DD on Oliver Term Sheet 160711,

DD Callahan re engement ltr 160714,

DD Callahan re cancelled Oliver mtg 160812,

DD on Oliver Hyder resurrection 160824,

DD Hinson on production volumes 161106,

Indeed re Galkin start 200716,

Indeed Company recruiter Indeed 200828,

Indeed re Kumin Galkin starts 200828,

Indeed recruiter re status 201022,

King AZ Arpaio Ops Connection 150818,

Liberty EB-5 initial hit 141027,

Liberty Keller Carter mtg thanks 141103,

Liberty EB-5 WinnettOrganics LOI 11-12-14 141112,

Liberty Carter ref request services matrix request 141114,

Liberty re CADC TEA eligibility 150106,

Liberty backout excuse sent to UFIG 150505,

Liberty EB-5 LOI to WP 221105,

Liquid Capital AZ Gottesman initial hit 170928,

Liquid Capital AZ Gottesman signed app 171012,

Liquid Capital AZ Gottesman on underwriting info request 171012,

Liquid Capital AZ Gottesman underwriting info complete 171013,

Liquid Capital AZ Gottesman email DLC sample 171017,

Liquid Capital AZ Gottesman 171101 mtg request 171024,

Lyle Hinson re Buckeye Grnhses DC 161218,

Lyle re 350K Buckeye whse cooler 160818,

Oliver AZ mtg contact 150902,

Oliver re Hyder Lease 150928,

Oliver PHX Hyder Lease Sign 151004,

Oliver Hyder Eqpt Lease Dep Status 151215,

Oliver Hyder Funding update 151222,

Oliver on financings outstanding 160111,

Oliver Dole sales update 160123,

Oliver on financings status 160129,

Oliver on financings status 160208,

Oliver on financings status 160217,

Oliver on financings status 160223,

Oliver has poss investor interest 160226,

Oliver on financings status 160226,

Oliver on status 160322,

Oliver re Costamanga invest decsion postponed 160420,

Oliver update 160629,

Oliver Term Sheet Proposal 160705,

Oliver on Term Sheet Clarification 160707,

Oliver PHX mtg proposal 160713,

Oliver re mtg location Arpaio King Castro Smith 160714,

Oliver 160719 mtg preview email 160718,

Oliver Term Sht mtg update to Tarazewich 160719,

Oliver on Hyder Budget Cost Detail 160810,

Oliver on Hyder Deal Fail 160810,

Oliver resurrects Hyder 160812,

Oliver re Hyder Dev collateral 161103,

Oliver re Hyder Dev proposal 161103,

Oliver re Hyder Farm Dev Plan 161103,

RAM connects Arpaio ACTS freedom farms 160913,

RAM on Hinson ACTS Freedom Farms 160914,

Rose Jordan Recruiter Fee Agreement 150824,

Smith re Oliver Term Sheet 160707,

Smith re fine tuning on Oliver financial proposal 160720,

Smith re IT traceability budget add Oliver Hyder 160731,

Smith re Status Report Detail on Hyder Oliver et al 160818,

WMT initial hit on cold email 161002,

WMT fup Baldwin 161010,

WMT McCormick ref from Balwin 161011,

WMT sales news to WO team 161011,

WMT McCormick Webex 161014,

WMT McCormick call tomorrow email 161017,

WMT McCormick call fup 161018,

WMT McCormick call fup production volumes 161020,

WMT McCormick call 161109,

WMT McCormick re DD discussion 161114,

WMT McCormick resked and participant list 161114,

WMT McCormick call fup 161116,

WMT McCormick call fup 161118,

WMT McCormick re investors ibankers 161121,

WMT McCormick on contract outline 170108,

WMT McCormick Bentonville Mtg Attendees 170111,

WMT McCormick 170224 Bentonville mtg Present Draft 170123,

WMT McCormick email Bentonville Mtg Presentation 170123,

WMT McCormick Bentonville Mtg Attendees 170216,

WMT McCormick Bentonville Mtg Invite 170216,

WMT McCormick Bentonville Mtg Location 170216,

WMT McCormick Bentonville mtg fup 170222,

WMT McCormick re post Bentonville Mtg Rev 170222,

WMT McCormick nonreply fup 170328,

WMT Baldwin re decision next week 170403,

WMT McCormick re mktg plans 170403,

WMT McCormick on price drop 170412,

WMT McCormick buyer contacts 170425,

WMT China Beef ref from McCormick 170703,

WMT connects China on beef 170703,

WMT China Zheng initial contact 170704,

WMT China Zheng merch support 170707,

WMT China Zheng ROM pricing 170708,

Willmeng Jarvis Tom Contact Info 150808,

WO Intent to Proceed Brewer corp apt rental inquiry 150809,

WO Team Initial Mtg LAX 150914,

WO Plant Kickoff Salinas Mtg 150916,

WO Plant Willmeng ref from Sayre 150917,

WO Status Report Adamson PPM 150917,

WO Team re PPM S-1 processes 150921,

WO Plant Kickoff Salinas Mtg 150922,

WO Plant Willmeng contract draft 151012,

WO Plant Willmeng kickoff meet Oct 27 151019,

WO Plant Willmeng cost workup status 151021,

WO Status Report Jabor and Sales 151022,

WO Hyder Farm Castro on Oliver 151028,

WO Weekly Status Report reaction Petersen 151029,

WO Hyder Farm Terminal Estimate to Oliver 151030,

WO Sales Fresh Express Smith contact 151104,

WO Grt Western Bk local takeover visit 151117,

WO Team on Jabor Funded on Time 151117,

WO Team re Jabor snag  151118,

WO Team on financings 151120,

WP Paypal Acct Detail Sep-Dec 151231,

WO Team on 179mm Financings 160101,

WO Status Financings 160121,

WO Financings deal status to team 160208,

WO Status Kingman Startup Financings 160209,

WO Status Report financings 160421,

WO Status re Oliver Term Sheet Verbal 160719,

WO Status Final Oliver Hyder present sked 160804,

WO Status Hyder Oliver rework 160818,

WO Status DD Fin Sales 160929,

WO Status Report on Hyder Oliver new pitch status 161006,

WO on WMT progress 161018,

WO Status financings 161103,

WO Status Financings WMT Kroger 161115,

WO Status Kroger projection incl 161226,

WP Great Western 2016 DDA Account 161231,

WO Org Chart 170111,

WO Blitch re ofc space tour 170118,

WO Status Report Reed Wood join 170119,

WO Team re Gerlach soi tests 170201,

WO Blitch re Stockton Hill Famr tour w Blackpool 170203,

WO Smith CFO re Revolution VC pass 170203,

WO Status Rpt Stockton Hill Update 170209,

WO Status Rpt incl WMT status 170223,

WO Team re Blackppol to fund 170301,

WO Team re Blackpool no reply stringout 170309,

WO Team re Blackpool deadline miss 170310,

WO Status Report DD retainer need 170320,

WO also Cardone on Status WMT others 170403,

WO Team WMT dead Alb on track others 170404,

WO Status Skaar 170504,

WP Executive Summary Bus Plan 170507,

WO Status Report Skaar Investor Interest 170515,

WO Team Smith CFO Termination Notice 170612,

WO Team Smith CFO Termination 170613,

Zaharis re Cowley Kodiak Produce temp cooler space 170206.

H. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Interline Exhibits 4-12, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440,  473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612, 616-661, 642-643, 651-652, 770-771,

783, 1074T-1074V, 8351-8352,  8370, 8371-8373, 8378, 8411, 8474, 8479,

8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255,

9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820,

9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for

Arizona destinations and locations,  10176-10178, 10179-10186, 10445-

10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts

throughout this Complaint are driven by Defendants' conspiracy to commit

and comprise an integrated pattern of racketeering acts, the most directly

relevant subcounts include, without limitation, C-29 through C-37.

I. Fraudulent corporate officers, employees, consultants, legal and

professional service providers were and are furnished without consent of the

Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff

access to alternative sources of qualified personnel, as elements of their

conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his

related entities of their right to pursue and benefit from commerce and

interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls,

and/or manages.

J. Fraudulent commercial sales opportunities, and the business

necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

K. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

L. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters,**

A. Defendants with police powers hack and manipulate Lead Plaintiff's personal computer and the websites presented to Lead Plaintiff thereon. Defendants engage in repeated blocking of access to legitimate business recruiters, repeatedly substitute their own fraudulent executive recruiters and place fake employees in Lead Plaintiff owned and managed companies to arrange the hiring of Defendants' own screened-in personnel and confidential informants. Defendants also refer other professionals and firms as service providers for design and architectural services, and as suppliers, to supplant

**Various Positions**

legitimate suppliers of plant and equipment which are essential to meeting customer needs of the various businesses which Lead Plaintiff owns, controls, and/or manages.

B. This scenario repeats many times, including, for example, Defendant police powers agents, officers, or confidential informants Brad Kumin, domiciled in Houston, TX as a Sales and Marketing contractor slated to be Vice President, and Eric Galkin, domiciled in New York State, slated to be Director- Procurement, once permanent financing can be arranged. These and others are recruited through online job postings on spoofed websites, and by an Indeed.com online contract recruiter. These contractors and personnel continue the Defendants' pattern of racketeering acts while interfering in interstate commerce and engaging in on-going entrapment attempts and entangle the Lead Plaintiff in other investigations in local, state, and federal interstate jurisdiction.

C. These online frauds and swindles run from the first instance of Lead Plaintiff's use of a personal computer in the 1980s to the present for personal job hunts and for business recruiting as Lead Plaintiff primarily uses these online tools for this purpose and Defendants use wire fraud and email fraud, in both in-state and interstate commerce to manage the Lead Plaintiff by controlling his employment and destroy his private enterprises to perpetuate Lead Plaintiff's trafficking, involuntary servitude, and forced labor; and their violations of the Fourth, Thirteenth, and Fourteenth Amendments, and other

civil, Constitutional, and human rights under international law and ratified treaties. See Complaint paragraph 371, Table 2-0001, LP Evidentiary pages 371, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 603, 609-612, 770-771, 783, 8479, 9181, 9820, 10179-10186.

      D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

      Abdelsayed on market 200710,

      Abdelsayed re status 200724,

      Abdelsayed Painter re loan gty 200730,

      Abdelsayed on est start dates team 200821,

      Abdelsayed re loan gty 200821,

      Abdelsayed signs loan form 200822,

      Abdelsayed 201123,

      Abdelsayed and Waseman Covid DB no vax appt Bergen 210120,

      Abdelsayed re 26 Ranch 210219,

      Abdelsayed re status 210302,

Abdelsayed pg decline 210716,

Abdelsayed inquiry on status 211202,

Abdelsayed re cancel email address 220114,

Blitch re contract fertilizer packaging 170526

BReed email Offer Letter 170115,

BReed Offer Letter 170115,

BReed on Stockton Hill Farm Kingman 170129,

BReed on Stockton Hill Farm offer progress 170131,

BReed re Gila Bend lead 170131,

BReed re Stockton Hills tour 170209,

BReed refs VP Grow candidate 170210,

Canchola phone number change 200727,

Castro CA VP-Ops Intvw 150825,

Castro CA re Mota Dir Ops add 150901,

Castro introduces Gerlach to DB Arpaio 151106,

Castro re financings 151120,

Castro re Hyder Water Quality 151126,

Castro on Dole Gerlach 160125,

Castro on lettuce production detail 160214,

Castro on Kingman Farms status 160304,

Castro progress report 160427,

Castro re Hinson Lyle proposal via Arpaio 160513,

Castro on Aqua 4D saline water trmt 160608,

Castro re personnel rqmts 160705,

Castro re Aqua 4D Giora bkfst miss and Oliver mtg 160719,

Castro on Aqua4D in Oliver Hyder budget 160731,

Castro on budget format Oliver Hyder 160801,

Castro on resignation 160810,

Castro Separation Agreement 160811,

Castro Separation Agreement to Sullivan 160811,

Castro connection Aqua 4D Giliad email samples 161101

CFO Smith entrap attempt backdating 161016,

D Merck Stock Cert 3 121202,

Dooley Hook to EB-5 110922,

Galkin NYCDir Procuremnt 200824,

Galkin is vehicle for procurement contacts dump 200826,

Galkin fishing expedition and leave 200831,

Galkin Kumin on quote requests 200831,

Galkin re termination after source strip via Indeed 200924,

Gomez Dir Food Safety Intvw 150829,

Gomez refers Brereton Hamilton 160407,

Gomez re investor call request 160408,

Gomez re investor interest 160427,

Gomez on Costamanga mtg plan 160429,

Gomez update on CA investor progress 160506,

Gomez Costamanga mtg request 160508,

Gomez re new investor leads 160512,

Gomez investor update 160525,

Gomez re Japanese Inv Lead sales progress 160616,

Gomez update Kevin investor 160704,

Gomez re Costamanga mtg 170203,

Gomez re Brereton has organic cattle in TX 171228,

Hansen AgriPlacment Glandt refers Nickless 170710,

Kumin Ind Contr TX 200710,

Kumin re China Supplier Search 200710,

Kumin re China chicken price diff 200721,

Kumin sales and fulfillment options 200723,

Kumin TX re third party supplier 200724,

Kumin re ABT FL sales contract 200728,

Kumin re ABT pork 200728,

Kumin Craft re rferaal agrmt 200731,

Kumin Craft referral agrmt 200629 sent 200731,

Kumin re ABT 200801,

Kumin ABT 200802,

Kumin ABT pork inquiry 200803,

Kumin re Thomas Referral Contract and NCNDA  200930,

Kumin LOA announcement 201015,

Kumin re China mkt dev 201207,

Kumin takes LOA 210120,

Kumin re his status 210813,

Maggard TX re Abdelsayed 200722,

Maggard TX re Abdelsayed start date 200817,

Maggard TX status 201015,

Maggard re Korea Angus pgm etc 210118,

Maggard re 26 Ranch and Abdelsayed 210221,

Maggard on Abdelsayed positive connect 210222,

Maggard re Abdelsayed 210302,

Maggard re Abdelsayed to Egypt 210304,

Maggard on loan docs PFS need 210306,

Maggard re gty and PFS 210307,

Maggard re Big Sandy BAFO 210322,

Maggard re Big Sandy reprise 210505,

Maggard re investors and Big Sandy 210519,

Maggard re Lake County LOI 210701,

Maggard re Lake County 210702,

Maggard re 500k loan 210703,

Maggard enroute Lake County 210707,

Maggard re Lake County enroute 210707,

Maggard re Lake Copunty tour and plus minus issues 210709,

Maggard re Lake County and pers FICo improvement 210715,

Maggard re Lake County 210719,

Maggard Loan to DB improving FICO 210721,

Maggard re Lake County 3559 LOI 210721,

Maggard on Lake County Fin snags 210725,

Maggard on WMT Wagyu comp price and other status 210804,

Maggard re startup sequencing plan 210816,

Maggard re status web dev sales 210816,

Maggard re add subs WeFunder 210817,

Maggard re GAAP fin need 210818,

Maggard re mkt gap 210818,

Maggard 5k GPR loan 210826,

Maggard re 4500 loan recvd 210826,

Maggard Revised GPR Startup Plan 210830,

Maggard re DB overadvance 210901,

Maggard re loan not pursued 210903,

Maggard re 26k loan 210909,

Maggard re ICPO LOI-FM-LZ-210913,

Maggard re Terminating Trader efforts 210916,

Maggard re status 211104,

Maggard re 700 211221,

Nickless initial hits re 170803,

Nickless initial hits re Skaar 170803,

Nickless on status 170818,

Nickless sources a TX feedyard 171229,

Nickless re HEC Friona eqpt 180116,

Nickless re HEC price drop 180116,

Nickless re HEC LOI 180117,

Nickless on Rio Bravo fake finls 180213,

Nickless Ops re Galkin Procurement 200811,

Nickless Ops re Galkin Procurement contract 200811,

Nickless re Korea sales pgm 210116,

Nickless re Big Sandy 210217,

Nickless re Big Sandy Housing 210307,

Nickless on Lake County tour 210709,

Nickless re Intl Trader Termination 210917,

Paul Smith Resume 170308,

Poindexter VP Sales intvw Kingman later 150826,

Poindexter Kingman veg crops 151001,

Poindexter Kingman tour Jim Rhodes intro 151007,

Poindexter direct Rhodes re Kingman 151017,

Recruiter Connections Plus DeLeon Recruiter 150903,

Recruiter Connection Plus DeLeon ref Waseman 150911,

Recruiter Connections Plus DeLeon submits Waseman 150915,

Recruiter Connections LeBlond subord searches 150928,

Recruiter Connections Smith CFO subord 151117,

Recruiter Connections DeLeon on Waseman fee160229,

Recruiter Connections JBN  Contingency Fee Agrmt 160414,

Recruiter Connections JBN 160414,

Recruiter Connections DeLeon update Waseman 160513,

Recruiter Connections JBN 160513,

Recruiter Connections Plus DeLeon 160513,

Recruiter Connections DeLeon re Waseman start160627,

Recruiter Connections Plus DeLeon on Waseman fees 170307,

Recruiter Connections Agricareers 170615,

Recruiter Connections Glandt 170630,

Reed VP Ops intvw Lunch Tucson 150831,

Reed re Gerlach 170127,

Reed on Stockton Hill Farm Kingman 221028 170129,

Reed re Stockton Hill Status 170130,

Reed xmits Stockton Hill Rd LOI draft 170209,

Reed re Black Rock visit 170304,

Reed to Gomez on Bacak Rock Farm Maps Gerlach 170305,

Reed on Jiim Rhodes ppty 170311,

Reed on Rhodes Peacock Highlands 170313,

Reed Gerlach assessment 170315,

Reed Gerlach  Plan B  Memo UTAH 170320,

Reed re Gerlach Assessment 170320,

SBI first accesible email Canchola 200709

Tarazewich TX re VP Sales position 160420,

Tarazewich TX re RAM on Maines other progress 160503,

Tarazewich TX re Maines fail others in flux 160506,

Tarazewich TX refers ibanker 160527,

Tarazewich TX re financing progress 160616,

Tarazewich accepts alt employ 160706,

Tarazewich TX loan 2500 160725,

Tarazewich TX loan 2500 demand 170419,

WO Blitch re ofc space tour 170118,

WO Status Report Reed Wood join 170119,

WO Blitch re Stockton Hill Famr tour w Blackpool 170203,

WO Smith CFO re Revolution VC pass 170203.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371 (13) (14), Interline Exhibit 9, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440,  473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612,  616-661, 642-643, 651-652,

770-771, 783, 1074T-1074V, 8351-8352,  8370, 8371-8373, 8378, 8411, 8474, 8479,  8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona destinations and locations,  10176-10178, 10179-10186, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-29 through C-37.

F. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of  acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-34**

**Commercial**

**Frauds: Fake**

**Professional**

**Services,**

**Employees,**

**Recruiters,**

**Logistics**

A. Numerous Defendants' police powers agents, officers, and confidential informants posed as current or prospective employees of one of the Lead Plaintiff's commerce and interstate commerce business entities. Jason Waseman was the only individual who requested and accepted payroll direct deposits. Two payments are made through the ADP payroll service for payroll amounts and ADP fees deposits directly to Waseman's personal accounts by Lead Plaintiff managed Winnett Perico, headquartered in New Jersey to Waseman, then a resident of Arizona. See LP Evidentiary Exhibits pages 659-

661, 9256-9259, 9636-9637, 9639, 9727-9728, 9820, 9987, 9991-9993. Other fake employees and potential employees had stock and stock option grants, including most of those whose resumes are listed at LP Evidentiary pages 616-658, 9820. Note that several of these individuals also had military and/or international employment experiences, including in special operations, a recurrent theme among the individuals who were assigned to employment stints with the Lead Plaintiff by Defendant United States and other Defendants.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Recruiter Connections Plus DeLeon Recruiter 150903,

Recruiter Connection Plus DeLeon ref Waseman 150911,

Recruiter Connections Plus DeLeon submits Waseman 150915,

Recruiter Connections DeLeon on Waseman fee160229,

Recruiter Connections DeLeon update Waseman 160513,

Recruiter Connections Plus DeLeon 160513,

Recruiter Connections DeLeon re Waseman start160627,

Recruiter Connections Plus DeLeon on Waseman fees 170307,

Waseman re Tucson ofc tour 160604,

Waseman re intvw new VP Ops Bill Reed 170104,

Waseman re Stockton Hill Farm 170310,

Waseman re WMT China logistics and fulfillment process 170926,

Waseman history disappeared new email acct needed 210104,

Waseman Nickless re Korea sales pgm 210115,

Waseman ref request 210525,

Waseman ref request fup 210526,

Waseman checkin re WMT organic beef 210616,

Waseman re cold chain fulfillment 210830,

Waseman re cold chain launch timing 210830.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Interline Exhibit 9, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612, 616-661, 642-643, 651-652, 770-771, 783, 8351-8352, 8370, 8371-8373, 8378, 8411, 8474, 8479, 8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956, 9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona

destinations and locations,  10176-10178, 10179-10186, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-29 through C-37.

D. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of  acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-35**

**Commercial**

**Frauds: Fake**

**Professional**

**Services,**

**Employees,**

**Sales**

A. Peter LeBlond is recruited as Vice President of Sales and Marketing at WinnettOrganics, the organic fresh produce business entity managed by the Lead Plaintiff with planned operations in Maricopa County, AZ.. He vociferously requests and accepts two advances totaling $7500 and claims close relationships with senior executives at several large grocery retailers, then leaves before turning these commitments to sales contracts, depriving WinnettOrganics of his honest services while consuming financial resources. Discovery will show the Mr. LeBlond is another in the long series of carefully screened-in police power agents, officers, and confidential informants used to strip company financial resources, interfere with legitimate interstate commerce activities; and contribute to the company's financial destruction using mail fraud, wire fraud, and other frauds and swindles in conspiracy with

other WinnettOrganics team members, including Defendant Joseph Arpaio while Maricopa County Sheriff and individually thereafter until about the time of his federal conviction and Presidential pardon in 2017. See LP Evidentiary Exhibits pages 642-643, 8489-8506, 8715-8718, 8813-8854, 9920, 10179-10186.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

LeBlond CA VP Sales Intvw 150825,

LeBlond re Kroger connection 150910,

LeBlond sales update 150917,

LeBlond sales update 150928,

LeBlond 5K advance 150930,

LeBlond re 2500 advance 151117,

LeBlond re status 160525.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 371, Interline Exhibit 9, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612, 616-661, 642-643, 651-652, 770-771, 783, 8351-8352, 8370, 8371-8373, 8378, 8411, 8474, 8479, 8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956, 9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona destinations and locations, 10176-10178, 10179-10186, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-29 through C-37.

D. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

| | |
|---|---|
| **C-36** | A. Defendant police powers agent, officer, or confidential informant |
| **Commercial** | Dean Smith, President of Mountain Pacific Machinery in Portland, Oregon" |
| **Frauds: Fake** | introduces his brother, "Paul Smith, Boulder, Colorado" as a candidate for |

**Professional Services, Employees, CFO**

CFO of Winnett Perico. Paul is selected by Lead Plaintiff based upon his resume, a phone interview, and emails. Among the Defendants' police powers agents, officers, and confidential informants posing as current or prospective employees of one of the Lead Plaintiff's private interstate commerce business entities, Paul Smith is the only individual who requests back-dated stock options and delays signing the properly dated stock options offered for months. Back-dating is an illegal act and is an example of one more of the vast series of entrapment attempts by Defendants acting under the color of law without reasonable suspicion or any sound legal basis for their actions. See LP Evidentiary Exhibits pages 651-652, 10176-10178, 10179-10186.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

CFO Smith entrap attempt backdating 161016,

Smith CFO re Belli invoices 151105,

Smith CFO re Jabor confirms xfr BkTucson rejects 151113,

Smith CFO on avoiding expenditures 151119,

Smith CFO reports Castro determines Jabor is scam 151119,

Smith CFO Keiser re PPM wire xfr 151123,

Smith CFO re PPM Expert Fees Paid160103,

WO Smith CFO re Revolution VC pass 170203,

WO Team Smith CFO Termination Notice 170612,

WO Team Smith CFO Termination 170613.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Interline Exhibit 9, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612, 616-661, 642-643, 651-652, 770-771, 783, 8351-8352, 8370, 8371-8373, 8378, 8411, 8474, 8479, 8489-8506, 8715-8718, 8813-8854, 8937-8938, 8956, 9181, 9249-9255, 9256-9259, 9285, 9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona destinations and locations, 10176-10178, 10179-10186, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-4, C-27, C-29 through C-37.

D. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-37 Commercial Frauds: Fake Professional Services, Employees, Controller**

A. Lori Alvarez, an agent, officer, or confidential informant of Defendants posing as an accountant contractor and prospective employee of a Lead Plaintiff business entity is paid to attend an online store kickoff meeting in Avondale, Maricopa County, Arizona, for a web-based wholesale beef supply store, along with Chris Canchola and Jason Waseman, also scheduled to become business entity team members. Other Defendants will block access to the online store and block or fail to deliver email business solicitations for this store around this same time. See this $854 interstate payment to Alvarez, an Arizona resident by the Colorado organized and New Jersey domiciled business entity at LP Evidentiary Exhibits page 9649, 9651, 10013.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 371, Interline Exhibit 9, Table 2-0001, 2-0171, 2-0172, 2-0174, 2-0176, 2-0177, and LP Evidentiary Exhibits pages 371, 383-384, 386, 427, 430-438, 440, 473, 474, 486, 544, 549, 566-573, 575-576, 599, 602, 603, 609-612, 616-661, 642-643, 651-652, 770-771, 783, 8351-8352, 8370, 8371-8373, 8378, 8411, 8474, 8479, 8489-8506,

8715-8718, 8813-8854, 8937-8938, 8956,  9181, 9249-9255, 9256-9259, 9285,

9311, 9636-9637, 9639, 9649, 9651, 9727-9728, 9820, 9920, 9987, 9991-

9993, 10013, 10093, 10094, 10132-10137, noting entries for Arizona

destinations and locations,  10176-10178, 10179-10186, 10445-10506, 10507-

10527, 10528-10566, 10566-10613. While all subcounts throughout this

Complaint are driven by Defendants' conspiracy to commit and comprise an

integrated pattern of racketeering acts, the most directly relevant subcounts

include, without limitation, C-29 through C-37.

C. Fraudulent corporate officers, employees, consultants, legal and

professional service providers were and are furnished without consent of the

Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff

access to alternative sources of qualified personnel, as elements of their

conspiracy to and pattern and practice of  acts depriving Lead Plaintiff and his

related entities of their right to pursue and benefit from commerce and

interstate commerce. The overriding intent of Defendants, with regard to these

violations, was and continues to be, to consume the financial resources and

management time of Lead Plaintiff and the entities he legally owns, controls,

and/or manages.

D. Fraudulent commercial sales opportunities, and the business

necessity to expend time and financial resources to locate and secure

financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they

have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-38 Commercial Frauds: Fake Production Asset Purchase Options,**

A. Defendant United States and co-conspirator Defendants' frauds against the Lead Plaintiff repeatedly cause extensive time, effort, and expenses to be incurred for travel, office products, overhead, and staff expenses for professional services. These services are used to develop concepts, process designs, and conduct plant location analysis, equipment selection and design analyses, and architectural design requiring services, travel, and other expenses by Lead Plaintiff's companies and, at times, by legitimate prospective suppliers engaged in in-state and interstate commerce. Examples of these

**Professional**

**Services**

efforts and related expenses are shown at Complaint paragraph 321, LP Evidentiary Exhibits pages 368, 369, 449, 456-459, 509, 513, 537-540, 566, 598, 599, 601, 614, 772-773, 787, 1074T-1074V, 8518-8562, 8906-8936, 8957-9052, 9192, 9286-9299, 9831-9838, and at 10134-10137 noting Arizona destinations and locations therein.

   B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

   26 Ranch Clark re PPM stock swap 151016,

   26 Ranch Terms Marvel 160107,

   Artuso re plant design 200722,

   Artuso on plant progression 200901,

   Artuso update 210409,

   BDO SLC initial contact 170727,

   BDO SLC to DD NYC connection 170807,

   Belli intital hit 141217,

   Belli on payment 160304,

Belli on investor sales progress 160608,

Belli on status 160811,

Belli on organic mkt conditions 170802,

Belli on progress lack of 180117,

Big Sandy Ranch sub debt RFQ 210314,

Bretz Hutchins on HEC E6 Double D feedyards 180120,

Bretz re E6 proof of funds conflict w investor 180208,

Burges Salmon 1 re London Closing 140917,

Burges Salmon 1 re London Closing 140918,

Caviness CS Cattle re finishing contrct potential 200901,

Caviness on plant availability for slaughter pending order 210617,

Caviness re salughter availability 210915,

CCW Artuso on plant design 200722,

CCW Artuso Case Ready Plant email to 3rd party 200807,

CCW Atruso re engrng recommendation 200811,

CCW Artuso on plant progression 200901,

CCW Artuso on plant Dematic study 210114,

CCW Artruso update 210409,

CCW Artuso on Dematic study 211014,

Colliers re Dev prtnr IN plant 200819,

Colliers Powers check in 220118,

Cresa Realty Advisors AZ Office Search 180904,

Dallam Cty LOI Farm HULL LOI 0001 120809,

DD on WMT Swisslog 161230,

DD re 5 yr plan to WMT 161231,

DD Callahan re 170124 Swisslog mtg 170109,

DD Callahan re Swisslog mtg 170109,

DD Callahan re lending DD name to WMT presentation 170126,

DD Callahan re Swisslog mtg fup 170126,

DD re Rabo ID Skaar 170503,

DD Skaar Site Plan Barns Winnet  Site Opt 8 170509,

DD Transom re Skaar 170512,

DD on Skaar fert option 170513,

DD Skaar Barns Detail Site Opt 8 170523,

DD Fleming on DD Finl Model 170526,

DD Callahan re PE dilutive 170531,

DD on Skaar Organic Fertilizer Mkt Size 170531,

DD on Skaar Organic Fertilizer Plant Ops 170531,

DD on Skaar Organic Fertilizer Plant Concept Plan 170601,

DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604,

DD Skaar Site Plan 170605,

DD Skaar Site Plan Ammonia Recovery Manure 170605,

DD Skaar Organic Fertilizer Effectiveness 170607,

DD Skaar Organic Fertilizer Pricing 170607,

DD Skaar PE Investor Bid email 170607,

DD Skaar PE Investor Bid form 170607,

DD re Centerboard Housing Solution WO 170608,

DD WCC teaser draft 170608,

DD Skaar Organic Fertilizer Production Cost 170609,

DD Callahan re funding sked 170612,

DD Skaar Organic Fertilizer Advantages 170614,

DD WCC Pitch Deck Skaar etal 170614,

DD Callahan on DeSai 170616,

DD Skaar Biiding Process to Sanders 170616,

DD Callahan on Axial lead Chatham 170619,

DD Skaar Site Plan Mods 170619,

DD NGEN fake NYC investor 170622,

DD NYC Van Brakel 170622,

DD Callahan re AGIS NDA cmu not credible 170628,

DD Skaaar AgIS Boston 170628,

DD Skaar Advantage NDA 170628,

DD Skaar AgIS Boston 170628,

DD Callahan re Skaaar visit sked 170726,

DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,

DD Skaar BDO Auditor SLC Gordon 170804,

DD Skaar BDO Auditor SLC Gordon 170807,

DD NYC Callahan connects to BDO SLC 170808,

DD Skaar Callahan Update 170809,

DD LaBelle Teton County 240 Tour Pass 170810,

DD Skaar Cost per pound gain 170811,

DD Skaar LOI xmit 170811,

DD Skaar LOl signing 170821,

DD Skaar past contacts 170821,

DD Skaar Teton River Farm Feeney email 170822,

DD Skaar rcv Alt Offer 170828,

DD Skaar Teaser 170905,

DD Callahan re no progress 170906,

DD Skaar Site Plan Barns Winnet   Site Opt 8 170509,

DD Transom re Skaar 170512,

DD on Skaar fert option 170513,

DD Skaar Barns Detail Site Opt 8 170523,

DD Fleming on DD Finl Model 170526,

DD Callahan re PE dilutive 170531,

DD on Skaar Organic Fertilizer Mkt Size 170531,

DD on Skaar Organic Fertilizer Plant Ops 170531,

DD on Skaar Organic Fertilizer Plant Concept Plan 170601,

DD Skaar Royal Chem CAS numbers Contract Fert Pkg 170604,

DD Skaar Site Plan 170605,

DD Skaar Site Plan Ammonia Recovery Manure 170605,

DD Skaar Organic Fertilizer Effectiveness 170607,

DD Skaar Organic Fertilizer Pricing 170607,

DD Skaar PE Investor Bid email 170607,

DD Skaar PE Investor Bid form 170607,

DD re Centerboard Housing Solution WO 170608,

DD WCC teaser draft 170608,

DD Skaar Organic Fertilizer Production Cost 170609,

DD Callahan re funding sked 170612,

DD Skaar Organic Fertilizer Advantages 170614,

DD WCC Pitch Deck Skaar etal 170614,

DD Callahan on DeSai 170616,

DD Skaar Biiding Process to Sanders 170616,

DD Callahan on Axial lead Chatham 170619,

DD Skaar Site Plan Mods 170619,

DD NGEN fake NYC investor 170622,

DD NYC Van Brakel 170622,

DD Callahan re AGIS NDA cmu not credible 170628,

DD Skaaar AgIS Boston 170628,

DD Skaar Advantage NDA 170628,

DD Skaar AgIS Boston 170628,

DD Callahan re Skaaar visit sked 170726,

DD on HIG Capital Miami 170728,

DD Skaar site visit Sander 170728,

DD JJU - Winnett Cattle Target Tracker_8_4_17 170804,

DD Skaar BDO Auditor SLC Gordon 170804,

DD Skaar BDO Auditor SLC Gordon 170807,

DD NYC Callahan connects to BDO SLC 170808,

DD Skaar Callahan Update 170809,

DD LaBelle Teton County 240 Tour Pass 170810,

DD Skaar Cost per pound gain 170811,

DD Skaar LOI xmit 170811,

DD Skaar LOI signing 170821,

DD Skaar past contacts 170821,

DD Skaar Teton River Farm Feeney email 170822,

DD Skaar rcv Alt Offer 170828,

DD Skaar Teaser 170905,

DD Callahan re no progress 170906,

DD Skaar Sanders tours Frank Maughan BDO 170913,

DD Skaar Sander re Kritser 170921,

DD Skaar Sanders on revised structure 170929,

DD Skaar Sanders Update 171013,

DD Skaar Sanders re Kritser Friona Ind ExCEO call 171022,

DD Skaar WMT China ND Rep Sr Legislator Banco Advisors 171024,

DD Skaar Revised Buyout 171112,

Dematic Proposal to Waseman 161228,

Dematic 200720,

Dematic 200806,

Dematic2 200806,

Digested Organics WO Proposal 1 page DD 170531,

Digested Organic 1 pager 170601,

Digested Organic on processing cost per gallon 170609,

Digested Organic liq fert offering 171107,

Digested Organic liq fert offering referrals 171116,

Euro pig trailers 210427,

Feedex UAE Export Quotes ref from Phillips 201209,

Feedex Phillips update 210224,

Feeedex re their catalog our volumes 210312,

Feedex update 210420,

Feedex re organic dairy in Earth TX 210604,

Freelancer disappearance on Chinese beef label 210907,

Full Circle Compost Cody Witt Invoice 170331,

G3 Vancouver BC Terminal Transit for AGI Quote Request 211130,

Gearn Ibach on HEC feedyard 171231,

Gearn Ibach on state of HEC feedyard 180104,

Gearn Ibach Nickless re HEC design reconfig 180118,

Gearn Ibach HEC design discusssion 180119,

Gearn Ibach re halt work as HEC gone 180126,

Google Ads circular response to initial ban info request 210805,

Hartman re Gross organic mkt research inquiry 210520,

Hartman re refs and experience 210525,

Hartman Group re Organic Mktg Study for Gross Mark 210603,

Heuer MO on timing 200720,

JBS Williams Organic Beef 170523,

JBS on Natural Cattle Production Projection 170530,

JBS re natural program for customer 170818,

JBS WMT is customer for JBS program inquiry 170818,

JBS Stevens re WMT China natural cattle processing Hyrum 171002,

JBS Hyrum Rawlings 171108,

JBS Rust re plant slaughter capacity 210116,

JBS Bradbury re slaughter pgm 210119,

JBS chicken pork quote requests 210126,

JLL Sayre AZ check in 170926,

Lonergan re BRF China 210125,

Luckhart pig trlr quote request 210428,

Luckhart pig trlrs and transport 210428,

Lux re virtual ofc svcs 161021,

Lux ofc switch Waseman 161022,

Lux 1 of many credit card decline 170301,

Lux DB advances rent Indian School Rd 180206,

Lux AZ re rent Indian School Rd 180301,

Marchal Semple CPA AZ 160125,

Mijajlovic acctnt re billing 200804,

Mijajlovic re deferral of billing 210325,

Mijajlovic re no response email acct delete and status 210831,

Mijajlovic checkin 220222,

MO Contract Farmer Heuer 200921,

OWB Brandt intro to Summers 180123,

OWB Summers Korea Angus pgm 201214,

OWB Korea suspension reply 201223,

OWB Korea beef pgm 201226,

OWB Summers slaughter availability 210116,

OWB Summers Quote Request 210321,

OWB re Utility Cattle for China 210609,

OWB Summers  Req 6 for deboning cost 210620,

OWB Summers apology re telcon 210621,

Oxbo Eqpt PO 1004_from_Winnett_Perico_Inc 170303,

Oxbo Eqpt WP PO 170303,

Oxbo Smith PO for 170306,

Portable Vac Coolers Inquiry 160216,

Royal Chem re organic liq fert 170530,

Royal Chemical email price quote 170721,

Royal Chemical drop on True misinformation 170723,

Ryder re financing plan 160317,

Ryder Nichols VP Sales Ramsey mtg 161201,

Ryder Aquilino re startup sequence fin 161208,

Sayre Belli re Jabor scam 151119,

Sayre AZ check in 170926,

Southern Vacuum Coolers Inquiry 160216,

Stampede Meats delay sales reply 4MM pound opptny 210317,

Stampede Meats retail prepack RFQ 210317,

Stampede Meats retail prepack RFQ questions 210319,

Stampede re WMT China pricing reaction 210426,

Sterling re further process beef 201226,

Sure Fresh re bean processing 170309,

Swisslog automation Jennings NYC in house 161101,

Swisslog automation Jennings NYC in house 161107,

Swisslog automation Jennings NYC in house 161205,

Swisslog to Waseman re automation 161228,

Swisslog Jennings re DD mtg and progress 170113,

Swisslog re NYC meeting notes and fup 170126,

Swisslog Deck DD mtg to WO team members 170128,

Swisslog developer search 170316,

Swisslog referral developer 170331,

Swisslog ref Developer on PPDC costs 170402,

Swisslog Dev Chain Berger 170405,

Swisslog re ASRS investment 170515,

Symbrosia Etzioni re methane reduction cattle trial 210731,

Symbrosia re LITIGATION transition 210928,

True Fert re org fert samples 170719,

Tucson Intel Ofc re temrination 161020,

Tyson chicken re China no availability, alt pork contact 210201,

Tyson re China mkt 180205,

Uddermatic Martin re Uddermatic 180202,

Uddermatic cutout 180206,

Uddermatic feeding rates 180217,

WestCoastPrime reatil prepack quote request 210313,

Willmeng Jarvis Tom Contact Info 150808,

Winnett Initial Property Search Email to Espy 110627.

C. An additional 10,000 or more pages of documents, emails, business plans, proposals, studies, and other relevant materials dating to 2002 or earlier may be produced upon request.

D. This pattern continually repeats across time through Lead Plaintiff's last gainful employment allowed by Defendants for ten months from August 2007 to June 2008, after Lead Plaintiff is trafficked by Defendant United States and co-conspirators from Seattle, WA via 21 months of homelessness in Boston, MA, including seventeen months in a publicly funded homeless shelter (with unknown rotating minders living alongside), to Fort Lee, NJ for this fake ten month stint of employment. See LP Evidentiary Exhibits pages 8351-8352, 10305-10310.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, and LP Evidentiary Exhibits pages 368, 369, 449, 456-459, 509, 513, 537-540, 566, 598, 599, 601, 614, 772-773, 787, 1074T-1074V, 8351-8352, 8454-8467, 8518-8562, 8805-8812, 8899-8905, 8906-8936, 8939-8955, 8957-9052, 9053-9059, 9060-9065, 9068-9078, 9192, 9228-9239, 9286-9299, 9392-9293, 9605-9607, 9608-9609, 9700-9701, 9831-9838, 9876-9880, 9881-9885, 10095, including all disbursements listed at subcount 40, 10134-10137 noting Arizona destinations and locations throughout, 10138-10156, 10305-10310, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-38 through C-40.

F. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their

conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ**

A. Defendants initiate their Kingman Stockton Farms fake sales and financing frauds in 2015 as Lead Plaintiff discovers the agricultural production asset acquisition opportunity they plant online to acquire around 8,000 acres of irrigated farmland near Kingman, Arizona. This land would support Lead plaintiff's planned organic produce production operation, a project then in negotiation with Defendant Walmart. This elaborate fraud engages several Defendant agents, likely FBI, across Las Vegas, NV, Kingman, AZ, and Phoenix, AZ who serve as fake Winnett Perico employees, realtors; and a Las

Vegas real estate developer, likely then suspected of bank fraud, financial fraud, and a tangentially related drug trafficking investigation involving employees of the farm's lessee operator.

B. This is one illustration of the abusive involvement and enmeshment by Defendants in long-running, highly prejudicial actions against Lead Plaintiff as they continue their myriad attempts to entrap and incriminate, or at least perpetuate fraudulent color of law suspicion by Lead Plaintiff's mere presence in the vicinity of persons of interest and suspects in other investigations.

C. As usual, the Defendants' entrapment attempt fails in 2017. The financing allegedly available through Defendant Jonathan Cross related entities commonly known as Blackpool and Shefford, and allegedly with the participation of TIAA/CREF, a large scale pension and retirement funds manager, fails. The Kingman Stockton Hill Farm deal collapses after a series of delays, twists, turns, and more lies are piled upon the Defendants' now vast pile of lies. This complex sequence involves New York based Defendant entities Blackpool/Shefford and Dominick and Dickerman, an Arizona and Nevada based realtor team, the Nevada based real estate developer, and a Massachusetts based investor and former investment partner and land co-owner with the Las Vegas developer. Wire fraud, fraudulent offers of financing, and travel expenses paid by Winnett Perico are used to perpetuate this sequence of trafficking, involuntary servitude, and forced labor, while

asset stripping and entrapment efforts continue. See LP Evidentiary Exhibits pages 1074U (entries 2/6 and 2/8), 8454-8467, 8805-8812, 8899-8905, 8939-8955, 9053-9059, 9060-9065, 9068-9078, 10134-10137 noting Arizona destinations and locations throughout, 10138-10156.

 D. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

  Broadway AZ 16K acres Hyder 161005,

  Broadway AZ likely cutout msg 161006,

  Broadway Kingman Red Lake info 161020,

  Broadway KJV re Blackpool Cross sked arrival 170203,

  Broadway KJV re Saul and Barings availability 170209,

  Broadway KJV re Stockton Hill Loans 170212,

  Broadway KJV re well drill sub Stockton Hill Loans 170213,

  Broadway KJV xmit NDA dataroom access 170214,

  Broadway KJV escrow and psa to be drafted 170301,

  Kingman Land Swap status inquiry 160219,

Kingman land legal des request 160223,

Kingman Farm land swap 160224,

Kingman Land Swap status 160224,

Kingman Farms deal structure revision 160229,

Kingman Farms Rhodes discussion confirm 160229,

Kingman status to team 160303,

Kingman Farms deal structure revision 160304,

Poindexter VP Sales intvw Kingman later 150826,

Poindexter Kingman veg crops 151001,

Poindexter Kingman tour Jim Rhodes intro 151007,

Poindexter direct Rhodes re Kingman 151017,

Saul Barings Stockton Hill WO LOI RLV 170215,

Saul Stockton Hill WinnettOrganics LOI RLV 170215,

Saul re Stockton Hill Farms Structure 170217,

Saul Barings revise Stockton Hill WO LOI RLV 170218,

Saul Barings re LOI rev plans 170220,

Saul Barings status on Blackpool financing 170224,

Saul Barings moving ahead Blackpool financing 170301,

Saul Barings re sked pressure on fin 170303,

Saul to Fiera Comox 170804,

Saul JV Structure incl Teton Valley Farm 170929,

Saul re Skaar Purchase Leaseback 170929,

Zaharis re Cowley Kodiak Produce temp cooler space 170206.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 328, and LP Evidentiary Exhibits pages 368, 369, 449, 456-459, 509, 513, 537-540, 566, 598, 599, 601, 614, 772-773, 787, 8351-8352, 8454-8467, 8518-8562, 8805-8812, 8899-8905, 8906-8936, 8939-8955, 8957-9052, 9053-9059, 9060-9065, 9068-9078, 9192, 9228-9239, 9286-9299, 9392-9293, 9605-9607, 9608-9609, 9700-9701, 9831-9838, 9876-9880, 9881-9885, 10095, including all disbursements listed at subcount 40, 10134-10137 noting Arizona destinations and locations throughout, 10138-10156, 10305-10310, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-38 through C-40.

F. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and

continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of  acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's

right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX**

A. Defendants repeatedly misrepresent farms and ranches as available properties for purchase by Lead Plaintiff business entities as part of their scheme to keep Lead Plaintiff engaged in expending time and financial resources to develop the productive capacity of his planned organic agriculture businesses. Among other elements, this includes presenting actually unavailable properties as available for purchase. One of these fake sales is a 3559 acre ranch in Lake County, Oregon, presented by Defendants. Lead Plaintiff spent more than $700 to travel to and inspect this property. The specific emails and travel records related to this trip are currently blocked by an unknown party, likely a police powers entity, but a signed Letter of Intent is included in the evidence presented.

B. The outbound trip to Lake County, Oregon via Kennedy Airport, NYC to Seattle-Tacoma Airport near Seattle, WA, then to Redmond Airport, Redmond, OR for ground transportation to Lake County, OR by Defendants' agent or officer (operating undercover, unknown to Lead Plaintiff at that time)

includes a thunderstorm delay and missed connection, forcing a late arrival and

very brief overnight stay near Sea-Tac. See LP Evidentiary Exhibits page

10095, noting disbursements on (yymmdd) 210706 Delta $534.40, 210707

JFK $22.90, 210707 Motel 6 $2121.54, 210708 Africa Lounge $23.81, SEPTA

$9.25.

C. See further evidence related to this subcount in LP Evidentiary

Exhibits emails. A compendium of key entities and individuals; and of selected

emails, documents, and disbursements listed in both date order and alphabetic

order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page

number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the

following:

Broussard re Lake County fin 210710,

Lake County 3559 Appraisal 210322,

Lake County Appraisal 210322,

Lake County OR Brandon 210627,

Lake County Gannett Peak Ranch Mid-Case Business Plan 210628,

Lake County OR Offer Mod 210629,

Lake County Opptny Zone Investments cold email 210630,

Lake County LOI 210702,

Lake County Due Diligence folder link 210703,

Lake County tour fup 210708,

Lake County Creek Fishway project 210709,

Lake County plant siting opptny zone 210710,

Lake County 3559 Mike Maggard PFS 210712,

Lake County Opptny Zone seller options 210712,

Lake County seller re stock v loan 210713,

Lake County Binding PurchSale Agrmt 210714,

Lake County Prelim title report request 210719,

Lake County Loan Options Disappear Ex 1of11 210725.

D. Other email and wire predicate frauds of agriculture real estate and production facilities and related financing options include those at LP Evidentiary Exhibits pages 9605-9607, 9608-9609, 9700-9701, 9876-9880, 9881-9885. See, for example, Julian Bros Sheep Ranch, Boulder, WY fraudulent ranch sale listing as Big Sandy Ranch, in 2021 sale brochure and 2023 New York Times article at LP Evidentiary Exhibits pages 10750-10771, and "LaBelle" emails listed below. A compendium of key entities, individuals, selected emails, documents, and disbursements, including predicate frauds, is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual predicate emails are listed below, and at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include:

26 Ranch Clark re PPM stock swap 151016,

26 Ranch Terms Marvel 160107,

Colliers re Dev prtnr IN plant 200819,

Colliers Powers check in 220118,

Cresa Realty Advisors AZ Office Search 180904,

Dallam Cty LOI Farm HULL LOI 0001 120809,

Grasse Long Realty 160601,

Grasse re properties search 160630,

Guitierrez Ranch LOI Signed140130,

HEC feedyard email contract 180118,

HEC feedyard NBH cattle loan 180119,

HEC Feedyard NBH re loans 180119,

HEC water lease contact 180119,

HEC Bretz re Double D issues 180120,

HEC Rio Bravo agrres to share fin data 3yr 180123,

HEC contract redraft fm Sullivan 180124,

HEC returns to mkt per Nickless 180212,

HEC and E6 Blitch re workflow 180218,

HEC E6 calf barns quote 180219,

HEC E6 calf barn eqpt 180221,

HEC E6 calf milk pasteurizing plant 180222,

HEC E6 note sale to Summit 180222,

HEC E6 Calf hutch housing option 180223,

HEC E6 Calf barn floors 180228,

IntegratedAg initial web hit Prader 170516,

LaBelle MJ hold add Big Sandy 210216,

LaBelle re Big Sandy cmsn split w Theo list agt 210218,

LaBelle on Big Sandy Rejects First Offer 210222,

LaBelle re contract for deed 210224,

LaBelle on Big Sandy deal structure 210226,

LaBelle re Big Sandy botton line from Theo 210301,

LaBelle Big Sandy basic title info 210304,

LaBelle on Big Sandy Ranch Maggard gty 210305,

LaBelle re Big Sandy 210310,

LaBelle re New Mexico comp AU pricing 210310,

LaBelle Big Sandy BAFO 210317,

LaBelle on Big Sandy BAFO DB reaction to rejection 210324,

LaBelle re Big Sandy BAFO response to Theo comments 210324,

LaBelle on Theo ping Big Sandy 210415,

LaBelle re Theo and Big Sandy new interest 210506,

LaBelle on Big Sandy structure and deal quantitties 210508,

LaBelle re Theo Pearson Big Sandy behavior 210510,

LaBelle on broker comments and Big Sandy 210514,

LaBelle Big Sandy delay and deficient reply pattern 210517,

LaBelle Pearson re Big Sandy deficient communications 210517,

LaBelle Big Sandy drop 210617,

Marvel 26 Ranch rejects structure 160122,

Marvel re Black Rock Famrs deal 170303,

Nelson on dropping Yreka CA ranch no water 210614,

Oppliger via Abacherli 180130,

Oppliger Abacherli  drops out 180209,

Oppliger Abacherli  ref to McDowel 180228,

Renfrew CA Ashurst Ranch into escrow 210312,

SBI team on Big Sandy BAFO deal fail 210324,

SBI Team on Lake County 210701,

SBI team on Lake County fin WMT mtg 210715,

Skaar Sanders Swan 170419,

Skaar Winnett Cattle Company LOI Skaar 170429,

Skaar Pitch Deck 170512,

Skaar Sales Brochure 170512,

Skaar JBS Williams on Organic Beef 170523,

Skaar Teton River Ranch Broker ref Rumsfeld ref 170523,

Skaar Barns 170530,

Skaar Steam Flake Plant Cost Est Gearn170530,

Skaar Jeffereon Cty ID on Skaar Expansion  170731,

Skaar Poulsen CPA appt 170731,

Skaar WF Id Falls Kay Burke and Sanders 170809,

Skaar ID Dept of Ag rqmts 170810,

Skaar outreach - US Bank reply delay arrange cutout 170817,

Skaar Sander re US Bank established relationship 170817,

Skaar Teton River Ranch Broker Feeney 170822,

Skaar AGR interest initial hit 170828,

Skaar Kritser Ranch Creek WA initial hit 170829,

Skaar ClearLight initial hit 170905,

Skaar Harris Williams re AGR 170906,

Skaar Sanders on strong interest Kritser Ranch Creek 170907,

Skaar WF Id Falls Luke on sub debt 170915,

Skaar Teton River Ranch Broker sale fail price drop Feeney 170925,

Skaar Teton River Ranch Broker Feeney connects RL Holdings

170929,

Skaar Teton River Ranch Broker Halgerson 171002,

Skaar Kritser WA advisor John Herring Friona Ind 171030, (see also

LP Evidentiary Exhibits page 1074V, entries 9/7/2017 and 10/30/2017)

Skaar deal dead Gerra 171208,

Skaar Sanders on alt buyer LOI 180124,

Zeman Ranch 2 NE on famr sales process and investors 210605,

Zeman Ranch broker discussion re investors 210605.

E. A comprehensive set of relevant pre-discovery evidence and

information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 328, and LP Evidentiary Exhibits

pages 368, 369, 449, 456-459, 509, 513, 537-540, 566, 598, 599, 601, 614, 772-773, 787, 1074T-1074V, 8351-8352, 8454-8467, 8518-8562, 8805-8812, 8899-8905, 8906-8936, 8939-8955, 8957-9052, 9053-9059, 9060-9065, 9068-9078, 9192, 9228-9239, 9286-9299, 9392-9293, 9605-9607, 9608-9609, 9700-9701, 9831-9838, 9876-9880, 9881-9885, 10095, including all disbursements listed at subcount 40, 10134-10137 noting Arizona destinations and locations throughout, 10138-10156, 10305-10310, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-38 through C-40.

F. Fraudulent agricultural production and processing related assets were and are furnished, by Defendants, while simultaneously depriving Lead Plaintiff access to alternative sources, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

G. Fraudulent commercial sales opportunities, and the business necessity to expend time and financial resources to locate and secure financings thereof arose as a result of, and have been continuously interfered

with, by Defendants through their offering of fraudulent pending sales they have no intention be completed, and as elements of a pattern of commercial and police powers frauds and conspiracies of Defendants in commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

H. Fraudulent corporate officers, employees, consultants, legal and professional service providers were and are furnished without consent of the Lead Plaintiff by Defendants, while they simultaneously deprive Lead Plaintiff access to alternative sources of qualified personnel, as elements of their conspiracy to and pattern and practice of acts depriving Lead Plaintiff and his related entities of their right to pursue and benefit from commerce and interstate commerce. The overriding intent of Defendants, with regard to these violations, was and continues to be, to consume the financial resources and management time of Lead Plaintiff and the entities he legally owns, controls, and/or manages.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator

Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. One simple and relatively recent example of the myriad forms of public harassment by Defendant police powers operations is related here. Lead Plaintiff's flight from Kennedy Airport in New York City to Seattle, WA, enroute to Redmond OR, for the Lake County Ranch tour listed at subcount C-40, in July 2021 is delayed for about two hours due to local thunderstorm over Kennedy Airport. The flight arrives in Seattle about 1AM local time, about 20 hours after the Lead Plaintiff awakened the previous morning in New Jersey, and well after last evening flight connection to Redmond, OR. Lead Plaintiff remains overnight in Seattle, where he gets about four hours of sleep. Defendants attempt to take advantage of this much shortened night of sleep to cause the Lead Plaintiff to act out against an undercover officer the next morning.

B. An undercover police powers officer abruptly replaces a food service worker in a concourse restaurant shortly after the Lead Plaintiff orders breakfast, then delays providing a check for about 15 minutes while he converses with the 6 to 8 person undercover police backup team which has arrived and is seated a couple of tables away. Needing to catch the departing flight, Lead Plaintiff calls to this server several times for the food service

check, the server delays repeatedly, so the Lead Plaintiff, who rarely carries cash, drops a $20 bill on the table and begins to leave. Seeing that his bluff has been called and the establishment allegedly not accepting cash (illegal in Washington state), the server rushes to the table and a BRMT induced moment of anger on short sleep ensues as the server insists a credit card must be used. No violence occurs as Lead Plaintiff has by now learned more about BRMT brain hijacking and manipulations, and carefully keeps his arms rigid at his sides so his movements cannot be misinterpreted by the police snatch team seated nearby, and simply raises his voice, so the nearby police snatch team will be aware of the operational failure.

C. This is a typical BRMT-enhanced entrapment sequence run by Defendant United States hundreds of times against Lead Plaintiff (including many dangerous scenarios which are not reverse engineered until 2021 and thereafter), using the natural circumstances of events as they unfold to involve local police powers who would not be aware of BRMT manipulation (BRMT has been a very highly classified federal program of Defendant United States) in an entrapment attempt. If an unpaid food service check walk-off or an assault on the undercover officer (food server) occurs, local police would arrest, process, and prosecute this incident as an unprovoked assault on a police officer, though it is actually a perfect entrapment crime perpetrated on the Lead Plaintiff by Defendant United States using BRMT, its brain hijacking

bioweapon and bioweapon delivery system, to effect the imprisonment of the Lead Plaintiff through this third party local police powers operation.

D. This conduct is completely consistent with prior and subsequent behaviors of Defendant United States and its co-conspirator Defendant police powers entities, officers, and agents, as expressed through their conduct, including conspiratorial conduct cited in all the Lethality counts (L-1 through L-16) and several of the Personal subcounts (P-1, P-2, P-15, P-29 through P-31, N-1 through N-5). See also this type of attempt at LP Evidentiary Exhibits page 181H paragraph 138. These are but a very small selection of examples of these incidents run against Lead Plaintiff. Hundreds of other such incidents will be unveiled through the discovery process, including in Lead Plaintiff's hand-written notes and other materials currently in the hands of the Defendants dating back into the early 2000s

E. Since members of the general public also engage in these behaviors in the vicinity of the Lead Plaintiff at times, it can be difficult at times to distinguish the purposeful harassment by Defendant police powers personnel acting illegally under color of law from lawful exercises of civil rights and nonviolent free expression by members of the public. This particular scenario on a Sea-Tac Airport concourse before flying to Redmond OR is a clearly obvious police powers operation to the well-experienced Lead Plaintiff. The clear of risk of BRMT induced escalation in his hijacked brain at these kind of moments leads Lead Plaintiff to exercise extreme caution around others in

these scenarios to avoid any undue provocations and encounters which could lead to escalation and use of force by police powers personnel or others.

F. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Bryant Park Jazz and 911 call bemused response 220701,

Costco GC reply to verficiation request 211102,

Match Group Second Notice re Preserve Evidence 220122,

Match EPL Response 221110,

Match Group Legal Dept Email 221110,

NYPD FOIL righttoknow Summary 210901,

NYPD FOIL Appeal Denial Letter 210915,

NYC Mayor Ofc Assist Re NYPD FOIL Appeal Denial 211001,

NYC Mayor Ofc Assit Request NYPD FOIL Appeal Denial 211001,

NYPD FOIL Request 210901,

NYPD Response to FOIL Request 210903,

NYPD Notice of Duty to Preserve Evidence 211116,

NYPD Reply to Evidence Retention Letter 211123,

NYPD Reply to Corbett Evdence Preservation 211127,

NYPD Event Sequence 220422.

G. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 25, 30, 35, 312-347, 369-389, Table 1 entirety, Table 2 entirety, paragraphs 314, 321, 327, 340, 357, 369-374, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 125-134, 142, 145; pages 371, 473, 544, 548-549, 566-573, 575-576, 582-597, 599, 603, 609-612, 770-772, 782, 783-784, 8453, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444, 10772-10775. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-1, P-2, P-15, P-29 through P-31, and N-1 through N-5.

H. Fraudulent deprivations of rights resulting from the Defendants' careful timing of events and public exposure to facilitate vigilantism contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and

employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be

retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-2 Personal Frauds: Rights Violations -**    A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants fraudulently and repeatedly engage in the hacking of Lead Plaintiff's personal computer and printers, use for both personal and

**Illegal Searches, Hacking, and Harassing**

business matters beginning around 1984 and into the present time, even for the purposes of managing his unemployment compensation access and his work with public charities. They have and do create troubleshooting opportunities to strip data, to install and remove malware and keyboard loggers, to permit personal computer video camera operation without consent, to create remote printer and other computer hacks which require harassing forms of customer support use by Lead Plaintiff while failing to solve the problem they created and shifting responsibility among various in-house assets to perpetuate these frustrations of Lead Plaintiff.

B. Defendants also cause and create circumstances requiring the Lead Plaintiff to replace or return non-functional equipment at considerable expense on his very limited financial resources (also subject to control and to asset stripping by Defendant United States and co-conspirators). Defendants have and do systematically violate the Fourth Amendment rights, among many other rights, of Lead Plaintiff, and have and do continuously fail to respect, much less protect, those rights. See Complaint paragraph 314, 321, 327, 340, 357, 369-374 Table 1-010, 1-024, 1-031, LP Evidentiary Exhibits pages beginning 140-189 paragraphs 125-134, 142, 145; pages 371, 473, 544, 549, 566-573, 575-576, 599, 603, 609-612, 770-771, 783, 6044-6084, 10251-10255, 10259-10301, 10423-10433, 10434-10444.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 25, 30, 35, 312-347, 369-389, Table
1 entirety, Table 2 entirety, paragraphs 314, 321, 327, 340, 357, 369-374, and
LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52,
55, 58, 60, 64-68, 72-77, 83-95, 125-134, 142, 145; pages 371, 473, 544, 548-
549, 566-573, 575-576, 582-597, 599, 603, 609-612, 770-772, 782, 783-784,
8453, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444,
10772-10775. While all subcounts throughout this Complaint are driven by
Defendants' conspiracy to commit and comprise an integrated pattern of
racketeering acts, the most directly relevant subcounts include, without
limitation, P-1, P-2, P-15, P-29 through P-31, and N-1 through N-5.

    D. Fraudulent deprivations of rights resulting from the Defendants'
careful timing of events and public exposure to facilitate vigilantism contrived
by Defendants to appear as life circumstances and events have been and are
used to control and traffick Lead Plaintiff through a series of physical and
emotional traumas including the selection, assignment and destruction of
teenage and adult relationships; destruction and recovery of physical and
mental health; tortures and suicide ideations; homelessness; enterprise and
employment failures; de facto takings of real and financial assets; various
emergency situations with barely avoided lethal consequences; among other
traumas, many of which are directly created by or arise from the Defendants

direct acts and their willful violation of the privacy of the Lead Plaintiff to
expose him to risks resulting from adverse exposure to the general public and
vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are
elements of and arise from Defendants' pattern of racketeering acts, including,
without limitation, their commercial and police powers frauds and conspiracies
in commerce and interstate commerce, and violations of individual rights and
liberties protected by the Constitution, laws, and treaties of the United States
of America.

  E. Relevant emails providing further evidence and incorporated herein
by reference are shown at each relevant subcount listed above. Note that
relevant evidence is currently blocked, or hacked and deleted, from various
Lead Plaintiff's email accounts, including virtually all business and personal
emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead
Plaintiff as this Complaint is being written. Discovery will provide further
evidence of extensive correspondence and documentation of exchanges by
and/or with the Defendants using email and other electronic means; recovery
of Lead Plaintiff's own records currently in the hands of Defendants; as well
as relevant information, documents, and items conveyed by US Mail, and
private mail and express carriers. Such detailed information needs to be
retained both to provide evidence for Defendants' programmed color of law
prosecutions if their entrapment efforts work, and to sustain the intricate
neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

   F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic**    A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendant United States uses its BRMT bioweapon and bioweapon delivery system to deliver and suppress natural occurrences of hormones such as melatonin (sleep) and oxytocin (love) to manipulate Lead Plaintiff to their desired goals. (For melatonin induced double homicide by motor vehicle, see subcount L-1.) Defendant United States uses BRMT

**Interests,**

**BRMT**

**Oxytocin**

**Manipulation**

induced oxytocin dosing to manage the romantic and intimate affairs of Lead Plaintiff by suppressing or accelerating the oxytocin (love) hormone, beginning as early as the 1970s to gain and sustain its control of the Lead Plaintiff and his involuntary servitude from that time to the present. These BRMT induced brain biochemical manipulations occurred in the presence of his long term college girlfriend, a second strongly interested college friend who became a newscaster, and both spouses, who were all carefully placed by Defendant United States and its agents, officers, or confidential informants, in his presence at key periods in his life.

B. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed two BRMT manipulated romantic interests in his life for a time (see subcounts P-11, P-12, and P-13).

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 25, 313, 314, 371, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other

innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne**

A. Defendants purposefully destroy the first marital community of Lead Plaintiff with Lynne. Defendant United States, to support its development and deployment of the BRMT bioweapon and bioweapon delivery system, directly interferes in the personal lives, careers, and brain biochemistry of both spouses from the purpose of attempting to harm and destroy the marital community and endanger and/or entrap both spouses.

B. Defendants eventually succeed in causing and creating the circumstances of the divorce by delivering overdoses of oxytocin (love hormone) to Lynne in the presence of her best work friend's husband, a serial adulterer, which results in divorces of both couples, forces liquidation of real property and improvements, and causes and creates the loss of marital community, mutual emotional and financial support, and a wide range of future financial benefits from that community remaining intact, including accretion of financial assets and real property appreciation. See Complaint Table 1-001 subheads A and B, paragraphs 313, 315, 331, Interline Exhibit 2, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038, 2-0039, LP Evidentiary Exhibits pages 153-154 (para 42-45), 181-182 (para 107-111), 8233-8262.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential

romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422.

While all subcounts throughout this Complaint are driven by Defendants'
conspiracy to commit and comprise an integrated pattern of racketeering acts,
the most directly relevant subcounts include, without limitation, P-3 through P-
12.

      F. Fraudulent relationships resulting from the Defendants' careful
timing of events and of hormone release and suppression contrived by
Defendants to appear as life circumstances and events have been and are used
to control and traffick Lead Plaintiff through a series of physical and emotional
traumas including the selection, assignment and destruction of teenage and
adult relationships; destruction and recovery of physical and mental health;
tortures and suicide ideations; homelessness; enterprise and employment
failures; de facto takings of real and financial assets; various emergency
situations with barely avoided lethal consequences; among other traumas,
many of which are directly created by or arise from the Defendants direct acts
and their willful violation of the privacy of the Lead Plaintiff to expose him to
risks resulting from adverse exposure to the general public and vigilantism. All
these acts against Lead Plaintiff's interests, life and liberty are elements of and
arise from Defendants' pattern of racketeering acts, including, without
limitation, their commercial and police powers frauds and conspiracies in
commerce and interstate commerce, and violations of individual rights and
liberties protected by the Constitution, laws, and treaties of the United States
of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying

Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse - Jeanette**

A. As Lead Plaintiff's first marriage dissolution is being processed by the Court, Defendants purposefully, through Defendant Stephen Waters, a contract software engineer at Lead Plaintiff's employer, LazerSoft, arrange a meeting with several female co-conspirators to introduce Jeanette Smith, an employee of First American Title Insurance, Bellevue, WA at the Greenwood Inn, Bellevue, WA on a week night when there are no other parties present in the bar/lounge, which eventually results in his second marriage to Jeanette. After approximately two years of dating and fifteen years of marriage, Defendant United States again orchestrates the destruction of the Lead Plaintiff's second marital community with Jeanette. As before, Defendant United States acts to support its development and deployment of the BRMT bioweapon and bioweapon delivery system by interfering directly in the personal lives, careers, and brain biochemistry of both spouses, causing, among other violations, financial distress and extended separations for the purpose of attempting to harm and destroy the marital community, and

engages in other deliberate acts which stress, harm, endanger and attempt to entrap spouses.

B. Defendants eventually succeed in causing and creating the circumstances of the divorce, forced liquidation of real property and improvements, and loss of marital community and mutual support, and a wide range of future financial benefits from that community remaining intact, including accretion of financial assets and real property appreciation. See Complaint Table 1-001 subhead C, paragraphs 313, 316, 331, Table 2-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062-2-0109, 2-0116-0121, LP Evidentiary Exhibits pages 155-164 (paragraphs 45-69), 8263-8287, 8347-8350.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, 398, Table 2-0115, 2-0185, 2-0186, 2-0188,

LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health;

tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath

of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

J. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arranged In-person Contacts**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants, in late 2004 and continuing in 2005 use an ostensibly drunken female bar patron in hot pants, an in-person bar pickup, and other females of interest as they screen-in and screen-out women placed in the presence of Lead Plaintiff. Lead Plaintiff expends personal funds during these screened and manipulated in-person events in the Kirkland, WA area. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188. Additional evidence noted by Lead Plaintiff during this period and related to this sequence is currently in the hands of Defendants.

B. Defendants continue this romantic and intimate interests manipulation through 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain

isolation of Lead Plaintiff. Defendants also placed two BRMT manipulated romantic interests in his life for a time (see subcounts P-11, P-12, and P-13).

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits

pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without

limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon

which these AUMF's are authorized to be conducted. Under the Geneva

Conventions of 1949 and Additional Protocols, as well as the Constitution, all

US persons are entitled, by law, to all the protections found in the Geneva

Convention. All US persons are also entitled to the rights and protections

found within two international treaties (see LP Evidentiary Exhibits pages 866-

933) and the United Nations charter, all of which have been ratified by the

United States Senate.

J. These force of law documents each spell out various protections

from certain acts involving military, intelligence, and police powers forces in

time of war. Defendants have systematically violated these rule of law

mandatory international obligations by their acts against the Lead Plaintiff and

other Plaintiffs of this class. These acts therefore comprise war crimes against

these plaintiffs as protected civilians in time of war. Defendant United States,

including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants use the online dating platform Match.com, a Match Group website, or its spoofing by an unknown Defendant police powers operation, to arrange approximately 15 to 20 fake dates with Defendant police powers agents, officers, and confidential informants in the greater Seattle and Tacoma, WA area and the greater Portland, OR area. Lead Plaintiff spends over $1,000 for in-state and interstate travel and to pay for meals and other entertainment during these fake dates in late 2004 and the first half of 2005, arranged using email and other electronic means. Documentation is available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, as well as the routine police reports of these incidents controlled by Defendants. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Match Group Second Notice re Preserve Evidence 220122,

Match EPL Response 221110,

Match Group Legal Dept Email 221110.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed two BRMT manipulated romantic interests in his life for a time (see subcounts P-11, P-12, and P-13).

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead

Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts,

the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon

delivery system (known herein as BRMT) against US persons and other

innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in

approximately 1972, to the present.

**P-8 Personal**    A. This subcount consolidates multiple violations, with the exact

**Frauds:**    number and date of each violation to be determined through discovery against

**Personal and**    Defendant United States. Defendants, use the online dating platform

**Intimate**    Match.com, owned and controlled by Defendant Match Group, or its spoofing

**Relationships**    by an unknown Defendant police powers operation as they screen-in and

**- Managed**    screen-out women of interest to Lead Plaintiff. This screening occurs in 2008.

**Romantic**    See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188.

**Interests,**    B. See further evidence related to this subcount in LP Evidentiary

**Dates**    Exhibits emails. A compendium of key entities and individuals; and of selected

emails, documents, and disbursements listed in both date order and alphabetic

order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page

number found at bottom of page). Relevant individual emails are listed below,

alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the

following:

Match Group Second Notice re Preserve Evidence 220122,

Match EPL Response 221110,

Match Group Legal Dept Email 221110.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-

154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

    F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in

commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead
Plaintiff of free exercise of will and rights guaranteed under the United States
Constitution and ratified international treaties having force of law. By denying
Lead Plaintiff's right to pursue a free and ordinary life, under their color of law
fiction of "state secrets" and "national security," Defendant United States
conceals its criminal and illegal deployment of a bioweapon and bioweapon
delivery system (known herein as BRMT) against US persons and other
innocents. These violations of rights also serve to conceal the illegal acts of co-
conspirator Defendants, as they have from BRMT program inception, in
approximately 1972, to the present.

**P-9 Personal**          A. This subcount consolidates multiple violations, with the exact
**Frauds:**          number and date of each violation to be determined through discovery against
**Personal and**          Defendants. Defendants use online dating platforms, including those of Match
**Intimate**          Group and Bumble, or their spoofing by an unknown Defendant police powers
**Relationships**          operation, to arrange approximately 15 to 20 fake dates with Defendant police
**– Managed**          powers agents, officers, and confidential informants in the greater New York
**Romantic**          City area in 2019 and early 2020. All these dates require interstate travel from
**Interests,**          Lead Plaintiff's residence in Edgewater, NJ to various parts of New York City,
**Dates**          NY. Lead Plaintiff spends over $1,000 to travel to and pay for meals and other
entertainment during these fake dates in 2019 and 2020, arranged using email
and other electronic means. See Complaint paragraphs 313, 314, Table 2-0115,
2-0185, 2-0186, 2-0188.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Match Group Second Notice re Preserve Evidence 220122,

Match EPL Response 221110,

Match Group Legal Dept Email 221110.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See

Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP
Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39,
92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and
information which relates this subcount to other relevant subcounts includes,
without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347,
371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-
0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148,
2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits
pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-
154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs
107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-
8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422.
While all subcounts throughout this Complaint are driven by Defendants'
conspiracy to commit and comprise an integrated pattern of racketeering acts,
the most directly relevant subcounts include, without limitation, P-3 through P-
12.

F. Fraudulent relationships resulting from the Defendants' careful
timing of events and of hormone release and suppression contrived by
Defendants to appear as life circumstances and events have been and are used
to control and traffick Lead Plaintiff through a series of physical and emotional
traumas including the selection, assignment and destruction of teenage and

adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-10 Personal Frauds:**    A. Defendants use the online dating platform Match.com, owned and controlled by Defendant Match Group, or its spoofing by an unknown

| | |
|---|---|
| **Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship** | Defendant police powers operation to screen-in and screen-out persons of interest to Lead Plaintiff, to conspire to arrange the introduction of a co-conspirator, whether by choice or coercion, and to arrange a fake relationship between Lead Plaintiff and Marinka Modderman, whereabouts currently unknown to Lead Plaintiff, but very likely known to various police powers Defendants. Lead Plaintiff has dates with this New York City resident in New York City and Cliffside Park, NJ, as well as one weekend trip to rural NY and CT, all of which require at least one of the two parties to engage in interstate travel. Lead Plaintiff spent over $1,000 to travel and pay for meals and other entertainment during these fake relationship dates. These dates occur in 2008 and are further described at Complaint Table 2-0148 and LP Evidentiary Exhibits pages 10336-10342, 10346-10351, 10394-10422. |

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Match Group Second Notice re Preserve Evidence 220122,

Match EPL Response 221110,

Match Group Legal Dept Email 221110,

Modderman email re Pankowski wedding Drumm attends 080625,

Modderman email re Pankowski wedding Drumm attends 312pm
080625,

Modderman re wedding 080626,

Modderman email re Pankowski wedding Drumm attends 817am
080627,

Modderman bustup after 6 week absence 080803.

C. Defendants continue this romantic and intimate interests
manipulation in 2022 by purposefully screening-in and screening out potential
romantic interests using wire fraud on dating sites and his known concern to
retain traceability of these manipulations primarily to sustain isolation of Lead
Plaintiff. Defendants also placed three BRMT manipulated romantic interests
in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates
and conducts such interferences of his romantic partners and their interests to
manage this aspect of the lives of these various plaintiffs, who are themselves
also members of this class of injured US persons. These victims included both
spouses, one college girlfriend, and one close college female friend. See
Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP
Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39,
92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts in this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas,

many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization

for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary
Exhibits pages 10437-10444) which empowered a global war throughout the
world, include the United States of America as part of the territory upon which
these AUMF's are authorized to be conducted. Under the Geneva Conventions
of 1949 and Additional Protocols, as well as the Constitution, all US persons
are entitled, by law, to all the protections found in the Geneva Convention. All
US persons are also entitled to all rights and protections found within two
international treaties referenced below (and see LP Evidentiary Exhibits pages
866-933) and the United Nations charter, all of which have been ratified by the
United States Senate.

J. These force of law documents each spell out various protections
from certain acts involving military, intelligence, and police powers forces in
time of war. Defendants have systematically violated these mandatory force of
law international obligations by their acts against the Lead Plaintiff and other
Plaintiffs of this class. These acts therefore comprise war crimes against these
plaintiffs as protected civilians in time of war. Defendant United States,
including its department and agencies, together with Defendants including,
without limitation, all state and local police powers agencies; and all
Defendants' officers, agents, confidential informants, and other related
persons, whether acting within or without their color of law alleged authority,
have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|

| Servitude, Forced Labor | | **Degrading Treatment, ratified 1990** | |
|---|---|---|---|
| Detention Lacking Authorization, | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Including Virtual Detention | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Medical Experiments | 27, 32, 33, 97, 147 | | |
| Family, privacy | | | |
| Religion | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Cruel, Inhuman, Degrading Treatment | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Property Crime | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Covid vaccine deprivation | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further

evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship**

A. Defendants use online dating platforms, including Match Group and Bumble websites, or their spoofing by an unknown Defendant police powers operation to screen-in and screen-out women in 2014, and arrange a fake online relationship with Laura Akoto, ostensibly a resident of Ghana until 2018. Using wire fraud and BRMT oxytocin (love hormone) manipulation this online relationship steals more than $11,000, two cell phones, a PlayStation 1, and game cartridges from Lead Plaintiff between 2014 and 2018 for police powers control over his movements and finances. See Complaint Table 2-0171, 2-0179, 2-0181, LP Evidentiary Exhibits pages 7467-8179 (2014-2018), and 2023 Financial Times photo confirmation of identity at 7470-7470A.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

> Akoto re AltaVista bad actor 161018,
>
> Akoto re Blackpool then DD 170315,
>
> Akoto Laura re $2K to Mr Prince from Porter Patten $3K 171021,
>
> Akoto Hints of money laundering entrap scam 171025,
>
> Akoto Ramsey Fixup Expenses 171027.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts in this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas,

many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate

neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police

and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

J. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime     Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship**

A. Defendants use online dating platforms including those of Match Group and Bumble, or their spoofing by an unknown Defendant police powers operation to screen-in and screen-out persons of interest to Lead Plaintiff, to arrange the introduction of their co-conspirator, whether by choice or coercion, to arrange a fake relationship between Lead Plaintiff and Norelle Dean, aka Gia Shakur, aka Nina Rhinehart, whereabouts currently unknown to Lead Plaintiff, but very likely known to various police powers Defendants. Lead Plaintiff has dates with this New York City resident in New York City and in Edgewater, NJ, along with one trip to New Orleans, LA, all of which require at least one of the two parties to engage in interstate travel. Lead Plaintiff spends over $1,000 to travel and pay for meals and other entertainment during these fake relationship dates. These dates occur between December 2019 and 2021 and are described at Complaint Table 2-0188.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected

emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

> Gia first date 211207,
>
> Match Group Second Notice re Preserve Evidence 220122,
>
> Match EPL Response 221110,
>
> Match Group Legal Dept Email 221110.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to manage this aspect of the lives of these various plaintiffs, who are themselves members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP

Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health;

tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be

retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

 H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

 I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations

of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

 J. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime   Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have

any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendants use intimate relationships between Lead Plaintiff and a series of women from 2005 to 2021 to field deploy increasingly sophisticated BRMT functionality against the Lead Plaintiff by inducing erectile dysfunction (ED). In 2005, two dates result in ED failure (BRMT induced). In 2008, BRMT is again induced but is offset by prescription medication tadalafil. In 2020 into 2021, Defendant United States uses its BRMT bioweapon and bioweapon delivery system to induce a progression of ED symptoms despite this medication, indicating that BRMT bioweapon sophistication has evolved to be much more granular in its effects on the brain, central nervous system, and muscular control to attain and sustain an erection.

B. Periodically throughout and after this progression, Lead Plaintiff's erectile dysfunction completely disappears, directly indicating the ED symptoms are explicitly due to BRMT bioweapon intervention by Defendant United States. Accomplishing this result requires coordination between persons with direct operational control of the BRMT bioweapon and bioweapon delivery system, field agents and confidential informants willing or coerced to engage sexually with the Lead Plaintiff. Wire fraud is used to arrange some of these dates as part of the date sequences which are the subject of other sub-counts in this Complaint. Lead Plaintiff expends personal funds on travel and entertainment during these fake relationship dates. These dates occur in 2005, 2008 and 2020-2021. They are further described at Complaint Table 2-0115, 2-0148, 2-0188, LP Evidentiary Exhibits pages 1-10, page 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111, 194.

C. Defendants continue this romantic and intimate interests manipulation in 2022 by purposefully screening-in and screening out potential romantic interests using wire fraud on dating sites and his known concern to retain traceability of these manipulations primarily to sustain isolation of Lead Plaintiff. Defendants also placed three BRMT manipulated romantic interests in his life for a time (see subcounts P-10 through P-13).

D. On knowledge and belief, Defendant United States also orchestrates and conducts such interferences of his romantic partners and their interests to

manage this aspect of the lives of these various plaintiffs, who are themselves also members of this class of injured US persons. These victims included both spouses, one college girlfriend, and one close college female friend. See Complaint paragraphs 313, 314, Table 2-0115, 2-0185, 2-0186, 2-0188, LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint Table 1-001 A, B, C; paragraphs 25, 313-347, 371, Interline Exhibits 2, 3, Table 2-0023, 2-0025, 2-0028, 2-0030, 2-0038-0040, 2-0045, 2-0046, 2-0054, 2-0055, 2-0062, 2-0109, 2-0115-0121, 2-0148, 2-0171, 2-0179, 2-0181, 2-0185, 2-0186, 2-0188, and LP Evidentiary Exhibits pages 1-10, 140-189 paragraphs 1-6, 14, 21-32, 38-39, 92-93, 111; pages 153-154 (paragraphs 42-45), 155-164 (paragraphs 45-69), 181-182 (paragraphs 107-111), 181C-181D (paragraphs 124-126), 7467-8179, 8233-8262, 8263-8287, 8347-8350, 10256-10258, 10336-10342, 10346-10351, 10394-10422. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-3 through P-12.

F. Fraudulent relationships resulting from the Defendants' careful timing of events and of hormone release and suppression contrived by

traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

J. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these

plaintiffs as protected civilians in time of war. Defendant United States,

including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture<br>Lethality<br>Theft<br>Servitude, Forced Labor<br>Detention Lacking Authorization, Including Virtual Detention<br>Medical Experiments<br>Family, privacy<br>Religion<br>Cruel, Inhuman, Degrading Treatment<br>Property Crime<br> Covid vaccine deprivation | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendant United States and its Defendant co-conspirators deprive Lead Plaintiff to access to basic health care services using a variety of means including, without limitation, through penury inflicts by denial of employment, theft of compensation, theft of personal services, deprivation of access to unemployment benefits payments, using email fraud and wire fraud. Defendant United States and its Defendant co-conspirators deny access to initial Covid vaccinations series 149 times when eligible; to medical doctors;

**Basic Health Care**

Defendant United States and its Defendant co-conspirators deny access to initial Covid vaccinations series 149 times when eligible; to medical doctors; to prescription medications essential to treat the BRMT induced mental depression ranging to suicide ideation, while Defendant United States is fully aware of the broad spectrum of biochemical and physical abuses it is inflicting with its BRMT bioweapon and bioweapon delivery system while the Lead Plaintiff resides at Cliffside Park, NJ after being terminated from his fake employment in Fort Lee, NJ in June 2008.

B. This awareness is most clearly demonstrated by the physical presence of two undercover officers on the southeast corner of Thompson Lane and River Road, Edgewater, NJ, who stand in front of and block the Lead Plaintiff's path to cross this very busy street at this particular moment on this particular day of suicide ideation. Defendants also block access to basic preventative dental services, exams, checkups, and other routine but essential preventative services. See LP Evidentiary Exhibits beginning page 140 paragraphs 78, 95, 128; pages 10187-10250.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Bergen Covid Exec emails 210324,

Bergen Covid Exec emails 210326.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-13 through P-20.

E. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide

lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate

neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and

deployed against US persons and other innocents.

G. These violations by Defendants are key elements of their

intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead

Plaintiff of free exercise of will and rights guaranteed under the United States

Constitution and ratified international treaties having force of law. By denying

Lead Plaintiff's right to pursue a free and ordinary life, under their color of law

fiction of "state secrets" and "national security," Defendant United States

conceals its criminal and illegal deployment of a bioweapon and bioweapon

delivery system (known herein as BRMT) against US persons and other

innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in

approximately 1972, to the present.

H. Defendant violations against the Lead Plaintiff accelerated with

national security pretexting beginning in 1996, a sensitive US Navy project

introduced in the Summer of 2001, and very dramatically in the aftermath of

the 9/11/2001 attack and interdiction failure. This subcount includes violations

of international treaties having the force of law within the United States of

America. The acts described herein as undertaken by Defendants with police

and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

I. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime     Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

J. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

K. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendant United States uses BRMT bioweapon induced anxiety and depression to manage, direct, and control Lead Plaintiff's movements for the convenience of the Defendants, including daily movements as basic as shopping, being purposefully misdirected by flipping Lead Plaintiff's sense of direction in New York City to arrange non-randomized directed walks which include psychological operations, to manage the timing of his arrival at events or his missing of events, to elect and cancel vacation travel, and many other activities and actions inside his personal residence and in public places.

B. One such example is the inducement of strong anxiety in advance of a film festival in Telluride, CO which he arranges and cancels as shown at LP Evidentiary Exhibits pages 10365-10375 while employed at Establish. This anxiety-induced vacation cancellation comes in May 2008 after an earlier ski

Evidentiary Exhibits pages 10365-10375 while employed at Establish. This anxiety-induced vacation cancellation comes in May 2008 after an earlier ski vacation to Park City, UT The Park City trip is orchestrated and allowed by Defendant United States to arrange his "incidental" view of classified pulse jet technology in flight operations during this early 2008 trip on the day before he visits the Hill Air Force Base Museum near Ogden, UT See other examples of this type of physical movement intervention, a daily occurrence to Lead Plaintiff by Defendant United States' use of its BRMT bioweapon to hijack Lead Plaintiff's daily life, at Complaint paragraph 26, 344, Table 2-0115, paragraphs 369, 400, and at LP Evidentiary Exhibits pages 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

New York Cares Library Bowling Outing 080815.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-13 through P-20.

 E. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead

and police powers frauds and conspiracies in commerce and interstate

commerce, and violations of individual rights and liberties protected by the

Constitution, laws, and treaties of the United States of America.

 F. Relevant emails providing further evidence and incorporated herein

by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be

retained both to provide evidence for Defendants' programmed color of law

prosecutions if their entrapment efforts work, and to sustain the intricate

neurological research process used to further develop Defendant United States

brain hijacking bioweapon and its deployment system, collectively known as

BRMT, as each succeeding generation of BRMT technology is developed and

deployed against US persons and other innocents.

 G. These violations by Defendants are key elements of their

intertwined pattern of racketeering acts to control and traffick Lead Plaintiff.

Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

H. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons

are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

I. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture<br>Lethality<br>Theft<br>Servitude, Forced<br>Labor<br>Detention Lacking<br>Authorization,<br>Including Virtual<br>Detention<br>Medical Experiments<br>Family, privacy<br>Religion | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |

| Cruel, Inhuman, Degrading Treatment | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
|---|---|---|---|
| Property Crime | 27, 33 | | 17.1, 17.2, 23 |
| Covid vaccine deprivation | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

J. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

K. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendant United States engaged in protracted manipulation of Lead Plaintiff's words and action from approximately 2000 to 2021 to publicly defame and mischaracterize the Lead Plaintiff.. Combined with their careful pre-texting of Lead Plaintiff in national security matters beginning in 1996 and continuing after the September 11, 2001 terrorist attack, their purposeful public internet exposure of Lead Plaintiff, and their enhanced powers and general public and police powers paranoia surrounding Defendants United States' failure to interdict the 9/11 attack, these BRMT manipulations recklessly endangered the Lead Plaintiff's life at the hands of both other Defendants and due to public vigilantism; and defamed the Lead Plaintiff in the view of many people.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages

140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-13 through P-20.

C. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal

and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

F. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, include the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to all rights and protections found within two international treaties referenced below (and see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

G. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these mandatory force of law international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture<br>Lethality<br>Theft<br>Servitude, Forced<br>Labor<br>Detention Lacking<br>Authorization,<br>Including Virtual<br>Detention<br>Medical Experiments<br>Family, privacy<br>Religion<br>Cruel, Inhuman,<br>Degrading Treatment<br>Property Crime<br>          Covid vaccine<br>deprivation | **1949 Geneva Conventions Articles Violated** | **Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990** | **Covenant on Civil and Political Rights, ratified 1992** |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

H. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

I. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-17 Personal Frauds: Biological and Medical Invasions -**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States.

B. Lead Plaintiff begins experiencing constipation in irregular cycles around 1984. Periodically throughout and after these progressions, Lead

**BRMT Induced Reactions, Symptoms, and Illnesses**

Plaintiff's constipation completely disappears, then recurs in bouts, and is severely persistent as this Complaint is being written in full view of Defendants' surveillance.

C. Lead Plaintiff begins experiencing allergy symptoms in the early 1980s, despite having lived in the exact same environment with evergreen trees since birth. An allergist diagnoses this as a primary allergy to deciduous trees which steadily worsens through 2005, requiring persistent nasal steroid use and frequent antibiotic use, as well as nasal surgery in the 1990s. Once Lead Plaintiff relocates from the Seattle area and its millions of fir, hemlock, and cedar trees, to Boston, a heavily treed city with millions of deciduous trees, his allergies nearly vanish and never again present in any particularly notable manner though 2022, even when pollen loads are heaviest, despite deciduous trees being the only trees near any of his residences in the Boston and northern New Jersey area from 2006 to today.

D. Lead Plaintiff begins experiencing strong headaches shortly after joining CNA Industrial Engineering in November 1996. His visit to an optometrist results in a moderate strength bifocal prescription. Subsequent visits indicate this progression until 2008, when he is told on each successive visit that his prescription strength is being reduced, including at his most recent vision check-up in 2022. This vision progression, as verbally represented by his eye doctors, directly contradicts the normal progression over time of virtually everyone who must use prescription eyewear.

visits indicate this progression until 2008, when he is told on each successive visit that his prescription strength is being reduced, including at his most recent vision check-up in 2022. This vision progression, as verbally represented by his eye doctors, directly contradicts the normal progression over time of virtually everyone who must use prescription eyewear.

   E. Further evidence of these BRMT bioweapon induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses without Constitutional authority and in violation of rights, law and ratified international treaties, which comprise crimes against its own citizens and other innocents. To the extent they have not been destroyed medical records, likely including copies maintains by Defendant United States, its medical contractors and/or researchers, can also be discovered to validate these claims. See Complaint Table 2-001, 2-026, 2-0150, 2-0153, 2-201, 2-202, paragraphs 332, 369, 371, 373, 400, LP Evidentiary Exhibits pages 140-189 paragraphs 1-24, 54, 116-117, 575-597, 598-606.

   F. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes,

without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459, 460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-13 through P-20.

G. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead

H. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's

right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

J. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-

933) and the United Nations charter, all of which have been ratified by the United States Senate.

K. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture<br>Lethality<br>Theft<br>Servitude, Forced<br>Labor<br>Detention Lacking<br>Authorization,<br>Including Virtual<br>Detention<br>Medical Experiments<br>Family, privacy<br>Religion<br>Cruel, Inhuman,<br>Degrading Treatment<br>Property Crime<br>     Covid vaccine<br>deprivation | 1949 Geneva<br>Conventions<br>Articles Violated | Convention Against<br>Torture, Other Cruel,<br>Degrading Treatment,<br>ratified 1990 | Covenant on Civil<br>and Political Rights,<br>ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

L. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

M. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further

evidenced by the continued prosecution in the present day of war criminals

who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State**

A. This subcount consolidates multiple violations, with the exact

number and date of each violation to be determined through discovery against

Defendant United States. During 1975-1976, 1988-1989, and 2002-2005,

Defendant United States uses BRMT and its carefully orchestrated life event

sequences to disguise and sustain a series of biomedical manipulations of Lead

Plaintiff's brain chemistry. These manipulations are also routinely used to

influence a variety of personal decisions of Lead Plaintiff. This combination of

stealthy high frequency manipulations (comparable to "Chinese Water

Torture"); and a protracted episode of extreme duress leading to a suicide

ideation in 2005; are interspersed with periodic lethality events and attempts

from the 1980s to 2022; as well as selective exposure to lethality events

directed at others and then amplified through selective coverage in the

manipulated media sources fed by Defendant United States to Lead Plaintiff

(2002 to 2022).

B. These manipulations are combined with Defendants' field-deployed psychological operations, and with incidentally occurring public vigilantism to create and sustain oppressive life circumstances across all dimensions of Lead Plaintiff's life, from career and entrepreneurial choices and outcomes, to intimate personal relationships, to BRMT bioweapon bio-manipulated feelings of self-worth, and to shape public perceptions and direct public vigilantism, including threats of lethal violence, toward Lead Plaintiff. This is an overwhelming effort by Defendant United States and its co-conspirators against Lead Plaintiff which is comparable to and worthy of any of the world's great demagogues and propagandists throughout history.

C. During 2002-2005, the methods used by Defendant United States, and its Defendant police powers co-conspirators and private sector co-conspirators are even more extreme, leading to Lead Plaintiff's suicide ideation. During this period, BRMT imposed brain chemistry and physical manipulations of brain, central nervous system, and muscles are particularly extreme, severe, and of long duration, leading to Lead Plaintiff to prolonged spells of extreme anxiety, pain, depression, and crying, imposed by Defendant United States use of BRMT.

D. At other moments, these BRMT bioweapon brain hijackings and manipulations lead to repeated near-lethal events as described in subcounts L-1 through L-16. BRMT induced symptoms experienced by Lead Plaintiff during these periods range from momentary blackouts, statue falls, and torturous

muscle spasms episodically in public and for days and hours on end in private settings, among many others. For a more complete description of the complete array of symptoms imposed by BRMT, and aided by field psychological operations, see Complaint Table 1-015, 1-023, paragraph 26, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-0150, 2-0153, paragraphs 321, 335, 352, 354, 369, 371, 373, 400 and LP Evidentiary Exhibits pages 1-10, pages 140-189 paragraphs 1-6, 54, 62-73, 78-80, 103-124; pages 371, 575-597, 9679-9696. See also sub-counts L-1 through L-16, C-4, P-3 through P-20.

E. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202,  and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459, 460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

F. Fraudulent BRMT manipulations resulting from the Defendants'
careful timing of events contrived by Defendants to appear as life
circumstances and events have been and are used to control and traffick Lead
Plaintiff through a series of physical and emotional traumas including the
selection, assignment and destruction of teenage and adult relationships;
destruction and recovery of physical and mental health; tortures and suicide
ideations; homelessness; enterprise and employment failures; de facto takings
of real and financial assets; various emergency situations with barely avoided
lethal consequences; among other traumas, many of which are directly created
by or arise from the Defendants direct acts and their willful violation of the
privacy of the Lead Plaintiff to expose him to risks resulting from adverse
exposure to the general public and vigilantism. All these acts against Lead
Plaintiff's interests, life and liberty are elements of and arise from Defendants'
pattern of racketeering acts, including, without limitation, their commercial
and police powers frauds and conspiracies in commerce and interstate
commerce, and violations of individual rights and liberties protected by the
Constitution, laws, and treaties of the United States of America.

G. Relevant emails providing further evidence and incorporated herein
by reference are shown at each relevant subcount listed above. Note that
relevant evidence is currently blocked, or hacked and deleted, from various
Lead Plaintiff's email accounts, including virtually all business and personal
emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

H. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

I. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

J. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law

mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime     Covid vaccine deprivation | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

K. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

L. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have

any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further

evidenced by the continued prosecution in the present day of war criminals

who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**P-19 Personal**        A. This subcount consolidates multiple violations, with the exact

**Frauds:**        number and date of each violation to be determined through discovery against

**Biological and**        Defendant United States. During 2006-2007, Defendant United States uses

**Medical**        BRMT and its carefully orchestrated life event sequences to disguise and

**Invasions -**        sustain a series of biomedical manipulations of Lead Plaintiff's brain

**BRMT**        chemistry. These manipulations are also routinely used to influence a variety

**Induced**        of personal decisions of Lead Plaintiff. This combination of stealthy high

**Torture,**

**Massachusetts**

frequency manipulations (comparable to "Chinese Water Torture"); long duration extreme daily headaches and severe vision impairment for protracted periods of extreme duress; and BRMT manipulated hypersensitivity to certain sounds (the crinkling of plastic bags) which are employed each night in a public shelter by Lead Plaintiff's nearby minders while he is homeless (together with occasional fights among homeless residents and collapses of consciousness leading to concussions among other homeless residents amplify this emotional anxiety) are interspersed with periodic lethality events and attempts from the 1980s to 2022; as well as selective exposure to lethality events directed at others and then amplified through selective coverage in the manipulated media sources fed by Defendant United States to Lead Plaintiff (2002 to 2022).

B. In late June 2006, one of his minders leaves a section of the Boston Globe newspaper containing an article about the suicide of Denise Denton, then Chancellor of the University of California at Santa Cruz, carefully folded to that story on the end table next to the couch on which he watched the evening news so Lead Plaintiff would be sure to see this announcement. Chancellor Denton, who jumped to her death from her 33rd floor high rise apartment in San Francisco, had previously been the Dean of the College of Engineering at the University of Washington in Seattle, WA and had invited Lead Plaintiff to join the College's Board of advisors which met periodically to advise the Dean.

C. These psychological operations (including the above reminder of his own previous suicide ideation, and the theft and destruction of Lead Plaintiff's eyeglasses which are placed on a sidewalk he uses each day to reach the Boston Public Library on the day after the theft) and BRMT manipulations are combined with Defendants' other field-deployed psychological operations, and with incidentally occurring public vigilantism to create and sustain oppressive life circumstances across all dimensions of Lead Plaintiff's life, from career and entrepreneurial choices and outcomes, to intimate personal relationships, to BRMT bioweapon bio-manipulated feelings of self-worth, and to shape public perceptions and direct public vigilantism, including threats of lethal violence, toward Lead Plaintiff. This is an overwhelming effort by Defendant United States and its co-conspirators against Lead Plaintiff which is comparable to and worthy of any of the world's great demagogues and propagandists throughout history.

D. At other moments, these BRMT bioweapon brain hijackings and manipulations lead to repeated near-lethal events as described in subcounts L-1 through L-16. BRMT induced symptoms experienced by Lead Plaintiff during these periods range from momentary blackouts, statue falls, and torturous muscle spasms episodically in public and for days and hours on end in private settings, among many others. For a more complete description of the complete array of symptoms and injuries imposed by BRMT, and aided by field psychological operations, see Complaint Table 1-015, 1-023, paragraph 26,

Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-0150, 2-0153, paragraphs 321, 335, 371, 373, 400, and LP Evidentiary Exhibits pages 1-10, pages 140-189 paragraphs 1-6, 54, 62-73, 78-80, 103-124; pages 371, 575-597, 9679-9696.

E. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Hurd Pine Street Inn update 110419.pdf

F. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354, 369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout

Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

G. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

H. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

I. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal

and illegal deployment of a bioweapon and bioweapon delivery system
(known herein as BRMT) against US persons and other innocents. These
violations of rights also serve to conceal the illegal acts of co-conspirator
Defendants, as they have from BRMT program inception, in approximately
1972, to the present.

   J. Defendant violations against the Lead Plaintiff accelerated with
national security pretexting beginning in 1996, a sensitive US Navy project
introduced in the Summer of 2001, and very dramatically in the aftermath of
the 9/11/2001 attack and interdiction failure. This subcount includes violations
of international treaties having the force of law within the United States of
America. The acts described herein as undertaken by Defendants with police
and intelligence powers in the aftermath of the Congressional Authorization
for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738),
which empowered a global war, included the United States of America as part
of the territory upon which the AUMF operations are authorized to be
conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages
10614-10736) and the Congressional AUMF authorization, all US persons are
entitled, by law, to all the protections found in the Geneva Convention. All US
persons are also entitled to the rights and protections found within two
international treaties – human rights and torture (see LP Evidentiary Exhibits
pages 895-933) and the United Nations charter, all of which have been ratified
by the United States Senate and President.

K. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture<br>Lethality<br>Theft<br>Servitude, Forced Labor<br>Detention Lacking Authorization, Including Virtual Detention<br>Medical Experiments<br>Family, privacy<br>Religion<br>Cruel, Inhuman, Degrading Treatment<br>Property Crime<br>    Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

L. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

M. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-20 Personal Frauds: Biological and Medical Invasions -**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. During 2008-2011, Defendant United States uses BRMT and its carefully orchestrated life event sequences to disguise and sustain a series of biomedical manipulations of Lead Plaintiff's brain

**BRMT Induced Torture, New Jersey**

chemistry. These manipulations are also routinely used to influence a variety of personal decisions of Lead Plaintiff. This combination of stealthy high frequency manipulations (comparable to "Chinese Water Torture"); and a protracted episode of extreme duress leading to a suicide ideations around 2009-2010 and involuntary commitment in 2010; are interspersed with periodic lethality events and attempts from the 1980s to 2022; as well as selective exposure to lethality events directed at others and then amplified through selective coverage in the manipulated media sources fed by Defendant United States to Lead Plaintiff (2002 to 2022).

B. These BRMT manipulations are combined with Defendants' field-deployed psychological operations which include a sequence of events which later indicate foreknowledge and pretexting of the US Airways 1549 Hudson River emergency landing he witnesses on January 15, 2009 from a living room window; followed by a brief out of place sighting from his apartment's kitchen window looking onto Palisade Avenue of the "Beast" Presidential limousine some months later and; shortly before his forced departure from this Cliffside Park, NJ apartment, three messages delivered one afternoon to appear as aural hallucinations to Lead Plaintiff from the "United States Secret Service" instructing him to descend to the building's basement and hide, a behavior witnessed by two female undercover officers.

C. These incidents are intermingled with years of sustained daily BRMT induced extremely painful headaches and severe vision impairment,

and other coercive psychological operations and public vigilantism inspired by

Defendants to create and sustain oppressive life circumstances across all

dimensions of Lead Plaintiff's life, from career and entrepreneurial choices

and outcomes, to intimate personal relationships, to BRMT bioweapon bio-

manipulated feelings of self-worth, and to shape public perceptions and direct

public vigilantism, including threats of lethal violence, toward Lead Plaintiff.

This is an overwhelming effort by Defendant United States and its co-

conspirators against Lead Plaintiff which is comparable to and worthy of any

of the world's great demagogues and propagandists throughout history.

D. During 2008-2011, the methods used by Defendant United States,

and its Defendant police powers co-conspirators and private sector co-

conspirators are even more extreme than usual, leading to Lead Plaintiff's

second suicide ideation and, eventually to Lead Plaintiff's involuntary

commitment without benefit of personal contact with legal counsel or the

Court before so ordered by the Court. During these periods, BRMT imposed

brain chemistry and physical manipulations of brain, central nervous system

and muscles are particularly extreme, severe, and of long duration, leading to

Lead Plaintiff to repeatedly cry out in pain and suffering imposed by

Defendant United States use of BRMT.

E. At other moments, these BRMT bioweapon brain hijackings and

manipulations lead to repeated near-lethal events as described in subcounts L-1

through L-16. BRMT induced symptoms experienced by Lead Plaintiff during

these periods range from momentary blackouts, statue falls, and torturous muscle spasms episodically in public and for days and hours on end in private settings, among many others. For a more complete description of the complete array of symptoms imposed by BRMT, and aided by field psychological operations, see Complaint Table 1-015, 1-023, paragraph 26, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-0150, 2-0153, paragraphs 321, 335, 352, 354, 369, 371, 373, 400, and LP Evidentiary Exhibits pages 1-10, pages 140-189 paragraphs 1-6, 54, 62-73, 78-80, 103-124; pages 371, 575-597, 9679-9696. See also sub-counts L-1 through L-16, C-4, P-3 through P-20.

F. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Bergen Regional Sinisi re resume and cover ltr 101230

G. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 26, 321, 332, 335, 344, 352, 354,

369, 371, 373, 400, Table 1-015, 1-023, Interline Exhibit 1C, 1D, Table 2-0003 through 2-0006 (under column entitled Destroy Career, Business), 2-026, 2-0115, 2-0150, 2-0153, 2-0201, 2-0202, and LP Evidentiary Exhibits pages 140-189 paragraphs 1-32, 38-39, 54, 62-73, 78-80, 92-93, 95, 103-124, 128, 194; pages 371, 420, 456-459,460-464, 543, 548-563, 564-571, 575-597, 598-606, 9679-9696, 10365-10375, 10187-10250. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, C-4, P-3 through P-20.

H. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants'

pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

K. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be

conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages

10614-10736) and the Congressional AUMF authorization, all US persons are

entitled, by law, to all the protections found in the Geneva Convention. All US

persons are also entitled to the rights and protections found within two

international treaties – human rights and torture (see LP Evidentiary Exhibits

pages 895-933) and the United Nations charter, all of which have been ratified

by the United States Senate and President.

L. These force of law documents each spell out protections from certain acts

involving military, intelligence, and police powers forces in time of war.

Defendants have systematically violated these rule of law mandatory

obligations by their acts against the Lead Plaintiff and other Plaintiffs of this

class. These acts therefore comprise 18 USC § 2441 war crimes against this

class of plaintiffs - protected civilians in time of war. Defendant United States,

including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |

| Including Virtual Detention | 27, 32, 33, 97, 147 | | |
| Medical Experiments | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Family, privacy Religion | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Cruel, Inhuman, Degrading Treatment | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Property Crime | 27, 33 | | 17.1, 17.2, 23 |
|     Covid vaccine deprivation | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

M. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and

| Including Virtual Detention | 27, 32, 33, 97, 147 | | |
|---|---|---|---|
| Medical Experiments | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Family, privacy | 27, 31, 33 | | |
| Religion | | | 9.1, 9.4, 9.5 |
| Cruel, Inhuman, Degrading Treatment | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Property Crime | 27, 33 | | 17.1, 17.2, 23 |
| Covid vaccine | 3(1), 27 | | 18.1 |
| deprivation | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

M. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore, all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants orchestrate multiple episodes of food borne illnesses to Lead Plaintiff by arranging for spoiled food products to be placed among fresh refrigerated product in 2008 through 2010 and again in 2020-2022. Bagged salads are contaminated with rotted and blackened spoiled spinach in 2008 through 2010, and milk and packaged Johnsonville brats are allowed to spoil and then placed on the refrigerated dairy shelf for sale to the Lead Plaintiff in 2020-2022. Lead Plaintiff also endures several episodes of vomiting from rice and other packaged foods in 2020-2022. All refrigerated foods which are spoiled originate at the grocery store in Edgewater Commons shopping center in Edgewater, NJ. Some packaged foods originate there, and others are home delivered from Walmart in North Bergen, NJ. Emails evidencing Lead Plaintiff's correspondence with the parent company of the Edgewater, NJ grocery store, Albertsons, customer service organization in 2020-2022 is no longer on the Lead Plaintiff's personal Hotmail.com email account as of the date this Complaint is being prepared and is not known to have been deleted by the Lead Plaintiff.

B. Further evidence of these food borne illness induced bodily reactions and responses is likely to available through the discovery process, including the recovery of the Lead Plaintiff's own records currently in the hands of Defendants, through deposition of the direct witness, as well as the routine internal reports of these incidents authored and controlled by Defendants, particularly the classified BRMT bioweapon and bioweapon delivery system Defendant United States uses. To the extent they have not been destroyed maintained by Defendant United States, its medical contractors and/or researchers, can also be discovered to validate these claims.

C. Fraudulent BRMT manipulations resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants'

pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-22 Personal Frauds: Theft and Takings - Financial Resources, Blocking Personal Employment Opportunities**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants with police powers hack and manipulate Lead Plaintiff's personal computer and the websites and/or spoofs of legitimate websites presented to Lead Plaintiff to engage in repeated blocking of access to legitimate personal employment opportunities. Defendants repeatedly substitute their own fraudulent executive recruiters and their own insider network of Defendant police powers, domestic and international intelligence agents, officers, and confidential informants for both legitimate existing and non-existent positions, and do not permit the Lead Plaintiff to seek or engage

in legitimate private employment. This fraudulent scheme, running from the Lead Plaintiff's first instance of mailed application and resumes through his ownership of a personal computer beginning in the 1980s to the present, used mail fraud, and since the 1980s primarily uses wire frauds and email frauds, in both in-state and interstate commerce, to sustain and perpetuate Defendants' involuntary servitude, forced labor, and their systematic violations of the First, Fourth, Ninth, Thirteenth, Fourteenth, and Fifteenth Amendments, and other civil, Constitutional, and human rights guaranteed under ratified international treaties. See Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 2-0001, 2-0024, 2-0044, 2-0062, 2-0063, 2-0094, 2-0151, 2-0157, 2-0180, LP Evidentiary pages 140-189 paragraphs 28, 31, 42, 44, 51-52, 55, 60, 64-65, 72, 84-95, 125-132; pages 382-385, 416-417.421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 10259-10301, 10376-10393.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

CaseStack cutout Edwards Tracy 080625,

IBM Circo DB Headhunter 1080717,

LLoyd Staffing K Shipper DB Headhunter 110621,

Paul Rainer IMS 080701,

Personal Recruiter Connections Carnegieww Stricklin DB Headhunter 080625,

Personal Recruiter Connections Circo 080716,

Personal Recruiter Connections Kvederis 080716,

Personal Recruiter Connections Circo 080725,

Personal Recruiter Connections Rivera 080725,

Personal Recruiter Connections Rowa 080801,

Personal Recruiter Connections Sklenar 081021,

Personal Recruiter Connections Gonzalez 110324,

Personal Recruiter Connections Knox 110413,

Personal Recruiter Connections Santorelli 110420,

Personal Recruiter Connections McQuilkin 111015,

Personal Recruiter Connections Lang 120726,

Personal Recruiter Connections Melino 130213,

Personal Recruiter Connections Andersen 140128,

Personal Recruiter Connections DeNapoles 150210,

Personal Recruiter Connections Weis 171019,

Personal Recruiter Connections Pages 171205,

Personal Recruiter Connections Nithin 180206,

Personal Recruiter Connections Alcanzirin 181105,

Personal Recruiter Connections Harte 190910,

Personal Recruiter Connections Foster Peters 210518,

Personal Recruiter Connections Olympia 210518,

Personal Recruiter Connections Walsh 210518,

Personal Recruiter Connections Foster Peters 210604,

Personal Recruiter Connections Vasamshetti 220127.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of

racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

D. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system

(known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

G. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

H. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture Lethality Theft Servitude, Forced Labor | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Detention Lacking Authorization, Including Virtual Detention | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Medical Experiments | 27, 32, 33, 97, 147 | | |
| Family, privacy Religion | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Cruel, Inhuman, Degrading Treatment | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Property Crime | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Covid vaccine deprivation | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

I. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

J. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-23 Personal Frauds: Theft and Takings - Financial Resources,**
A. Establish sales commissions are not paid as due while Lead Plaintiff is employed in 2007 and 2008, despite the explicit and specific wording of the Lead Plaintiff's offer letter from Establish. This purposeful and deliberate fraud by Defendant Establish and its key executive in the United States, Defendant William Drumm, later misidentified to SDNY due to a local feed

**Unpaid Compensation**   Lead Plaintiff, as a prominent member of the news media and a long-serving former political operative and aide to Richard B. Cheney, the current Vice President at the time of Lead Plaintiff's trafficking from the Seattle, WA area to Boston, MA in 2005 and then to northern New Jersey in 2007. This fraudulent employment is first confirmed while this individual is posing as William Drumm in Summer 2007. Mr. Drumm chooses to fail to pay Lead Plaintiff these commissions timely, citing company cash flow issues, despite this sole US office being represented as wholly owned by a well-capitalized Swedish parent company.

B. Defendants purposefully delay these payments until they place the Lead Plaintiff in a more financially vulnerable position when he is terminated a few months later and lacks the financial resources to adequately defend his personal financial interests.

C. The actual sales commissions due by the time of Lead Plaintiff's June 2008 termination are approximately $6,600. Establish also refuses to pay the one month of termination pay agreed with the executive recruiter (nearly $11,666) despite a verbal agreement. According to the terminating manager, Conrad Ross, the agreement to pay one month of severance is not included in the company offer letter signed by William Drumm, and therefore is not due. Establish provides $700 to Lead Plaintiff and claims this is full payment of these claims.

D. The Defendants thus once again defraud the Lead Plaintiff, this time of approximately $18,000. The Lead Plaintiff lacks the funds to pay for legal services to litigate this matter and so is unable to pursue it and collect the full amount of compensation due, legally permitted damages, and attorney's fees, which he could otherwise receive in a Court action.

E. See Complaint paragraph 322, Table 2-0046, 2-0047, 2-0054, 2-0055, 2-0063, 2-0082, 2-0110, 2-0114, 2-0138, LP Evidentiary Exhibits pages from 140-189 paragraphs 44-48, 51-52, 58, 60, 64-68, 72-77, 83-90, 125-126; pages 8351-8355, 10311-10364 for evidence of these involuntary servitude, forced labor, trafficking, email, and compensation frauds by Defendants.

F. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include:

Establish Drumm post wedding 253pm 080630,

Establish Meeks re closeout issues 080630,

Establish Ross re CWP stiff and closeout 080702,

Establish Ross re CWP stiff and closeout 080709,

Establish Ross Demand Ltr 080714,

Establish Meeks New Ramsey Address Move in date 110331.

G. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 - C-40, and P-22 - P-27, P-31.

H. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and

destruction of teenage and adult relationships; destruction and recovery of

physical and mental health; tortures and suicide ideations; homelessness;

enterprise and employment failures; de facto takings of real and financial

assets; various emergency situations with barely avoided lethal consequences;

among other traumas, many of which are directly created by or arise from the

Defendants direct acts and their willful violation of the privacy of the Lead

Plaintiff to expose him to risks resulting from adverse exposure to the general

public and vigilantism. All these acts against Lead Plaintiff's interests, life and

liberty are elements of and arise from Defendants' pattern of racketeering acts,

including, without limitation, their commercial and police powers frauds and

conspiracies in commerce and interstate commerce, and violations of

individual rights and liberties protected by the Constitution, laws, and treaties

of the United States of America.

 I. Relevant emails providing further evidence and incorporated herein

by reference are shown at each relevant subcount listed above. Note that

relevant evidence is currently blocked, or hacked and deleted, from various

Lead Plaintiff's email accounts, including virtually all business and personal

emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further

evidence of extensive correspondence and documentation of exchanges by

and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well

as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

K. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project

introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

L. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime     Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

M. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have

any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further

evidenced by the continued prosecution in the present day of war criminals

who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**P-24 Personal**      A. After Lead Plaintiff is terminated from Establish in June 2008, his

**Frauds: Theft**    Cliffside Park landlord requests he renovate and improve his top floor

**and Takings -**    apartment in Cliffside Park, NJ. To avoid losing his eligibility for

**Financial**     unemployment payments, Lead Plaintiff agrees and stops his unemployment

**Resources,**    compensation payments while he works on this project. When the project is

**Theft of**    completed, he presents Defendant Chalom the bill for equipment rental, tools,

**Funds and**    materials, supplies, and for his labor at $17.00 per hour, a total of

**Services**    approximately $16,000. Defendant Chalom then informs Lead Plaintiff that

New Jersey law requires written contracts for all such agreements when the

cost totals more than $5,000. Lead Plaintiff is forced to settle for $5,200, less

than the out of pocket costs he incurred. He continues his professional job

search for alternate employment as he applies for resumption of unemployment compensation.

B. As in similar prior sequences driven and orchestrated by Defendant United States and its co-conspirators, Lead Plaintiff is again in a very precarious financial position while unemployed and with no financial reserves after only ten months of employment in this fraudulent VP job at Establish and prior homelessness, exactly where Defendant United States and it co-conspirators seek to keep him as they have for years already – and will tomorrow and the next day – through 2022 and the preparation of this Complaint. See Complaint Table 2-0141, Table 2-0157, 2-0160, paragraph 371, LP Evidentiary Exhibits pages 8351-8355, 10259-10301, 10305-10310, 10311-10364, 10434-10444. See also LP Evidentiary Exhibits pages from 140-189 paragraph 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-90, 91-95, 125-126, 127-132; pages 382-385, 416-417.421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 10376-10393. See LP Evidentiary Exhibits emails listed below at subparagraph C.

C. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at

LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

> Chalom re improvements billing 081229,
>
> Chalom Final rent pymt 100913.

D. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

E. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

F. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead

Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

   G. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-

conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

H. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

I. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory

obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime     Covid vaccine deprivation | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

    M. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have

any provision for any time limitations for statutory offenses involving murder

and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further

evidenced by the continued prosecution in the present day of war criminals

who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**P-25 Personal**         A. This subcount consolidates multiple violations, with the exact

**Frauds: Theft**    number and date of each violation to be determined through discovery against

**and Takings -**    Defendants.

**Financial**

**Resources,**         B. As a result of incurring renovation and improvement out-of-pocket

expenses at Cliffside Park, NJ apartment, as related in subcount P-24, while

**Deprivation of**   his unemployment compensation has been suspended, by using his available

**Benefits and**     credit to pay for the project costs and for daily food and other necessities, Lead

**Involuntary Commitment**   Plaintiff's access to credit he has reestablished in 2007 and 2008 is eliminated yet again, and his credit rating is again destroyed in this process. His $10,000 Bank of America credit card is completely exhausted. When he misses a payment on the card while awaiting resumption of unemployment benefits, the card issuer immediately cancels his credit insurance. The card then goes into default as he must now choose between eating and paying rent or making his credit card payment.

C. Lead Plaintiff composes and files a Newark US District Court Complaint on June 23, 2010. This is swiftly followed in July by a certified letter from his landlord, Defendant Chalom, terminating his month to month apartment rental. He overstays his rental period to remain in his renovated Cliffside Park, NJ until October 1, 2008, when with no financial resources or credit, he becomes homeless again. Lead Plaintiff travels to the Bergen County homeless shelter in Hackensack. He is informed the shelter is full and redirected to the street address of a nightly shelter a few blocks away. There is no shelter at that address, only older family residences, and no such number between those residences.

D. Lead Plaintiff then walks to the Hackensack Police station and waits for about 20-30 minutes for a not particularly busy desk sergeant to respond. He is directed and walks to a South Hackensack motel about 2 miles away. One night in this low budget motel exhausts remaining funds, and he calls 911 the morning of October 2, 2010. A South Hackensack Police officer and an

ambulance respond. Lead Plaintiff is loaded to the ambulance and, without explanation, transported to an unfamiliar hospital location (Bergen Regional Medical Center in Paramus, NJ), briefly examined, and waits about 12 hours in the emergency room. Unknown to Lead Plaintiff, an emergency involuntary commitment hearing is held with no contact with his appointed legal counsel before the hearing, or the Court and he is ordered involuntarily committed for 14 days. His first contact with the attorney comes days later. Since NJ state law says hospitals may only release admitted patients to safe housing and he has no access to housing or funds, he "elects" to remain, and is unable to leave the locked psychiatric wards of his confinement until March 31, 2011, about six months later.

 E. This "voluntary decision" is the direct consequence of the sequence of Defendants' police powers actions, including their intentional starve outs, thefts of resources, and deprivation of benefits under law, including their denial of shelter and misdirection to a non-existent homeless shelter on October 1, 2010. Defendants, led by Defendant United States in this on-going conspiracy against rights and long-running RICO frauds sequence, once again act as, and are clearly shown to be, human traffickers of the Lead Plaintiff, among their other violations of rights and law.

 F. See Complaint Table 2-0141, Table 2-0157, 2-0160, paragraph 326, 327, 371, LP Evidentiary Exhibits pages 8351-8355, 10259-10301, 10305-10310, 10311-10364, 10434-10444.

G. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

H. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of

physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

I. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and

private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

K. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of

the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| Torture Lethality Theft Servitude, Forced Labor Detention Lacking Authorization, Including Virtual Detention Medical Experiments Family, privacy Religion Cruel, Inhuman, Degrading Treatment Property Crime    Covid vaccine deprivation | **1949 Geneva Conventions Articles Violated** | **Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990** | **Covenant on Civil and Political Rights, ratified 1992** |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

M. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory

of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore, all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. In September 2019, Defendant Dean T. Smith files litigation in the Eastern District of California (19-cv-01918, which see on Pacer) which further extends Lead Plaintiff's involuntary servitude and functionally destroys Winnett Perico and its subsidiaries. The federal court case filed lacks a sound legal basis for the claims made and is based on false representations, demonstrating virtually no due diligence by the filing attorney. The Smith v. Winnett/Brewer et al case 19-cv-01918 is voluntarily dismissed without prejudice in April 2022, so it effectively continues to hang over the Lead Plaintiff despite the false original premise for the claims being made in the

Complaint. See LP Evidentiary Exhibits pages 140-189 paragraph 85; pages 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9925, 9926, 9997, 10004.

B. This litigation pattern of racketeering acts by Defendants is similar to prior accounts receivable, bad checks, and compensation theft and related litigation recounted at subcounts C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

C. Litigation is also required to attempt recovery of stolen and/or promised funds and compensation at (1) LaserAccess (formerly LazerSoft when run by Lead Plaintiff) in 1993; at (2) Alliance for a stolen project account receivable payment; (3) P.A.N. Environmental Services (PAN), an employer who promises and then denies compensation by using the fraudulent subterfuge of accounts receivable factoring fraud in 1994; (4) to pay legal fees after leaving PAN by a supposed freelancer seeking payment for a unpaid PAN bill for services which must be defended; with (5) CNA Industrial Engineering in 2003, another compensation theft where there is no valid legal basis for the arguments being presents and legal maneuvering and failures to comply with deadlines are use string out the matter while starving Lead Plaintiff's financial resources so as to avoid the treble damages and attorney's fees recovery allows under Washington state law for this kind of theft (see LP Evidentiary Exhibits pages 10507-10527., and (6) Allegent LLC dba Performa for bad checks passed to Performa by a customer, actually a Defendant insider entity (see LP Evidentiary Exhibits pages 10445-10506).

C. Adding these six litigation efforts to the other thefts and misappropriations by Defendants operating under color of law brings the total number of such violations directly against the interests of Lead Plaintiff to twelve such events since 1990.

D. This series of "legal" techniques, as use by Defendant United States and its officers, agents, and confidential informants, abuses the legal system to induce delays, expenses, and mental and financial stresses, while "dirtying up" the Lead Plaintiff and other similarly situated victims.

E. The acts of compensation theft alone, leaving out all other offenses, directly cost the Lead Plaintiff over $400,000 in previously agreed compensation, all of which is agreed while under the coercive control of his trafficker, Defendant United States, in circumstance not reflecting the full market value of the Lead Plaintiff's professional services. These amounts are not adjusted for inflation or interest due, nor for consequential damages such as the loss of other professional and entrepreneurial opportunities, the repeated loss of real property and financial assets, and appreciation of those assets over time due to interest compounding and real property appreciation. See Complaint paragraphs 317, 318, 319, 322, Table 2-0001, Table 2-0047, 2-0056, 2-0057, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0185, 2-0186, LP Evidentiary Exhibits pages 140-189 paragraph 85; pages 371, 382-383, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 10311-10364.

F. These acts are and are sponsors and permitted by Defendant United States to sustain its involuntary control, servitude, and forced labor and to cover its criminal acts against US persons while it continues to claim "state secrets" and "national security" like playing cards in the game it plays with the lives of its own citizens and other innocents lives, with their mental and physical well-being, and as it insures the benefits of liberty unto itself and its personnel acting in the corrupt interests of the institutions, departments, and agencies which employ those decision-makers and their hierarchically managed personnel.

G. Notably, Defendant Department of Justice has never criminally prosecuted wide-spread institutional criminal actions, as in its notable failures to do so in both Cointelpro and MKUltra both of which included thousands of individual felonies committed by sworn personnel and their government-funds private sector violent extremists and other criminal collaborators.

H. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

Costco GC reply to verficiation request 211102,

D Brewer reply to DOJ OIG decline ltr 220325.

I. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

J. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of

physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

K. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

L. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

M. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

N. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against

these plaintiffs as protected civilians in time of war. Defendant United States,
including its department and agencies, together with Defendants including,
without limitation, all state and local police powers agencies; and all
Defendants' officers, agents, confidential informants, and other related
persons, whether acting within or without their color of law alleged authority,
have systematically violated the provisions of these treaties as follows:

| Torture<br>Lethality<br>Theft<br>Servitude, Forced Labor<br>Detention Lacking Authorization, Including Virtual Detention<br>Medical Experiments<br>Family, privacy<br>Religion<br>Cruel, Inhuman, Degrading Treatment<br>Property Crime<br>    Covid vaccine deprivation | **1949 Geneva Conventions Articles Violated** | **Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990** | **Covenant on Civil and Political Rights, ratified 1992** |
|---|---|---|---|
| | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| | 27, 32, 33, 97, 147 | | |
| | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| | 27, 33 | | 17.1, 17.2, 23 |
| | 3(1), 27 | | 18.1 |
| | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| | 27, 33, 147 | | 17.1 |
| | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

O. Treaties above are formally known as the International Covenant on
Civil and Political Rights and the Convention against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment. See full text at LP
Evidentiary Exhibits pages 895-933.

P. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**P-27 Personal Frauds: Theft and Takings - Financial Resources, Banking System Manipulations**

A. Defendants' control of Lead Plaintiff's finances is demonstrated yet again by their hacking of the ACH system, or their complete control of Lead Plaintiff's financial life through use of a completely controlled financial system in their hack or their contrivance to appear as a hack. An $8 ACH payment to CapitalOne from Lead Plaintiff's personal checking account fails as a result of their hack or some other fraudulent contrivance of Defendants, and results in a $20 late fee.

B. Defendants routinely impound Lead Plaintiff's funds and credit availability using double-billing and overbilling for goods and services, as well

as order fulfillment shortages, delivery of wrongly sized items, and hacked electronic devices requiring return to the vendor, to constrain available financial resources and limit financial flexibility and the ability of Lead Plaintiff to travel, entertain, and purchase goods and services at certain times.

C. Defendants also contrive and conspire to prevent Lead Plaintiff's continuing monthly repayment to CapitalOne on two credit card accounts in collection, and desire that Lead Plaintiff will decline to make an interest payment on a $6,000 loan from Defendant Michael Maggard, who has also engaged as a participant in other frauds against the Lead Plaintiff and his business enterprises. See Complaint Table 1-035, Table 2-0204, 2-0205, 2-0207, LP Evidentiary Exhibits pages 140-189 paragraph 125; pages 544, 9886-9889, 10098-10107, 10305-10307, 10434-10444.

D. On knowledge and belief, this particular collection accounts fraud and swindle is part of Defendants' broader scheme to use these uncollected credit card accounts as part of their conspiracy to generate a federal tax liability. Non-payment of these collection accounts by Lead Plaintiff would lead to taxable income from these unpaid debts. This specific entrapment combination of unpaid collection accounts and loans which are not serviced by Lead Plaintiff's annual interest payment to Defendant Maggard, could render the Lead Plaintiff guilty of tax fraud for a failure to declare income resulting from these debt extinguishments. He could then be deprived of certain federal

government benefits, including, without limitation, the Section 8 housing voucher he must use to maintain stable housing.

E. This scheme arises shortly after the Lead Plaintiff mentions such a scheme to the US Attorney for the Southern District of New York in a letter hand delivered to their New York City office on July 18, 2022 (which see at LP Evidentiary Exhibits page 544). This is yet another in Defendants' recent desperate series of conspiratorial actions, to and including physical violence, which rise to new levels of intensity in 2022. See LP Evidentiary Exhibits pages 10098-10107.

F. Such a conviction and a subsequent deprivation of benefits would "prove" that the Lead Plaintiff, the subject of Defendants' color of law conspiracies since the 1970s, rather than these Defendants themselves, is the bad actor they have persistently sought to portray and entrap him to be.

G. All these acts are carefully planned and integrated elements of Defendants' pattern of racketeering acts under color of law to prevent public exposure of a systematic, predatory, and criminal program abusing US persons and other innocents. Defendants, led by Defendant United States, use involuntary servitude, forced labor, entrapment, intimidation, retaliation, and lethal means, together with other crimes and their purposeful public endangerment of this entire class of Plaintiffs, who are US persons and other innocents, to serve their direct interests and to serve the interests of others who

use, abuse, and benefit from the "state secrets" privilege, all while evading accountability for crimes against humanity and myriad other offenses.

H. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 1 (Second), 25, 312-345, 371, 375-378, Table 1-035, Table 2-0001, 2-0024, 2-0044, 2-0046, 2-0047, 2-0054, 2-0055, 2-0056, 2-0057, 2-0062, 2-0063, 2-0082, 2-0094, 2-0110, 2-0111, 2-0113, 2-0114, 2-0134, 2-0138, 2-0141, 2-0157, 2-0160, 2-0180, 2-0185, 2-0186, 2-0204, 2-0205, 2-0207, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 84-95, 125-132; pages 371, 382-385, 416-417, 421, 428, 462-464, 509, 544, 567, 576, 598-601, 692-694, 768, 8233-8262, 8263-8287, 8288-8289, 8288-8289, 8291-8293, 8351-8355, 8472-8473, 9601-9604, 9610-9611, 9788-9790, 9886-9889, 9925, 9926, 9997, 10004, 10259-10301, 10311-10364, 10376-10393, 10098-10107, 10305-10307, 10434-10444, 10445-10506, 10507-10527, 10528-10566, 10566-10613. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, C-1, C-4, C-29 through C-40, and P-22 through P-27, P-31.

I. Fraudulent takings resulting from the Defendants' careful timing of events contrived by Defendants to appear as life circumstances and events have been and are used to control and traffic Lead Plaintiff through a series of

physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

J. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery

of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

K. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendant United States purposefully engages in a fraudulent scheme to misuse Lead Plaintiff's passport and an airline ticket he purchases in 2015 as cover to exfiltrate an unknown individual from the United States to Dubai by orchestrating and directing a fraudulent financing in that region to Lead Plaintiff and then demanding a known to be unaffordable advance fee a few days prior to the Lead Plaintiff's already paid and scheduled departure. Simple replacement of the Lead Plaintiff's picture and physical description by Defendant United States is all that is needed to complete this specific exfiltration to Dubai. According to these records, Lead Plaintiff left the United States on May 2, 2015 and has never returned. See LP Evidentiary Exhibits page 8453.

B. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 25, 30, 35, Table 1 in its entirety, Table 2 in its entirety, paragraphs 312 through 347, 357, 369 through 374, and LP Evidentiary Exhibits pages 140 through 189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 125-134, 142, 145; pages 371, 473, 544, 548-549, 566-573, 575-576, 582-597, 599, 603, 609-612, 770-772, 782, 783-784, 8453, 10251-10255, 10259-10301, 10376-10393, 10423-10433, as well as 10434 through 10444. While all subcounts throughout this Complaint

are driven by Defendants' conspiracy to commit and comprise an integrated
pattern of racketeering acts, the most directly relevant subcounts include,
without limitation, P-1, P-2, P-28 through P-31, and N-1 through N-5.

      C. Fraudulent deprivations of rights resulting from the Defendants'
careful timing of events and public exposure to facilitate vigilantism contrived
by Defendants to appear as life circumstances and events have been and are
used to control and traffick Lead Plaintiff through a series of physical and
emotional traumas including the selection, assignment and destruction of
teenage and adult relationships; destruction and recovery of physical and
mental health; tortures and suicide ideations; homelessness; enterprise and
employment failures; de facto takings of real and financial assets; various
emergency situations with barely avoided lethal consequences; among other
traumas, many of which are directly created by or arise from the Defendants
direct acts and their willful violation of the privacy of the Lead Plaintiff to
expose him to risks resulting from adverse exposure to the general public and
vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are
elements of and arise from Defendants' pattern of racketeering acts, including,
without limitation, their commercial and police powers frauds and conspiracies
in commerce and interstate commerce, and violations of individual rights and
liberties protected by the Constitution, laws, and treaties of the United States
of America.

D. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

E. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's

right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinfor- mation**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendants have and do block, continuously surveil, and/or spoof Lead Plaintiff's access to various online services both in-state and interstate, including, without limitation, dating sites; news sites such as New York Times, Washington Post, Wall Street Journal, Al Jazeera, and others; corporate sites for shopping, technical support, customer service, and other commercial purposes; performance and performance ticketing sites; brain-computer interface company sites, a vital element of evidence for the non-technical US District Courts to evaluate the veracity of Lead Plaintiff's technological claims, are blocked and suppressed from Lead Plaintiff's web search results until at least late 2021; and many others, including all online activities. Defendants fraudulently fail, despite their direct control of access, to prevent certain hacks, perform others of their own making, some of which require remote computer takeovers by technical support personnel to resolve

(particularly useful for color of law "legal" manipulations, and for installing and/or deinstalling Defendants' own software and malware under color of law), and use paid services to sustain their control and manipulation of Lead Plaintiff, including events attended by Lead Plaintiff, and for arranging various captive events, including public charity volunteer work, which Lead Plaintiff attends both alone and with other Defendant police powers agents, officers, confidential informants and/or performance actors, in their scheme to manage and control the actions of Lead Plaintiff. See Complaint paragraph 388, Table 2-0200, LP Evidentiary Exhibits pages 140-189 paragraphs 91-93, 125-134, 142, 145; pages 548-549, 576, 582-597, 771-772, 782, 10251-10255, 10259-10301, 10423-10433, 10614, 10620. See also LP Evidentiary pages beginning 148  paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95.

B. This spoofing and/or blocking of various websites, has and does include the blocking of accurate information access and its absence or replacement by other false and misleading information intended to mislead and/or publicly discredit the Lead Plaintiff when he cites this incorrect information currently continues under Defendants' direction and control.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 2, 15-18, 23, 25, 30,  32, 35, 42, 44-46, 49, 317, 330, 369, 385, 388, 398, Table 1-010, 1-024, 1-031, 1-040, Table 2-0191, 2-0200,  and LP Evidentiary Exhibits pages 140-189 paragraphs 28,

31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 125-134, 142, 145; pages 371, 473, 544, 548-549, 566-573, 575-576, 582-597, 599, 603, 609-612, 770-772, 782, 783-784, 8453, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-1, P-2, P-28 through P-31, and N-1 through N-5.

 D. Fraudulent deprivations of rights resulting from the Defendants' careful timing of events and public exposure to facilitate vigilantism contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including, without limitation, their commercial and police powers frauds and conspiracies

in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants

perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Defendants fraudulently and repeatedly engage in the hacking of Lead Plaintiff's personal computer and printers, used for both personal and business matters, beginning around 1984 and into the present time. At all times, they invade his privacy, and monitor his communications whether by email, telephone, or cellular phone, including arranging through his spouse, then a newly hired employee of US West Cellular, cellular car telephone service in the 1980s from AT&T's cellular telephone service. This US West subsidiary, and a previous client of Lead Plaintiff while serving as a consultant at Deloitte, is used to track movements, to listen to in-car conversations and communications and to sustain their pattern of planning and

manufacturing pretexts for color of law investigations of Lead Plaintiff. See Complaint Table 1-040, paragraphs 317, 330, Table 2-0191, LP Evidentiary Exhibits pages 770-772, 783-784, 10251-10255, 10376-10393, 10434-10444.

B. See further evidence related to this subcount in LP Evidentiary Exhibits emails. A compendium of key entities and individuals; and of selected emails, documents, and disbursements listed in both date order and alphabetic order; is at LP Evidentiary Exhibits pages 934-1075 (RED colored page number found at bottom of page). Relevant individual emails are listed below, alphabetically by date. Each email is found in date order from 2008 to 2022 at LP Evidentiary Exhibits pages 1076-6094. Relevant emails include the following:

D Brewer reply to DOJ OIG decline ltr 220325,

DOJ OIG Institutional Contacts 211109,

DOJ OIG From Investigations 220128 Div Ack Letter 220128,

DOJ OIG Decline Ltr 220322,

NJ EDC Inquiry 200805,

NJ Unemployment Hangup and shelter info request 081217,

Wire Fraud Examples Raising Consciousness of Guilt 221004.

C. A comprehensive set of relevant pre-discovery evidence and information which relates this subcount to other relevant subcounts includes, without limitation, Complaint paragraphs 2, 15-18, 23, 25, 30, 32, 35, 42, 44-46, 49, 317, 330, 369, 385, 388, 398, Table 1-010, 1-024, 1-031, 1-040, Table

2-0191, 2-0200, and LP Evidentiary Exhibits pages 140-189 paragraphs 28, 31, 42, 44-48, 51-52, 55, 58, 60, 64-68, 72-77, 83-95, 125-134, 142, 145; pages 371, 473, 544, 548-549, 566-573, 575-576, 582-597, 599, 603, 609-612, 770-772, 782, 783-784, 8453, 10251-10255, 10259-10301, 10376-10393, 10423-10433, 10434-10444. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, P-1, P-2, P-28 through P-31, and N-1 through N-5.

D. Fraudulent deprivations of rights resulting from the Defendants' careful timing of events and public exposure to facilitate vigilantism contrived by Defendants to appear as life circumstances and events have been and are used to control and traffick Lead Plaintiff through a series of physical and emotional traumas including the selection, assignment and destruction of teenage and adult relationships; destruction and recovery of physical and mental health; tortures and suicide ideations; homelessness; enterprise and employment failures; de facto takings of real and financial assets; various emergency situations with barely avoided lethal consequences; among other traumas, many of which are directly created by or arise from the Defendants direct acts and their willful violation of the privacy of the Lead Plaintiff to expose him to risks resulting from adverse exposure to the general public and vigilantism. All these acts against Lead Plaintiff's interests, life and liberty are elements of and arise from Defendants' pattern of racketeering acts, including,

without limitation, their commercial and police powers frauds and conspiracies in commerce and interstate commerce, and violations of individual rights and liberties protected by the Constitution, laws, and treaties of the United States of America.

E. Relevant emails providing further evidence and incorporated herein by reference are shown at each relevant subcount listed above. Note that relevant evidence is currently blocked, or hacked and deleted, from various Lead Plaintiff's email accounts, including virtually all business and personal emails from March 4, 2018 through July 7, 2020, and is inaccessible to Lead Plaintiff as this Complaint is being written. Discovery will provide further evidence of extensive correspondence and documentation of exchanges by and/or with the Defendants using email and other electronic means; recovery of Lead Plaintiff's own records currently in the hands of Defendants; as well as relevant information, documents, and items conveyed by US Mail, and private mail and express carriers. Such detailed information needs to be retained both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

F. These violations by Defendants are key elements of their intertwined pattern of racketeering acts to control and traffick Lead Plaintiff. Defendants perpetuate their violations by systematically depriving Lead Plaintiff of free exercise of will and rights guaranteed under the United States Constitution and ratified international treaties having force of law. By denying Lead Plaintiff's right to pursue a free and ordinary life, under their color of law fiction of "state secrets" and "national security," Defendant United States conceals its criminal and illegal deployment of a bioweapon and bioweapon delivery system (known herein as BRMT) against US persons and other innocents. These violations of rights also serve to conceal the illegal acts of co-conspirator Defendants, as they have from BRMT program inception, in approximately 1972, to the present.

**P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Since approximately 1972, Lead Plaintiff's life, relationships, family life, physical health, emotional well-being, career, businesses, life circumstances, and public reputation, as well as all human, Constitutional, civil, and legal rights have been usurped by Defendant United States and its co-conspirators. Lead Plaintiff was, without consent, designated as an involuntary servant of Defendant United States as a child. Lead Plaintiff's formal petitions in 2005 under FTCA for limited injuries, as then understood, were never answered by any Defendant United States department,

agency, nor the Executive Office of the President. A litigation attempt in US District Court at Newark, NJ, was indirectly answered by Defendants through their illegal racketeering acts. By their acts, he was rendered homeless, then involuntarily committed to a psychiatric hospital for six months. In 2022, as this entire pattern of facts was first completely understood and communicated to a US Attorney's Office, Defendants again answered indirectly with BRMT assisted attempts on the Lead Plaintiff's life, and through their still on-going and persistent pattern of threats and violence. Defendants desperately seek to avoid legal liability for their association-in-fact enterprise, their patterns of racketeering and civil rights conspiracy and acts of violence, and their patterns of terror. Terror acts include at least three mass casualty attempts, the most recent against an express train traveling 50 to 60 miles per hour enroute to New York City on the evening of September 11, 2022 which directly threatened the lives of about 300 people in addition to the Lead Plaintiff.

B. The broad sweep of about fifty years and nearly uncountable predicate acts of Defendant, including 2,599 examples presented in this Complaint and the accompanying exhibits which, together with the violations of five international treaties, are systematic violations of RICO, civil rights, and the powers of limited government envisioned by the founders. The Constitution, from its ratification in June 1788 was and is intended to restrain the federal government from replacing the tyranny and oppression of a King with new forms of the same. Our institutions continue to fail us rather

dramatically in these matter including their failure to protect both enumerated and unenumerated rights of Lead Plaintiff and others of this class, each and every one of whom is, together with all others, entitled to the quiet enjoyment of life, liberty, family, and property; to the pursuit of happiness rather than the imposition of coercive psychological operations and BRMT driven suicide ideations; and to the protections of the rule of law, rather than their lives being dictated – past, present, and future – to the whims of government executives, managers, remote BRMT operators, and undercover police powers a ting with impunity under color of law and subjecting them to the dangers of public vigilantes. paragraphs 25, 30, 35, 312-347, 369-389, Table 1 entirety, Table 2 entirety, paragraphs 314, 321, 327, 340, 357, 369-374.

**N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution,**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendants. Defendant United States begins pretexting Lead Plaintiff in national security matters for the purpose of perpetuating and covering up his involuntary enrollment as a human subject of BRMT in the early 1970s while he is a high school teenager and encounters an apparent hitchhiker, actually a federal agent who leaves a classified briefcase satellite phone in the bed of Lead Plaintiff's pickup truck. Lead Plaintiff spots his first terrorist in about 1980 as he walks in the morning from an ATM machine near his office in Seattle, back to his car to pay for parking as an unmarked prisoner van and two unmarked Ford Crown Victoria federal police cruisers sweep into the secured

**Laws, and**
**Ratified**
**International**
**Treaties**

loading dock of the US Federal Courthouse in Seattle carrying a later-convicted domestic terrorist.

B. This color of law pattern of pretexts and irregular sightings while alone continues until at least the 2022/2023 preparation of this Complaint, soon after a carefully timed and choreographed September 11, 2022 mass casualty attempt on an express train he is riding south along the Hudson River to New York City, two other lethality attempts in September and November 2022 which occur using City of New York municipal assets and a northern New Jersey parking lot, and various other such acts related elsewhere in these subcounts.

C. Lethality efforts, and a life-events encompassing set of other biomedical, physical, financial, and emotional abuses and violations are performed against the Lead Plaintiff by Defendant United States which, in the aftermath of 9/11/2001 enlists other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and deployment, including its international criminal law and ratified treaty violations of US persons and other innocents. See Complaint paragraphs 1-9, Table 1-001 through 1-011, 1-015, 1-021; paragraphs 15-46, 321-347, 371, Table 2-0003, 2-0024, 2-0060, 2-0095, 2-0097 and LP Evidentiary Exhibits pages 140-189 paragraphs 1-35, 49-53, 61-62, 88-90, 140, 143-146; pages 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10187-10250, 10423-10433, 10434-10444.

D. These violations by Defendants perpetuate their pattern of limiting Lead Plaintiff's access to All Privileges and Immunities guaranteed under Article IV Section 2 Clause 1 of the United States Constitution. Defendants perpetuate these violations, systematically precluding Lead Plaintiff's right to pursue a free and ordinary life, for the purpose of continuing Defendants' pattern of conspiracy and racketeering acts to sustain their cover-up of systemic violations of rights under the color of law fiction of "state secrets" and "national security."

E. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-1 through P-4, P-13 through P-21, P-28 through P-31, and N-1 through N-5.

F. All other sub-counts are intertwined with and perpetuated in furtherance of Defendants' continuous pattern of racketeering acts for the primary purposes of conspiring to and preserving of Defendant United States' concealment of its illegal deployment of the bioweapon and bioweapon delivery system known herein as BRMT against US persons and other innocents; and preventing public discovery of the full scope, extent, and duration of the criminal acts against and injuries to this class of Plaintiffs, from approximately 1972 to the present time.

G. This pattern of racketeering acts is the continuation of the illegal and criminal practices used by Defendant United States and its co-conspirators in both MKUltra and Cointelpro. These corrupt and criminal practices have never been criminally prosecuted at the institutional level, so they persist behind the "sword and shield" of "state secrets" and "national security," as invoked for the self-exculpation of the Defendants under color of law.

H. Discovery against Defendants will provide additional evidence of the violations of this subcount in furtherance of related violations thereof documented herein, and an element of the pattern of offenses, including a pattern of racketeering acts, critical to the Defendants' overarching and continual pattern of involuntary servitude at all times from inception of their violations to the present time of, among others, the Thirteenth and Fourteenth Amendments to the United States Constitution, in furtherance of the Defendants' conspiracy to and the systematic violation of 18 USC § 175 prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of rights; and in furtherance of conspiracy to and violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC § 1590 relating to trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

I. Such detailed information needs to be retained by Defendants both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

J. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits

pages 895-933) and the United Nations charter, all of which have been ratified

by the United States Senate and President.

F. These force of law documents each spell out protections from certain acts

involving military, intelligence, and police powers forces in time of war.

Defendants have systematically violated these rule of law mandatory

obligations by their acts against the Lead Plaintiff and other Plaintiffs of this

class. These acts therefore comprise 18 USC § 2441 war crimes against this

class of plaintiffs - protected civilians in time of war. Defendant United States,

including its department and agencies, together with Defendants including,

without limitation, all state and local police powers agencies; and all

Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |

| Religion | 3(1), 27 | | 18.1 |
|---|---|---|---|
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

M. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

N. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. During 1990 through 1994, Defendant United State, its agents, officers, and confidential informants, conspire with Canadian and British intelligence and police powers organizations to develop pretexts for international spying on Lead Plaintiff. Defendant United States directly or through a confidential informant used the Lead Plaintiff's search for financings for Alliance and for P.A.N. Environmental Services (PAN) to defraud Lead Plaintiff of authentic financing options in Canada and Great Britain through authentic sources.

B. This series of RICO frauds includes persons posing and/or acting as financial brokers, barristers, company executives, and in other professional roles to facilitate these frauds and swindles and permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in British Columbia, Alberta, and elsewhere in Canada, as well as within the United States using intelligence acquisition methods and assets which Defendant United States cannot legally deploy against its own citizens.

C. Defendant United States operates primarily through Gerald Cornwell, a US Navy veteran of the Vietnam War era, a female agent or officer posing as his wife, a fake cover residence in Newcastle, WA, and an extended series of financing services search trips to Vancouver, British Columbia while seeking financing to offset the prior frauds, thefts, and denial

of SBA bonding and loan guarantees by Defendant United States against Lead Plaintiff's environmental services company, Alliance in 1990-1993. The Canadian intelligence and police powers operations, most likely RCMP and CSIS, posed in various roles and as domestic and international mining executives and financiers in various office locations throughout Vancouver, British Columbia, Canada.

D. RCMP undercover officers are engaged, together with Defendant United States undercover agents and officers, for various trips over many years to Vancouver and Whistler, British Columbia and to the Rocky Mountain area of western Alberta in 2005. The Rocky Mountain trip in late Summer 2005 includes an overnight disappearance and search of the Lead Plaintiff's briefcase travel bag including his personal computer and all related tracking data and documents to that point, somewhere between Lake Louise, Calgary, Canada and its recovery at the front desk of his condo hotel in Canmore, Calgary, Canada, the following day.

E. Lethality efforts, and a life-events encompassing set of other biomedical, physical, financial, and emotional abuses and violations are performed against the Lead Plaintiff by Defendant United States which, in the aftermath of 9/11/2001 enlists other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and deployment, including its international criminal law and ratified treaty violations of US persons and other innocents. See Complaint Table 1-001

through 1-011, 1-015, 1-021; paragraphs 1-9, 15-46, 321-347, 371, Table 2-0003, 2-0024, 2-0060, 2-0095, 2-0097 and LP Evidentiary Exhibits pages 140-189 paragraphs 1-35, 49-53, 61-62, 88-90, 140, 143-146; pages 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10187-10250, 10423-10433, 10434-10444.

F. These violations by Defendants perpetuate their pattern of limiting Lead Plaintiff's access to All Privileges and Immunities guaranteed under Article IV Section 2 Clause 1 of the United States Constitution. Defendants perpetuate these violations, systematically precluding Lead Plaintiff's right to pursue a free and ordinary life, for the purpose of continuing Defendants' pattern of conspiracy and racketeering acts to sustain their cover-up of systemic violations of rights under the color of law fiction of "state secrets" and "national security."

G. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-1 through P-4, P-13 through P-21, P-28 through P-31, and N-1 through N-5.

H. All other sub-counts are intertwined with and perpetuated in furtherance of Defendants' continuous pattern of racketeering acts for the primary purposes of conspiring to and preserving of Defendant United States' concealment of its illegal deployment of the bioweapon and bioweapon

delivery system known herein as BRMT against US persons and other innocents; and preventing public discovery of the full scope, extent, and duration of the criminal acts against and injuries to this class of Plaintiffs, from approximately 1972 to the present time.

I. This pattern of racketeering acts is the continuation of the illegal and criminal practices used by Defendant United States and its co-conspirators in both MKUltra and Cointelpro. These corrupt and criminal practices have never been criminally prosecuted at the institutional level, so they persist behind the "sword and shield" of "state secrets" and "national security," as invoked for the self-exculpation of the Defendants under color of law.

J. Discovery against Defendants will provide additional evidence of the violations of this subcount in furtherance of related violations thereof documented herein, and an element of the pattern of offenses, including a pattern of racketeering acts, critical to the Defendants' overarching and continual pattern of involuntary servitude at all times from inception of their violations to the present time of, among others, the Thirteenth and Fourteenth Amendments to the United States Constitution, in furtherance of the Defendants' conspiracy to and the systematic violation of 18 USC § 175 prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of rights; and in furtherance of conspiracy to and

violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC § 1590 relating to trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

K. Such detailed information needs to be retained by Defendants both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

L. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages

10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

M. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |

| Theft | 27, 32, 33, 97, 147 | | |
|---|---|---|---|
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

N. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

O. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. During 1990 through 1994, Defendant United State, its agents, officers, and confidential informants, conspire with Canadian and British intelligence and police powers organizations to develop pretexts for international spying on Lead Plaintiff. Defendant United States directly or through a confidential informant used the Lead Plaintiff's search for financings for Alliance and for P.A.N. Environmental Services (PAN) to defraud Lead Plaintiff of authentic financing options in Canada and Great Britain through authentic sources.

B. This series of RICO frauds includes persons posing and/or acting as financial brokers, company executives and employees, and in other professional roles to facilitate these frauds and swindles and permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in London and elsewhere in Great Britain, as well as within the United States using intelligence acquisition methods and assets which Defendant United States cannot legally deploy against its own citizens.

C. Defendant United States operates primarily through Gerald Cornwell, a US Navy veteran of the Vietnam War era, a female agent or officer posing as his wife, a fake cover residence in Newcastle, WA, and an extended series of financing services search trips to Vancouver, British Columbia while seeking financing to offset the prior frauds, thefts, and denial of SBA bonding and loan guarantees by Defendant United States against Lead Plaintiff's environmental services company, Alliance in 1990-1993.

D. British intelligence and police powers operations (likely London Metropolitan Police, MI-5, and MI-6) primarily operate through an individual known to Lead Plaintiff as Michael Kurtanjek, likely an MI-6 agent, posing as a Managing Director - Mining of Credit Lyonnaise Laing, an international investment bank headquartered in France, and operating from its stock trading floor in London. Lead Plaintiff travels to London on three occasions, including one three week business trip. On one of these trips between Summer 1993 and the end of 1994, Lead Plaintiff is greeted by a trotting Metropolitan Police counter-terror squad in a lengthy construction tunnel at Heathrow Airport. He is the only other person in the 500 plus foot long tunnel in mid-afternoon at a busy Heathrow Airport international terminal. (The second of three similar instances related to terror-related alerts and episodes, including one in Seattle in the early 1980s and another in New York City in 2007.)

E. Lethality efforts, and a life-events encompassing set of other biomedical, physical, financial, and emotional abuses and violations are

performed against the Lead Plaintiff by Defendant United States which, in the aftermath of 9/11/2001, enlists other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and deployment, including its international criminal law and ratified treaty violations of US persons and other innocents. See Complaint Table 1-001 through 1-011, 1-015, 1-021; paragraphs 1-9, 15-46, 321-347, 371, Table 2-0003, 2-0024, 2-0060, 2-0095, 2-0097 and LP Evidentiary Exhibits pages 140-189 paragraphs 1-35, 49-53, 61-62, 88-90, 140, 143-146; pages 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10187-10250, 10423-10433, 10434-10444.

F. These violations by Defendants perpetuate their pattern of limiting Lead Plaintiff's access to All Privileges and Immunities guaranteed under Article IV Section 2 Clause 1 of the United States Constitution. Defendants perpetuate these violations, systematically precluding Lead Plaintiff's right to pursue a free and ordinary life, for the purpose of continuing Defendants' pattern of conspiracy and racketeering acts to sustain their cover-up of systemic violations of rights under the color of law fiction of "state secrets" and "national security."

G. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without

limitation, L-1 through L-16, P-1 through P-4, P-13 through P-21, P-28 through P-31, and N-1 through N-5.

H. All other sub-counts are intertwined with and perpetuated in furtherance of Defendants' continuous pattern of racketeering acts for the primary purposes of conspiring to and preserving of Defendant United States' concealment of its illegal deployment of the bioweapon and bioweapon delivery system known herein as BRMT against US persons and other innocents; and preventing public discovery of the full scope, extent, and duration of the criminal acts against and injuries to this class of Plaintiffs, from approximately 1972 to the present time.

I. This pattern of racketeering acts is the continuation of the illegal and criminal practices used by Defendant United States and its co-conspirators in both MKUltra and Cointelpro. These corrupt and criminal practices have never been criminally prosecuted at the institutional level, so they persist behind the "sword and shield" of "state secrets" and "national security," as invoked for the self-exculpation of the Defendants under color of law.

J. Discovery against Defendants will provide additional evidence of the violations of this subcount in furtherance of related violations thereof documented herein, and an element of the pattern of offenses, including a pattern of racketeering acts, critical to the Defendants' overarching and continual pattern of involuntary servitude at all times from inception of their violations to the present time of, among others, the Thirteenth and Fourteenth

Amendments to the United States Constitution, in furtherance of the Defendants' conspiracy to and the systematic violation of 18 USC § 175 prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of rights; and in furtherance of conspiracy to and violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC § 1590 relating to trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

K. Such detailed information needs to be retained by Defendants both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

L. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of

America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization for Use Of Military Force (see LP Evidentiary Exhibits pages 10737-10738), which empowered a global war, included the United States of America as part of the territory upon which the AUMF operations are authorized to be conducted. Under the Geneva Convention (see LP Evidentiary Exhibits pages 10614-10736) and the Congressional AUMF authorization, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties – human rights and torture (see LP Evidentiary Exhibits pages 895-933) and the United Nations charter, all of which have been ratified by the United States Senate and President.

M. These force of law documents each spell out protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise 18 USC § 2441 war crimes against this class of plaintiffs - protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related

persons, whether acting within or without their color of law alleged authority,

have systematically violated the provisions of these treaties as follows:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

N. Treaties above are formally known as the International Covenant on

Civil and Political Rights and the Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment. See full text at LP

Evidentiary Exhibits pages 895-933.

O. These treaties offer no refuge of immunity for these acts against

Lead Plaintiff and others of this class of plaintiffs, whether they are victims of

individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**N-4 National Security Frauds: Pretexting, Abuse of Sensitive and Classified Nuclear and Space Programs – Pre and Post**

A. This subcount consolidates multiple violations, with the exact number and date of each violation to be determined through discovery against Defendant United States. Beginning in 1996, the Lead Plaintiff is trafficked from a purposeful period of unemployment to C.N.A. Industrial Engineering, Bellevue, WA, as that company begins work on the Boeing/US Air Force Delta IV rocket assembly plant design in Decatur, AL.

9/11/2001

Attack

**DELTA IV ROCKET FACTORY**
THE BOEING COMPANY

 

B. As this project progresses. CNA is also engaged in other sensitive technologies projects, including software selection for non-destructive eddy current technology testing equipment and services company which support the nuclear industry, aerospace, rail and other key industries in the United States and elsewhere. Software selection and engineering services require extensive detailed knowledge of processes and procedures, so Lead Plaintiff and his team develop an extensive body of knowledge of the technology, company services, and customer base to assist this client to make the optimal software system selection.



# ZETEC

## Sustaining the energy for the power generation industry

We have extensive experience in conducting feasibility studies and developing inspection solutions in the power generation industry. From developing and maintaining standardized processes to developing customized solutions for client-specific needs, we are a leader in enabling utilities to reduce their inspection costs, improve their safety and reduce their downtime. Our clients can count on our eddy current and ultrasound technologies to be safe, sophisticated and successful in the procedure of flaw detection of their critical systems.

### Nuclear

With our world-class manufacturing and breadth of offerings in the eddy current instruments and ultrasound technologies, we can exceed the demands of the power generation industry. Our extensive experience in the nuclear segment, and our ability to leverage learnings from other segments, helps us deliver products that are well-engineered and field-tested. Discover our nuclear solutions.



C. Lead Plaintiff is also engaged by Media Arts Group to design its new art production and distribution facility to be built in Morgan Hills, CA. This study and design process begins under the management of an international intelligence asset of the United States temporarily redeployed from Asia to Silicon Valley using this as his interim commercial cover while in the United States. This asset is redeployed to Asia and the technology sector about six months later and CNA continues with the project through design, implementation, and completion. A similar study, design, and implementation

process for a Japanese consumer technologies firm is undertaken in Orange County, CA.

D. These projects continue CNA's long history of unprofitable industrial design and engineering projects, such as various US Navy nuclear submarine base construction and maintenance facility projects; domestic international airport projects; the Boeing 747 assembly plant; and Sega, Sony, Nintendo, and Panasonic manufacturing and distribution plants in the United States. These prior projects, and the projects Lead Plaintiff is involved in are, in fact, undertaken as commercial cover domestic intelligence acquisition and counterintelligence operations of the United States. The Lead Plaintiff is thereby continually being entangled unknowingly in various commercial cover domestic and international intelligence operations as he has been since arriving at his professional employment in 1979. And his treatment at the hands of these Defendant United States departments and agencies is about to spiral ever more quickly toward his destruction and death.

E. In May 2001, the Lead Plaintiff travels to Washington, DC for the annual May AeA National Board Meeting and Capitol Hill visit. The Lead Plaintiff's taxi from Dulles Airport is halted on Constitution Avenue west of 15th Street, soon after passing the White House, for the Vice President's motorcade enroute west from Capitol Hill toward the White House or Naval Observatory in late afternoon as the Lead Plaintiff travels to his hotel a few blocks south of the Capitol in Washington, DC. During this visit, Lead

Plaintiff is part of a group which tours the West Wing of the White House one evening and has his picture taken at the Press Room podium.

F. On this visit, the Lead Plaintiff spends an unusually long 90 minutes with Representative Jennifer Dunn (the Washington Eighth District Republican Congressperson who represents Lead Plaintiff and is close to the President) in a House office building television studio which is set up to look like a typical Congressional outer office but has television studio lighting and an interview style conference set-up in what is typically expected to be an inner office. As an aide sits nearby, Representative Dunn and the Lead Plaintiff discuss higher education policy and the Lead Plaintiff's policy related report and work with the Legislature, Governor, universities, colleges, and private sector in Washington State.

G. In Summer 2001, CNA is requested by a Naval Facilities Command regional office (NAVFAC) contractor to perform an indefinite quantity engineering study at Puget Sound Naval Shipyard (PSNS), Bremerton, WA to repurpose and redeploy engineering and maintenance space in several dockside buildings at this nuclear submarine and aircraft carrier heavy maintenance and decommissioning facility. This project is placed on hold immediately after the 9/11/2001 attack on the World Trade Center, Pentagon, and in Shanksville, PA.

H. When the project resumes in Spring 2002, the Lead Plaintiff and one other CNA employee are escorted through the approximately six to seven

buildings to be studied in the 1.48 mile long shipyard docks area. On a typical weekday, the shipyard employs about 15,000 people. On this regular workday, not a federal holiday, there are about two dozen total employees in the entire dockside complex.



I. During this detailed hours-long tour, Lead Plaintiff is left standing beside a highly classified nuclear submarine pump covered by a green tarp, sitting, completely out of place, on the floor in an engineering building which has no tooling or machine tools which would be used to repair or maintain such a pump.

J. Lead Plaintiff and one other uncleared individual, a fellow employee, are left standing unescorted in this maintenance and engineering building for about fifteen minutes as the entire escort team of about five to six people

simply walk away. Upon the return of the escort team, the tour resumes

without comment or explanation. This is a major breach of security protocol in

a secure U.S. Navy facility with sand-bagged gun emplacements. The Marine

Corps detachment which guards this facility is on a heightened alert status

after the 9/11/2001 attack and has shoot-to-kill authorization to protect

sensitive and classified technology, nuclear fuels, and other sensitive

equipment and materials as needed.

K. This PSNS tour is undertaken a few months after Lead Plaintiff

visits New York City at the same time (different locations) as the President of

the United States. During this November 2001 visit, Lead Plaintiff visits the

9/11 World Trade Center wreckage family viewing platform one afternoon as

recovery work is underway and the workforce stops to honor the dead as they

are removed.

L. Lead Plaintiff also has extensive interaction with an internationally

deployed US intelligence asset while that individual is working in a domestic

cover assignment before redeploying in Asia. This is similar to Lead Plaintiff's

experiences with commercial cover assets on international projects in the

Middle East and Africa, and southeast Asia while at Deloitte from 1979 to

1986.

M. Lethality efforts, and a life-events encompassing set of other

biomedical, physical, financial, and emotional abuses and violations are

performed against the Lead Plaintiff by Defendant United States which, in the

aftermath of 9/11/2001, enlists other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and deployment, including its international criminal law and ratified treaty violations of US persons and other innocents. See Complaint Table 1-001 through 1-011, 1-015, 1-021; paragraphs 1-9, 15-46, 321-347, 371, Table 2-0003, 2-0024, 2-0060, 2-0095, 2-0097 and LP Evidentiary Exhibits pages 140-189 paragraphs 1-35, 49-53, 61-62, 88-90, 140, 143-146; pages 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10187-10250, 10423-10433, 10434-10444.

   N. These violations by Defendants perpetuate their pattern of limiting Lead Plaintiff's access to All Privileges and Immunities guaranteed under Article IV Section 2 Clause 1 of the United States Constitution. Defendants perpetuate these violations, systematically precluding Lead Plaintiff's right to pursue a free and ordinary life, for the purpose of continuing Defendants' pattern of conspiracy and racketeering acts to sustain their cover-up of systemic violations of rights under the color of law fiction of "state secrets" and "national security."

   O. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-1 through P-4, P-13 through P-21, P-28 through P-31, and N-1 through N-5.

P. All other sub-counts are intertwined with and perpetuated in furtherance of Defendants' continuous pattern of racketeering acts for the primary purposes of conspiring to and preserving of Defendant United States' concealment of its illegal deployment of the bioweapon and bioweapon delivery system known herein as BRMT against US persons and other innocents; and preventing public discovery of the full scope, extent, and duration of the criminal acts against and injuries to this class of Plaintiffs, from approximately 1972 to the present time.

Q. This pattern of racketeering acts is the continuation of the illegal and criminal practices used by Defendant United States and its co-conspirators in both MKUltra and Cointelpro. These corrupt and criminal practices have never been criminally prosecuted at the institutional level, so they persist behind the "sword and shield" of "state secrets" and "national security," as invoked for the self-exculpation of the Defendants under color of law.

R. Discovery against Defendants will provide additional evidence of the violations of this subcount in furtherance of related violations thereof documented herein, and an element of the pattern of offenses, including a pattern of racketeering acts, critical to the Defendants' overarching and continual pattern of involuntary servitude at all times from inception of their violations to the present time of, among others, the Thirteenth and Fourteenth Amendments to the United States Constitution, in furtherance of the Defendants' conspiracy to and the systematic violation of 18 USC § 175

prohibiting the use and deployment of biological weapons and biological weapons delivery systems against US persons; in furtherance of conspiracy to and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy against and violation of rights; and in furtherance of conspiracy to and violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC § 1590 relating to trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

S. Such detailed information needs to be retained by Defendants both to provide evidence for Defendants' programmed color of law prosecutions if their entrapment efforts work, and to sustain the intricate neurological research process used to further develop Defendant United States brain hijacking bioweapon and its deployment system, collectively known as BRMT, as each succeeding generation of BRMT technology is developed and deployed against US persons and other innocents.

T. Defendant violations against the Lead Plaintiff accelerated with national security pretexting beginning in 1996, a sensitive US Navy project introduced in the Summer of 2001, and very dramatically in the aftermath of the 9/11/2001 attack and interdiction failure. This subcount includes violations of international treaties having the force of law within the United States of America. The acts described herein as undertaken by Defendants with police and intelligence powers in the aftermath of the Congressional Authorization

for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary Exhibits pages 10437-10444) which empowered a global war throughout the world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

U. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|

| | | Degrading Treatment, ratified 1990 | |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

V. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

W. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or

the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals who committed such offenses or were accessory to such offenses as long ago as World War II. Therefore. all such Defendants are, both institutionally and individually, subject to criminal and civil sanctions under law for each and all of these acts and may make absolutely no valid or enforceable claim of immunity under law for these offenses.

**N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK**

A. During 2007 through 2008, Defendant United States, its agents, officers, confidential informants and other Defendants, after trafficking Lead Plaintiff from Washington state to homelessness in Massachusetts, and subsequently to fraudulent employment in Fort Lee, NJ at Establish Inc, a logistics consulting firm cover operation, conspire with British intelligence and police powers organizations to traffick Lead Plaintiff to London, United Kingdom for an ostensible week-long company international business conference, and thereby develop pretexts for international spying on Lead Plaintiff.

B. This series of Defendants' RICO frauds includes persons posing and/or acting as company executives and employees, in professional roles which facilitate color of law pretexts to permit foreign intelligence operations to "legally" engage in color of law spying upon the Lead Plaintiff in London and elsewhere in Great Britain, as well as within the United States using

intelligence acquisition methods and assets which Defendant United States cannot legally deploy against its own citizens.

C. During this London trip, and for several months before and after, Defendant United States operates primarily through William Drumm and several other US based "employees" of Establish, likely including various federal, state, and local police powers and intelligence operations and assets in the greater New York City area. Defendant NYPD verifies and then disappears evidence of a terror related investigation against the Lead Plaintiff including during this period of time, when Lead Plaintiff is met on his first 2007 recreational outing in New York City at the Port Authority Bus Terminal by about two dozen uniformed counter-terror squad in bulletproof vests, helmets, and bearing submachine guns along the west side of Eighth Avenue in Fall 2007.

D. British intelligence and police powers operations (likely London Metropolitan Police, MI-5, and MI-6) pose as international employees of Establish posted at varied location in Europe, including its ostensible Swedish headquarters, and in China for this London meeting.

E. Lethality efforts, and a life-events encompassing set of other biomedical, physical, financial, and emotional abuses and violations are performed against the Lead Plaintiff by Defendant United States which, in the aftermath of 9/11/2001, enlists other co-conspirators and volunteer public vigilantes in this perpetual effort to sustain BRMT development and

deployment, including its international criminal law and ratified treaty violations of US persons and other innocents. See Complaint Table 1-001 through 1-011, 1-015, 1-021; paragraphs 1-9, 15-46, 321-347, 371, Table 2-0003, 2-0024, 2-0060, 2-0095, 2-0097 and LP Evidentiary Exhibits pages 140-189 paragraphs 1-35, 49-53, 61-62, 88-90, 140, 143-146; pages 420-423, 428, 569-571, 575-581, 598-606, 769, 778-780, 10187-10250, 10332, 10333, 10355, 10423-10433, 10434-10444.

F. These violations by Defendants perpetuate their pattern of limiting Lead Plaintiff's access to All Privileges and Immunities guaranteed under Article IV Section 2 Clause 1 of the United States Constitution. Defendants perpetuate these violations, systematically precluding Lead Plaintiff's right to pursue a free and ordinary life, for the purpose of continuing Defendants' pattern of conspiracy and racketeering acts to sustain their cover-up of systemic violations of rights under the color of law fiction of "state secrets" and "national security."

G. While all subcounts throughout this Complaint are driven by Defendants' conspiracy to commit and comprise an integrated pattern of racketeering acts, the most directly relevant subcounts include, without limitation, L-1 through L-16, P-1 through P-4, P-13 through P-21, P-28 through P-31, and N-1 through N-5.

H. All other sub-counts are intertwined with and perpetuated in furtherance of Defendants' continuous pattern of racketeering acts for the

primary purposes of conspiring to and preserving of Defendant United States'
concealment of its illegal deployment of the bioweapon and bioweapon
delivery system known herein as BRMT against US persons and other
innocents; and preventing public discovery of the full scope, extent, and
duration of the criminal acts against and injuries to this class of Plaintiffs, from
approximately 1972 to the present time.

      I. This pattern of racketeering acts is the continuation of the illegal and
criminal practices used by Defendant United States and its co-conspirators in
both MKUltra and Cointelpro. These corrupt and criminal practices have never
been criminally prosecuted at the institutional level, so they persist behind the
"sword and shield" of "state secrets" and "national security," as invoked for
the self-exculpation of the Defendants under color of law.

      J. Discovery against Defendants will provide additional evidence of the
violations of this subcount in furtherance of related violations thereof
documented herein, and an element of the pattern of offenses, including a
pattern of racketeering acts, critical to the Defendants' overarching and
continual pattern of involuntary servitude at all times from inception of their
violations to the present time of, among others, the Thirteenth and Fourteenth
Amendments to the United States Constitution, in furtherance of the
Defendants' conspiracy to and the systematic violation of 18 USC § 175
prohibiting the use and deployment of biological weapons and biological
weapons delivery systems against US persons; in furtherance of conspiracy to

and violations of 18 USC §§ 241, 242, 246, 247, prohibiting conspiracy

against and violation of rights; and in furtherance of conspiracy to and

violations of 18 USC § 1581 relating to peonage, 18 USC § 1584 relating to

involuntary servitude, USC § 1589(a)(3) relating to forced labor, and 18 USC

§ 1590 relating to trafficking with respect to peonage, slavery, involuntary

servitude, or forced labor.

K. Such detailed information needs to be retained by Defendants both

to provide evidence for Defendants' programmed color of law prosecutions if

their entrapment efforts work, and to sustain the intricate neurological research

process used to further develop Defendant United States brain hijacking

bioweapon and its deployment system, collectively known as BRMT, as each

succeeding generation of BRMT technology is developed and deployed

against US persons and other innocents.

L. Defendant violations against the Lead Plaintiff accelerated with

national security pretexting beginning in 1996, a sensitive US Navy project

introduced in the Summer of 2001, and very dramatically in the aftermath of

the 9/11/2001 attack and interdiction failure. This subcount includes violations

of international treaties having the force of law within the United States of

America. The acts described herein as undertaken by Defendants with police

and intelligence powers in the aftermath of the Congressional Authorization

for Use Of Military Force in Afghanistan and Iraq (see LP Evidentiary

Exhibits pages 10437-10444) which empowered a global war throughout the

world, included the United States of America as part of the territory upon which these AUMF's are authorized to be conducted. Under the Geneva Conventions of 1949 and Additional Protocols, as well as the Constitution, all US persons are entitled, by law, to all the protections found in the Geneva Convention. All US persons are also entitled to the rights and protections found within two international treaties (see LP Evidentiary Exhibits pages 866-933) and the United Nations charter, all of which have been ratified by the United States Senate.

M. These force of law documents each spell out various protections from certain acts involving military, intelligence, and police powers forces in time of war. Defendants have systematically violated these rule of law mandatory international obligations by their acts against the Lead Plaintiff and other Plaintiffs of this class. These acts therefore comprise war crimes against these plaintiffs as protected civilians in time of war. Defendant United States, including its department and agencies, together with Defendants including, without limitation, all state and local police powers agencies; and all Defendants' officers, agents, confidential informants, and other related persons, whether acting within or without their color of law alleged authority, have systematically violated the provisions of these treaties as follows:

|  | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |

| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
|---|---|---|---|
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |
| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

N. Treaties above are formally known as the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. See full text at LP Evidentiary Exhibits pages 895-933.

O. These treaties offer no refuge of immunity for these acts against Lead Plaintiff and others of this class of plaintiffs, whether they are victims of individual acts or of mass casualty acts, whether within or without the territory of the United States of America. Further, neither ratified treaties nor law have any provision for any time limitations for statutory offenses involving murder and attempted murder (referred to frequently herein as lethality) under law or the Geneva Conventions. This lack of immunity and of time bar are further evidenced by the continued prosecution in the present day of war criminals

who committed such offenses or were accessory to such offenses as long ago

as World War II. Therefore. all such Defendants are, both institutionally and

individually, subject to criminal and civil sanctions under law for each and all

of these acts and may make absolutely no valid or enforceable claim of

immunity under law for these offenses.

**END OF SUBORDINATE COUNTS**

PRINCIPAL COUNTS

PRINCIPAL COUNT 1

**AA. Physical and Emotional Injuries**

Racketeering Influenced and Corrupt Organizations Act

(18 USC §§ 1113, 1119, 1962(c), 1962(d); RCW 9A.28.020; NJ Rev Stat § 2C:5-1;

New York Penal L § 110; Cal. Penal Code § 245(a)(1))

**Attempted Murder**

(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1113, 1119, 1962(c), 1962(d); RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code § 245(a)(1), in their series of attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified

this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

 F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a)

persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to loss of balance. Lead Plaintiff has regular medical examinations and tests, including neurological examinations, which disclose no known injury or disability which would lead to loss of balance or mental reasoning ability absent the purposeful external manipulations of BRMT, a prohibited bioweapon and bioweapon delivery system funded by Defendant United States; developed by and/or with contracted services, entities, and persons acting with Defendant United States; and deployed by Defendant United States against US persons and other innocent victims in violation of the Constitution, laws, and ratified international treaties of the United States of America.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington

State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture,

Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey –

page 740

## PRINCIPAL COUNT 2

### AA. Physical and Emotional Injuries

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1113, 1119, 1962(c), 1962(d); RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code §§ 192(a), 245(a)(1))**

### Attempted Manslaughter

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1113, 1119, 1962(c), 1962(d); RCW 9A.28.020; NJ Rev Stat § 2C:5-1; New York Penal L § 110; Cal. Penal Code §§ 192(a), 245(a)(1) in their series of attempts to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

     i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to loss of balance. Lead Plaintiff has regular medical examinations and tests, including neurological examinations, which disclose no known injury or disability which would lead to loss of balance or mental reasoning ability absent the purposeful external manipulations of BRMT, a prohibited bioweapon and bioweapon delivery system funded by Defendant United States; developed by and/or with contracted services, entities, and persons acting with Defendant United States; and deployed by Defendant United States against US persons and other innocent victims in violation of the Constitution, laws, and ratified international treaties of the United States of America.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington

State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture,

Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey –

page 740

## PRINCIPAL COUNT 3

### AA. Physical and Emotional Injuries

**Racketeering Influenced Corrupt Organizations Act (18 USC §§ 1117, 1962(c), 1962(d);**

**New York Penal L § 110; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 182(a)(1))**

### Conspiracy to Murder

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1117, 1962(c), 1962(d); New York Penal L § 110; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 182(a)(1) their series of conspiracies to cause and create injury and death to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

   E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

    F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

> i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Lead Plaintiff is an active person who regularly engages in exercise, has an excellent sense of balance, and a demonstrated history of sports and other activities which have not, on their own, led to loss of balance. Lead Plaintiff has regular medical examinations and tests, including neurological examinations, which disclose no known injury or disability which would lead to loss of balance or mental reasoning ability absent the purposeful external manipulations of BRMT, a prohibited bioweapon and bioweapon delivery system funded by Defendant United States; developed by and/or with contracted services, entities, and persons acting with Defendant United States; and deployed by Defendant United States against US persons and other innocent victims in violation of the Constitution, laws, and ratified international treaties of the United States of America.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington

State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture,

Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey –

page 740

**PRINCIPAL COUNT 4**

**AA. Physical and Emotional Injuries**

**Racketeering Influenced Corrupt Organizations Act (18 USC §§ 373, 1962(c), 1962(d);**

**New York Penal L § 100; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 653f)**

**Soliciting Crime of Violence**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 373, 1962(c), 1962(d); New York Penal L § 100; NJ Stat 2C:5-2, RCW 9A.28.040; Cal. Penal Code § 653f in their series of solicitations to commit a crime of violence and related conspiracies to cause and create injury, death, assault, aggravated assault, and other crimes of violence to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on

March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in

any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile

purposes or in armed conflict."

    D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being

developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

     E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

    F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

### PRINCIPAL COUNT 5

### AA. Physical and Emotional Injuries

**Racketeering Influenced Corrupt Organizations Act (18 USC §§ 175, 1962(c), 1962(d);**

**New York Penal L § 490; NJ Stat 2C:38-3, 2C:39-3, 2C:39-4; Assault, Aggravated Assault**

**- RCW 9A.36; Mayhem, Aggravated Mayhem - Cal. Penal Code § 203, 205, 206**

### Bioweapons and Bioweapons Delivery Systems Prohibited

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has and does act in violation of federal and state statutes 18 USC § 175, 1962(c), 1962(d); New York Penal L § 490; NJ Stat 2C:38-3, 2C:39-3, 2C:39-4; Assault, Aggravated Assault - RCW 9A.36; Mayhem, Aggravated Mayhem - Cal. Penal Code § 203, 205, 206; and Article 1 of that certain Senate ratified international treaty "Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction" in its long history of violations against Lead Plaintiff and other plaintiffs of this class and its prior and on-going operation, management, and collaboration with other Defendants in their pattern of racketeering acts, conspiracies, violations

of rights, interference with interstate commerce, and other crimes and rights violations to cause and create injuries to the Lead Plaintiff and other plaintiffs of this class, including, without limitation, those specifically cited and described in the subcounts in this Principal Count, both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

section.."

    H. The facts, actions, and circumstances alleged in this Complaint demonstrate the

following:

        i. Existence of an associated-in-fact enterprise which crosses many formal and

        informal organizational boundaries among the co-conspirators and has its own

        separate and unique existence. This enterprise is comprised of entities, individuals,

        groups, and loose associations, acting individually and in conspiracy, who are (a)

        persons, including individuals, departments, agencies, unions, governmental divisions

        and subdivisions at all levels, and others under law who govern, enact policy,

        manage, supervise, and are employed as officers, agents, employees, confidential

        informants, contractors or have civic or political affiliations and associations with and

        among intelligence operations, police powers operations, and military operations

        within and without the United States (b) political entities, groups, affiliations, and

        associations, and (c) trade associations, groups, corporations, and other entities and

        individual members of the business and legal communities, (d) among others known

        and not yet known. These Defendants, known and unknown, have and do act jointly

        in conspiracy and severally, to plan, coordinate, and execute violations of law and

        rights to injure the Lead Plaintiff and other members of this class of plaintiffs.

        Persons acting both within and outside the scope of their employment in various

        department and agencies of Defendant United States, both severally and together with

all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

    O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

    P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:


L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls -- page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT
Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

## PRINCIPAL COUNT 6

### AA. Physical and Emotional Injuries

### Federally Protected Activities 18 USC § 245(b)5

### Posse Comitatus - Use of Military To Violate Constitutional Rights –

### Third and Ninth Amendments

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-65)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has and does violate the human, Constitutional, and civil rights of Lead Plaintiff and similarly situated plaintiffs, including without limitation the Ninth Amendment, and by virtual means, the Third Amendment. Defendant United States has and does use members and facilities of the US Navy and infrastructure of the US Air Force and US Space Force in violation of 18 USC § 1835 "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws….," to engage in color of law criminal pretexting, to aid and abet its operation of BRMT for decades, and to conspire with other Defendants, known and unknown, for these corrupt purposes, and to violate human, Constitutional, and civil rights. Within and without the territory of the United States, Defendant United States has and does violate the Third Amendment, forcing the virtual quartering of soldiers in the private residence of the Lead Plaintiff. Defendant United States has and does violate the Ninth Amendment unenumerated right to "Liberty for ourselves and our posterity" as paraphrased in terms the Founders would recognize – by its oppressive and tyrannical direct daily interference in the private affairs, personal business, and property of the Lead Plaintiff and others of this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint,

are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

   D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

 E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT
Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in
Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in
Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests,
Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates –
page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington

State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture,

Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey –

page 740

**PRINCIPAL COUNT 7**

**AA. Physical and Emotional Injuries**

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**(18 USC §§ 1962(c), 1962(d), 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060;**

**Mass. Gen. Laws ch. 265 § 29, 274 § 7; NJ Stat 2C:5-2 2C:11-6, 2C:12-1, 2C:13-5))**

**Conspiracy to Torture**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Torture is defined at 18 USC §§ 2340 as:

**(1)**

"torture" means an act committed by a person acting under the color of law

specifically intended to inflict severe physical or mental pain or suffering (other

than pain or suffering incidental to lawful sanctions) upon another person within

his custody or physical control;

(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—

(A)

the intentional infliction or threatened infliction of severe physical pain or suffering;

(B)

the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C)

the threat of imminent death; or

(D)

the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

(3)

"United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

C. Defendants, including all Federal, State and Local Defendants, as listed in the caption, have and do act in violation of federal and state statutes 18 USC §§ 1962(c), 1962(d), 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060; Mass. Gen. Laws ch. 265 § 29, 274, § 7; NJ Stat 2C:5-

2, 2C:11-6, 2C:12-1, 2C:13-5 in their series of conspiracies to engage in torturous acts (both

violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead

Plaintiff and other plaintiffs of this class as specifically cited and described in the subcounts in

this Principal Count both within and without the territory of these states and of the United States.

These acts and injuries are representative of those inflicted by Defendants on this class of

plaintiffs.

     D. Defendant United States and all State and Local Defendants, as listed at the caption,

and as currently unknown, and their officers, agents, confidential informants, contractors,

assigns, or others, associated with any or all of these torturous acts, are prohibited from asserting

any waiver of liability or immunity for their conspiracies and for these injuries to Lead Plaintiff

and to other members of this class of plaintiffs under 18 USC § 2340B. The *Convention Against*

*Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the

Senate requires demands recovery of civil damages and other civil remedies for torture and other

inhumane and degrading treatment as follows:

     "Article 14

     1. Each State Party shall ensure in its legal system that the victim of an act of torture

     obtains redress and has an enforceable right to fair and adequate compensation, including

     the means for as full rehabilitation as possible. In the event of the death of the victim as a

     result of an act of torture, his dependents shall be entitled to compensation."

     E. Bioweapons and bioweapons delivery systems, which are among the underlying

causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint,

are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

      F. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

G. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign

state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

H. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

I. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

J. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

       i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

K. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

L. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

M. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

N. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

O. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

    P. The acts and circumstances alleged above in this Complaint demonstrate the

following:

        i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

Q. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

R. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

S. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

T. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

U. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

V. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 8

### AA. Physical and Emotional Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**(18 USC §§ 1962(c), 1962(d), 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060;**

**Mass. Gen. Laws ch. 265 § 29, 274 § 7; NJ Stat 2C:5-2, 2C:11-6, 2C:12-1, 2C:13-5))**

### Torture – Mental and Physical Abuse

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Torture is defined at 18 USC §§ 2340 as:

**(1)**

"torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

**(2)** "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—

**(A)**

the intentional infliction or threatened infliction of severe physical pain or suffering;

**(B)**

the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

**(C)**

the threat of imminent death; or

**(D)**

the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

**(3)**

"United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

C. Defendants, including all Federal, State and Local Defendants, as listed in the caption, have and do act in violation of federal and state statutes 18 USC §§ 1962(c), 1962(d), 2340A; RCW 9A.28.040, 9A.36.011, 9A.36.060; Mass. Gen. Laws ch. 265 § 29, 274, § 7; NJ Stat 2C:5-2, 2C:11-6, 2C:12-1, 2C:13-5 in their series of conspiracies and their willful engagement in torturous acts (both violent and aggressive series' of acts, and perpetually harassing series' of acts) to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

D. Defendant United States and all State and Local Defendants, as listed at the caption, and as currently unknown, and their officers, agents, confidential informants, contractors, assigns, or others, associated with any or all of these torturous acts, are prohibited from asserting any waiver of liability or immunity for their conspiracies and for their injuries to Lead Plaintiff and other members of this class of plaintiffs under 18 USC § 2340B. The *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the Senate requires demands recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including

the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation."

E. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

F. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

G. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited

treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

H. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals,

over time.

 I. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

J. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

K. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

L. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

M. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

N. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

O. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

P. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

Q. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

R. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

S. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

T. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

U. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

V. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 9

### AA. Physical and Emotional Injuries

War Crimes, 18 USC §§ 2441(d) Violations of Common Article 3, Encompassing Torture

- Racketeering Influenced and Corrupt Organizations Act

(18 USC §§ 1962(c), 1962(d), 2340, 2340A)

### War Crimes Against Civilians - Torture

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States substantially increased the intensity of national security pretexting against Lead Plaintiff beginning in 1996 as described here and in considerably more detail at subcount N-4. Lead Plaintiff's employer was requested to conduct an engineering study at the US Navy's Puget Sound Naval Shipyard (PSNS) in Summer 2001, a few months prior to the 9/11/2001 terrorist attacks. PSNS is a strategically important heavy maintenance facility located in Puget Sound, west of Seattle, Washington, servicing nuclear submarines, aircraft carriers, and other Navy ships.

C. The pace, intensity, and frequency of violations against Lead Plaintiff accelerated still further in the aftermath of the 9/11/2001 attacks and the 2001 Authorization For Use of Military Force (AUMF) in Afghanistan. Pub. L. 107–40.

S. J. Res. 23

# One Hundred Seventh Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Wednesday,*
*the third day of January, two thousand and one*

## Joint Resolution

To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force".

SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) IN GENERAL.—That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

## SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) IN GENERAL.—That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

S. J. Res. 23—2

(2) APPLICABILITY OF OTHER REQUIREMENTS.—Nothing in this resolution supercedes any requirement of the War Powers Resolution.

D. In Spring 2002, months after the 9/11/2001 attacks and the AUMF, the Lead Plaintiff toured PSNS with an escort team, to kick off the engineering project which had been brought to the Lead Plaintiff as the Managing Director of C.N.A. Industrial Engineering by a shipyard contractor. Lead Plaintiff was led to and left standing unescorted for about 15 minutes by an out of place object on a shipping pallet loosely covered by a secured green tarp. The escort team described this as a nuclear submarine cooling pump. This is known to the Lead Plaintiff to be a highly classified piece of technology, so leaving an uncleared visitor standing there was a deliberate and major national security breach, and breach of shipyard security protocol, by the escort team. The team returned with no explanation for their absence and continued the tour of the virtually empty shipyard. The tour occurred on a regular workday when the 1.4 mile long

dock area should have been filled with many of its 15,000 employees. The Lead Plaintiff witnessed about two dozen employees, including his 5 to 6 person escort team in the entire shipyard.

E. Lead Plaintiff traveled to a national trade association Board meeting in DC in Spring 2002, was invited to a 90 minute Capitol Hill television studio live screening conducted by a member of Congress close to the then President, received unsolicited federal Executive branch expressions of interest demonstrated by both tradecraft and, a few weeks later, the interest of the then President of the United States in visiting Lead Plaintiff's business in Washington state. This sequence was followed by a highly intensive repetition of prior patterns of racketeering activity, including aggressive field operations leading to destruction of Lead Plaintiff's business enterprise, sole source of income, and marital dissolution; torturous BRMT and psychological operations leading to suicide ideation; forced forfeiture of real, financial, and personal property; and eventual homelessness and trafficking by Defendants by the end of 2005.

F. The *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* as ratified by the Senate requires the United States of America to permit recovery of civil damages and other civil remedies for torture and other inhumane and degrading treatment as follows:

"Article 14

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law."

G. Under the global scope of the 2001 Afghanistan AUMF at subparagraph C. above, and (i) the demonstrated acts by Defendant United States in its clear pattern of military facilities and sensitive technologies pretexting, and (ii) its accelerated and more extreme pattern of racketeering acts against him from that time hence, Defendant United States was and is obligated, as are all State and Local government Defendants to treat Lead Plaintiff in accordance with all international conventions regarding civilians in hostilities including, without limitation, Article 75 of the Geneva Conventions below:

### Article 75.–Fundamental guarantees

1. In so far as they are affected by a situation referred to in Article 1 of this Protocol, persons who are in the power of a Party to the conflict and who do not benefit from more favourable treatment under the Conventions or under this Protocol shall be treated humanely in all circumstances and shall enjoy, as a minimum, the protection provided by this Article without any adverse distinction based upon race, colour, sex, language, religion or belief, political or other opinion, national or social origin, wealth, birth or other status, or on any other similar criteria. Each Party shall respect the person, honour, convictions and religious practices of all such persons.

2. The following acts are and shall remain prohibited at any time and in any place whatsoever, whether committed by civilian or by military agents:

(a) Violence to the life, health, or physical or mental well-being of persons, in particular:

(i) Murder;

(ii) Torture of all kinds, whether physical or mental;

(iii) Corporal punishment ; and

(iv) Mutilation;

(b) Outrages upon personal dignity, in particular humiliating and degrading treatment, enforced prostitution and any form of indecent assault;

(c) The taking of hostages;

(d) Collective punishments; and

(e) Threats to commit any of the foregoing acts

H. As demonstrated throughout this Complaint and more particularly at subparagraph C. above, Defendants United States, State and Local Defendants, known and unknown, have and do act in violation of Common Article 3 as defined at 18 USC §§ 2441(d), including 2441(d)(1)(a) Torture, 2441(d)(1)(b) Cruel or inhuman treatment, 2441(d)(1)(c) Performing biological experiments, 2441(d)(1)(d) Attempted murder, 2441(d)(1)(f) Intentionally causing serious bodily injury, 2441(d)(1)(f) Sexual assault or abuse, in their series of acts against the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

I. The totality of war crimes violations of Defendant United States, and State and Local Defendants, as known and defined at the caption or as yet unknown, and their officers, agents, confidential informants, contractors, assigns, or others, against Lead Plaintiff encompass each and all of the following violations of Senate ratified treaties:

| | 1949 Geneva Conventions Articles Violated | Convention Against Torture, Other Cruel, Degrading Treatment, ratified 1990 | Covenant on Civil and Political Rights, ratified 1992 |
|---|---|---|---|
| Torture | 3(1)(a), 27, 31, 32, 147 | 2, 4-7, 10-14, 16 | 3(a), 7 |
| Lethality | 3(1)(a), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 6.1, 18 |
| Theft | 27, 32, 33, 97, 147 | | |
| Servitude, Forced Labor | 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 8.2, 8.3a |
| Detention Lacking Authorization, Including Virtual Detention | 27, 31, 33 | | 9.1, 9.4, 9.5 |
| Medical Experiments | 27, 31, 32, 33, 50, 147 | 2, 4-7, 10-14, 16 | 7, 18 |
| Family, privacy | 27, 33 | | 17.1, 17.2, 23 |
| Religion | 3(1), 27 | | 18.1 |

| Cruel, Inhuman, Degrading Treatment | 3(1)(a), 3(1)(c), 27, 31, 32, 33, 147 | 2, 4-7, 10-14, 16 | 7, 9.1, 9.4, 9.5 |
|---|---|---|---|
| Property Crime | 27, 33, 147 | | 17.1 |
| Covid vaccine deprivation | 27, 31, 32, 33, 56 | 2, 4-7, 10-14, 16 | 7, 18.1 |

J. In accordance with the 2001 AUMF then and currently in force, and under the Senate ratified treaties having force of law throughout the United States without exception, as cited at paragraph F. and G. above, neither Defendant United States nor any State and Local Defendant, as known and defined at the caption or as yet unknown, nor their officers, agents, employees, confidential informants, contractors, assigns, or others, associated with any or all of these acts and offenses, are permitted to assert any waiver of liability or immunity under law for any act against Lead Plaintiff or any other effected member of this class of plaintiffs after the September 18, 2001 AUMF as their actions are subject to the aforementioned treaties at all times while the 2001 AUMF is in force and our nation is officially at war. Lead Plaintiff has been, is, and continues to be constrained and restrained, denied liberty, by the totality of the pattern of acts and injuries undertaken by and in conspiracy with, the acts of Defendant United States since that time, including its torturous treatment of the Lead Plaintiff. It is currently unknown if other plaintiffs of this class are subject to the same totality of limits and constraints as the Lead Plaintiff. No action has ever been taken by Defendant United States which formally or informally indicate it has or ever intends to remove these limitations, constraints, threats, and torturous acts toward Lead Plaintiff which continue and continue to imperil the liberty, free exercise of will, of movement, of bodily control, of and by Lead Plaintiff as imposed extra-legally by Defendant United States.

K. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

L. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

    M. The criminal and civil offenses underlying this entire conspiracy are, are in part

related to, and are in part motivated by, Defendant United States' illegal development and

deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited

bioweapon and bioweapon delivery system, has been and is used by Defendant United States

acting alone, and in conspiracy with others, to assault US persons and other innocents in its

criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited

treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide,

conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty,

of the US Constitution, and of its violations of its legal obligations to US persons and other

innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175,

"Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses

any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign

state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be

fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial

Federal jurisdiction over an offense under this section committed by or against a national of the

United States."

    N. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

O. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

P. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights,

businesses, and financial, real, and intangible property of Lead Plaintiff and other

plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide

variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional,

and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

Q. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

R. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

S. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

T. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

U. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

V. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

W. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

X. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Y. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

Z. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

AA. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

AB. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 10

### AA. Physical and Emotional Injuries

### Assault

### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States using BRMT and its officers, agents, confidential informants, both separately and together with other known and unknown Defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked, both physically and by their coercive psychological operations, Lead Plaintiff and other plaintiffs from time to time from the early 1980s to the present, as described by a very small set of example incidents described herein, and in so doing attempted or threatened by their words and/or acts to do physical harm to Plaintiffs. Plaintiffs each reasonably suffered apprehension of imminent harmful or offensive contact on a daily or near daily basis throughout much of this 43 year period both within and without the territory of the United States as a result. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

 E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

   F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

      i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

      i. Defendants at all governmental levels, both with and without intelligence and police

      powers act and acted under color of law in their exercise or failure to exercise their

      duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

      Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

      scope of their individual duties; and/or outside the scope of their supervisory duties to

      properly direct their subordinate(s); and/or pursuant to an expressly adopted official

      policy or a widespread or longstanding practice or custom of the defendant

      organization; and/or while engaged in acting as a final policymaker, had final

      policymaking authority, and knew of and specifically made a deliberate choice to

      approve the act or policy; and/or the policies and training of the defendant

      organization were not adequate to prevent violations of law by its employees to

      handle the usual and recurring situations with which they must deal; and/or the

      defendant organization was deliberately indifferent to the substantial risk that its

      policies were inadequate to prevent violations of law and injuries by its employees

      and known or obvious consequences of its failure to train its employees adequately;

      ii. In the exercise or failure to exercise their duties under law, Defendants know,

      knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 11

### AA. Physical and Emotional Injuries

### Aggravated Battery

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States using BRMT and its officers, agents, confidential informants, both separately and together with other known and unknown Defendants, all operating either remotely or undercover in plainclothes and undistinguishable from the general public, intentionally and unlawfully attacked Lead Plaintiff and other plaintiffs from time to time from the early 1980s to the present, on a daily basis for approximately 43 years, as depicted by a very small subset of

examples described herein, and in so doing acted to do physical harm to Plaintiffs. Defendant United States using BRMT and, at times other Defendants intentionally and unlawfully attacked Plaintiffs as described in subcounts below, causing harmful or offensive bodily contact to Lead Plaintiff and others of the class of plaintiffs throughout this 43 year period both within and without the territory of the United States as a result. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

   E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various

department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture,

Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey –

page 740

## PRINCIPAL COUNT 12

### AA. Physical and Emotional Injuries

### Terrorism - Racketeering Influenced and Corrupt Organizations Act

### (18 USC §§ 1961(1)(G), 1962(c), 1962(d), 1992(b)(3))

### Violent Crimes in Aid of Racketeering Enterprises – Terrorism

### (Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendants have acted in violation of (18 USC §§ 1961(1)(G), 1962(c), 1962(d),

1992(b)(3)) by committing an act of violence on a rail mass transit express train operating on the

Metropolitan Transportation Authority Hudson River Line on September 11, 2022 as described

in subcount L-14 below. This event was the fourth in a sequence of threatening and violent

threats and acts occurring in the four months between mid-July 2022 and November 2022, which

are further described at Complaint Interline Exhibit 1: Indirect Verbal Threat and Subsequent

Lethality Events on Complaint pages 48-53. These acts and injuries are representative of those

inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying

causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint,

are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide

variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional,

and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

**PRINCIPAL COUNT 13**

**AA. Physical and Emotional Injuries**

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 175, 1512, 1513, 1951,**

**1192, 1961(1)(A), 1961(1)(G), 1962(c), 1962(d), 1992(b)(3), 2332, 2340A**

**Interference With Interstate Commerce By Threats or Violence**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs. 175 1512 1513 1951 1192 2332 2340A

B. Defendants have acted in violation of 18 USC §§ 175, 1512, 1513, 1951, 1192, 1961(1)(A), 1961(1)(G), 1962(c), 1962(d), 1992(b)(3), 2332, 2340A to interfere in interstate commerce by making and by acting upon threats with violence. Within one four month period in 2022, Defendants (i) made an indirect verbal threat on the Lead Plaintiff in a New York City performance space on July 17, 2022 as described at Interline Exhibit 1A on Complaint page 47; (ii) a derailment attempt at speed on a rail mass transit express train operating on the Metropolitan Transportation Authority Hudson River Line on September 11, 2022 with the Lead Plaintiff a passenger as described in subcount L-14 below, (iii) upon the Lead Plaintiff in a Defendant City of New York park on September 16, 2022 as described at subcount L-15 below, and (iv) on New York City streets with their streetlights deliberately extinguished and by a rapidly accelerating vehicle in a Bergen County, New Jersey shopping center parking lot on November 19, 2022 as described at L-16 below. These threats and violence, including physical injury in L-15, the City of New York park incident, are further described at Complaint Interline

Exhibit 1: Indirect Verbal Threat and Subsequent Lethality Events on Complaint pages 47-53. Other example incidents are noted in the subcounts at subparagraph R below. Discovery will provide further specific evidence relevant to each noted incident and more incidents of such acts, both survived and likely not survived, by members of this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the

following:

i. Existence of an associated-in-fact enterprise which crosses many formal and

informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a)

persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy,

manage, supervise, and are employed as officers, agents, employees, confidential

informants, contractors or have civic or political affiliations and associations with and

among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and

associations, and (c) trade associations, groups, corporations, and other entities and

individual members of the business and legal communities, (d) among others known

and not yet known. These Defendants, known and unknown, have and do act jointly

in conspiracy and severally, to plan, coordinate, and execute violations of law and

rights to injure the Lead Plaintiff and other members of this class of plaintiffs.

Persons acting both within and outside the scope of their employment in various

department and agencies of Defendant United States, both severally and together with

all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

   N. The acts and circumstances alleged above in this Complaint demonstrate the following:

   > i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

## PRINCIPAL COUNT 14

### AA. Physical and Emotional Injuries

**Federal Food Drug and Cosmetic Act (18 USC § 1365(a); NJ Stat 2C:40-17.2.a.)**

### Tampering With Consumer Products

**(Lead Plaintiff & Unknown Plaintiffs against**

**Defendants at paragraphs 51-81, 123, 124, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

January 16, 2023        BREWER et al v. WRAY et al        COMPLAINT Page 1038 of 1532

B. Defendants have and do act in violation of federal and state statutes 18 USC § 1365(a), NJ Stat 2C:40-17.2.a. in their series of schemes, conspiracies, and deprivations of uncontaminated and spoiled refrigerated foods placed upon grocery store shelves at Acme Market, Edgewater, NJ in 2021 and 2022 for sale on more than one dozen occasions to the Lead Plaintiff as specifically cited and described in the subcount in this Principal Count. Defendants have and do create injuries by depriving the Lead Plaintiff of uncontaminated and/or spoiled foods and of access to same. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, some are currently blocked and inaccessible in email accounts as noted elsewhere in this Complaint, and are representative of these types of violations, acts, injuries, and deprivations experienced by Lead Plaintiff from 2008 to 2010 at this same location, and by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

## PRINCIPAL COUNT 15

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced Corrupt Organizations Act (18 USC §§ 1581, 1962(c), 1962(d), RCW 9A.40.110(3), NJ Stat 2C:13-5a(7) )**

### Peonage

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1581, 1962(c), 1962(d), RCW 9A.40.110(3), NJ Stat 2C:13-5a(7) to engage in a lifetime of peonage in their assigned and dictated compensation employment periods, unemployment periods, enterprise wreckings, and deprivation of both personal and commercial benefits legally entitled, destruction of marital communities and families, entrapment attempts, physical and emotional injuries approaching death, by illness, deep vein thrombosis, and direct BRMT hijacking to drive their dozens of attempts to inflict lethality remotely. This pattern of peonage is part of the Defendants' pattern of racketeering acts directed at the Lead Plaintiff as specifically cited and described in the subcounts at subparagraph R below in this Principal Count both within and

without the territory of these states and of the United States. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

    E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings - Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 16

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1584, 1962(c), 1962(d), RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7))**

### Involuntary Servitude

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-150, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1584, 1962(c), 1962(d), RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7) in their management and operation of an enterprise-in-fact system of involuntary servitude in all matters of life through a system of fraud-based virtual restraints and assigned and designated circumstances to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts below. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

　　　　i. Existence of an associated-in-fact enterprise which crosses many formal and
　　　　informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

### PRINCIPAL COUNT 17

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced and Corrupt Organizations Act (18 USC §§ 1589, 1962(c), 1962(d), RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7))**

### Forced Labor

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-150, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1584, 1962(c), 1962(d), RCW 9A.40.040, 9A.40.110(3), NJ Stat 2C:13-2, 2C:13-5a(7) in their management and operation of an enterprise-in-fact system of forced labor by using virtual restraints and assigned and designated circumstances to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts below at subparagraph R. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

 E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

 F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

    i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

    ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 18

### BB. Income, Property, and Reputation Injuries

**Klu Klux Klan Act, (18 USC § 250, RCW 9A.44.115, NJ Stat 2C:30-6, 2C:30-7)**

### Civil Rights - Sexual Abuse

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 250, RCW 9A.44.115, NJ Stat 2C:30-6, 2C:30-7 in their series of acts to screen-in and screen-out potential sexual partners to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count within the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of sexual abuse, sexual assault and attempted psychological humiliation by BRMT, elements of their pattern of racketeering acts and involuntary servitude are found in the subcounts below. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

     F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

## PRINCIPAL COUNT 19

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations Act

### (18 USC §§ 1341, 1962(c), 1962(d))

### Frauds - Mail

### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1341, 1962(c), 1962(d) as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of fraudulent checks and other documents mailed to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts below. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

      E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

      F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

      i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

**PRINCIPAL COUNT 20**

**BB. Income, Property, and Reputation Injuries**

**Racketeering Influenced and Corrupt Organizations (18 USC § 1037, 1962(c), 1962(d))**

**Frauds – Electronic Mail**

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1037, 1962(c), 1962(d))as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of emails which contain false and misleading content and/or personation to the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive,

and systematic pattern of racketeering acts series are found in the subcounts below. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin – "love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

  F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals,

over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their
attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business
prospects, and the personal financial, real, and intangible property of the Lead
Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other
plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions
and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from
learning the identities of the Defendants who act under color of law in violation of
their legal duties and responsibilities under the Constitution and laws of the United
States, and the nations and states within which they operate so as to perpetuate the
conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)
and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within
the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified
above, each Plaintiff suffered and continues to suffer injuries to their business, property, and
person, including economic, financial, physical, and emotional injuries, as described herein both
collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for
individuals injured by conspiracies " If two or more persons in any State or Territory conspire or
go in disguise on the highway or on the premises of another, for the purpose of depriving, either
directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

    N. The acts and circumstances alleged above in this Complaint demonstrate the following:

        i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of

Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 21

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced and Corrupt Organizations Act (18 USC § 1343, 1962(c), 1962(d))**

### Frauds - Wire

#### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding

paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1343, 1962(c),

1962(d)) as well as state statutes in other originating locations, many of which are unknown at

the time of this Complaint and will be available upon discovery, in their series of fraudulent bank

and other payment system wires by and between those Defendants and the Lead Plaintiff as

specifically cited and described in the subcounts in this Principal Count both within and without

the territory of these states and of the United States. Detailed examples of this long-running,

comprehensive, and systematic pattern of racketeering acts series are found in the subcounts

below at subparagraph R. These acts and injuries are representative of those inflicted by

Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying

causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint,

are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified

this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974.

The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on

March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in

any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile

purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being

developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin – "love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

    S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

    T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 22

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced and Corrupt Organizations (18 USC § 1030, 1962(c), 1962(d))**

### Frauds - Computers

#### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1030, 1962(c), 1962(d)) as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of fraudulent transactions, website hacking and spoofing for financial frauds, transactions, communications, and other purposes to the Lead Plaintiff as specifically cited and described in the subcounts in

this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts below at subparagraph R. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

   F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal

actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through

direction, influence, and /or coercion, to conspire with them to harm the rights,

businesses, and financial, real, and intangible property of Lead Plaintiff and other

plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide

variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional,

and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

    N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

        i. Defendants at all governmental levels, both with and without intelligence and police

        powers act and acted under color of law in their exercise or failure to exercise their

        duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

        Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

        scope of their individual duties; and/or outside the scope of their supervisory duties to

        properly direct their subordinate(s); and/or pursuant to an expressly adopted official

        policy or a widespread or longstanding practice or custom of the defendant

        organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 23

### BB. Income, Property, and Reputation Injuries

Racketeering Influenced and Corrupt Organizations, (18 USC §§ 1349, 1962(c), 1962(d))

### Attempts and Conspiracy - Mail Fraud

### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1349, 1962(c), 1962(d)) as well as state statutes in all originating locations, many of which are unknown at the time of this Complaint and will be available upon discovery, in their series of conspiracies and attempts to defraud, entrap, incriminate, discredit, disable, and/or destroy the Lead Plaintiff as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts series are found in the subcounts below. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on

March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in

any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile

purposes or in armed conflict."

    D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being

developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

     i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

    N. The acts and circumstances alleged above in this Complaint demonstrate the following:

        i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

        ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services –
page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and
Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses –
page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations –
page 792

## PRINCIPAL COUNT 24

### BB. Income, Property, and Reputation Injuries

### Racketeering Influenced and Corrupt Organizations (18 USC §§ 1346, 1962(c), 1962(d))

### Attempts and Conspiracy – Scheme to Defraud of Honest Services - Mail, Wire, Email

### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding
paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1346, 1962(c),
1962(d) in their series of schemes, conspiracies, and deprivations of honest services to the Lead
Plaintiff and closely held business entities as specifically cited and described in the subcounts in
this Principal Count both within and without the territory of these states and of the United States.
Defendants have and do actively create injuries by depriving the Lead Plaintiff of honest services
and of access to honest services in Washington, California, Arizona, New York, New Jersey,
Illinois, Iowa, Texas, Maryland, Massachusetts, and relevant state statutes in all originating

locations, many of which locations and particular details are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and

rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

   i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**PRINCIPAL COUNT 25**

**BB. Income, Property, and Reputation Injuries**

Racketeering Influenced and Corrupt Organizations Act (18 USC § 1952, 1962(c), 1962(d))

**Interstate and Foreign Travel or Transportation For Racketeering Purposes**

(All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 1952, 1962(c), 1962(d) in their series of frauds, schemes, conspiracies, injuries, and deprivations of rights using interstate and international travel, federally funded public transportation modes and facilities in interstate and international commerce to deprive the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do deprive the Lead Plaintiff of free travel absent interference with civil rights and of fair, free, non-discriminatory access to and respect for personal privacy on and in these transportation modes and facilities in the absence of any reasonable suspicion for police powers operations against Lead Plaintiff, and targeting his person rather than any reasonably known or suspected behavior, many of which locations and particular details are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

    F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights,

businesses, and financial, real, and intangible property of Lead Plaintiff and other

plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide

variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional,

and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO -- page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller -- page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services -- page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ -- page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX -- page 613

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates -- page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates -- page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates -- page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship -- page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship -- page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship -- page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction -- page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 26

### BB. Income, Property, and Reputation Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**(18 USC §§ 241, 242, 245, 1962(c), 1962(d); 42 U.S.C. § 1982)**

## <u>Fifth Amendment – Property Rights and Illegal Takings,</u>

## <u>Civil Rights - Deprivation of Rights</u>

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC § 241, 242, 245, 1962(c), 1962(d); 42 U.S.C. § 1982, and create and sustain injuries and deprivations under the state laws of Washington and New Jersey, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, including, without limitation, Lead Plaintiffs rights to free, equal, and non-discriminatory access to acquire, possess, retain, and enjoy all forms of property, including those rights to same as guaranteed under ratified international treaties, and including such rights as they relate to interstate commerce and to closely held business entities, as specifically cited and described in the subcounts in this Principal Count in these states and the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs.

Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class. These acts and injuries are representative of those inflicted by Defendants on this class of plaintiffs.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and

rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

    i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

    ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

    iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

      i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment -- page 809

## PRINCIPAL COUNT 27

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**(18 USC §§ 1905, 1957, 1962(c), 1962(d); 42 U.S.C. § 1982)**

### Racketeering - Monetary Benefit From Unlawful Activity;

### Civil Rights - Deprivation of Rights,

### Fifth Amendment – Property Rights and Illegal Takings

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 1905, 1957, 1962(c), 1962(d); 42 U.S.C. § 1982 in their series of schemes, conspiracies, and deprivations of real, financial, and personal property to the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendant United States used oxytocin against Lead Plaintiff's spouse and her presence in the workplace with a known serial adulterer to cause and create divorce in 1988, forcing the rapid bargain sale of their residence shortly after Lead Plaintiff completed extensive landscaping improvements to the property at considerable time and expense. Defendant United States deprived Lead Plaintiff's business Alliance Environmental Services of Small Business Administration bid and performance bonding services from 1990 to 1993, provided a fraudulent performance bond for a federally funded project using

a previously seized Utah insurance company as cover for this fraudulent issuance, then cancelled the performance bond they had fraudulently issued in the seized company's name, and arranged the acceleration of the project's performance requirements, all to create financial distress for the company and for the Lead Plaintiff, then again deprived the company of performance bonding to deprive Alliance of a federally funded air route traffic control center project for about $1.2 million, forcing a personal bankruptcy which deprived Lead Plaintiff of financial assets and severely damaged his access to credit. This scheme was repeated and accelerated in 2002 to 2005 using a combination of check fraud and false sales opportunities requiring extensive travel throughout the United States to starve another Lead Plaintiff company, Allegent LLC dba Performa, of legitimate sales opportunities, and to again force the rapid bargain sale, this time to avoid foreclosure, of Lead Plaintiff's residence improved at considerable out of pocket and borrowed funds.

C. Defendants repeated this same process again at his residences in Cliffside Park, NJ in 2010 and Ramsey, NJ, in 2018. Each and every time, Defendants conspired and acted to deprive him of (i) the benefit of his financial investments, (ii) adequate compensation for his labor, materials, and other expenses, and (iii) of any enjoyment of those improvements, and (iv) each time this occurred very soon after (never during) the time these investments, expenses, and labor were completed.

D. In each of these four sequences, the two forced removals from his owned real properties, and the two removals from his rented residences, the removal occurred soon after the improvements were completed and before financial reserves could be reaccumulated. This is the very same pattern of acts these Defendants also used to orchestrate periods of employment, unemployment, and setbacks in his pay rate while he had little or no bargaining power and his

paths to alternative employment were blocked by mail frauds and wire frauds during his employment searches. Thereafter, Defendants completely eliminated all the Lead Plaintiff's employment options, including all professional employment, and even including hourly part-time employment at a local supermarket in Ramsey, NJ while he lived there between 2011 and 2018.

E. All these acts were and are part of their conspiracy and scheme to deprive Lead Plaintiff of the benefits of real property appreciation and the accumulation of financial resources so as to sustain his involuntary servitude to Defendant United States' BRMT brain hijacking program and its cover up in plain sight. These Defendants used their official knowledge and their color of law "investigations" to individually and personally to directly benefit themselves or others by exploit this insider conspiracy and knowledge of each of these schemes in sequence over a thirty year period, from 1988 to 2018.

F. Particular details of those directly benefiting or steering benefits of these property improvements and subsequent appreciation of real properties Lead Plaintiff improved (from $189,340 in 1984 to $1,829,013 in 2023 per Redfin.com for his first residence in Redmond, WA) are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below, and are representative of these types of violations, acts, and injuries, and deprivations experienced by other plaintiff members of this class.

G. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

H. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

I. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

J. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

   K. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

   L. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

      i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

M. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

N. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

O. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

P. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

Q. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

R. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

S. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

T. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

U. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

V. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

W. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

X. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

## PRINCIPAL COUNT 28

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**18 USC §§ 241, 1962(c), 1962(d); 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994**

### Civil Rights - Conspiracy Against Rights

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC § 241, 1962(c), 1962(d) and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified

this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

    F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a)

persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to

prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving

his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations -- page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**PRINCIPAL COUNT 29**

**CC. Personal and Constitutional Rights Injuries**

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**18 USC §§ 242, 1962(c), 1962(d); 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994**

**Civil Rights Generally - Deprivation of Rights Under Color of Law**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal statutes 18 USC §§ 242, 1962(c), 1962(d), 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those

Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, , and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

     E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

     F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

    i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 30

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**18 USC §§ 245(b), 1962(c), 1962(d), 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994;**

### Civil Rights Generally - Federally Protected Activities

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC §§ 245(b), 1962(c), 1962(d), 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states

physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on

March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in

any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile

purposes or in armed conflict."

     D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being

developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

     i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that

their actions did and do directly and explicitly cause damage and injury to the rights,

businesses, and financial, real, and intangible property business, of Lead Plaintiff and

other plaintiffs in in-state, interstate, and international commerce, among other

injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in

each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the

agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have

and do conspire with each other and others to accomplish the objectives detailed in this

Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and

injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their

attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 31

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**18 USC §§ 245(b), 1962(c), 1962(d), 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994;**

### Civil Rights - Federally Protected Activities, Thirteenth Amendment –

### Involuntary Servitude, Intentional Discrimination in Employment

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC §§ 245(b), 1962(c), 1962(d), 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994; and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, including, without limitation, his rights to free, equal, and non-discriminatory access to employment, to contract, and to engage in the earning of an income by whatsoever legal means he chooses, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs.  Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts,

deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

     E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know,

knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 32

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**(18 USC §§ 245, 1962(c), 1962(d); 42 U.S.C. § 1981)**

### Civil Rights - Deprivation of Rights, Fourteenth Amendment – Equal Protection

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants, including both those with police powers and those defendants, whether named herein or as yet unknown, without duly authorized domestic US police and intelligence powers under law, have and do act in violation of federal statutes 18 USC § 245, 1962(c), 1962(d); 42 U.S.C. § 1981 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, in their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, including, without limitation, Lead Plaintiffs rights to free, equal, and non-discriminatory access to all human, Constitutional, and civil rights, including those

guaranteed under ratified international treaties, and including such rights as they relate to interstate commerce and to closely held business entities, as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure the Lead Plaintiff and other members of the class by such deprivations directed at or to those plaintiffs.  Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and

individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**PRINCIPAL COUNT 33**

**CC. Personal and Constitutional Rights Injuries**

**Racketeering Influenced and Corrupt Organizations Act,  Klu Klux Klan Act**

**18 USC §§ 242, 1962(c), 1962(d); 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994**

**Civil Rights - Deprivation of Rights Under Color of Law**

**Fourth Amendment - Searches and Warrants**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. As to the Fourth Amendment right to be free of searches and seizures absent a lawfully obtained warrant, Defendant United States and other defendants named in the caption as federal, state, and local Defendants possessing police and intelligence powers have and do act in systematic violations of federal statutes 18 USC §§ 242, 1962(c), 1962(d), 42 USC §§ 1981, 1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead Plaintiff, and in violation of international laws and treaties through Defendant United States and

its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and enabling foreign scammers electronically screened in by those Defendants, and foreign intelligence services of countries pretexted and/or physically visited by Lead Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any reasonable standard of practice, to engage in a pattern of racketeering acts and Fourth Amendment searches and seizures violations through their series of schemes, conspiracies, injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do injure Lead Plaintiff and other members of the class by such deprivations and acts. Locations and particular details of many of these acts, violations, and injuries are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of

law in the United States of America as agreed when it entered into force internationally on

March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in

any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or

other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2)

Weapons, equipment or means of delivery designed to use such agents or toxins for hostile

purposes or in armed conflict."

  D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being

developed or used for hostile purposes, which purposes include hostile use against any US

person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the

brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault

under law, as it is done without the knowledge or consent of the victim. As a biological weapon,

BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body,

ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include

a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

    E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United States."

F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

     i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions

and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 34

### CC. Personal and Constitutional Rights Injuries

**Racketeering Influenced and Corrupt Organizations Act, Klu Klux Klan Act**

**18 USC §§ 242, 1962(c), 1962(d), 2234-2236; 42 USC §§ 1981, 1982, 1983, 1985, 1986,**

**1994;**

### Civil Rights - Deprivation of Rights Under Color of Law

### Fourth Amendment - Searches and Warrants:

### Searches Exceeding Authority, Malicious Procurement, Searches Without Warrant

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. As to the Fourth Amendment right to be free of searches and seizures absent a lawfully obtained warrant, Defendant United States and other defendants named in the caption as

federal, state, and local Defendants possessing police and intelligence powers have and do act in

systematic violations of federal statutes 18 USC §§ 242, 1962(c), 1962(d), 42 USC §§ 1981,

1982, 1983, 1985, 1986, 1994 and the state laws of at least 44 states physically visited by Lead

Plaintiff, and in violation of international laws and treaties through Defendant United States and

its domestic defendant co-conspirators pretexting Lead Plaintiff, and enlisting, empowering, and

enabling foreign intelligence services of countries pretexted and/or physically visited by Lead

Plaintiff, and/or pretexted regarding Lead Plaintiff, and in violation of their own and any

reasonable standard of practice, to engage in a pattern of racketeering acts and Fourth

Amendment searches and seizures violations through their series of schemes, conspiracies,

injuries, and deprivations of rights, and of Privileges and Immunities, of the Lead Plaintiff and

closely held business entities as specifically cited and described in the subcounts in this Principal

Count both within and without the territory of these states and of the United States. Defendants

have and do injure Lead Plaintiff and other members of the class by such deprivations and acts.

Locations and particular details of many of these acts, violations, and injuries are unknown at the

time of this Complaint and will be available to be introduced upon proper discovery. Detailed

examples of this long-running, comprehensive, and systematic pattern of racketeering acts and

Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts

below, and are representative of these types of violations, acts, injuries, and deprivations

experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying

causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint,

are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

     D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

E. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

    F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

  i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

    N. The acts and circumstances alleged above in this Complaint demonstrate the

following:

        i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer –
International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment
Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent
Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

### **PRINCIPAL COUNT 35**

### **CC. Personal and Constitutional Rights Injuries**

### **Klu Klux Klan Act, (42 U.S.C. § 1985(1), 18 USC § 987)**

### **Civil Rights - Deprivation of Rights Under Color of Law,**

### **Anti-Terrorist Forfeiture Protection**

### **(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have engaged in a color of law terrorist investigation against Lead Plaintiff, beginning from their initial pretexting in the 1980s and proceeding to a formally designated investigation, as officially acknowledged by Defendant NYPD on September 3, 2021,

(see Complaint Interline Exhibit 13 at page 121-124) which was based upon Defendant United States' fraudulent pretexting beginning in 1996 and accelerating after their failure to interdict the September 11, 2001 terror attack. This pretexting and related color of law injuries to Lead Plaintiff are explained in detail at subcounts N-1 through N-5 and referenced at subparagraph T below.

C. The BRMT bioweapon brain hijacking program is not defensible either as a "state secret" nor in the interests of "national security," as it systematically (i) violates the Article II limits on the federal executive established in the Constitution, (ii) vastly exceeds the Article I authorities of Congress to constitutionally approve or appropriate to support tor sustain such a program, (iii) can and does directly injure US persons rights and (iv) even their physical well-being to and including torturous injury and death with due process, and (v) systematically violates their human, Constitutional, legal, and civil rights, including (vi) those guaranteed to all humans under ratified international treaties having force of law in the United States of America, while (vii) posing a direct, immediate, and continuing threat to any and all US persons.

D. Any argument by Defendant United States or any other party that the Lead Plaintiff ever presented or currently presents any such threat is based solely upon the Defendants' own conspiracies, acts, and actions against the Lead Plaintiff. All available evidence, including the manipulated words of the Lead Plaintiff derived by Defendant United States' abuse of BRMT against Lead Plaintiff, points directly and immediately at Defendant United States and its co-conspirators as this source of this threat. So, there is no legal basis for any argument by Defendants that there is any foundation in law for any forced forfeiture of property by Lead Plaintiff, nor have they ever indicated, much less undertaken, any proceeding to even assert such a claim as required under 18 USC § 983. Nonetheless, Defendants have illegally conspired,

schemed, and acted to effect such a scheme, upon which this Court must act and order to reverse, both to restore to equity the Lead Plaintiff and to order Defendants to disgorge all relevant and to immediately undertake to reconstruct and identify those injured as part of this class of plaintiffs since BRMT program initiation in the 1970s, so they may receive justice under our Constitution and laws.

E. Neither the federal executive, acting through Defendant Department of Justice nor Congress has previously taken up or pursued, much less implemented, such an action to restore equity, as demonstrated by their complete neglect of the victims of Cointelpro and MKUltra, both deceased and living, in the aftermath of those programs. These extreme excursions from Constitutional limits by federal excess are systematically denied by both Article I and Article II failures to act, and it is the Article III Courts constitutional responsibility to act against such egregious injuries and to restore equity.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

     E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

     F. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt -- Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**PRINCIPAL COUNT 36**

**CC. Personal and Constitutional Rights Injuries**

**(18 USC § 1038)**

**False Information and Hoaxes In Furtherance of BRMT Torture and Theft**

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendant United States has at all times since 1972 acted in knowing and willful violation of 18 USC §§ 1038 to injure Lead Plaintiff and all members of this class of plaintiffs by using and spreading false information and hoaxes in furtherance of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

C. Defendant United States and its co-conspirators have and do create and sustain injuries by pretexting and other methods to spread false information and hoaxes to other public agencies and departments, and to the general public, so as to deprive the Lead Plaintiff and others of this class of injured plaintiffs of their rights, their liberty, their life, their property, and other rights and aspects of quiet enjoyment of their lives. Particular details of millions of these injuries over the past approximately 50 years are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph S and are representative of these types of false information and hoaxes used to engage and encourage the violations, and injuries, and deprivations experienced by all plaintiff members of this class as initiated and exploited by the Defendants for their own benefit.

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in

quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

F. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

G. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals, over time.

H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations

within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

O. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

R. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations, all of which are based in the false information and hoaxes of Defendants acting or intending for others to act on their behalf to harm the Lead Plaintiff and other similarly situated plaintiffs with such injuries as the following examples which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer –
International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment
Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent
Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**PRINCIPAL COUNT 37**

**DD. Threats, Retaliation, and Negligence Injuries**

**Negligence - Failure to Protect**

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all times since 1972 acted in a knowing and willfully negligent manner to fail to protect and, in fact, acted jointly and severally to align their various teams, details, and organizations to injure Lead Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of

those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

C. Defendant United States and its co-conspirators have and do create and sustain injuries by pretexting and other methods to spread false information and hoaxes to other public agencies and departments, and to the general public, so as to deprive the Lead Plaintiff and others of this class of injured plaintiffs of their rights, their liberty, their life, their property, and other rights and aspects of quiet enjoyment of their lives. Particular details of millions of these injuries over the past approximately 50 years are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph S and are representative of these types of false information and hoaxes used to engage and encourage the violations, and injuries, and deprivations experienced by all plaintiff members of this class as initiated and exploited by the Defendants for their own benefit.

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified

this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

F. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under

this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal

jurisdiction over an offense under this section committed by or against a national of the United

States."

G. This prohibited BRMT bioweapon and bioweapon delivery system most probably

originated in the early 1970s. It was and is Defendant United States' knowing and willful

continuation of the MKUltra program operated in the United States and Canada by Defendants

CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory.

CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US

soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's

Dachau Concentration Camps through Defendant Unites States' import of that program toward

the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant

United States has violated law through myriad departments and agencies loosely coordinated and

engaging in patterns of racketeering acts (as they are known under law since 1972) and by

engaging co-conspirator Defendants. Defendant United States, through its own and its co-

conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a)

persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

O. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act

result in the violation of the human, Constitutional, and civil rights of the Lead

Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the

plaintiffs' rights as to be the moving force that caused or causes the ultimate injury;

and/or play a substantial part in bringing about or actually causing the injury or

damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the

commission of overt act(s) and injuries in furtherance of each such agreement, and each

Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants

conspired with each other and others to accomplish the objectives and injuries detailed in this

Complaint, including through their agreements as detailed in the Subordinate Counts referenced

herein.

R. Defendants named as known, and unknown individuals, acting under color of law are

directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial.  Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to protect) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

### PRINCIPAL COUNT 38

### DD. Threats, Retaliation, and Negligence Injuries

### Negligence – Failure to Properly Supervise

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all times since 1972 acted in a knowing and willfully negligent manner to fail to properly supervise their forces, officers, agents, confidential informants, contractors, and others. They have, in fact, acted to supervise those persons and align their various teams, details, and organizations to both jointly and severally injure and to encourage and support injuries, and acted to injure Lead

Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

C. Defendant United States and its co-conspirators have and do create and sustain injuries by pretexting and other methods to spread false information and hoaxes to other public agencies and departments, and to the general public, so as to deprive the Lead Plaintiff and others of this class of injured plaintiffs of their rights, their liberty, their life, their property, and other rights and aspects of quiet enjoyment of their lives. Particular details of millions of these injuries over the past approximately 50 years are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph S and are representative of these types of false information and hoaxes used to engage and encourage the violations, and injuries, and deprivations experienced by all plaintiff members of this class as initiated and exploited by the Defendants for their own benefit.

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to

the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

F. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

G. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

   i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

O. The acts and circumstances alleged above in this Complaint demonstrate the

following:

i. Defendants at all governmental levels, both with and without intelligence and police

powers act and acted under color of law in their exercise or failure to exercise their

duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

scope of their individual duties; and/or outside the scope of their supervisory duties to

properly direct their subordinate(s); and/or pursuant to an expressly adopted official

policy or a widespread or longstanding practice or custom of the defendant

organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to

approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to

handle the usual and recurring situations with which they must deal; and/or the

defendant organization was deliberately indifferent to the substantial risk that its

policies were inadequate to prevent violations of law and injuries by its employees

and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

R. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to supervise) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer –
International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment
Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

## PRINCIPAL COUNT 39

### DD. Threats, Retaliation, and Negligence Injuries

### Negligence – Failure to Properly Train

**(Lead Plaintiff & Unknown Plaintiffs against Defendants at paragraphs 51-81, 172)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants United States, and all other Defendants with police powers, have at all times since 1972 acted in a knowing and willfully negligent manner to fail to properly train their forces, officers, agents, confidential informants, contractors, and others and, in fact, acted to train those persons and align their various teams, details, and organizations to jointly and severally injure and encourage and support injuries to Lead Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

C. Defendant United States and its co-conspirators have and do create and sustain injuries by pretexting and other methods to spread false information and hoaxes to other public agencies and departments, and to the general public, so as to deprive the Lead Plaintiff and others of this class of injured plaintiffs of their rights, their liberty, their life, their property, and other rights and aspects of quiet enjoyment of their lives. Particular details of millions of these injuries over the past approximately 50 years are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph S and are representative of these types of false information and hoaxes used to engage and encourage the

violations, and injuries, and deprivations experienced by all plaintiff members of this class as initiated and exploited by the Defendants for their own benefit.

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

 F. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

G. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals,

over time.

       H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

O. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

R. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and

proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC §

1985(1) by their agents, while acting within the scope of their agency as will be determined by

facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each

Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above,

including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c)

and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom

acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other

members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which

together comprise a representative sampling of the full scope of such violations, which are

representative examples of both the negligence (failure to train) and of the false information and

hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to

harm the Lead Plaintiff and other similarly situated plaintiffs:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page

277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer –
International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexing Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

### PRINCIPAL COUNT 40
### DD. Threats, Retaliation, and Negligence Injuries
### 18 USC §§ 2, 3, 4 and State Statutes in an Unknown Number of States
### Negligence - Failure to Report, Acting as Accessory, Acting as Accomplice, Aiding and Abetting, Misprison of Felony
### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have at all times since 1972 acted knowingly and willfully negligent manner to fail in their duties as departments, agencies, organizations, groups, and individual citizens and have, in fact, acted negligently and willfully as principals (18 USC § 2), accomplices and accessories (18 USC § 3) in their (i) failure to report illegal acts; (ii) failure to report violations of rules and regulations essential to good order and discipline within departments and agencies; (iii) have acted as accessories to criminal acts and civil violations; (iv) have acted as accomplice to criminal acts and civil violations; (v) have aided and abetted others and each other in acts, violations, and injuries; and (vi) have engaged in knowing misprison of felonies (18 USC § 4) which directly injured Lead Plaintiff and other plaintiffs of this class including their persons, businesses, and properties, in both in-state and interstate commerce.

C. Defendants with police powers have so engaged to improperly implement their forces, officers, agents, confidential informants, contractors, and others in these acts, injuries, and violations, and acted to train those persons and align their various teams, details, and organizations to jointly and severally injure and encourage and support injuries to Lead Plaintiff and all members of this class of plaintiffs by failing to comply with their sworn oath to preserve, protect, and defend the Constitution, their fellow citizens, the rights and properties of those citizens, and the personal relationships, homes, and families of those citizens. This purposeful and willful negligence actively furthered of their series of schemes, conspiracies, frauds, thefts, and deprivations to these plaintiffs, their families, personal relations and relationships, their careers, reputations, fortunes, and business interests, including closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States.

D. Defendant United States and its co-conspirators have and do create and sustain injuries by pretexting and other methods to spread false information and hoaxes to other public agencies and departments, and to the general public, so as to deprive the Lead Plaintiff and others of this class of injured plaintiffs of their rights, their liberty, their life, their property, and other rights and aspects of quiet enjoyment of their lives. Particular details of millions of these injuries over the past approximately 50 years are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph S and are representative of these types of false information and hoaxes used to engage and encourage the

violations, and injuries, and deprivations experienced by all plaintiff members of this class as initiated and exploited by the Defendants for their own benefit.

E. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction*. The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

F. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter,

disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

G. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited

treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

H. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and

deaths, all under color of law, has been and continues to house the originating and sustaining

principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering

acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and

other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues

to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals,

over time.

 I. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

J. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown

plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

K. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

L. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real,

and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

M. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

N. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

O. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

P. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final

policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately; ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

Q. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

R. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

S. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their

agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

T. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

U. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

V. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations, which are representative examples of both the negligence (failure to protect) and of the false information and hoaxes of Defendants who have or will act, and/or intend for others to act on their behalf, to harm the Lead Plaintiff and other similarly situated plaintiffs:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer – International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

### PRINCIPAL COUNT 41

### DD. Threats, Retaliation, and Negligence Injuries

### Racketeering Influenced and Corrupt Organizations

### 18 USC § 1512, 1962(c), 1962(d); New York Penal Law §§ 215; NJ Stat 2C:28-5

### Tampering With Witness

### (All Plaintiffs against All Defendants)

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 1512, 1962(c), 1962(d); New York Penal Law §§ 215; NJ Stat 2C:28-5 in their series of schemes, conspiracies, acts, injuries, and deprivations to tamper with, interfere with, and attempt to intimidate the Lead Plaintiff from contacting the US District Court for the district of Eastern California, the US district Court for the District of Columbia, the office of the US Attorney for the Southern District of New York, the Department of Justice, and the Public Integrity section of the Attorney General of New Jersey, as specifically cited and described in the subcounts in this Principal Count at subparagraph S below and are representative of these types of violations, acts, and injuries, and deprivations experienced by other plaintiff members of this class.

C. Defendants have and do create and sustain injuries by their efforts and acts to threaten, intimidate, and deprive the Lead Plaintiff of access to legitimate law enforcement agencies and courts. Particular details of the specific Defendant departments, agencies, officers, agents, and other conspiring and acting Defendants are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below and are representative of injuries to the class of plaintiff victims.

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing) locally delivered, to highly granular hijacking of thought, action, behavior, and control of involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle movements, among other things, all of which can now be remotely and very precisely delivered as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United States can and does literally hijack some to all of the biochemistry of the body of a human being or other sentient being using BRMT. This is a clear and transparent hostile assault with a prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear intent, by Defendant United States. In so doing, Defendant United States also violates ratified international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint; as well as US law, as described in the subparagraphs of this Principal Count..

F. The criminal and civil offenses underlying this entire conspiracy are, are in part related to, and are in part motivated by, Defendant United States' illegal development and deployment of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and bioweapon delivery system, has been and is used by Defendant United States acting alone, and in conspiracy with others, to assault US persons and other innocents in its criminal color of law abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further, Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover up, and sustain this five decade long willful and knowing violation of the treaty, of the US Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

G. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which

used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and

individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each

such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

O. The acts and circumstances alleged above in this Complaint demonstrate the following:

i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

R. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

## PRINCIPAL COUNT 42

### DD. Threats, Retaliation, and Negligence Injuries

**Racketeering Influenced and Corrupt Organizations**

**18 USC § 1513, 1962(c), 1962(d); New York Penal Law §§ 215; NJ Stat 2C:28-5**

### Retaliating Against Witness

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC § 1512, 1962(c), 1962(d); New York Penal Law §§ 215; NJ Stat 2C:28-5 in their series of schemes, conspiracies, acts, injuries, and deprivations to retaliate against, interfere with, and attempt to intimidate the Lead Plaintiff from contacting the US District Court for the district of Eastern California, the US district Court for the District of Columbia, the office of the US Attorney for the Southern District of New York, the Department of Justice, and the Public Integrity section of the Attorney General of New Jersey, as specifically cited and described in the subcounts in this Principal Count at subparagraph S below and are representative of these types of violations, acts, and injuries, and deprivations experienced by other plaintiff members of this class.

C. Defendants have and do create and sustain injuries by their efforts and acts to threaten, intimidate, and deprive the Lead Plaintiff of access to legitimate law enforcement agencies and courts. Particular details of the specific Defendant departments, agencies, officers, agents, and other conspiring and acting Defendants are unknown at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below at subparagraph R, and are

D. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of*

*Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

   E. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery technology, and neurological science have progressed since the 1970s, the capability of this bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

F. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents.

Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever

knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological

agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any

organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

      G. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class. As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses,

violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs,

including each and all those directly injured. This class of plaintiff victims includes those who

are, without limitation, deceased, permanently disabled, have had their properties, businesses,

and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and

are otherwise directly or indirectly injured by these willful and knowing acts and violations of

this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and

international police powers and intelligence operations, as well as other entities and individuals,

over time.

H. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended,

provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns

of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1),

which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC §

1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for

"any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

section.."

I. The facts, actions, and circumstances alleged in this Complaint demonstrate the

following:

i. Existence of an associated-in-fact enterprise which crosses many formal and

informal organizational boundaries among the co-conspirators and has its own

separate and unique existence. This enterprise is comprised of entities, individuals,

groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights, businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and

financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

J. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

K. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business prospects, and the personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from learning the identities of the Defendants who act under color of law in violation of their legal duties and responsibilities under the Constitution and laws of the United States, and the nations and states within which they operate so as to perpetuate the conspiracy.

L. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c) and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within the scope of their agency, and at other times, outside the scope of their agency.

M. As a result of each act committed, and in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their business, property, and person, including economic, financial, physical, and emotional injuries, as described herein both collectively and as to each Subordinate Count.

N. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for individuals injured by conspiracies " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or

advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged

therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for

the recovery of damages occasioned by such injury or deprivation, against any one or more of

the conspirators."

     O. The acts and circumstances alleged above in this Complaint demonstrate the

following:

          i. Defendants at all governmental levels, both with and without intelligence and police

          powers act and acted under color of law in their exercise or failure to exercise their

          duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead

          Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the

          scope of their individual duties; and/or outside the scope of their supervisory duties to

          properly direct their subordinate(s); and/or pursuant to an expressly adopted official

          policy or a widespread or longstanding practice or custom of the defendant

          organization; and/or while engaged in acting as a final policymaker, had final

          policymaking authority, and knew of and specifically made a deliberate choice to

          approve the act or policy; and/or the policies and training of the defendant

          organization were not adequate to prevent violations of law by its employees to

          handle the usual and recurring situations with which they must deal; and/or the

          defendant organization was deliberately indifferent to the substantial risk that its

          policies were inadequate to prevent violations of law and injuries by its employees

          and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

P. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

Q. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

R. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial.  Defendants named as known, and as currently unknown, entities and organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

S. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial

interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

T. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

U. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

<u>**PRINCIPAL COUNT 43**</u>

<u>**DD. Threats, Tampering, Retaliation, and Negligence Injuries**</u>

**Racketeering Influenced and Corrupt Organizations Act**

**(18 USC §§ 1962, 18 USC § 1962(c), 1962(d))**

<u>**Prohibited Activities - Pattern of Racketeering Acts**</u>

**(All Plaintiffs against All Defendants)**

A. Plaintiffs incorporate herein by reference the allegations contained in all preceding paragraphs.

B. Defendants have and do act in violation of federal and state statutes 18 USC §§ 1962, 18 USC § 1962(c), 1962(d) in their series of schemes, conspiracies, deprivations, blocking, screening and other related acts, violations, and injuries targeting, directed to, and directed at the Lead Plaintiff and closely held business entities as specifically cited and described in the subcounts in this Principal Count both within and without the territory of these states and of the United States. Defendants have and do violate human, Constitutional, civil rights and laws by engaging in a continuous pattern of racketeering activity against the Lead Plaintiff and other members of this class of plaintiffs at least since the Lead Plaintiff was a minor child. Additional particular details are both unknown and unrecollected at the time of this Complaint and will be available to be introduced upon proper discovery. Detailed examples of this long-running, comprehensive, and systematic pattern of racketeering acts and Defendants' series' of violations, acts, deprivations, and injuries are found in the subcounts below, and are representative of these types of violations, acts, injuries, and deprivations experienced by other plaintiff members of this class.

C. Bioweapons and bioweapons delivery systems, which are among the underlying causes of the extraordinary variety of criminal and civil offenses and injuries in this Complaint, are prohibited to and in the United States of America. The President negotiated and presented to the Senate the *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction.* The Senate ratified this international treaty (referred to as "Bioweapons Prohibited" herein) on December 16, 1974. The treaty was ratified by the President on January 22, 1975, and it thereby attained the force of law in the United States of America as agreed when it entered into force internationally on March 26, 1975. Under treaty Article I, "Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:(1) Microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes; (2) Weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict."

D. The Bioweapons Prohibited treaty prohibits any form of biological agent from being developed or used for hostile purposes, which purposes include hostile use against any US person. Since the BRMT bioweapon and bioweapon delivery system directly manipulates the brain's natural biochemistry to immediately alter the biochemistry of the victim, this is an assault under law, as it is done without the knowledge or consent of the victim. As a biological weapon, BRMT acts directly upon the brain to control the voluntary and involuntary systems of the body, ranging from thought to muscle contraction to heart rhythm and breathing, including to alter, disrupt, or halt these systems and organs. Foreseeable injuries from its prohibited use can include a broad array of injury from mental malfunction of thought, to physical injury and death. As

research, development, and deployment of the prohibited BRMT bioweapon, bioweapon delivery

technology, and neurological science have progressed since the 1970s, the capability of this

bioweapon and bioweapon delivery system has evolved from crude disruption of hormonal

systems (such as melatonin – "sleep" - and oxytocin –"love"- suppression and extreme dosing)

locally delivered, to highly granular hijacking of thought, action, behavior, and control of

involuntary biological functions such as breathing, heart rhythms, emotions, and reactive muscle

movements, among other things, all of which can now be remotely and very precisely delivered

as individual prohibited acts and as lengthy sequences of prohibited acts. Defendant United

States can and does literally hijack some to all of the biochemistry of the body of a human being

or other sentient being using BRMT. This is a clear and transparent hostile assault with a

prohibited bioweapon and bioweapon delivery system in violation of this treaty, and of its clear

intent, by Defendant United States. In so doing, Defendant United States also violates ratified

international treaties on civil rights and torture, which also have force of law at all levels of

government under the Constitution's federal supremacy clause, as discussed in this Complaint;

as well as US law, as described in the subparagraphs of this Principal Count..

    E. The criminal and civil offenses underlying this entire conspiracy are, are in part related

to, and are in part motivated by, Defendant United States' illegal development and deployment

of Brain Remote Management Technology (BRMT). BRMT, a prohibited bioweapon and

bioweapon delivery system, has been and is used by Defendant United States acting alone, and in

conspiracy with others, to assault US persons and other innocents in its criminal color of law

abuse and "state secrets" violations of the ratified Bioweapons Prohibited treaty. Further,

Defendant United States has and does engage in an on-going conspiracy to hide, conceal, cover

up, and sustain this five decade long willful and knowing violation of the treaty, of the US

Constitution, and of its violations of its legal obligations to US persons and other innocents. Defendant United States has and does directly and knowingly violate 18 U.S.C. § 175, "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States."

   F. This prohibited BRMT bioweapon and bioweapon delivery system most probably originated in the early 1970s. It was and is Defendant United States' knowing and willful continuation of the MKUltra program operated in the United States and Canada by Defendants CIA and Army through CIA's technical services branch and the Army's Bioweapons Laboratory. CIA's MKUltra, and it's Army companion program, were illegal drug dosing programs which used 100 million doses of LSD against US citizens, other US and Canadian persons, and US soldiers from 1953 to 1973. Throughout the entire illegal progression from its origins in Hitler's Dachau Concentration Camps through Defendant Unites States' import of that program toward the end of World War II to become MKUltra, and through its continuation as BRMT, Defendant United States has violated law through myriad departments and agencies loosely coordinated and engaging in patterns of racketeering acts (as they are known under law since 1972) and by engaging co-conspirator Defendants. Defendant United States, through its own and its co-conspirator Defendants' broad array of criminal and civil violations, subterfuges, injuries, and deaths, all under color of law, has been and continues to house the originating and sustaining principals, using informal collaboration across a broad array of police powers and intelligence

operations as an associated-in-fact enterprise to engage in an evolving pattern of racketeering acts and rights violations against US persons and other innocents, such as the Lead Plaintiff and other plaintiff victims of this class.  As such, Defendant United States has been, is, and continues to be, directly liable, as well as indirectly and vicariously liable, for the conduct of all offenses, violations of law and rights, and injuries against Lead Plaintiff and this class of injured Plaintiffs, including each and all those directly injured. This class of plaintiff victims includes those who are, without limitation, deceased, permanently disabled, have had their properties, businesses, and families destroyed, been incarcerated as a result of Defendants' predicate acts, and have and are otherwise directly or indirectly injured by these willful and knowing acts and violations of this associated-in-fact enterprise, which has grown to encompass a wide variety of domestic and international police powers and intelligence operations, as well as other entities and individuals, over time.

G. The Racketeering Influenced and Corrupt Organizations Act of 1970, as amended, provides for recovery for individuals injured by associated-in-fact enterprises engaged in patterns of racketeering, including a specific list of crimes and injuries defined in 18 USC § 1961(1), which include the crime(s) and injuries listed in this Principal Count. As stated in 18 USC § 1962(c) it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. As stated in 18 USC § 1962(d) it is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.."

H. The facts, actions, and circumstances alleged in this Complaint demonstrate the following:

    i. Existence of an associated-in-fact enterprise which crosses many formal and informal organizational boundaries among the co-conspirators and has its own separate and unique existence. This enterprise is comprised of entities, individuals, groups, and loose associations, acting individually and in conspiracy, who are (a) persons, including individuals, departments, agencies, unions, governmental divisions and subdivisions at all levels, and others under law who govern, enact policy, manage, supervise, and are employed as officers, agents, employees, confidential informants, contractors or have civic or political affiliations and associations with and among intelligence operations, police powers operations, and military operations within and without the United States (b) political entities, groups, affiliations, and associations, and (c) trade associations, groups, corporations, and other entities and individual members of the business and legal communities, (d) among others known and not yet known. These Defendants, known and unknown, have and do act jointly in conspiracy and severally, to plan, coordinate, and execute violations of law and rights to injure the Lead Plaintiff and other members of this class of plaintiffs. Persons acting both within and outside the scope of their employment in various department and agencies of Defendant United States, both severally and together with all categories of other Defendants, conspire and act to cover up their own criminal actions, civil violations, and injuries against Lead Plaintiff and other unknown plaintiffs of this class, and have and do engage and coordinate with others, through direction, influence, and /or coercion, to conspire with them to harm the rights,

businesses, and financial, real, and intangible property of Lead Plaintiff and other plaintiff victims of this class;

ii. A pattern of racketeering has and continues to emerge over time involving a wide variety of actions, offenses, and injuries which harm the rights, businesses, and financial, real, and intangible property, as well as violate the human, Constitutional, and civil rights of Lead Plaintiff and other plaintiffs;

iii. Defendants were, are, should have been, or ought to be, aware at all times that their actions did and do directly and explicitly cause damage and injury to the rights, businesses, and financial, real, and intangible property business, of Lead Plaintiff and other plaintiffs in in-state, interstate, and international commerce, among other injuries.

I. The acts and circumstances alleged in this Complaint and as specifically described in each Subordinated Count further demonstrate the commission of overt acts in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

J. The acts and circumstances alleged in this Complaint establish that Defendants have and do conspire with each other and others to accomplish the objectives detailed in this Complaint, including through the following agreements:

i. To sustain acts and a pattern of actions which have and continue to damage and injure the business, business prospects, and the business and personal financial, real, and intangible property of the Lead Plaintiff and other plaintiffs, regardless of their attributed motive;

ii. To sustain acts and a pattern of actions which damage the business, business

prospects, and the personal financial, real, and intangible property of the Lead

Plaintiff and other plaintiffs so as to suppress or eliminate Lead Plaintiff's and other

plaintiffs' ability to act to expose the Defendants' prior and planned criminal actions

and rights violations and those by other of the Defendants;

iii. To directly and explicitly prevent the Lead Plaintiff and other plaintiffs from

learning the identities of the Defendants who act under color of law in violation of

their legal duties and responsibilities under the Constitution and laws of the United

States, and the nations and states within which they operate so as to perpetuate the

conspiracy.

K. All Defendants are vicariously liable for the violations of sections 1961(1), 1962(c)

and 1962(d) by themselves and/or their agents, each of whom acted, from time to time, within

the scope of their agency, and at other times, outside the scope of their agency.

L. As a result of each act committed, and in furtherance of the conspiracies identified

above, each Plaintiff suffered and continues to suffer injuries to their business, property, and

person, including economic, financial, physical, and emotional injuries, as described herein both

collectively and as to each Subordinate Count.

M. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides for recovery for

individuals injured by conspiracies " If two or more persons in any State or Territory conspire or

go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of

equal privileges and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons within

such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

N. The acts and circumstances alleged above in this Complaint demonstrate the following:

        i. Defendants at all governmental levels, both with and without intelligence and police powers act and acted under color of law in their exercise or failure to exercise their duty to establish policy, govern, manage, supervise, lead, train, and protect the Lead Plaintiff's rights and/or other plaintiffs' rights while acting within and outside the scope of their individual duties; and/or outside the scope of their supervisory duties to properly direct their subordinate(s); and/or pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant organization; and/or while engaged in acting as a final policymaker, had final policymaking authority, and knew of and specifically made a deliberate choice to approve the act or policy; and/or the policies and training of the defendant

organization were not adequate to prevent violations of law by its employees to handle the usual and recurring situations with which they must deal; and/or the defendant organization was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law and injuries by its employees and known or obvious consequences of its failure to train its employees adequately;

ii. In the exercise or failure to exercise their duties under law, Defendants know, knew, should know, or should have known, that their actions and/or failures to act result in the violation of the human, Constitutional, and civil rights of the Lead Plaintiff and/or other plaintiffs; and/or is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused or causes the ultimate injury; and/or play a substantial part in bringing about or actually causing the injury or damage to the Lead Plaintiff and/or other plaintiffs.

O. The acts and circumstances alleged in this Complaint further demonstrate the commission of overt act(s) and injuries in furtherance of each such agreement, and each Defendant's intentional participation in the furtherance of the agreement.

P. The acts and circumstances alleged in this Complaint establish that Defendants conspired with each other and others to accomplish the objectives and injuries detailed in this Complaint, including through their agreements as detailed in the Subordinate Counts referenced herein.

Q. Defendants named as known, and unknown individuals, acting under color of law are directly liable for the violations of 42 USC § 1985(1) while acting outside the scope of their agency, as will be determined by facts which can only be established through discovery and proven at trial. Defendants named as known, and as currently unknown, entities and

organizations acting under color of law are vicariously liable for the violations of 42 USC § 1985(1) by their agents, while acting within the scope of their agency as will be determined by facts which can only be determined through discovery and proven at trial.

R. As a result of acts committed in furtherance of the conspiracies identified above, each Plaintiff suffered and continues to suffer injuries to their person, personal, and commercial interests, including physical, emotional, financial, and property injuries, as described above, including, without limitation, in both in-state and interstate commerce.

S. All Defendants are vicariously liable for the violations of 18 USC 1961(1), 1962(c) and 1962(d), 42 USC § 1985(1), and other statures cited herein, by their agents, each of whom acted within the scope of their agency, to cause and create injury to the Lead Plaintiff and other members of this class of plaintiffs.

T. Applicable subcount violations related to this Principal Count are the following, which together comprise a representative sampling of the full scope of such violations:

L-1 Lethality Events: British Columbia Sea to Sky Highway BRMT Melatonin Overdose – page 277

L-2 Lethality Events: Washington State BRMT Falls – page 279

L-3 Lethality Events: Washington State BRMT Induced Suicide Ideation – page 284

L-4 Lethality Events: Inciting Public Vigilantism – page 289

L-5 Lethality Events: New Jersey BRMT Induced Suicide Ideation – page 295

L-6 Lethality Events: New Jersey Cliffside Park BRMT Falls – page 300

L-7 Lethality Events: BRMT Near Falls on Staircases in New Jersey and New York – page 305

L-8 Lethality Events: New Jersey, Hackensack, BRMT Fall – page 310

L-9 Lethality Events: California, BRMT Induced Extreme Eye Watering – page 315

L-10 Lethality Events: New Jersey, Edgewater Bedroom  BRMT Falls – page 321

L-11 Lethality Events: Website Hacks to Eliminate or Delay Covid Vaccination – page 326

L-12 Lethality Events: New Jersey Edgewater BRMT Falls – page 331

L-13 Lethality Events: North Bergen Hospital Fall – page 336

L-14 Lethality Events: New York Metro North Mass Casualty Attempt – page 341

L-15 Lethality Events: New York Morningside Park BRMT Fall – page 346

L-16 Lethality Events: New Jersey North Bergen Vehicle Rundown – page 351

C-1 Commercial Frauds: Theft of Receivables, Check Frauds – page 357

C-2 Commercial Frauds: Fraudulent Financial Services – Ex-CIA Latin America Case Officer –
International Investment Banker Cover – page 360

C-3 Commercial Frauds: Fraudulent Financings and Loans - NYC Broker/Investor – page 365

C-4 Commercial Frauds: BRMT Assisted Check Fraud Entrapment Attempt – Top US Financial
Institution – page 370

C-5 Commercial Frauds: False Personation – NYC Forbes 200 Captive Corporate Investment
Firm – page 376

C-6 Commercial Frauds: Fraudulent Investor Personation - Investments and Loans – page 380

C-7 Commercial Frauds: Fraudulent Investor Personation and Investments – page 386

C-8 Commercial Frauds: Fraudulent Financings – Private Placement and Public IPO – page 390

C-9 Commercial Frauds: Fraudulent  Financings – International CFIUS Pretexting, Fraudulent Financing – page 397

C-10 Commercial Frauds: Dissipation of Resources – Financing Fees Supporting Fraudulent Sales Opportunities – page 401

C-11 Commercial Frauds: Fraudulent Financing Fees – page 404

C-12 Commercial Frauds: Fraudulent  Financial Services – Domestic Debt Broker – page 406

C-13 Commercial Frauds: Fraudulent Financial Services -International Debt Broker – page 409

C-14 Commercial Frauds: Fraudulent Financial Services – Mid-Market Investment Bank – page 413

C-15 Commercial Frauds: Fraudulent Financial Services - International Financial Services Institution – page 417

C-16 Commercial Frauds: Fraudulent Financial Services – Wall Street Investment Bank – page 421

C-17 Commercial Frauds: Fraudulent Financings and Representation, Online Referral Services – page 439

C-18 Commercial Frauds: Fraudulent Financings and Financial Representation, Fraudulent Solicited Responses – page 443

C-19 Commercial Frauds: Fraudulent Financings and Litigation -Cornhusker, Auctus – page 477

C-20 Commercial Frauds: Fraudulent Financings, Online Platform – page 482

C-21 Commercial Frauds: Fraudulent Sales Leads – page 486

C-22 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 490

C-23 Commercial Frauds: Fraudulent Sales Lead Solicitation Services – page 493

C-24 Commercial Frauds: Fraudulent Sales Lead Development Services – page 496

C-25 Commercial Frauds: Fraudulent Sales Lead Development Services – page 499

C-26 Commercial Frauds: Fraudulent Sales Opportunities, International – page 502

C-27 Commercial Frauds: Fraudulent Sales Opportunities, Domestic – page 509

C-28 Commercial Frauds: Fraudulent  Sales and Marketing Representation – page 523

C-29 Commercial Frauds: Resource Dissipation By Professional Services, Web – page 528

C-30 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 533

C-31 Commercial Frauds: Deprivation of Honest Professional Services, Legal – page 539

C-32 Commercial Frauds: Deprivation of Honest Professional Services, Maricopa County, AZ – page 544

C-33 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Various Positions – page 560

C-34 Commercial Frauds: Fake Professional Services, Employees, Recruiters, Logistics – page 573

C-35 Commercial Frauds: Fake Professional Services, Employees, Sales – page 578

C-36 Commercial Frauds: Fake Professional Services, Employees, CFO – page 582

C-37 Commercial Frauds: Fake Professional Services, Employees, Controller – page 587

C-38 Commercial Frauds: Fake Production Asset Purchase Options, Professional Services – page 590

C-39 Commercial Frauds: Fake Production Asset Purchase Options, AZ – page 606

C-40 Commercial Frauds: Fake Production Asset Purchase Options, OR, ID, TX – page 613

P-1 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 623

P-2 Personal Frauds: Rights Violations - Illegal Searches, Hacking, and Harassing – page 629

P-3 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, BRMT Oxytocin Manipulation – page 633

P-4 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With First Spouse - Lynne – page 638

P-5 Personal Frauds: Personal and Intimate Relationships - BRMT and Other Interference in Marital Community With Second Spouse – Jeanette – page 642

P-6 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Arrange In-person Contacts – page 649

P-7 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 656

P-8 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 661

P-9 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Dates – page 665

P-10 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 669

P-11 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 677

P-12 Personal Frauds: Personal and Intimate Relationships - Managed Romantic Interests, Induced Fake Relationship – page 684

P-13 Personal Frauds: Biological and Medical Invasions - Managed Romantic Interests, BRMT Induced Erectile Dysfunction – page 691

P-14 Personal Frauds: Biological and Medical Invasions - Access to Basic Health Care – page 698

P-15 Personal Frauds: Biological and Medical Invasions - BRMT Managed Personal Movements and Orchestrated Activities – page 705

P-16 Personal Frauds: Biological and Medical Invasions - Reckless Endangerment Through BRMT Induced Defamation – page 712

P-17 Personal Frauds: Biological and Medical Invasions - BRMT Induced Reactions, Symptoms, and Illnesses – page 718

P-18 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Washington State – page 725

P-19 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, Massachusetts – page 732

P-20 Personal Frauds: Biological and Medical Invasions - BRMT Induced Torture, New Jersey – page 740

P-21 Personal Frauds: Biological and Medical Invasions – Food Borne Illnesses – page 749

P-22 Personal Frauds: Theft and Takings -Financial Resources, Blocking Personal Employment Opportunities – page 752

P-23 Personal Frauds: Theft and Takings - Financial Resources, Unpaid Compensation – page 760

P-24 Personal Frauds: Theft and Takings - Financial Resources, Theft of Funds and Services – page 768

P-25 Personal Frauds: Theft and Takings - Financial Resources, Deprivation of Benefits and Involuntary Commitment – page 775

P-26 Personal Frauds: Theft and Takings - Financial Resources, Imposed Litigation Expenses – page 783

P-27 Personal Frauds: Theft and Takings -Financial Resources, Banking System Manipulations – page 792

P-28 Personal Frauds: Rights - Misuse of Official Records, Mispersonation – page 798

P-29 Personal Frauds: Rights - Blocking Information Access and Supplying Deliberate Disinformation – page 801

P-30 Personal Frauds: Rights - Illegal Searches, Continual Monitoring – page 805

P-31 Personal Frauds: Rights - Privacy and Quiet Enjoyment – page 809

N-1 National Security Frauds: Pretexting, Misuse of "State Secrets and "National Security" for Criminal Violation of Constitution, Laws, and Ratified International Treaties – page 811

N-2 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – CSIS, RCMP – page 818

N-3 National Security Frauds: Pretexting, Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 825

N-4 National Security Frauds: Violation of Rights - Nuclear and Space Pretexting Pre and Post 9/11 Attack – page 832

N-5 National Security Frauds: Pretexting Abuse of "State Secrets" and Allies for Violations of Rights – MI-6, MI-5, London Metropolitan Police, UK – page 844

**END OF PRINCIPAL COUNTS --- PRAYER FOR RELIEF BEGINS ON NEXT PAGE**

\*            \*            \*

For each count asserted in this Complaint, each Plaintiff is entitled to injunctive relief, compensatory and statutory damages, and punitive damages, in addition to reasonable attorneys' fees and costs, from each of these Defendants for physical and emotional injuries, loss of income, assets, and property, and other injuries incurred as direct and indirect causal effect of the actions of Defendants.

## PRAYER FOR RELIEF

Lead Plaintiff, as representative of and behalf of the class of injured Plaintiffs, respectfully requests an award of the following relief:

1. **Declaratory Judgment** that the actions described herein constitute violations of all federal and state statutes cited in this Complaint.

2. **Order** that the language in 18 USC 2340B "…nor shall anything in this chapter be construed as creating any substantive or procedural right enforceable by law by any party in any civil proceeding" violates the ratified and adopted *Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,* Article 14.1. "Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall be entitled to compensation." 18 USC 2340B is null and void as to that specific clause as from October 27, 1990, and may not be enforced from that date under the Constitution and laws of the United States, and that the Constitution and laws of the United States and the common law interests of equity require all such deprived Plaintiffs in whatever action be so notified by Defendant United States, and that the entire class of plaintiffs as parties to this litigation be restored as near as

possible for all injuries suffered throughout the development, deployment, and operation

of Defendant United States' illegal BRMT bioweapon and bioweapon system in violation

of the Constitution, ratified international treaty, and law.

3. **Emergency Order** providing immediate injunctive relief under 42 USC § 1983

deprivation of rights, and under 18 USC § 1964 (related to 18 USC § 175 Defendant

United States' prohibited use of BRMT bioweapon and bioweapon delivery system per

18 USC 1961(1)(B), and for other injuries as further defined at 19 USC § 1961), ordering

Defendant United States and any and all other known and unknown Defendants who may

possess or be able to access the BRMT bioweapon, bioweapon system, and any variant

thereof, and including, without limitation, all their officers, agents, employees,

contractors, and assigns, to cease and desist all and every use of the prohibited BRMT

bioweapon and bioweapon delivery system technology, and declaring the prohibited

BRMT (Brain Remote Management Technology) bioweapon, bioweapon delivery

system, and any variant(s) thereof, as an immediate and continuing threat to the life and

health, and to the human, civil, and Constitutional rights, of each and every Plaintiff as a

member of this class, to their families and communities, and to the general public,

including any and all US persons wherever they may be.

The Court is reminded that absent such an Emergency Order, the harms and

injuries to the entire class of Plaintiffs, to others as indirect victims, and to the public at

large will continue, may very well escalate, and will lead to further injuries, such as

death, disability, injury, incarceration, and other readily foreseeable injuries and adverse

consequences, as such consequences have already been experienced by Lead Plaintiff and

other members of the class of plaintiffs for approximately fifty years, a continuing

practice from prior illegal operations of Defendant United States in predecessor

programs.

D. **A Permanent Injunctive Order** prohibiting and any and all other known and unknown

Defendants who may possess or be able to access the BRMT bioweapon, bioweapon

delivery system, and any variant thereof, and including, without limitation, all their

officers, agents, contractors, and assigns, Defendant United States, and any other person,

from owning, possessing, operating, developing, using, licensing, or permitting any use

of the BRMT bioweapon and bioweapon delivery system, in any form or variant, for any

purpose, against any US person or other innocent at any time and place. Further, that such

Order (a) declare the BRMT (Brain Remote Management Technology) bioweapon,

bioweapon delivery system, and any variant(s) thereof has, does, and will pose an

immediate and continuing threat to the life and health; and to the human, civil, and

Constitutional rights; (b) that the BRMT bioweapon and bioweapon delivery system have

and do violate that certain ratified international treaty having force of law in the United

States of America, Convention on the Prohibition of the Development, Production and

Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,

(c) that the BRMT bioweapon and bioweapon delivery system and is an instrument of

domestic terrorism in violation of US law as defined at 18 USC § 2331(5), and is

therefore subject to penalties under 18 USC 2339(a) relating to 18 USC §175, (d) require

Defendant United States to use all feasible, ordinary, and extraordinary means and

resources to protect and defend all US persons and other innocents from any such device,

equipment, system, or operation, at any time and for all time, (e) that the BRMT bioweapon and bioweapon delivery system have been and are used as an instrument of torture by Defendant United States in violation of that certain treaty Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, (f) to facilitate violations of 18 USC 1962, and (g) all future appropriations, funding, contracting, research, development, deployment and uses by Defendant United States and/or any other party, including any sovereign, are prohibited for all time.

The Court is reminded that absent such a permanent Order, Defendant United States will continue its historical pattern of serial violations in which it has continuously engaged since at least 1945, that is has does harm and injure the entire class of Plaintiffs, others as indirect victims, and the public at large, together with its co-conspirator Defendants it may very well escalate these violations, injuries, and abuses, and cause and create further injuries, such as death, disability, incarceration, racketeering acts, and other readily foreseeable adverse consequences, as such consequences have been experienced by Lead Plaintiff and other members of the class of plaintiffs for more than fifty years as relate to the prohibited BRMT bioweapon and bioweapon delivery, and to the immediate predecessor programs of Defendant United States, CIA's MKUltra and FBI's Cointelpro, and their predecessor programs from at least the 1940s.

E. **An Order of Forfeiture** commanding Defendant United States to promptly and swiftly identify to the Court all direct and indirect victims of the BRMT bioweapon system, and to immediately restore any real, personal, or intangible property of any plaintiff, or if unavailable through intervening operation of law, to restore in equity and/or fairly

compensate, all which was proximately caused to be lost to these plaintiffs and/or to their business, estate, or kin as a result of the use of the BRMT bioweapon and bioweapon system, and/or the pattern of racketeering acts of Defendants, whether or not directly or indirectly caused and created by Defendant United States, from the date of the commencement of the prohibited BRMT bioweapon and bioweapon delivery system brain hijacking program to the present, in accordance with procedure 18 USC §§ 981 through 987, with 18 USC § 1964, and with 18 USC §2333 as the prohibitions on such litigation at 18 USC § 2337 have and do violate those certain ratified international treaties having force of law in the United States of America, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* and *Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction* , 42 USC 1983, and any other applicable federal, state, or common law.

F. **Monetary Damages** in an amount to be determined by the jury, which amount cannot be properly identified at this time, which will fully compensate the plaintiff victims for injuries resulting directly and indirectly from the use of the BRMT bioweapon system, system technology, and the related pattern of racketeering acts throughout the Defendants' five decade long pattern of color of law and other criminal violations, acts, misconduct, prejudicial operations, and injuries against the Lead Plaintiff and other plaintiffs of the class. Lead Plaintiff is currently unable to identify and describe each specific violation and injury sustained over the past approximately 18,000 to 18,500 days, and has provided a sampling of 92 forms of criminal, civil, and treaty guaranteed

compensable injuries as representative, but not fully encompassing of, the extent and types of injuries to plaintiff victims. Members of this class of plaintiffs, victimized by Defendants' patterns' of racketeering acts, criminal acts, civil rights violations, treaty violations, manipulations, and injuries, likely experienced from perhaps a few hours of BRMT bioweapon and bioweapon system operations with unknown injuries ranging to death at some point in their lives, to more than five decades of continuously torturous injury including numerous attempted lethality events, such as the injuries experienced by the Lead Plaintiff to date. Some plaintiffs of this class are doubtless deceased, permanently disabled, or incarcerated as a result of undiscovered remotely manipulated criminal act(s) perpetrated by Defendant United States' use of the BRMT bioweapon and bioweapon delivery system against that plaintiff or to provoke that plaintiff to involuntarily, without so knowing, undertake a harmful act against a third party they would not otherwise have undertaken. All members of this class and their kin are entitled to full discovery of these crimes and injuries, and to justice, including, without limitation, monetary damages. The monetary damages to be awarded will include some or all of the following:

    a. ***Compensatory damages*** for individual human, constitutional, civil, statutory, and ratified treaty rights having force of law injuries in amounts to be determined by the jury at trial for:

        i. *Torture* - for each and every day of (a) torture and torture enhancement imposed by Defendant United States' operation of the BRMT bioweapon and bioweapon system, and (b) torture and torture

enhancement by the psychological operations of all Defendants, whether imposed each on their own, or enhanced by joint operation, such as:

1. *Daily suffering from torturous injury* such as the 18,000 to 18,500 days experienced by Lead Plaintiff, and unknown numbers of days and injuries to other plaintiffs of this class, from (a) physical, mental, and psychological manipulations; from (b) public humiliations and threats; from (c) extreme fear, anxiety, and panic inducing damaging hyper-vigilance and other phobias and stress, and including post-traumatic stress disorder;

2. *Repeated induced mental illnesses*, imposed by Defendant United States and its co-conspirator Defendants, such as (a) chronic anxiety, depression, phobias, and suicide ideations from short cycle and long cycle psychological manipulations, provocations and fears, and (b) inducing both temporary and permanent biochemical damage to the brain, gut, and immune systems;

3. *Repeated physical illnesses* imposed by Defendants such as manifested symptoms of physical illness and disease, such as (a) repeated and extreme headaches of long duration; (b) heart irregularities, (c) breathing irregularities, (d) vision irregularities, all with physical symptoms such as pain to extreme levels, and inducing fears and phobias; (e) extreme physical pain in the torso, arms, legs, and head; (f) loss of control of bodily functions; and (g)

induced allergic symptoms, requiring cost, expense of treatment, and (h) inducing needless emotional distress, to and including post-traumatic stress disorder;

4. *Repeated daily coercion of psychological operations* by Defendants such as those conducted using (a) hacked and spoofed websites, hacked home appliances, computers, printers, cell phones, and other electronic devices to induce and amplify stress, anxiety, anger, fear, and panic; (b) to engage in repeated cycles of hope, despair, fear, anger and reversal of those cycles, magnifying physical and biochemical changes, and (c) causing permanent irreparable damage to brain, gut, and immune system biochemistry, and (d) to cause the necessity, inconvenience, and expense of contacting fraudulently delivered and stressful customer support by Defendants as a further provocation; and (e) the necessity, cost, inconvenience and expense of repairs, returns, loss of use, and replacements;

5. *Permanent health damage and disability* imposed by Defendants such as those resulting from (a) medical misdiagnosis or malpractice by wrongfully modified biomedical test results and malfunction through hacking of medical test and diagnostic equipment; (b) appetite suppression and magnification to induce rapid weight and physical health changes; (c) organ malfunctions

and simulated symptoms of organ malfunctions; and (d) short term memory blocking and loss; among others;

6. *Repeated physical and mental injury and lethality attempts and incidents,* directed, orchestrated, and executed by Defendants such as (a) all forms of visual and verbal violent threats, (b) a wide variety of natural and accidental injury and lethality attempts and cycles, such as choking, tripping, falling, loss of balance, loss of consciousness; (c) purposeful distraction by color choices and other psychological tricks, and by BRMT bioweapon operations by Defendants leading to loss of concentration on points of risk and injury; (c) induced dangerous movements of plaintiff victims, (d) plaintiff victim operation of vehicles and equipment under dangerous induced conditions, such as BRMT bioweapon brain hijacking for momentary and longer periods of extreme sleepiness, extreme eye watering and other allergic reactions, rapidly induced vision distortions and headaches;

7. *All these torturous injuries at 1 through 6 above were and are aggravated by Defendant United States' prohibited BRMT bioweapon and bioweapon delivery system brain hijacking* to (a) magnify the adverse physical and psychological experience and injury to the plaintiff victim, and (b) to engage the plaintiff victim in high risk activities and conditions, and (c) in environments

where their action may result in injury, incarceration, or death from

their own involuntary acts, or (d) from the acts of others who

wrongly interpret their acts as voluntary and threatening, such as

an armed agent or officer perceiving a lethal threat to themselves

from a body movement or words which are in fact induced through

BRMT bioweapon brain hijacking;

ii.   *Involuntary servitude* imposed by Defendants such as (a) partially

compensated and uncompensated, unwitting, and involuntary injury

imposed upon plaintiff and/or aggravated or perpetuated by Defendant

United States' through its conspiracy with another Defendant, (b)

various frauds, and/or (c) use the BRMT bioweapon and bioweapon

delivery system. Plaintiff injuries have been, are, and will be

experienced such as partial and total loss of income, due to (d)

purposeful below-market compensation and (e) periods of

unemployment; (f) failure to fully compensate for materials, equipment,

and services rendered; (g) deprivation of access to equal employment

and career opportunities available to all other persons; (h) limits on

and/or total elimination of business and entrepreneurship options,

including (i) deprivation of rights to start, acquire, operate, and innovate

freely and fairly in in-state, interstate, and international commerce.

Involuntary servitude is a condition imposed by Defendants, and is not

dependent upon the existence or lack of compensation or its specific

amounts, it exists if _any_ conditions are imposed, such as threat, act, or

destitution of the plaintiff and/or other family or household members;

iii.  _Forced labor injuries_ imposed by Defendants such as lack of fair market

determined and fully paid compensation from Defendants' deprivation

of fair and equal access to private and governmental employment

opportunities and market established compensation. Defendant network

capture, entrapment, and retention for (a) plaintiff victim labor, services,

and planned subsequent adverse termination and/or failure to fully

compensate thefts; network capture for (b) enhanced entrapment,

incarceration and lethality risks; network capture for (c) loss of income,

dividends, property and financial assets appreciation, and compound

interest due to forced and contrived forfeitures; network capture leading

to (d) adverse income and employment outcomes and to (e) planned

imposition of loss of creditworthiness and of access to non-usurious

credit facilities; network capture for (f) adverse imposition of and upon

family, relationship, and financial choices and distress; (g) network

capture, frauds, and entrapment for adverse imposition of peonage; (h)

network capture for imposition of tax liabilities and penalties; (i)

network capture for color of law pretexting to falsely create suspicion,

and imagined risks to state secrets and national security; (j) network

capture for the false imposition of international subject and terror

classification designations, for (k) network retention and trafficking; (l)

network retention and trafficking for purposeful exposure to high risk

and lethal domestic and international police powers environments; (m)

network retention for threat of destitution, (n) realized destitution, (o)

homelessness, (p) imposition of extreme risks and hardships on plaintiff

victim and/or (q) members of their families, such as loss of liberty,

health, and life, all at the direction, manipulation, and/or hands and color

of law acts of these Defendants;.

iv.     *Loss of individual income and property* for each and every instance of

injury, such as predicate acts by Defendants to force (a) disposal of

personal, real, intangible property including real estate and financial

assets and force the forfeiture of appreciation of those assets, such as by

(b) the use of prohibited BRMT bioweapon hijacking and

biomanipulation to create the circumstances of marital dissolution; (c)

force litigation expanse and compromise of financial assets by

screening-in bad faith actors and screening out reliable service asset

purchasers, service providers, vendors, and relationships; (d) providing

or screening-in dishonest services and service providers; using coerced

service providers who act in their own self-interest to avoid personal

consequences and penalties by functionally transferring those

consequences to the plaintiff through their actions and failures to act,

such as legal counsel in criminal and/or civil difficulties begin

manipulated into adverse actions or advice to a target Defendants are

head hunting; (e) Defendant injury to plaintiff victim under color of law to evade accountability for prior or planned self-inculpatory acts and/or (f) to evade accountability for self-inculpatory acts and injuries to plaintiff victim by using color of law abuses of other third parties; (g) Defendant computer, appliance, and electronic hacking and harassment, (h) forcing loss of opportunity, driving individuals into circumstances useful for incrimination and pretexting; creating financial, economic, relationship, and other personal difficulties, and (i) integrating BRMT bioweapon hijackings and manipulations to add stress and to create conditions where the injured plaintiff victim is more likely to act out to discredit plaintiff, and thereby evade Defendant responsibility, liability, and loss of reputation when their patterns of acts, actions, injuries, and racketeering are publicly exposed; (j) manipulation and loss of marital community and benefits therefrom such as emotional, real, personal, and intangible property injuries; (k) purposeful exhaustion of benefits through frauds and deprivations to orchestrate forfeitures, destitution, and homelessness; (l) deprivations of benefits, programs, loans, and loan guarantees from federal, state, local, and private sector organizations; (m) forced litigation and compromise of bad debts and dishonest services of and by those Defendants exploiting police powers under color of law both through direct injury, and through the screening-in and screening-out of persons and entities to manipulate particular outcomes;

(n) negotiation of contractual penalties to reduce profits on future forced

sales when a Defendant planned and contrived forced forfeiture occurs

at a future point;

*Virtual and physical incarceration* of plaintiffs by Defendants such as

each and every day of (o) network capture and entrapment by

Defendants for their own corrupt and self-interested purposes; (p)

continuous subjugation to the prohibited BRMT bioweapon system for

brain hijacking by Defendant United States; (q) subjugation to other

manipulative virtual restraints on liberty and rights in choices of

activities and movements at all times day and night; (r) all as aggravated

by ongoing BRMT bioweapon system induced torture, and by on-going

psychological operations; (s) six months of de facto involuntary color of

law psychiatric confinement and color of law abuse of state legal

constraints to Lead Plaintiff;

   v.   *Life and health* injuries by Defendants such as those to (a) personal

relationships, (b) mental and physical health, (c) freedom from fear of

injury to health, well-being from Defendants' police powers operations

and interferences, (d) public notoriety, discrediting, humiliation, harm to

reputation, and risks from public vigilantism, (e) manifested symptoms

of physical disease and sicknesses, such as mental illness, depression,

anxiety, physical illness, extreme headaches, heart irregularities,

breathing irregularities, vision irregularities, extreme pain in the torso, arms, legs, head; lethal threats, loss of control of bodily functions;

vi.    *Liberty and free exercise of rights* injuries by Defendants such as (a) free pursuit of personal interests, activities, and avocations; (b) freedom of movement and travel; (c) unimpeded access to professional and career choices; (d) freedom from induced anxiety, stress, fear, and panic related to Defendants' entrapment attempts and threats attempts on life, business, career, and property; (e) freedom from fear, pain, anxiety, panic, and suffering from Defendants' repeated forced forfeitures leading to homelessness, destitution, loss of personal relationships, (f) imposed threats on life from public vigilantism, loss of privacy and personal space, (g) loss of liberty to form relationships freely and without fear of disruption and injury caused and created by Defendants' ulterior motives related to prejudicial police powers operations and/or political agendas;

vii.    *Pursuit of happiness* injuries by Defendants, such as (a) feelings and reality of imposed isolation, (b) loss of companionship, community, and (c) trusted close emotional relationships and friendships imposed by Defendants such as the freedom to (d) enjoy family, leisure, hobbies, and interests; to (e) emotionally benefit from stable relationships and family, free of manipulations of the plaintiff victim and/or other family members by BRMT bioweapon hijackings, manipulations, and brain,

gut, and immune system disruptions and ill health; (f) to travel and experience events, activities, culture, and the natural environment free from fear, concern, and vigilance for contrived accidents, adverse encounters, and entrapment attempts;

viii.   *Civic participation rights and benefits* lost to injuries by Defendants such as (a) free and private expression absent harassment and entrapment for personal religious and political beliefs, political speech, participation in civic life and organizations, as well as (b) trade and business organizations for personal and social enrichment and benefit;

ix.   *All the torturous injuries at ii through viii above were and are aggravated by prohibited BRMT bioweapon and bioweapon delivery system brain hijacking* used by Defendants United States and its co-conspirators to (a) magnify these and other injuries and adverse emotional experiences of the plaintiff victim and to (b) further emotionally engage the plaintiff victim while in high risk conditions and environments where their actions are (c) more likely to result in injury, incarceration, or death from their own emotional state, (d) from BRMT bioweapon hijacked involuntary acts, or (e) the acts of others who wrongly interpret the plaintiff victims' acts as voluntarily hostile and use force to injure or kill the plaintiff victim, such as (f) an agent or officer perceiving a lethal threat to themselves from an involuntary body

movement or from words induced using BRMT bioweapon brain

hijacking to manipulate and control the plaintiff victim in that moment;

b. **Compensatory damages for Defendants' business, commercial, and entrepreneurial injuries** such as a wide variety of (a) malign acts, (b) failures to act despite a sworn duty to do so, and (c) other adverse acts which have and do injure in-state, interstate, and international business and entrepreneurship opportunities, and (d) injure business income and prospects such as loss of business and commercial reputation; (e) attempts on plaintiff victims' life which dampen the ability to freely travel and develop business and commercial interests; (f) harassing plaintiff and commercial interests to develop and enhance plaintiffs' personal feelings of vulnerability and loss of freedom of movement and choice, thereby constraining their business, commercial, and entrepreneurial activities and (g) their attractiveness to investors and other equity and debt resources; (h) forcing litigation expenses and loss or compromise of legally due amounts and assets; (h) providing dishonest services directly or through screened-in bad actors or compromised companies, persons, and services; (i) sabotaging company operations and equipment using undercover police powers agents and operators; (j) posing as interested third parties to prejudice potential customers to the plaintiff by engaging the customer in their entrapment efforts; (k) engaging, screening-in and promoting known third party bad actors; (l) loss of financial assets and appreciation of same; (m) forcing litigation and providing dishonest services by exploiting police powers under color of law both directly and through

the screening-in and screening-out of persons and entities to manipulate particular outcomes; (n) hacking and harassing to damage the business' ability to provide prompt services and products to customers; (o) anonymously disparaging business reputation; (p) engaging directly and through others in thefts of services; (q) creating and engaging directly and through others in business frauds such as receivables thefts, bad check losses, forced asset compromises, defalcations and thefts to reduce revenue, profits, and cash flow; (r) failing to provide, intervening to prevent, and/or providing fraudulent bid, performance, and loan guarantees; (s) failing to provide, intervening to prevent, and/or providing fraudulent insurance and other financial products and services; (t) using fraudulent services and/or their intervention preventing or discouraging legitimate service providers to sustain their control of plaintiff and business cash flow, profits, sales opportunities and prospects and (u) to cause and create adverse financial outcomes to the plaintiff victim's business and personal income and future prospects; (v) eliminating through screening, hacking, spoofing, and other frauds the ability of the plaintiff victim and their business to form relationships freely and (w) without fear of ulterior motives related to prejudicial police powers operations, sabotage and entrapments; deliberate overstaffing and costs by departments, agencies, and persons acting in bad faith and under color of law; (x) project delays, stoppages, and accelerations to increase labor and materials costs under color of law or coercion; (y) negotiation of contractual penalties which are normally rarely experienced as part of Defendants' conspiracy to reduce profits on future forced

sales when a Defendant planned and contrived forced forfeiture by plaintiff victim or their business occurs at a future point;

i. *Business, commercial, and entrepreneurial civic participation rights and benefits* injuries by Defendants' predatory acts against freedom, such as harassment and entrapment of plaintiff victim while participating in and benefiting from civic life and organizations, such as trade and business organizations, to develop (a) business growth and expansion options, (b) projects, (c) partnerships, (d) acquisitions, (e) credit relationships, and (f) other civic business and reputational benefits;

ii. *Civic participation* in organizations such as (a) religious, (b) political, (c) speech, (d) civic organizations, (d) trade and business organizations benefitting trade, business and commercial opportunities in-state, interstate, and/or international commerce;

iii. *All the torturous injuries at b and i above were and are aggravated by the prohibited BRMT bioweapon and bioweapon delivery system brain hijacking* used by Defendants United States and its Defendant co-conspirators to magnify the emotional experience of the plaintiff victim and to further emotionally engage the plaintiff victim while in high risk conditions and environments where their actions are more likely to result in (a) injury, (b) incarceration, or (c) death from their own involuntary acts or (d) the acts of others who wrongly interpret their acts as voluntary, such as (e) another individual, such as a police powers officer

or agent, or an individual in a weapons open-carry environment,

perceiving a lethal threat to themselves from a body movement or words

induced through BRMT bioweapon brain hijacking;

G.  **Additional statutory damages and remedies** as available to affected members of the

class of plaintiffs, including, without limitation, those to be awarded in accordance with

18 USC §§ 981 through 987, 1514, 1514A, 1962(a) through 1962(d), 1964, 1595, 2333,

2441, 2520; 42 USC Chapter 21 generally including §§ 1981 through 2000h-6, and

particularly 42 USC §§ 1983, 1986, 2000a, 2000b-2, 2000d, 2000d-1 through 2000d-7,

2000-e2(a)(2); and all other federal, state, and local statutory program protections, relief,

and civil and criminal recoveries afforded to any or all plaintiff victims of the class so

injured.

H.  **Costs and damages from loss of use, value, and appreciation of value** due to forced

sale; any and all transaction costs, fees, and expenses; accumulated appreciation;

accumulated interest; all from the date of the injury, for all injuries sustained as described

at 1 through 7 above in this section entitled Prayer For Relief.

I.  **Punitive damages** against Defendant United States and against all governmental

Defendants, including, their agents, officers, employees, confidential informants, and any

and all other acting at their behest, for (i) abuses of the "state secret" privilege under

*Totten v. United States, 92 U. S. 105, 107* (1876), which Defendants forfeited from the

first day of their violation of *Totten* as derived under the principle of stare decisis from

the precedent Opinion cited at Footnote 4: *5 U.S.C. 22*: "… **not inconsistent with law**…"

due to inconsistencies with existing US law and with ratified international treaties; for (ii)

bad faith abuses of "qualified immunity" under *Harlow v. Fitzgerald, 457 U.S. 800*

(1982) whereby they forfeited any legally valid claim to such defense; for (iii)

compensable war crimes, including for the grave Common Article 3 injuries as defined at

18 USC §§ 2441(d), including 2441(d)(1)(a) Torture, 2441(d)(1)(b) Cruel or inhuman

treatment, 2441(d)(1)(c) Performing biological experiments, 2441(d)(1)(d) Attempted

murder, 2441(d)(1)(f) Intentionally causing serious bodily injury, 2441(d)(1)(f) Sexual

assault or abuse; all as committed under the 2001 AUMF in violation of ratified

international treaties as cited at paragraph 7, pages 55-56 herein, and for (iv) other such

punitive damages as the Court may instruct, all in amounts to be determined by the jury

at trial.

J.  **Reasonable costs, expenses, and fees** including an award of reasonable attorneys' and

experts' fees, and for expenses.

K.  Such other relief as the Court deems necessary and just.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

\*          \*          \*

Dated: 2/13/2023

Respectfully submitted,

Dennis Sheldon Brewer, Lead Plaintiff and Pro Se Attorney

1210 City Place

Edgewater, NJ 07020

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

                                     \*            \*            \*

Dated: January 22, 2023    2/13/23

Respectfully submitted,

Dennis Sheldon Brewer, Lead Plaintiff and Pro Se Attorney

1210 City Place

Edgewater, NJ 07020

dbrewer@dennisbrewer.us